# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: SHOP-VAC SALES, ADVERTISING, AND MARKETING PRACTICES LITIGATION | No. 4:12-md-02380 <br><br> Chief Judge Yvette Kane |
| THIS DOCUMENT RELATES TO: <br> All Cases | |

## THE MILBERG GROUP'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR APPOINTMENT AS INTERIM CLASS COUNSEL

### AND

## OPPOSITION TO THE SCHAFFER/MUNLEY GROUP'S CROSS MOTION FOR APPOINTMENT AS INTERIM CLASS COUNSEL

**DILWORTH PAXSON LLP**
Joseph U. Metz (PA ID No. 32958)
112 Market Street, Suite 800
Harrisburg, Pennsylvania 17101-2015
Tel:  717-236-4812
Fax: 717-236-7811
Email: jmetz@dilworthlaw.com

***Proposed Interim Liaison Counsel***

## TABLE OF CONTENTS

I.    THE MILBERG GROUP INVESTIGATED AND
      DEVELOPED THE CASE................................................................1

II.   THE FACT THAT SHOP-VAC ENDORSES THE
      SCHAFFER/MUNLEY GROUP SPEAKS VOLUMES..............................6

III.  THE SCHAFFER/MUNLEY GROUP'S BOAST OF LITIGATING
      IN A SIMILAR CASE IS DISINGENUOUS .................................7

IV.   THE SCHAFFER/MUNLEY GROUP'S OTHER ARGUMENTS
      FAIL AS WELL ...............................................................8

V.    PLAINTIFF IGOR SELIZHUK AND HIS COUNSEL ARE
      CONFLICTED .............................................................10

VI.   CONCLUSION...............................................................12

These competing interim class counsel motions pit the Milberg Group,[1] which filed the first six cases, which is actively litigating the issues in this case in state court right now, and which has done the heavy lifting to ensure the class has the best possible case, against the Schaffer/Munley Group, which consists of lawyers in later-filed tag along actions.

Essentially, the Schaffer/Munley Group saw a good case investigated, developed and filed by another firm, filed copycat complaints, and conducted some sort of pretense at testing post hoc so that they could claim to be on equal footing with the Milberg Group. Since filing their cases, the Schaffer/Munley Group has done everything it could to slow the Milberg Group down.

## I.    THE MILBERG GROUP INVESTIGATED AND DEVELOPED THE CASE

The Schaffer/Munley Group claims to have performed "extensive" pre-filing investigation and "as early as March of this year, the Pennsylvania Group began considering various wet/dry vacuum manufacturers' claims and evaluating potential cases." Shaffer/Munley Opp. at 9. However, by "March of this year" the Milberg Group had already filed three cases against Shop-Vac, one on February 6, 2012 in the District of New Jersey; one on February 10 in New Jersey state court; and one on March 9, also in New Jersey District Court.

---

[1]  For consistency of nomenclature and to avoid confusion, the two competing movants will be referred to as the "Milberg Group" and the "Schaffer/Munley Group."

The Schaffer/Munley Group argues it has conducted "*in house* studies utilizing equipment that measured electrical power." Opp. at 9.  It is unclear what "in house" refers to, but generally speaking, law offices are not ideal places to conduct electrical testing.   Notably, the Schaffer/Munley Group has not disclosed anything about their "tests," nor offered to show them to the Court *in camera*.

In any case, whatever testing the Schaffer/Munley Group conducted does not aid their cause under Rule 23(g).  Rule 23(g)(1)(A)(i) requires the Court to consider counsel's work in "investigating *potential* claims."  By the time the Schaffer/Munley Group conducted its "tests" the claims were not potential ones, but actual ones, filed months earlier by the Milberg Group and developed earlier still.  A firm that copies a well-researched case filed by another firm and then sets out to do its own testing cannot argue it meets Rule 23(g)(1)(A)(i).  If it could, the Rule would be pointless, because every firm could meet it.

