## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: SHOP-VAC MARKETING AND SALES PRACTICES LITIGATION | MDL No. 2380 |
| | Civil Action No. 4:12-md-02380 |
| THIS DOCUMENT RELATES TO: All Cases | (Chief Judge Kane) |

## CONSOLIDATED AMENDED COMPLAINT

### INTRODUCTION

1.     Defendant Shop-Vac Corporation ("Shop-Vac") manufactures and sells a series of wet/dry vacuums.  Defendants Lowe's Home Centers, Inc. and Lowe's HIW, Inc. (together, "Lowe's") own and operate a chain of home improvement stores which sell Shop-Vac vacuums, including a series of vacuums produced especially for Lowe's.

2.     The three most important representations and the ones that appear most prominently in advertising and on the box of the Shop-Vac vacuums are horsepower, tank capacity, and price.



3.     Indeed, a visit to Shop-Vac's website will give consumers the opportunity to sort vacuums through two main searches: one based upon horsepower and the other based upon tank size:



4.      Shop-Vac makes false and misleading representations about two of the three most important representations.

5.      Plaintiffs retained two independent laboratories to conduct tests on Shop-Vac wet/dry vacuums.  The results of the tests demonstrated that Shop-Vac's representations about horsepower and tank capacity were false and misleading.

6.      Under Plaintiffs' tests, Shop-Vac wet/dry vacuums were only able to generate a small fraction the represented horsepower.

7.      In addition, under Plaintiffs' tests, the vacuums' tank capacity was only an average of 64% as large as advertised.

## JURISDICTION

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. 1332(d) because there are more than 100 class members in many different states and the aggregate amount in controversy exceeds $5 million.

9.     Venue is proper in this Court because Shop-Vac's headquarters is in this District and has advertised and sold products in this District.

## THE PARTIES

10.    Alan McMichael is a resident of the State of Florida.  Mr. McMichael purchased a Shop-Vac wet/dry vacuum at a Lowe's store in Florida and used it for personal, family, or household purposes.  Mr. McMichael made his purchase in reliance on the representations on the box concerning the vacuum's horsepower and tank capacity.  Mr. McMichael would not have purchased the wet/dry vacuum if he had known the representations concerning horsepower and tank capacity were false.

11.    Andrew Harbut is a resident of the State of Missouri.  Mr. Harbut purchased a Shop-Vac wet/dry vacuum at a Lowe's store in Missouri and used it for personal, family, or household purposes.  Mr. Harbut made his purchase in reliance on the representations on the box concerning the vacuum's horsepower and tank capacity.  Mr. Harbut would not have purchased the wet/dry vacuum if he

had known the representations concerning horsepower and tank capacity were false.

12.    Kris Reid is a resident of the State of California.  Mr. Reid purchased a Shop-Vac wet/dry vacuum in California and used it for personal, family, or household purposes.  Mr. Reid made his purchase in reliance on the representations on the box concerning the vacuum's horsepower and tank capacity.  Mr. Reid would not have purchased the wet/dry vacuum if he had known the representations concerning horsepower and tank capacity were false.

13.    David Smallwood is a resident of the State of California.   Mr. Smallwood purchased a Shop-Vac wet/dry vacuum in Arizona and used it in California for personal, family, or household purposes.  Mr. Smallwood made his purchase in reliance on the representations on the box concerning the vacuum's horsepower and tank capacity.  Mr. Smallwood would not have purchased the wet/dry vacuum if he had known the representations concerning horsepower and tank capacity were false.

14.    Clay Scott is a resident of the State of Illinois.  Mr. Scott purchased a Shop-Vac wet/dry vacuum at a Lowe's store in Illinois and used it for personal, family, or household purposes.  Mr. Scott made his purchase in reliance on the representations on the box concerning the vacuum's horsepower and tank capacity.

Mr. Scott would not have purchased the wet/dry vacuum if he had known the representations concerning horsepower and tank capacity were false.

15.     Defendant Shop-Vac Corporation appears to be incorporated in both New Jersey and Pennsylvania, and has its headquarters in Williamsport, Pennsylvania.  Shop-Vac manufactures and sells a line of wet/dry vacuums, and is responsible for the advertising, marketing, trade dress, and packaging of the Shop-Vac wet/dry vacuums.