Perhaps because the Schaffer/Munley Group has no testing of consequence, they attack the fact that the Milberg Group has shared a description of the tests. Opp. at 18.  To claim that a summary of the tests will somehow disarm the class is disingenuous.   Indeed, Shop-Vac, the presumed beneficiary of this disclosure, does not believe the information about the Milberg Group's testing to be helpful; Shop-Vac has said it prefers to litigate against the Schaffer/Munley

Group and its mysterious tests than deal with the Milberg Group. *See infra* at Section II.

In any case, the Milberg group hired independent testing facilities to perform its tests. This is important, because unscientific "in house" testing is, intentionally or not, often results-driven and can be biased.

Once experts were identified, an attorney who holds a degree in physics coordinated with the testing lab to ensure that measurements would be made in a supportable and thorough manner. These tests included six Shop-Vac wet/dry vacuums: a 2.0 HP, 1.5 gallon unit (model 201-25-27); a 2.5 HP, 2.5 gallon unit (model 589-52-00); a 3.0 HP, 8.0 gallon unit (model 586-08-27); a 3.5 HP, 8.0 gallon unit (model 586-73-00); a 5.5 HP, 16 gallon unit (model 586-46-27); and a 6.5 HP, 10 gallon unit (model 962-55-10).

Measurements were taken for line current, power factor, barometric pressure, air duct temperature, total pressure, static pressure, free velocity and air flow. From these measurements (encompassing over 1,800 data points), incoming horse power, air flow and air horse power were calculated. Testing was done at the typical household voltage of 120 Volts rms which is what a typical consumer will use when using a Shop-Vac.

The test results and attendant calculations showed that the Shop-Vac vacuums, in actual use, produced a range of 17% to 40% of the advertised

horsepower under full load and 26% to 51% when under no load.  However, even this measurement is taken at the motor, and is not a true indication of the actual work that the vacuum performs.  To further observe a true measure of actual work that a consumer could expect, the Milberg Group's laboratory measured and calculated "air horsepower," or the actual suction power of the vacuum.  Air horsepower is a more accurate measurement of the vacuum's ability to do work because it corresponds to the power seen at the intake of the vacuum.  In essence, air horsepower corresponds directly with the vacuum's ability to do the work that a consumer expects.  The test results and attendant calculations showed that the Shop-Vac vacuums, in actual use, produced a range of a negligible percentage to 2.7% of the advertised horsepower with no load and 1% to 10.3% at 90% load.

It was also found during testing that Shop-Vac routinely misstated the tank capacity of its vacuums by 47% to 83%.

Perhaps even more disturbing about Shop-Vac's purported horsepower numbers is that if true, they would easily violate established industry standards.  In the electronics industry, there are various standards that govern ratings and testing protocols for electrical devices.  These standards include, but are not limited to, those set by: Underwriters Labs (UL); Canadian Standards Association (CSA); International Electrotechnical Commission (IEC); and the National Electrical Code (NEC).  The horsepower claims advanced by Defendants violate many of these

standards including but not limited to UL-1017; CSA-243 and IEC 60335-1 and 60-335-2.  For example, UL-1017 sets standards for calculating the mean wattage (horsepower) of a device and requires that calculations be performed after the vacuum is warmed up and in normal operating conditions.  Shop-Vac could not have followed this testing protocol to obtain their numbers, and must have used their own derived methodology and/or not under normal operating conditions as established by UL-1017.

The NEC is a safety standard that has become an industry standard.  Since its first publication in 1897 the NEC has been completely adopted by 41 states (including Pennsylvania) and the District of Columbia.  Even in the states where there has not been a full scale adoption of the NEC standard, it is adopted at least partially; that is to say there is not a single state that does not at least to some extent recognize the NEC safety standard.  Under the NEC standard, a typical home 15 Amp rated circuit could sustain no more than a 12 Amp continuous circuit capacity.  Simply put, the standard means that the most horsepower that any electrical device could sustain safely in a home is 1.93 HP at the motor.  With the efficiency observed in the tests by Plaintiff that would mean that a safe wet dry vacuum (with an assumed 47% efficiency) could only see .91 HP as usable maximum horsepower. Thus, Defendants' horsepower claims, if true, would also violate NEC safety standards.