16.     Defendant Lowe's Home Centers, Inc. ("HCI") is a North Carolina corporation based in Mooresville, North Carolina.  HCI is one of the two primary operating subsidiaries of Lowe's Companies, Inc., a holding company.  HCI owns and operates "Lowe's" home improvement retail stores primarily in the eastern United States.   Among its many products, HCI sells both Shop-Vac wet/dry vacuums with traditional Shop-Vac trade dress and a series of Shop-Vac wet/dry vacuums that Shop-Vac produces specifically for sale in Lowe's retail stores with Lowe's-specific trade dress and in accordance with Lowe's specifications.

17.     Defendant Lowe's HIW, Inc. ("HIW) is a Washington corporation with its headquarters in Tukwila, Washington.  HIW is one of the two primary operating subsidiaries of Lowe's Companies, Inc., a holding company.  HIW owns and operates "Lowe's" home improvement retail stores primarily in the western United States.   Among its many products, HIW sells both Shop-Vac wet/dry

vacuums with traditional Shop-Vac trade dress and a series of Shop-Vac wet/dry vacuums that Shop-Vac produces specifically for sale in Lowe's retail stores with Lowe's-specific trade dress and in accordance with Lowe's specifications.

18.    Lowe's Home Centers, Inc. and Lowe's HIW, Inc. will hereinafter together be referred to as "Lowe's."

## FACTS

**Horsepower and Motors**

19.    Shop-Vac represents that its wet-dry vacuums are capable of reaching a certain "peak horsepower."  In fact, Shop-Vac's vacuums do not come close to reaching their advertised peak horsepower.

20.    Even in theory, Shop-Vac's horsepower claims are impossible.  There is not enough energy, in the form of electricity coming from a standard house electrical outlet, to generate the amount of horsepower claimed by Shop-Vac, even for a short time.  This is true even if Shop-Vac's motors were large enough to handle that much electricity (which they are not).

21.    Horsepower is a measure of the work performed by a motor.

22.    The term "horsepower" was coined in the 18th century by Scottish engineer James Watt to compare the output of his steam engines to draft horses. Watt calculated that a horse could generate 33,000 foot-pounds per minute of work on a consistent basis.  In describing electric power under the metric system, the

term "watt" is used instead of horsepower as a measure of work. One horsepower is equal to 746 watts.

23.     The amount of work generated by any given electrical motor can be determined by looking at the voltage available to it and the amperage that the motor is capable of drawing. To calculate a motor's operating horsepower, voltage is multiplied by amperage and then by a fraction representing the efficiency of the motor. That number is then divided by 746 watts to convert watts to horsepower. So:

$$\frac{\text{voltage x amperage x motor efficiency}}{746} = \text{HP}$$

24.     Most consumer electronics and most circuit breakers in standard homes are in the 15 amp range with some going as high as 20 amps, and most houses are built to handle 110 to 120 volts. This means that with the standard electrical format of a home the maximum horsepower that could be attained assuming 100% motor efficiency **by any motor** would be between 2.41 HP and 3.21 HP. Of course, that assumes a perfect world with 100% efficient machines with no losses due to heat or other factors.

25.     According to Plaintiffs' tests, a conservative approximation of the efficiency of a wet/dry vacuum was 47%. Thus, in reality, a wet/dry vacuum, no

matter what it says on the packaging, would not be able to exceed 1.13 HP to 1.5087 HP in operation, even for a short time.

26.    However, even those numbers assume that Shop-Vac's motors are much larger than they really are.  For example, what Shop-Vac calls a 3 HP motor is actually only a fraction of that.

27.    Indeed, Shop-Vac's 3 HP wet/dry vacuum, including its tank, hose, accessories and packaging, weighs less than 15 pounds.  A true 3 HP motor, by itself, would weigh about 100 pounds.

**Shop-Vac's Misrepresentations Concerning the Term "Peak Horsepower"**

28.    Shop-Vac places the word "peak" before "horsepower" to justify its false and misleading horsepower numbers.

29.    "Peak" horsepower generally refers to the actual *operating* horsepower which a motor can attain for short time.

30.    For example, the Power Tool Institute, a forty-five year old lobbying and education organization that represents the power tool industry, defines "peak horsepower" as "the maximum output that can be developed *in actual use*." (emphasis added).