5

The front end work done by the Milberg Group, going far beyond a mere presuit investigation, will ensure that they are fully able to best represent the consumer class and keep this litigation zealously moving forward. Thus, the Milberg Group is best qualified under the "investigation" and "willingness to commit resources" factors of Rule 23(g)(1)(A). The Milberg Group should be appointed interim class counsel and should be permitted to proceed with the litigation unencumbered by the copycat cases.

## II.   THE FACT THAT SHOP-VAC ENDORSES THE SCHAFFER/MUNLEY GROUP SPEAKS VOLUMES

In an unusual move, *Shop-Vac* asks the Court to appoint the Schaffer/Munley Group as its adversaries:

> Defendants, however, respectfully suggest that other sets of Plaintiffs' counsel are likely equally, if not more, qualified to represent this interest of the putative class. Thus far, Defendants have found the Levin, Fishbein, Sedran and Berman firm to be respectful and professional adversaries with whom the undersigned counsel have been able to work in moving the case forward in this Court. Unfortunately, Defendants have not had the same experience with the New Jersey Movants' counsel.

Shop-Vac Opp. at 4.

Indeed, Shop-Vac's experience with the Milberg Group *has* been considerably worse; the Milberg Group filed the first and most comprehensive complaints, assembled an experienced team of consumer class action lawyers committed to the successful prosecution of this action, and has aggressively

prosecuted the New Jersey state court case well into discovery, defeating a motion to stay and a partial motion to dismiss.

Faced with this, it is small wonder Shop-Vac would prefer to litigate against other firms. [2]

## III.   THE SCHAFFER/MUNLEY GROUP'S BOAST OF LITIGATING IN A SIMILAR CASE IS DISINGENUOUS

To bolster its credentials, the Schaffer/Munley Group touts the fact that it "is already involved in litigation against a similar defendant for its wet/dry vacuum claims." Opp at 9. However, that case, filed on August 28, 2012, was a copycat of a case filed by the Milberg Group *five months earlier*.

On March 29, 2012, the Milberg Group filed an action in Missouri federal court against Emerson Electric Co., the manufacturer of a wet/dry vacuum (similar to Shop-Vac's), under the trade name "Ridgid." The Milberg Group filed additional actions on March 30 and April 13. The Milberg Group also filed cases against Sears Roebuck & Co., which manufactures "Craftsman" brand wet/dry vacuums, in Illinois federal court on April 3 and April 16. Like in this case, counsel in the Milberg Group self-organized and agreed to proceed in Missouri

---

[2] Obviously, common sense dictates that the defendant would prefer to litigate against the weaker, less prepared adversary. *See Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130*, 657 F.2d 890, 895 (7th Cir. 1981) ("When it comes, for instance, to determining whether 'the representative parties will fairly and adequately protect the interests of the class,' or the plaintiffs' ability to finance the litigation, it is a bit like permitting a fox, although with a pious countenance, to take charge of the chicken house.").

federal court.  On August 15 and 17, the MDL transferred copycat cases from Illinois and California to Missouri.  Lastly, on August 28, the Schaffer/Munley group filed in Missouri (and is now seeking to be appointed class counsel in that forum as well).  Thus, the Schaffer/Munley Group's claim only highlights the reasons that the Milberg Group should be appointed interim class counsel.

However, in terms of litigation that speaks to relevant experience, the Milberg Group is also currently litigating the same issues against Shop-Vac in the *Palomino* case in New Jersey state court.  The Milberg group has defeated a motion to stay, a motion to dismiss, and the parties have exchanged discovery responses.  This experience not only gives the Milberg Group a distinct advantage in terms of knowledge of the issues in the case, it will help the federal litigation proceed more efficiently.