31.     In addition, Underwriters Laboratories, a prominent industry standard setting organization, has set a standard for calculating the mean wattage (and thus horsepower) of a device.  The standard, UL-1017, requires that horsepower

calculations be performed after the device is warmed up and under normal operating conditions.

32.    Shop-Vac violates UL-1017 by not measuring horsepower after the vacuum has warmed up and under normal operating conditions.

33.    Indeed, H-P Products, Inc., a company that manufacturers central vacuum systems, criticizes the bizarre definition of peak horsepower that Shop-Vac espouses as follows:

> Peak horsepower is also a poor indicator of cleaning power. Again, the message to the consumer is the more horsepower the motor has, the better. However, this may or may not translate into usable power. ***It is interesting to note that peak horsepower never really exists for the consumer in any usable manner.*** It is a value measured in labs with very sensitive instruments, and only exists for a tiny fraction of a second. (emphasis added)

34.    Plaintiffs' tests demonstrate that Shop-Vac vacuums are incapable of operating at their represented "peak horsepower" for any amount of time. Defendants therefore materially overstate and misrepresent the peak horsepower of the vacuums.

35.    A reasonable consumer would not understand that under Shop-Vac's definition, "peak horsepower" has nothing to do with the actual power of the vacuum.

**Plaintiffs' Independent Tests**

36.     Beginning in late 2011, Plaintiffs commissioned tests on multiple Shop-Vac wet/dry vacuums.  Upon information and belief, similar results would be reached for all Shop-Vac models.

37.     Measurements were taken for, among other things, line current, power factor, barometric pressure, air duct temperature, total pressure, static pressure, free velocity and air flow.  From these measurements, incoming horse power, air flow and air horse power were calculated.  Testing was done at the typical household voltage of 120 volts.

38.     The test results and attendant calculations showed that the Shop-Vac vacuums, in actual use, were incapable of operating at their represented horsepower, "peak" or otherwise.

39.     The vacuums produced a range of 17% to 40% of the advertised peak horsepower under full load and 26% to 51% when under no load.

40.     However, even these lab measurements overstate the actual horsepower capabilities of the vacuums in everyday use.  These measurements were taken at the motor, and are not a true indication of the actual work that the vacuums can perform.

41.     To observe a true measure of actual work being performed by the vacuums, Plaintiffs' tests measured and calculated "air horsepower," or the actual

suction power of the vacuum.  Air horsepower is a more accurate measurement of the vacuum's ability to do work as it corresponds to the power seen at the intake of the vacuum.  In essence, air horsepower corresponds directly with the vacuum's ability to do the work that a consumer expects.

42.   The test results and attendant calculations showed that the Shop-Vac vacuums, in actual use, produced a range of a negligible percentage to 2.7% of the advertised horsepower with no load and 1% to 10.3%[1] at 90% load:

| Stated Peak HP | HP At Motor | | Air HP | |
|---|---|---|---|---|
| | Full Load | No load | No Load | 90% Load |
| 2.0 | 0.8 | .89 | 0 | 0.02 |
| 2.5 | 0.95 | 1.26 | 0.01 | 0.2 |
| 3.0 | 0.9 | 1.37 | 0.08 | 0.31 |
| 3.5 | 1.17 | 1.41 | 0.07 | 0.36 |
| 5.5 | 0.91 | 1.44 | 0.12 | 0.46 |
| 6.5 | 1.24 | 1.66 | 0.05 | 0.14 |

43.   In short, Defendants grossly misrepresent the horsepower (and peak horsepower) that the vacuums can reach under any conditions for any length of time to consumers.

---

[1]  The highest percentage of advertised peak horsepower was observed in the operation of the "3.0" HP motor.  0.31 HP was observed, which equaled 10.3% of the advertised 3.0 peak horsepower.

**Shop-Vac's Horsepower Claims, If True, Would Violate Industry Standards**

44.    Another indication of the impossibility of Shop-Vac's horsepower claims is the fact that if they were true, they would violate industry standards and safety regulations.

45.    In the electronics industry, there are various standards that govern ratings and testing protocols for electrical devices.  These standards include, but are not limited to, those set by the National Electrical Code (NEC); Canadian Standards Association (CSA); and International Electrotechnical Commission (IEC).