## IV.   THE SCHAFFER/MUNLEY GROUP'S OTHER ARGUMENTS FAIL AS WELL

The Schaffer/Munley Group criticizes the Milberg Group for an "initial selection of an incorrect forum" (New Jersey) and argues that initially filing in Pennsylvania renders them better suited to lead the case.  Opp at 16-17.  Oddly, it also touts the fact that its group consists of lawyers who initially filed in multiple presumably "incorrect" states, New York, Louisiana, California, and yes, New Jersey.  Opp at 3, 6-7.  Accordingly, the Schaffer/Munley Group's forum selection argument, infirm to begin with, is contradicted by their own actions.

8

Among the Schaffer/Munley Group are some fine firms, albeit with a pronounced tilt towards products liability and personal injury work.  But Milberg *alone,* to say nothing of the eight other firms in its group, has had more success in consumer class actions than the ten firms in the Schaffer/Munley Group – *combined*.[3]  *See* Milberg Firm Resume, Exh. S to Declaration of Adam R. Gonnelli in Support of Motion of Movants Alan McMichael, Andrew Harbut, Clay Scott and Scott Mahoney for Appointment of Interim Class Counsel dated August 23, 2012.  Accordingly, pursuant to the Rule 23(g)(1)(A)(ii)-(iii) "experience" and "knowledge of the applicable law" factors, the Milberg Group is best qualified to lead this litigation.

Lastly, the speed and aggressiveness of the Milberg Group has been criticized by both the Schaffer/Munley Group and Shop-Vac.   Both have endeavored mightily to slow the Milberg Group down (and apparently prefer to work together).  The maneuvering of Shop-Vac and the lawyers in the copycat cases have cost the class months of time and an unnecessary MDL process. In Shop-Vac's case, it is perhaps understandable; in the Schaffer/Munley Group's case, it is not.   These antics should not be rewarded with a class counsel appointment.

---

[3] Also, the Schaffer Munley Group touts its "Pennsylvania" roots.  However, these are no stronger that those of the Milberg Group.  One of the proposed lead counsel (Faruqi & Faruqi) has an office in Philadelphia, and the Milberg Group has been joined by Dilworth Paxon LLP of Harrisburg.

## V.   PLAINTIFF IGOR SELIZHUK AND HIS COUNSEL ARE CONFLICTED

Plaintiff Igor Selizhuk filed the first of the copycat cases, on May 22, 2012 in the Eastern District of New York, over three months after the first of the Milberg Group's cases was filed in New Jersey.  Mr. Selizhuk's counsel is Parker Waichman of New York and Climaco Wilcox of Cleveland, Ohio, both of whom are proposed Schaffer/Munley Group executive committee members (Opp. at 4, fn. 7).

However, Mr. Selizhuk is either an employee or a contractor of Parker Waichman.   One website lists Mr. Selizhuk as the "Information Technology Department Manager" at Parker & Waichman in Port Washington, New York.  *See* Exhibit A to the Declaration of Adam Gonnelli In Further Support Of The Milberg Group's Application For Appointment of Interim Class Counsel, submitted herewith.   However, he is not listed as an employee on Parker Waichman's website.

In any case, Mr. Selizhuk relies, at least in part, on the good graces of Parker Waichman for his income.  As any experienced class action attorney would know, this presents an insoluble conflict.

People who derive financial benefits from a law firm cannot be lead plaintiffs or class representatives in the firm's cases.  *Miller v. Mercedes-Benz USA LLC*, No. CV 06-05382 ABC (JTLx), 2009 U.S. Dist. LEXIS 45512, at *5-7 n.3

10

(C.D. Cal. May 15, 2009) involved a paralegal who was employed by class counsel as a proposed class representative.  The court held that the plaintiff's employment meant that she could not put the interests of the class above the interests of class counsel:

> The court doubts that this is something she can do, given that her livelihood is contingent on her employment with Weiss & Lurie. … The Court finds Miller's purported statement that 'she has no financial stake in Weiss & Lurie that may sway her undivided interest in protecting the interest of the class' to be demonstrably false.  … Weiss & Lurie pays her salary.