46.    The horsepower claims advanced by Shop-Vac, if true, would violate these standards and would therefore render them unfit for their intended purposes and unable to pass into the stream of commerce without objection.

47.    The NEC is a safety standard that has become an industry standard. Since its first publication in 1897 the NEC has been completely adopted by 41 states and the District of Columbia.  Even in the states where there has not been a full scale adoption of the NEC standard, it is adopted at least partially; that is to say there is not a single state that does not at least to some extent recognize the NEC safety standard.

48.    Under the NEC standard, a typical home 15-amp rated circuit must sustain no more than a 12 amp continuous circuit draw.  Simply put, the standard

means that the most horsepower that *any* electrical device could sustain safely in a home is 1.93 HP at the motor.  With the efficiency observed in the tests by Plaintiff that would mean that a safe wet dry vacuum (with 47% efficiency) could only see .91 HP as usable maximum horsepower.

49.     Thus, Shop-Vac's horsepower claims, if true, would violate NEC safety standards.

50.     In reality, according to the product specifications put forth by Defendants, the largest Shop-Vac vacuum appears to draw no more than 12 amps (which would be in line with industry safety margins).

51.     Indeed, for example, if a consumer attempted to use a true 4 HP motor in their home, it would trip the circuit breaker and exceed the house's maximum current long before 4 HP was reached (assuming the motor was capable of reaching it).  In addition, assuming the efficiency observed in Shop-Vac vacuums, the motor would require over 400 volts to operate, which would be extremely dangerous, if not impossible, in a standard 120 volt house.

**Shop-Vac's Claims About Tank Capacity Are False And Misleading To Reasonable Consumers**

52.     Shop-Vac's representations about the capacity of the vacuum tanks are misleading because in actual operation the vacuums stop working, due to an automatic shut off feature, when the tanks reach between 47% and 83% of stated capacity (an average of 64%).

53.     Plaintiffs' expert tests have confirmed that Shop-Vac vacuums are incapable of reaching the advertised tank capacities:

| Stated Capacity (gallons) | Capacity at Shut Down | Actual Capacity as Percent Of Stated Capacity |
|---|---|---|
| 1.5 | 0.7 | 47% |
| 2.5 | 1.7 | 68% |
| 8 (3 HP unit) | 5.4 | 68% |
| 8 (3.5 HP unit) | 5.0 | 63% |
| 10 | 8.3 | 83% |
| 16 | 8.9 | 56% |

54.     Even when the capacity of the tanks is measured when the vacuums are not in use and the automatic shut off mechanism is disabled, only one of the test vacuums was able to reach its advertised capacity.

55.     A reasonable consumer would be misled by Shop-Vac's claims of tank capacity, which have nothing to do with how much the tanks can hold while operating the vacuums.

**Lowe's Misrepresentations Concerning Its Sale of Shop-Vac Vacuums**

56.     In additional to selling regular Shop-Vac vacuums, Lowe's also sells a line of Shop-Vac wet/dry vacuums that is only sold by Lowe's, pursuant to specifications agreed upon by Lowe's and Shop-Vac.

57.    The "Lowe's" Shop-Vac vacuums feature a blue trade dress:



58.    Lowe's also advertises its Shop-Vac line in its stores, periodicals and online.  Below is the image associated with Black Friday advertisements run by Lowe's both online and in print for sales in 2010:



59.     The "Lowe's" Shop-Vac vacuums have the same misrepresentations on the box about horsepower and tank capacity as regular Shop-Vac vacuums.  Just like Shop-Vac, Lowe's emphasizes horsepower and tank capacity, including on its hang tags in the store (above).

60.     Lowe's has also actively made the same misrepresentations about horsepower and tank capacity in its advertisements and buyer's guides for its "Lowe's Shop-Vacs."

61.     In addition, Lowe's has made independent misrepresentations about the vacuums. At least as late as 2011, Lowe's had a Vacuum Cleaner Buyer's

Guide available on its website.  The guide described the wet/dry vacuums based upon horsepower and capacity.  Lowe's had this to say about vacuum selection: "When choosing a vacuum don't use the amount of amperage as a deciding factor. Amperage is the amount of electricity the motor uses not the suction *power*." (Historic screen capture from www.lowes.com/cd_Vacuum+Cleaner +Buying+Guide_444956289_ emphasis added).