Similarly, the Eleventh Circuit upheld the disqualification of a plaintiff who was more loosely connected to his law firm employer, a title examiner who also worked for other firms.  The Court held that "Although [plaintiff] may not share in the award of attorneys fees to [counsel] Spieler in the event the class is victorious, a clear possibility remains that [plaintiff] is interested in maximizing the return to his employer.  [Plaintiff] is concerned about his future employment."  *Shroder v. Suburban Coastal Corp.*, 729 F.2d 1371, 1375 (11th Cir. 1984).

The relationship between Mr. Selizhuk and Parker Waichman is similar to the relationship between the plaintiffs and the law firms in *Miller* and *Shroder* and consequently, he cannot serve as a lead plaintiff or class representative.

Further, Parker Waichman and Cimlico cannot claim that this was a conflict that came to light later, one for which counsel may be chided for not vetting a

client more thoroughly.  This is an obvious and apparent conflict that existed from the outset.  The existence of this conflict also raises troubling issues concerning the proposed interim class counsel's willingness or desire to vet the plaintiffs and counsel they propose to appoint to their executive committee.

## VI.    CONCLUSION

For the reasons stated above and in the Milberg Group's opening brief, the Milberg Group should be appointed interim class counsel.

Respectfully submitted,

Dated:  September 24, 2012

**DILWORTH PAXSON LLP**

By: */s/ Joseph U. Metz*
Joseph U. Metz (PA ID No. 32958)
112 Market Street, Suite 800
Harrisburg, Pennsylvania 17101-2015
Tel:  717-236-4812
Fax: 717-236-7811
Email: jmetz@dilworthlaw.com

*Proposed Interim Liaison Counsel*

**MILBERG LLP**
Sanford P. Dumain
Andrei Rado
One Pennsylvania Plaza, 49th Floor
New York, New York 10119
Tel:  212-594-5300
Fax: 212-868-1229
Email: sdumain@milberg.com
Email: arado@milberg.com

**LAX LLP**
Robert I. Lax
380 Lexington Avenue, 31st Floor
New York, New York 10168
Tel:  212-818-9150
Fax: 212-818-1266
Email: rlax@lax-law.com

**FARUQI & FARUQI LLP**
Adam R. Gonnelli
369 Lexington Avenue, 10th Floor
New York, New York 10017
Tel:  212-983-9330
Fax: 212-983-9331
Email: agonnelli@faruqilaw.com

*Proposed Interim Class Counsel*

**FARUQI & FARUQI LLP**
Sandra Gail Smith
101 Greenwood Avenue, Suite 600
Jenkintown, Pennsylvania 19046
Tel:  215-277-5770
Fax: 215-277-5771

**LITE DePALMA GREENBERG LLC**
Bruce Daniel Greenberg
Marissa Lenore Quigley
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
Tel:  (973) 623-3000
Email: bgreenberg@litedepalma.com
        mquigley@litedepalma.com

**REESE RICHMAN LLP**
Michael R. Reese
875 Avenue of the Americas, 18th
Floor
New York, New York 10001
Tel:  (212) 643-0500
Fax: (212) 253-4272
Email: mreese@reeserichman.com

**BARON & HERSKOWITZ**
Jon Herskowitz
9100 South Dadeland Boulevard
One Datran Center, Suite 1704
Miami, Florida 33156
Tel: (305) 670-0101
Email: jon@bhfloridalaw.com

**PINILIS HALPERN LLP**
William J. Pinilis
160 Morris Street
Morristown, New Jersey 07962
Tel: (973) 401-1111
Fax: (973) 401-1114
Email:
wpinilis@consumerfraudlawyer.com

**TRUJILLO RODRIGUEZ &
RICHARDS, LLC**
Lisa J. Rodriguez
Nicole M. Acchione
258 Kings Highway East
Haddonfield, New Jersey 08033
Tel:  (856) 795-9002
Email: lisa@trrlaw.com
            nacchione@trrrlaw.com

## CERTIFICATE OF SERVICE

The undersigned certifies that, on September 24, 2012, he caused this document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of filing to counsel of record for each party.

Dated September 24, 2012

*/s/ Joseph U. Metz*
Joseph W. Metz