62.   Accordingly, Lowe's has misled consumers concerning the capabilities and value of the Shop-Vac vacuums it sells at its retail locations. Lowe's has materially overstated the vacuums' horsepower (including peak horsepower) and tank capacity.

## CLASS ACTION ALLEGATIONS

63.   Pursuant to Fed. R. Civ. P. 23, Plaintiffs bring this suit as representatives of a class of all individuals in the United States except New Jersey[2] who, within the relevant statute of limitations periods, purchased any Shop-Vac wet/dry vacuum (the "Class").  Although Plaintiffs are not residents of every state in the United States, all consumers have claims and causes of action which are legally and factually common with Plaintiffs such that they are all similarly situated and Plaintiffs can serve as adequate class representatives for consumers in all states.

---

[2]  The interests of consumers in New Jersey are at issue in *Palomino v. Shop-Vac Corporation*, BER-L-1399-12 in the Superior Court of New Jersey in Bergen County, N.J.

64.     Plaintiffs McMichael, Harbut, and Scott also seek to represent a subclass of all consumers who purchased their Shop-Vac at a Lowe's home improvement store (the "Lowe's Subclass").  The Lowe's Subclass, together with the Class, are hereinafter referred to as the "Classes."

65.     Specifically excluded from the Classes are all federal judges and members of their families within the first degree of consanguinity, and the officers, directors and counsel of record of Defendants, and all employees of Defendants. Also excluded from the Classes are persons or entities that purchased such Shop-Vac wet/dry vacuums for resale.

66.     Plaintiffs reserve the right to amend or modify the definitions of the Classes with greater specificity, further division into subclasses or limitation to particular issues as discovery and the orders of this Court warrant.

67.     Members of the Classes are so numerous that their individual joinder herein is impracticable.  While the exact number of the Classes' members is presently unknown, and can only be ascertained through appropriate discovery, Plaintiff believes the members of the Classes number in the tens of thousands.

68.     Common questions of law and fact exist as to members of the Classes and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

a.  whether Defendants misrepresented the peak horsepower, horsepower, and/or tank capacity of the Shop-Vac wet/dry vacuums;

b.  whether Defendants knew their claims regarding the Shop-Vac wet/dry vacuums were false and/or misleading;

c.  whether Defendants breached express warranties by making the misrepresentations;

d.  whether Defendants have been unjustly enriched as a result of their misrepresentations;

e.  whether Defendants' misrepresentations violate the Magnuson-Moss Act, 15 U.S.C. § 291, *et seq*.;

f.  whether Defendants' actions as described above violate the consumer fraud laws of individual states; and

g.  whether Class members are entitled to damages, restitution, injunctive and/or monetary relief and, if so, the amount and nature of such relief.

69.  Plaintiffs' claims are typical of the claims of Classes because Plaintiffs purchased Shop-Vac wet/dry vacuums and suffered a loss of money as a result of those purchases.  The claims have the same essential characteristics as the claims of the members of the Classes and are based on the course of conduct and similar legal theories.  The members of the Classes have suffered the same type of

injury and possess the same interests as Plaintiffs. A single resolution of these claims would be preferable to a multiplicity of similar actions.

70.    Plaintiffs are adequate representatives of the Classes because their interests do not conflict with the interests of the Classes, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of Classes will be fairly and adequately protected by Plaintiffs and their counsel.

71.    The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and the Classes. Individual members of the Classes may lack the resources to undergo the burden and expense of individual prosecutions of the complex and extensive litigation necessary to establish Defendants' liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

72.     This suit is maintainable as a class action under Fed. R. Civ. P. 23 (b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief with respect to the Classes in their entirety.

73.     This suit is maintainable as a class action under Fed. R. Civ. P. 23(b)(3) because the questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## COUNT I

**For Violation of Magnuson-Moss Warranty Act Brought By The Class Against Shop-Vac And Additionally By The Lowe's Subclass Against Lowe's**

74.     Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

75.     Shop-Vac wet/dry vacuums are consumer products as defined in 15 U.S.C. § 2301(1).

76.     Plaintiffs and members of the Classes are consumers as defined in 15 U.S.C. § 2301(3).

77.     Defendants are suppliers and warrantors as defined in 15 U.S.C. § 2301(4) and (5).

78.     In connection with the sale of Shop-Vac wet/dry vacuums, Defendants issued written warranties as defined in 15 U.S.C. § 2301(6), which warranted that Shop-Vac wet/dry vacuums had certain "peak horsepowers" and had a certain capacity in gallons.  These statements are untrue, as detailed above.  The term "peak horsepower" is false and/or misleading because even under ideal conditions, the motor in the vacuum cannot operate anywhere near the stated peak horsepower for any period of time.  Moreover, the description of the vacuum's capacity is false and/or misleading because during the operation of the unit the tank's capacity is significantly less than represented.

79.     By reason of Defendants' breach of the express written warranties stating that the Shop-Vac wet/dry vacuums had certain "peak horsepower" and had a capacity of a certain number of gallons, Defendants violated the statutory rights of Plaintiffs and members of the Classes pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq*., thereby damaging Plaintiffs and the members of the Classes.

## COUNT II

### For Breach of Express Warranty By The Class Against Shop-Vac And Additionally By The Lowe's Subclass Against Lowe's

80.     Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

81.     Defendants expressly warranted in their marketing, advertising and promotion of the Shop-Vac wet/dry vacuums that the Shop-Vac wet/dry vacuums had certain "peak horsepowers" and had a capacity of a certain number of gallons. These statements are untrue as detailed above.

82.     Plaintiffs and members of the Classes purchased the Shop-Vac wet/dry vacuums based upon the above express warranties.

83.     Defendants breached their express warranties by selling the Shop-Vac wet/dry vacuums with a motor that, even under ideal conditions, cannot operate anywhere near the stated peak horsepower and with a tank that has a capacity which is significantly less than represented.

84.     Plaintiffs and the members of the Classes were injured as a direct and proximate result of Defendants' breach because:  (a) they would not have purchased the Shop-Vac wet/dry vacuums on the same terms if the true facts concerning the Shop-Vac wet/dry vacuums' horsepower and tank capacity were known; (b) they paid a price premium for the Shop-Vac wet/dry vacuums; and (c) the Shop-Vac wet/dry vacuums did not have the quality or value as promised.

## COUNT III

### For Breach of Implied Warranty By The Class Against Shop-Vac And Additionally By The Lowe's Subclass Against Lowe's

85.     Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

86.     A Warranty of Merchantability is implied by law in sales of goods such as the wet/dry vacuums forming the subject matter of this case, and warrants that such goods are fit for their ordinary household use.

87.     As discussed in detail above, Plaintiffs' expert analysis has determined that the vacuums are incapable of operating at their stated "peak horsepower" or "horsepower" for any period of time.  Indeed, if the vacuums were capable of operating at their stated horsepower ratings, they would violate multiple safety standards.

88.     While Plaintiffs allege that the stated peak horsepower of the vacuums is false, Plaintiffs alternatively allege that if Shop-Vac's peak horsepower representations are correct – which Plaintiffs doubt -- then they would not comply with applicable standards for such devices and the vacuums would not pass freely and without objection into the stream of commerce, and would violate the implied warranty of merchantability.

89.     Plaintiffs and the members of the Classes were injured as a direct and proximate result of Defendants' breach because:   (a) they would not have purchased the Shop-Vac wet/dry vacuums on the same terms if the true facts concerning the Shop-Vac wet/dry vacuums' horsepower and tank capacity were known; (b) they paid a price premium for the Shop-Vac wet/dry vacuums; and (c) the Shop-Vac wet/dry vacuums did not have the quality or value as promised.

## COUNT IV

### For Injunctive and Declaratory Relief By The Class Against Shop-Vac And Additionally By The Lowe's Subclass Against Lowe's

90.     Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

91.     Through the improper practices described above, Defendants have intentionally misrepresented the horsepower and tank capacity of the Shop-Vac wet/dry vacuums sold to Plaintiffs and the members of the Classes.

92.     Defendants' practices described herein are unlawful and against public policy, and therefore, Defendants should be prohibited and enjoined from engaging in these practices in the future and should be compelled to correct the harm caused by their conduct.

93.     Defendants should be: (i) ordered to recall all Shop-Vac wet/dry vacuums with the false and misleading representations about the horsepower and tank capacity; (ii) enjoined from continuing to market and advertise the wet/dry vacuums with the false and misleading representations as described above; and (iii) ordered to issue corrective disclosures to all members of the Classes.

## COUNT V

### For Violation of the Consumer Fraud Laws of the Fifty States By The Class Against Shop-Vac And Additionally By the Lowe's Subclass Against Lowe's

94.     Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

95.     By mislabeling and selling the Shop-Vac wet/dry vacuums as having qualities, benefits and characteristics which they do not have, Defendants have engaged in unfair competition or unlawful, unfair, misleading, unconscionable, or deceptive acts in violation of the state consumer protection statutes listed below.

96.     Defendants have placed the identical vacuums into the stream of commerce of every one of the fifty States and the District of Columbia, utilizing identical misrepresentations relating to the horsepower, peak horsepower, and tank capacity of these devices.  The Defendants' misrepresentations violate the statutes proscribing consumer fraud and unfair and deceptive practices of every state, the laws of which do not materially vary as relevant herein.

97.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ALA. CODE § 8.19-1, *et seq.*

98.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ALASKA STAT. CODE § 45.50.471, *et seq.*

99.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ARIZ. REV. STAT. § 44-1522, *et seq.*

100.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ARK. CODE ANN. § 4-88-107, *et seq.*

101.    Defendants have engaged in unfair competition, unfair or deceptive acts or practices and false advertising in violation of CAL.BUS. & PROF CODE §

17200, *et seq.*, § 17500, *et seq.*, and CAL.CIV.CODE § 1750, *et seq.*  Plaintiffs Scott and Reid have sent appropriate notice to Defendants under CAL.CIV.CODE § 1780(a) and have not received the relief they requested.

102.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices or have made false representations in violation of COLO. REV. STAT. § 6-1-101, *et seq.*

103.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of CONN. GEN. STAT. § 42-110b, *et seq.*

104.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of DEL. CODE ANN. tit. 6, § 2511, *et seq.*

105.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. CODE ANN. § 28-3901, *et seq.*

106.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of FLA. STAT. ANN. § 501.201, *et seq.*

107.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of GA. CODE ANN. §10-1-392, *et seq.*

108.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of HAW. REV. STAT. § 480, *et seq.*

109.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of IDAHO CODE § 48-601, *et seq.*

110.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS 505/1 *et seq.*

111.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of IND. CODE ANN. § 24-5-0.5-1, *et seq.*

112.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of IOWA CODE § 714.16, *et seq.*

113.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of KAN. STAT. § 50-623, *et seq.*

114.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of KY. REV. STAT. ANN. § 367.110, *et seq.*

115.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of LA. REV. STAT. § 51:1404, *et seq.*

116.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ME. REV. STAT. tit. 5, § 205-A, *et seq.*

117.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MD. CODE. ANN., COM. LAW § 13-101, *et seq.*

118.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation MASS. GEN LAWS ch. 93A, §1, *et seq.*

119.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MICH. COMP. LAWS § 445.901, *et seq*.

120.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MINN. STAT. § 8.31, *et seq.*

121.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MISS. CODE ANN. § 75-24-3, *et seq.*

122.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MONT. CODE ANN. § 30-14-101, *et seq.*

123.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of NEB. REV. STAT. § 59-1601, *et seq.*

124.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of NEV. REV. STAT. § 598.0903, *et seq.*

125.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. REV. STAT. ANN. § 358-A:1, *et seq.*

126.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. STAT. ANN. § 57-12-1, *et seq.*

127.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. GEN. BUS. LAW § 349, *et seq.*

128.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. GEN. STAT. § 75-1.1, *et seq.*

129.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. CENT. CODE § 51-15-01, *et seq.*

130.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of OKLA. STAT. tit. 15, § 751, *et seq.*

131.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of OR. REV. STAT. § 646.605, *et seq.*

132.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 PA. CONS. STAT. § 201-1, *et seq.*

133.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. GEN. LAWS § 6-13.1-1, *et seq.*

134.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. CODE § 39-5-10, *et seq.*

135.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. CODIFIED LAWS § 37-24-1, *et seq.*

136.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of TENN. CODE ANN. § 47-18-101, *et seq.*

137.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of TEX. BUS. & COM. CODE ANN. § 17.41, *et seq.*

138.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of UTAH CODE. ANN. § 13-11-1, *et seq.*

139.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of VT. STAT. ANN. tit. 9, § 2451, *et seq.*

140.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of VA. CODE ANN. § 59.1-196, *et seq.*

141.   Defendants have engaged in unfair competition or unfair, deceptive or fraudulent acts or practices in violation of WASH. REV. CODE § 19.86.010, *et seq.*

142.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. VA. CODE § 46A-6-101, *et seq.*

143.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of WIS. STAT. § 100.18, *et seq.*

144.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of WYO. STAT. ANN. § 40-12-101, *et seq.*

145.   The acts, practices, misrepresentations and omissions by Defendants described above and Defendants' dissemination of deceptive and misleading advertising and marketing materials in connection therewith, occurring in the course of conduct involving trade or commerce, constitute unfair methods of competition and unfair or deceptive acts or practices within the meaning of each of

the above statutes because each of these statutes generally prohibits deceptive conduct in consumer transactions.  Defendants violated each of these statutes by representing that the Shop-Vac wet/dry vacuums had horsepower and tank capacity features that they do not have.

146.   Plaintiffs and the members of the Classes suffered a loss of money as a result of Defendants' misrepresentations because: (a) they would not have purchased the Shop-Vac wet/dry vacuums on the same terms if the true facts concerning their horsepower and tank capacity had been known; (b) they paid an unfair price premium due to the misrepresentations concerning horsepower and tank capacity; and (c) the vacuums did not perform as promised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

A.    For an order certifying the national Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as Class Representatives and their attorneys as Class Counsel to represent the Class members;

B.    For an order certifying the Lowe's Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs McMichael, Harbut and Scott as the representatives of the Subclass and their attorneys as counsel to the Subclass;

C.      For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

D.      For an order declaring that Defendants' conduct violates the statutes referenced herein;

E.      For an order awarding compensatory and punitive damages in amounts to be determined by the Court and/or jury;

F.      For prejudgment interest on all amounts awarded;

G.      For an order of restitution and all other forms of equitable monetary relief;

H.      For injunctive relief as pleaded or as the Court may deem proper; and

I.      For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of all issues so triable.

Dated:  February 19, 2013                 Respectfully submitted,

**DILWORTH PAXSON LLP**

By:   */s/ Joseph U. Metz*
Joseph U. Metz (PA ID No. 32958)
112 Market Street, Suite 800
Harrisburg, Pennsylvania 17101-2015
Tel:  717-236-4812
Fax: 717-236-7811
Email: jmetz@dilworthlaw.com

*Interim Liaison Counsel*

**MILBERG LLP**
Sanford P. Dumain
Andrei Rado
One Pennsylvania Plaza, 49th Floor
New York, New York 10119
Tel:  212-594-5300
Fax: 212-868-1229
Email: sdumain@milberg.com
Email: arado@milberg.com

**LAX LLP**
Robert I. Lax
380 Lexington Avenue, 31st Floor
New York, New York 10168
Tel:  212-818-9150
Fax: 212-818-1266
Email: rlax@lax-law.com

**FARUQI & FARUQI LLP**
Adam Gonnelli
369 Lexington Avenue, 10th Floor
New York, New York 10017
Tel:  212-983-9330
Fax: 212-983-9331
Email: agonnelli@faruqilaw.com

*Interim Class Counsel*

**LITE DePALMA GREENBERG LLC**
Bruce Daniel Greenberg
Marissa Lenore Quigley
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
Tel:  (973) 623-3000
Email: bgreenberg@litedepalma.com
        mquigley@litedepalma.com

**REESE RICHMAN LLP**
Michael R. Reese
875 Avenue of the Americas, 18th Floor
New York, New York 10001
Tel:  (212) 643-0500
Fax: (212) 253-4272
Email: mreese@reeserichman.com

**BARON & HERSKOWITZ**
Jon Herskowitz
9100 South Dadeland Boulevard
One Datran Center, Suite 1704
Miami, Florida 33156
Tel: (305) 670-0101
Email: jon@bhfloridalaw.com

**PINILIS HALPERN LLP**
William J. Pinilis
160 Morris Street
Morristown, New Jersey 07962
Tel: (973) 401-1111
Fax: (973) 401-1114
Email: wpinilis@consumerfraudlawyer.com

*Interim Executive Committee Members*