**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: SHOP-VAC MARKETING AND SALES PRACTICES LITIGATION | MDL No. 2380<br><br>Civil Action No. 4:12-md-02380 |
| THIS DOCUMENT RELATES TO:<br>All Cases | (Chief Judge Kane) |

## SECOND CONSOLIDATED AMENDED COMPLAINT

### INTRODUCTION

1.     Defendant Shop-Vac Corporation ("Shop-Vac") manufactures and sells a series of wet/dry vacuums.  Defendants Lowe's Home Centers, Inc. and Lowe's HIW, Inc. (together, "Lowe's") own and operate a chain of home improvement stores which sell Shop-Vac vacuums, including a series of vacuums produced especially for Lowe's.

2.     This is a straightforward case. Defendants sold wet/dry vacuum cleaners to consumers based on representations about horsepower and water tank capacity of those vacuums. The representations appeared prominently on product boxes themselves and other advertising.

3.     The representations about horsepower and tank capacity were important for Plaintiffs, who would not otherwise have bought the products. Horsepower and tank capacity are metrics that define the function of the products.

Horsepower is a measure of the work that the machine can do.  Tank capacity reflects how much material can be vacuumed by the machine before its holding ability has been reached.

4.     Testing by Plaintiffs' consulting experts have shown that the horsepower representations and tank capacity of the vacuums were both dramatically inflated, and mislead Plaintiffs and other consumers as to the true capabilities and specifications of these products.  The machines were much less powerful than Defendants' representations claimed, and the machines' tanks could hold less material than stated.  The vacuums are therefore capable of less useful work than was promised by Defendants.

## JURISDICTION

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. 1332(d) because there are more than 100 class members in many different states and the aggregate amount in controversy exceeds $5 million.

6.     Venue is proper in this Court because Shop-Vac's headquarters is in this District and has advertised and sold products in this District.

## THE PARTIES

7.     Andrew Harbut is a resident of the State of Missouri.  On or about December 19, 2011, Mr. Harbut purchased a Shop-Vac wet/dry vacuum at a Lowe's store on Maplewood Commons Drive in Maplewood, Missouri and used it

for personal, family, or household purposes. The vacuum was a "Lowe's Shop-Vac" with the Lowe's trade dress and was identified as "Lowes item # 19273 Model # 5851511." Upon information and belief, Shop-Vac may identify this model as either the same model number as Lowes or as the "85L575." Mr. Harbut was in the process of renovation work, and evaluated several vacuum models based upon their specifications, and sought a machine with the requisite power and capacity to carry out his project. Based upon the marketing representations he saw accompanying the product at Lowes -- including on the box of the vacuum he choose -- he choose not to purchase a less expensive machine and instead made his purchase with the belief that he was receiving a vacuum with 5.75 Peak Horsepower and 16-gallon capacity. Once taking the machine home, he also observed that both the capacity and horsepower were listed on a sticker on the face of the machine. Mr. Harbut would not have purchased the wet/dry vacuum if he had known the representations on the box and the placard concerning horsepower and tank capacity were false. In fact, due to the failure of the machine to comply with its represented specifications, the suction of the vacuum was insufficient to pick up screws, metal droppings, or drywall dust, and was not able to entirely remove saw dust from a plywood surface. Mr. Harbut found the performance of the vacuum to be so unsatisfactory that he returned to the Lowes store and notified

Lowe's personnel of his dissatisfaction with the performance of the vacuum, and purchased a replacement vacuum within several weeks.

8.      Alan McMichael is a resident of the State of Florida.  In late 2011 or early 2012, Mr. McMichael purchased a Shop-Vac wet/dry vacuum at a Lowe's store on NW 13th Street in Gainesville, Florida and used it for personal, family, or household purposes.   The vacuum was a "Shop-Vac Lowe's Wet/Dry Vac" identified as model number #165LT550A. Mr. McMichael made his purchase in reliance on the representations on the placard that Lowe's had placed upon their shelf that the machine was specified for 5.5 Peak Horsepower, and also relied upon representations on the product's packaging relating to the vacuum's purported horsepower and its tank capacity.  As Mr. McMichael intended to use the vacuum at home to pick up debris relating to cabinetry work done at his home – including plaster chips, small wood scraps, metal fasteners, saw dust, and dirt -- horsepower was the most important concern for Mr. McMichael in making his purchase. Unfortunately, due to the fact that the vacuum did not comply with the represented power specifications, it failed to pick up most of the materials and Mr. McMichael had to use broom and disposed most of it by hand. Relatedly, Mr. McMichael attempted to use the vacuum to pick up sawdust and chips from the carpet on his porch, but the vacuum similarly failed to pick up most of the debris. Mr. Michael also used the vacuum on his car to attempt to pick up crushed oak leaves that got

inside on the floors and inside his home to remove liquid on a wet carpet, but the unit struggled to pick up or clean up debris or liquid as expected or represented. Mr. McMichael would not have purchased the wet/dry vacuum if he had known the representations concerning horsepower was false.  Mr. McMichael sent notice of the failure of his vacuum to comply with represented specification to Shop-Vac and Lowes, via their attorneys, on August 13, 2013.  Likewise, Mr. McMichael falls within class of persons identified in the notice given by Mr. Reid as discussed below. *See* ¶8.

9.     Kris Reid is a resident of the State of California.  Mr. Reid purchased a Shop-Vac Ultra Pro wet/dry vacuum in late 2011 or early 2012 at Stock Building Supply on Grand View Boulevard in Los Angeles, California and used it for personal, family, or household purposes.  The box for the Ultra Pro model stated that it had 16- gallon capacity and "6.5 Peak HP."  Mr. Reid made his purchase in reliance on the representations on the box concerning the vacuum's horsepower and tank capacity.  Mr. Reid would not have purchased the wet/dry vacuum if he had known the representations concerning horsepower and tank capacity were false.  Mr. Reid found that the machine was not as powerful as he expected in actual use, and was unable to remove cat hair from sofas and furniture.  Plaintiff Reid sent pre-suit notice regarding to Defendant Shop-Vac on April 23, 2012

regarding their breaches of warranty.   Defendant never answered the letter or addressed the claims of Reid or offered to cure them prior to the initiation of suit.

10.   Defendant Shop-Vac Corporation appears to be incorporated in both New Jersey and Pennsylvania, and has its headquarters in Williamsport, Pennsylvania.  Shop-Vac manufactures and sells a line of wet/dry vacuums, and is responsible for the advertising, marketing, trade dress, and packaging of the Shop-Vac wet/dry vacuums.  These vacuums complained of herein, include those models falling within the following series: AllAround Series, Ash Vacuum Series, Back Pack Series, Blower Vac Series, BullDog Series, Farm Ranch and Home Series, Hardware Store Wet/Dry Vac Series, Industrial Series, Lowe's Wet/Dry Vac Series, Menards Wet/Dry Vac Series, Micro Series, Mulcher Series, Portable Series, Professional Series, Pump Vac Series, Quiet Series, Stainless Series, The Right Stuff Series,  Wall-Mount Series, and Walmart Wet/Dry Series, Shop-Vac wet/dry vacuums (hereinafter the "Vacuums" or the "Wet/dry Vacuums").

11.   Defendant Lowe's Home Centers, Inc. ("HCI") is a North Carolina corporation based in Mooresville, North Carolina.  HCI is one of the two primary operating subsidiaries of Lowe's Companies, Inc., a holding company.  HCI owns and operates "Lowe's" home improvement retail stores primarily in the eastern United States.   Among its many products, HCI sells both Shop-Vac wet/dry vacuums with traditional Shop-Vac trade dress and a series of Shop-Vac wet/dry

vacuums that Shop-Vac produces specifically for sale in Lowe's retail stores with Lowe's-specific trade dress and in accordance with Lowe's specifications.

12.     Defendant Lowe's HIW, Inc. ("HIW") is a Washington corporation with its headquarters in Tukwila, Washington.  HIW is one of the two primary operating subsidiaries of Lowe's Companies, Inc., a holding company.  HIW owns and operates "Lowe's" home improvement retail stores primarily in the western United States.   Among its many products, HIW sells both Shop-Vac wet/dry vacuums with traditional Shop-Vac trade dress and a series of Shop-Vac wet/dry vacuums that Shop-Vac produces specifically for sale in Lowe's retail stores with Lowe's-specific trade dress and in accordance with Lowe's specifications.

13.     Lowe's Home Centers, Inc. and Lowe's HIW, Inc. will hereinafter together be referred to as "Lowe's."

## FACTS

**Shop-Vac Misrepresents the Horsepower of Its Vacuums**

14.     The term "horsepower" was coined in the 18th century by Scottish engineer James Watt to compare the output of his steam engines to draft horses. Watt calculated that a horse could generate 33,000 foot-pounds per minute of work on a consistent basis.  In describing electric power under the metric system, the term "watt" is used instead of horsepower as a measure of work.

15.    One horsepower is equal to 746 watts and is a measure of work output. A higher horsepower device can, all other things being equal, do more work than lower horsepower devices. This is why the measurement is important to consumers purchasing devices with a motor. A higher horsepower motor means the device can do more of the work the device is meant to do.  In this case, a higher horsepower would be meant to correlate with an ability to pick up and suction heavier and more adhesive or tacky materials.

16.    Shop-Vac represents that its wet-dry vacuums have a certain "peak horsepower."

17.    A reasonable consumer would understand the term peak horsepower to mean the maximum horsepower reachable during the vacuum's operation.

18.    But Shop-Vac's vacuums do not come close to reaching their advertised peak horsepower, and this claim is both incorrect, and misleading as to the actual capabilities of the machine.

19.    Even in theory, Shop-Vac's horsepower claims are impossible.  There is not enough energy, in the form of electricity coming from a standard household electrical outlet, to generate the amount of output horsepower claimed by Shop-Vac, for any period of time.

20.    Horsepower is a measure of the *work* performed by a motor.   To be performing *work* a vacuum motor must actually be turning the impeller and have

an rpm greater than zero.  There are industry standards regarding the measurement of horsepower.  *See* ¶¶ 25-26, *infra*.

21.    The amount of work generated by any given electrical motor can be determined by looking at the voltage available to it and the amperage that the motor is capable of drawing.  To calculate a motor's operating horsepower, voltage is multiplied by amperage and then by a fraction representing the efficiency of the motor.  That number is then divided by 746 watts to convert watts to horsepower.  So:

$$\frac{\text{voltage x amperage x motor efficiency}}{746} = HP$$

22.    Most consumer electronics and most circuit breakers in standard homes are in the 15 amp range with some going as high as 20 amps, and most houses will see electricity available at the socket at 60hz and between 107 and 126 volts[1].  This means that with the standard electrical format of a home the maximum horsepower that could be attained assuming 100% motor efficiency **by any motor** would be between 2.15 HP and 3.38 HP.  That assumes an impossible 100% efficient machine, with no losses due to heat or other factors.

23.    According to Plaintiffs' tests, a conservative approximation of the efficiency of a wet/dry vacuum was 47%.  This means that essentially 53% of the

---

[1] In the United States residential voltage is designated as 120 Volts at 60 Hertz frequency.  Due to voltage drop associated with transmission the voltage delivered may be slightly higher or slightly lower.

power is lost between the motor and where the work is being performed at the end of the hose.   Thus, in reality, a wet/dry vacuum, no matter what it says on the packaging, would not be able to exceed 1.01 HP to 1.587 HP in normal operation for its intended application, even for a short time.

**Shop-Vac's Misrepresentations Concerning the Term "Peak Horsepower"**

24.     Shop-Vac's use of the term Peak Horsepower is inaccurate and misleading as to the actual operating power and functionality of its vacuums.

25.     "Peak" horsepower, to the limited extent it is used in the industry, generally refers to the actual *operating* horsepower which a motor can attain for short time.

26.     Respected members of the industry such as the Power Tool Institute, a forty-five year old lobbying and education organization that represents the power tool industry, defines "peak horsepower" as "the maximum output that can be developed *in actual use*." (emphasis added).

27.     In addition, Underwriters Laboratories, a prominent industry standard setting organization, has set a standard for calculating the mean wattage (and thus horsepower) of a device.   The standard, UL-1017, requires that horsepower calculations be performed after the device is warmed up and under normal operating conditions.

28.    These technical definitions are consistent with the understanding of ordinary consumers.

**Plaintiffs' Independent Tests**

29.    Even though it would be impossible for Shop-Vac's vacuums to achieve the peak horsepower represented in their marketing, beginning in late 2011, Plaintiffs commissioned tests on multiple Shop-Vac wet/dry vacuums to study how much horsepower they generate.  Upon information and belief, similar results would be reached for all Shop-Vac models.

30.    Measurements were taken for, among other things, line current, power factor, barometric pressure, air duct temperature, total pressure, static pressure, free velocity and air flow.  From these measurements, incoming horse power, air flow and air horse power were calculated.  Testing was done at the typical household voltage of 120 volts rms[2] with some additional measurements made with an over voltage of 126 volts rms.

_____

[2] "rms" is a mathematical abbreviation meaning the root mean square or quadratic mean.  In layman's terms, and in this application, rms is akin to an average equivalent Direct Current voltage.  Electricity is delivered to homes in Alternating Current which has a sinusoidal waveform and will average to zero each cycle.  Thus one must approximate a Direct Current voltage that would give the equivalent "average" waveform the same power.  For example, the voltage is delivered at 60Hz or 60 cycles per second.  So essentially there is one complete cycle every 16.7 milliseconds.  Thus 120 Volts rms would mean that the average Direct Current equivalent voltage for every 16.7 millisecond cycle would be 120 volts.  This becomes very important as the Voltage available and the Resistance of

31.     The test results and calculations showed that the Shop-Vac vacuums, in actual use, were incapable of operating at their represented output horsepower, "peak" or otherwise.

32.     Measured at the motor, the vacuums produced a range of 17% to 40% of the advertised peak horsepower under full load and 26% to 51% when under no load.

33.     However, even these lab measurements overstate the actual horsepower capabilities of the vacuums in everyday use.  These measurements were taken at the motor, and are not a true indication of the actual work that the vacuums can perform.  Power is lost in every mechanical system as it travels from the motor to the point where the actual work is being done.  In a vacuum there will be power losses associated with heat produced at the motor due to resistance, leaks in the system, travel of air through the length of the hose, travel of air through the filtration system as well as other possible mechanical processes.

34.     To observe a true measure of actual work being performed by the vacuums, Plaintiffs' tests measured and calculated "air horsepower," or the actual suction power of the vacuum.  Air horsepower is a more accurate measurement of the vacuum's ability to do work as it corresponds to the power seen at the intake of

---

a device (or breaker fuse) will determine the most power that could ever be created by any electric device in a household application.

the vacuum.  In essence, air horsepower corresponds directly with the vacuum's ability to do the work that a consumer expects.

35.    The test results and attendant calculations showed that the Shop-Vac vacuums, in actual use, produced a range of a negligible percentage to 2.7% of the advertised horsepower with no load and 1% to 10.3%[3] at 90% load:

| Stated Peak HP | HP At Motor | | Air HP | |
|---|---|---|---|---|
| | Full Load | No load | No Load | 90% Load |
| 2.0 | 0.8 | .89 | 0 | 0.02 |
| 2.5 | 0.95 | 1.26 | 0.01 | 0.2 |
| 3.0 | 0.9 | 1.37 | 0.08 | 0.31 |
| 3.5 | 1.17 | 1.41 | 0.07 | 0.36 |
| 5.5 | 0.91 | 1.44 | 0.12 | 0.46 |
| 6.5 | 1.24 | 1.66 | 0.05 | 0.14 |

36.    The tests covered multiple machines representing a broad range of claimed horsepowers including 2 HP, 2.5 HP, 3 HP, 3.5 HP, 5.5 HP, 5.75 HP, and 6.5HP. In each and every machine tested all wholly failed to come close to the claimed horsepower. Upon information and belief, similar results would be

[3]  The highest percentage of advertised peak horsepower was observed in the operation of the "3.0" HP motor.  0.31 HP was observed, which equaled 10.3% of the advertised 3.0 peak horsepower.

reached for all Shop-Vac models including but not limited to:  AllAround Series, Ash Vacuum Series, Back Pack Series, Blower Vac Series, BullDog Series, Farm Ranch and Home Series, Hardware Store Wet/Dry Vac Series, Industrial Series, Lowe's Wet/Dry Vac Series, Menards Wet/Dry Vac Series, Micro Series, Mulcher Series, Portable Series, Professional Series, Pump Vac Series, Quiet Series, Stainless Series, The Right Stuff Series,  Wall-Mount Series, and Walmart Wet/Dry Series Shop-Vac wet/dry vacuums.

37.     In short, Defendants grossly misrepresent the horsepower (and peak horsepower) that the vacuums can reach under any conditions for any length of time to consumers.

**Shop-Vac's Horsepower Claims, If True, Would Violate Industry Standards**

38.     Another indication of the impossibility of Shop-Vac's horsepower claims is the fact that if they were true, they would violate industry standards and safety regulations.

39.     In the electronics industry, there are various standards that govern ratings and testing protocols for electrical devices.  These standards include, but are not limited to, those set by the National Electrical Code (NEC); Canadian Standards Association (CSA); and International Electrotechnical Commission (IEC).

40.    The horsepower claims advanced by Shop-Vac, if true, would violate these standards and would therefore render them unfit for their intended purposes and unable to pass into the stream of commerce without objection.

41.    The NEC is a safety standard that has become an industry standard. Since its first publication in 1897 the NEC has been completely adopted by 41 states and the District of Columbia.  Even in the states where there has not been a full scale adoption of the NEC standard, it is adopted at least partially; that is to say there is not a single state that does not at least to some extent recognize the NEC safety standard.

42.    Under the NEC standard, a typical home 15-amp rated circuit must sustain no more than a 12 amp continuous circuit draw.  Simply put, the standard means that the most horsepower that *any* electrical device could sustain safely in a home is 1.93 HP at the motor.  With the efficiency observed in the tests by Plaintiff that would mean that a safe wet dry vacuum (with 47% efficiency) could only see .91 HP as usable maximum horsepower.

43.    Thus, Shop-Vac's horsepower claims, if true, would violate NEC safety standards.  In fact NEC has developed limits for full load current for motors with a horsepower rating.  By the NEC standards a 1.5 HP motor is permitted for up to 20 amp applications, consistent with the circuits in most homes.  Under the NEC standards to accommodate even a 5 horsepower motor the system would have

to accommodate 56 amperes of current, wholly unsafe for any household application.

44.    In reality, according to the product specifications put forth by Defendants, the largest Shop-Vac vacuum appears to draw no more than 12 amps (which would be in line with industry safety margins) but would create less than 2 horsepower at even 100% efficiency.

45.    If a consumer attempted to use a true 4 HP motor in their home, it would trip the circuit breaker and exceed the house's maximum current (needing in excess of 40 amps) long before 4 HP was reached.

**Shop-Vac's Claims About Tank Capacity Are False And Misleading To Reasonable Consumers**

46.    Shop-Vac's representations about the capacity of the vacuum tanks are misleading because in actual operation the vacuums stop working, due to an automatic shut off feature, when the tanks reach between 47% and 83% of stated capacity (an average of 64%).  As a result, these vacuums are significantly less capable of performing the tasks which they are designed to perform, and able to operate for a shorter period of time before capacity is reached.

47.   Plaintiffs' expert tests have confirmed that Shop-Vac vacuums are incapable of reaching the advertised tank capacities:

| Stated Capacity (gallons) | Capacity at Shut Down | Actual Capacity as Percent Of Stated Capacity |
|---|---|---|
| 1.5 | 0.7 | 47% |
| 2.5 | 1.7 | 68% |
| 8 (3 HP unit) | 5.4 | 68% |
| 8 (3.5 HP unit) | 5.0 | 63% |
| 10 | 8.3 | 83% |
| 16 | 8.9 | 56% |

48.   Even when the capacity of the tanks is measured when the vacuums are not in use and the automatic shut off mechanism is disabled, only one of the test vacuums was able to reach its advertised capacity.

49.   A reasonable consumer would be misled by Shop-Vac's claims of tank capacity, which have nothing to do with how much the tanks can hold while operating the vacuums.

**Lowe's Misrepresentations Concerning Its Sale of Shop-Vac Vacuums**

50.   In additional to selling regular Shop-Vac vacuums, Lowe's also sells a line of Shop-Vac wet/dry vacuums that is only sold by Lowe's, pursuant to specifications agreed upon by Lowe's and Shop-Vac.

51.    The "Lowe's" Shop-Vac vacuums feature a blue trade dress below is a screenshot from Lowe's of a vacuum similar to that purchased by Plaintiff Harbut:



52.   The "Lowe's" Shop-Vac vacuums have the same misrepresentations on the box about horsepower and tank capacity as regular Shop-Vac vacuums. Plaintiffs McMichael and Harbut observed these representations on the box of the vacuums they purchased

53.   Lowe's has also actively made the same misrepresentations about horsepower and tank capacity in its advertisements and buyer's guides for its "Lowe's Shop-Vacs."

54.   In addition, Lowe's has made independent misrepresentations about the vacuums. Presently Lowe's is again providing customers with a Vacuum Cleaner Buying Guide which can be found at http://www.lowes.com/cd_Vacuum+Cleaner+Buying+Guide_1306164521.   The guide describes the wet/dry vacuums based upon horsepower and capacity.  In that guide, Lowe's had this to say about vacuum selection: "When choosing a vacuum don't use the amount of amperage as a deciding factor.  Amperage is the amount of electricity the motor uses not the suction ***power***." (emphasis added)  Lowe's goes on to describe wet/dry vacuums based upon their capacities and horsepower.  The horsepower discussed in the guide lacks the qualifying word "peak."

55.   Accordingly, Lowe's has misled consumers concerning the capabilities and value of the Shop-Vac vacuums it sells at its retail locations.

Lowe's has materially overstated the vacuums' horsepower (including peak horsepower) and tank capacity.

## CLASS ACTION ALLEGATIONS

56.     Pursuant to Fed. R. Civ. P. 23, Plaintiffs bring this suit as representatives of a class of all individuals in the United States except New Jersey[4] who, within the relevant statute of limitations periods, purchased any Shop-Vac wet/dry vacuum (the "Class").  Although Plaintiffs are not residents of every state in the United States, all consumers have claims and causes of action which are legally and factually common with Plaintiffs such that they are all similarly situated and Plaintiffs can serve as adequate class representatives for consumers in all states.

57.     Plaintiffs McMichael, and Harbut also seek to represent a subclass of all consumers who purchased their Shop-Vac at a Lowe's home improvement store (the "Lowe's Subclass").  The Lowe's Subclass, together with the Class, are hereinafter referred to as the "Classes."

58.     Specifically excluded from the Classes are all federal judges and members of their families within the first degree of consanguinity, and the officers, directors and counsel of record of Defendants, and all employees of Defendants.

---

[4] The interests of consumers in New Jersey are at issue in *Palomino v. Shop-Vac Corporation*, BER-L-1399-12 in the Superior Court of New Jersey in Bergen County, N.J.

Also excluded from the Classes are persons or entities that purchased such Shop-Vac wet/dry vacuums for resale.

59.     Plaintiffs reserve the right to amend or modify the definitions of the Classes with greater specificity, further division into subclasses or limitation to particular issues as discovery and the orders of this Court warrant.

60.     Members of the Classes are so numerous that their individual joinder herein is impracticable.   While the exact number of the Classes' members is presently unknown, and can only be ascertained through appropriate discovery, Plaintiff believes the members of the Classes number in the tens of thousands.

61.     Common questions of law and fact exist as to members of the Classes and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

        a.      Whether Defendants misrepresented the peak horsepower, horsepower,  and/or tank capacity of the Shop-Vac wet/dry vacuums;

        b.      Whether Defendants knew their claims regarding the Shop-Vac wet/dry vacuums were false and/or misleading;

        c.      Whether Defendants breached express warranties by selling and delivering the Vacuums which do not conform to their represented product specifications and which do not perform as well as products which would conform,

and whether Plaintiffs are entitled to revocation of acceptance and other warranty damages as a result;

      d.    Whether Defendants breached implied warranties by selling the Vacuums which do not pass for sale into the trade without objection, due to the inaccurate specifications, and failure of the product to perform to specifications as to power and capacity;

      e.    Whether Defendants have been unjustly enriched as a result of their misrepresentations;

      f.    Whether Defendants sale of Vacuums which were delivered in a manner which do not conform to represented product specifications violate the Magnuson-Moss Act, 15 U.S.C. § 291, et seq.;

      g.    Whether Defendants' actions as described above violate the consumer fraud laws of individual states; and

      h.    Whether Class members are entitled to damages, restitution, injunctive and/or monetary relief and, if so, the amount and nature of such relief.

    62.    Plaintiffs' claims are typical of the claims of Classes because Plaintiffs purchased Shop-Vac wet/dry vacuums and suffered a loss of money as a result of those purchases.  The claims have the same essential characteristics as the claims of the members of the Classes and are based on the course of conduct and similar legal theories.  The members of the Classes have suffered the same type of

injury and possess the same interests as Plaintiffs. A single resolution of these claims would be preferable to a multiplicity of similar actions.

63.   Plaintiffs are adequate representatives of the Classes because their interests do not conflict with the interests of the Classes, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of Classes will be fairly and adequately protected by Plaintiffs and their counsel.

64.   The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Plaintiffs and the Classes. Individual members of the Classes may lack the resources to undergo the burden and expense of individual prosecutions of the complex and extensive litigation necessary to establish Defendants' liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

65.     This suit is maintainable as a class action under Fed. R. Civ. P. 23 (b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief with respect to the Classes in their entirety.

66.     This suit is maintainable as a class action under Fed. R. Civ. P. 23(b)(3) because the questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## COUNT I

**For Violation of the Consumer Fraud Laws of the Fifty States By The Class Against Shop-Vac And Additionally By the Lowe's Subclass Against Lowe's**

67.     Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

68.     By mislabeling and selling the Shop-Vac wet/dry vacuums as having qualities, benefits and characteristics which they do not have, Defendants have engaged in unfair competition or unlawful, unfair, misleading, unconscionable, or deceptive acts in violation of the state consumer protection statutes listed below. Defendants have grossly overstated to the named Plaintiffs, and class members, the horsepower and the capacity of the machines.  For example, Reid was promised a machine that could output 6.5 horsepower but could actually output somewhere

between .22 and 1.66 HP depending on where it was measured, and despite a promise of 16 gallons capacity would see gallons less capacity in use. Similarly Harbut was promised a similar capacity with similar misrepresentations and a 5.75 Horsepower motor that was found to output only a fraction of what was claimed. Likewise McMichael was trying to purchase a 5.5 horsepower vacuum but in reality received a machine that struggled in its intended role and likely was actually operating in a range well less than 1.5 horsepower even if measured at the motor.

69.     As a result of the misleading representations of Defendants, the Plaintiffs purchased vacuums which were incapable of performing the amount and quality of useful work than they reasonably believed, leading to their inability to perform vacuuming tasks -- and forcing Mr. Harbut to purchase a replacement machine.

70.     Defendants have placed the identical vacuums into the stream of commerce of every one of the fifty States and the District of Columbia, utilizing identical misrepresentations relating to the horsepower, peak horsepower, and tank capacity of these devices. The Defendants' misrepresentations violate the statutes proscribing consumer fraud and unfair and deceptive practices of every state, the laws of which do not materially vary as relevant herein.

71.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ALA. CODE § 8.19-1, et seq.

72.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ALASKA STAT. CODE § 45.50.471, et seq.

73.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ARIZ. REV. STAT. § 44-1522, et seq.

74.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ARK. CODE ANN. § 4-88-107, et seq.

75.     Defendants have engaged in unfair competition, unfair or deceptive acts or practices and false advertising in violation of CAL.BUS. & PROF CODE § 17200, et seq., § 17500, et seq., and CAL.CIV.CODE § 1750, et seq.  Plaintiffs Scott and Reid have sent appropriate notice to Defendants under CAL.CIV.CODE § 1780(a) and have not received the relief they requested.

76.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices or have made false representations in violation of COLO. REV. STAT. § 6-1-101, et seq.

77.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of CONN. GEN. STAT. § 42-110b, et seq.

78.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of DEL. CODE ANN. tit. 6, § 2511, et seq.

79.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. CODE ANN. § 28-3901, et seq.

80.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of FLA. STAT. ANN. § 501.201, et seq.

81.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of GA. CODE ANN. §10-1-392, et seq.

82.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of HAW. REV. STAT. § 480, et seq.

83.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of IDAHO CODE § 48-601, et seq.

84.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS 505/1 et seq.

85.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of IND. CODE ANN. § 24-5-0.5-1, et seq.

86.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of IOWA CODE § 714.16, et seq.

87.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of KAN. STAT. § 50-623, et seq.

88.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of KY. REV. STAT. ANN. § 367.110, et seq.

89.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of LA. REV. STAT. § 51:1404, et seq.

90.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ME. REV. STAT. tit. 5, § 205-A, et seq.

91.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MD. CODE. ANN., COM. LAW § 13-101, et seq.

92.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation MASS. GEN LAWS ch. 93A, §1, et seq.

93.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MICH. COMP. LAWS § 445.901, et seq.

94.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MINN. STAT. § 8.31, et seq.

95.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MISS. CODE ANN. § 75-24-3, et seq.

96.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MONT. CODE ANN. § 30-14-101, et seq.

97.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of NEB. REV. STAT. § 59-1601, et seq.

98.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of NEV. REV. STAT. § 598.0903, et seq.

99.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. REV. STAT. ANN. § 358-A:1, et seq.

100.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. STAT. ANN. § 57-12-1, et seq.

101.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. GEN. BUS. LAW § 349, et seq.

102.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. GEN. STAT. § 75-1.1, et seq.

103.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. CENT. CODE § 51-15-01, et seq.

104.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of OKLA. STAT. tit. 15, § 751, et seq.

105.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of OR. REV. STAT. § 646.605, et seq.

106.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 PA. CONS. STAT. § 201-1, et seq.

107.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. GEN. LAWS § 6-13.1-1, et seq.

108.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. CODE § 39-5-10, et seq.

109.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. CODIFIED LAWS § 37-24-1, et seq.

110.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of TENN. CODE ANN. § 47-18-101, et seq.

111.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of TEX. BUS. & COM. CODE ANN. § 17.41, et seq.

112.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of UTAH CODE. ANN. § 13-11-1, et seq.

113.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of VT. STAT. ANN. tit. 9, § 2451, et seq.

114.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of VA. CODE ANN. § 59.1-196, et seq.

115.   Defendants have engaged in unfair competition or unfair, deceptive or fraudulent acts or practices in violation of WASH. REV. CODE § 19.86.010, et seq.

116.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. VA. CODE § 46A-6-101, et seq.

117.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of WIS. STAT. § 100.18, et seq.

118.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of WYO. STAT. ANN. § 40-12-101, et seq.

119.   The acts, practices, misrepresentations and omissions by Defendants described above and Defendants' dissemination of deceptive and misleading advertising and marketing materials in connection therewith, occurring in the course of conduct involving trade or commerce, constitute unfair methods of competition and unfair or deceptive acts or practices within the meaning of each of the above statutes because each of these statutes generally prohibits deceptive conduct in consumer transactions.  Defendants violated each of these statutes by representing that the Shop-Vac wet/dry vacuums had horsepower and tank capacity features that they do not have.

120.   Plaintiffs and the members of the Classes suffered a loss of money as a result of Defendants' misrepresentations because: (a) they would not have purchased the Shop-Vac wet/dry vacuums on the same terms if the true facts concerning their horsepower and tank capacity had been known; (b) they paid an

unfair price premium due to the misrepresentations concerning horsepower and tank capacity; and (c) the vacuums did not perform as promised.

## COUNT II

### For Violation of Magnuson-Moss Warranty Act Brought By the Class Against Shop-Vac and Additionally By the Lowe's Subclass Against Lowe's

121.   Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

122.   Shop-Vac wet/dry vacuums are consumer products as defined in 15 U.S.C. § 2301(1).

123.   Plaintiffs and members of the Class are consumers as defined in 15 U.S.C. § 2301(3).

124.   Defendants are suppliers and warrantors as defined in 15 U.S.C. § 2301(4) and (5).

125.   In connection with the sale of Shop-Vac wet/dry vacuums, Defendants issued written warranties as defined in 15 U.S.C. § 2301(6), which warranted that Shop-Vac wet/dry vacuums had certain specifications relating to their power and capacity.   These statements are untrue, as detailed above, and the machines actually delivered by Defendants to Plaintiffs and the class did not in fact comply with their stated specifications, and were unable to perform at those stated specifications.

126.    Defendants have additionally made written affirmations of fact or promises that the vacuums would meet a specified level of performance over a specified period of time with regards to horsepower and capacity through their packaging, displays and hang tags in stores.  For example, Defendant Shop-Vac's self-imposed definition of peak horsepower requires that the vacuum be capable of producing a maximum output horsepower.

127.    However no output horsepower nearing that claimed by the Defendant was ever observed.  For example a tested machine similar to that purchased by Plaintiff Reid, and claiming to have a peak horsepower of 6.5, was unable to output over 1.66 horsepower at the motor.   In other testing performed by Sperber Communications it was determined that a "peak horsepower" was observed during some of the first several alternating current cycles[5], but that no suction was generated during that fraction of time, thus there was no output horsepower. Additionally while a "peak horsepower" was observed by Sperber it was significantly less than the outrageous claims of Shop-Vac.  For example in a claimed 5.75 Horsepower machine a "peak horsepower" during the initial amperage surge was observed with a maximum theoretical horsepower of 2.5 HP

---

[5] As noted above electricity delivered at 60 Hertz has 60 alternating current cycles each second.  Each cycle is approximately 16.7 milliseconds long.

assuming 100% efficiency6 at a time when there was no output.   Thus even disregarding the definition of peak horsepower by Defendants, and calculating horsepower at a time when there was no work output by the machine, the machines are unable to meet the claims advanced by Defendants.

128.   The vacuums remain incapable of performing at their "peak horsepower" specifications, or other representations of power, and is false and/or misleading because the motor in the vacuum cannot operate anywhere near the stated peak horsepower for any period of time.   As a result of the failure to operate at represented power specifications, the vacuums are incapable of lifting heavier, more adhesive, and tackier materials, which machines meeting such specifications would be capable of.

129.   Moreover, the description of the vacuums capacity is false and/or misleading because during the operation of the unit the tank's capacity is significantly less than represented.   As a result of the vacuums failure to meet the promised specifications with regard to capacity, the vacuums are incapable of operating for the same length of time, or to pick up as much material, as a machine meeting such specifications,

130.   By reason of Defendant's breach of the express written warranties stating that the Shop-Vac wet/dry vacuums had certain "peak horsepower" and had

---

[6] Using the observed efficiency of approximately 47% this maximum initial "peak" horsepower would be less than 1.25 HP.

a capacity of a certain number of gallons, Defendant violated the statutory rights of Plaintiffs and members of the Classes pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq., thereby damaging Plaintiffs and the members of the Classes.

## COUNT III

### For Breach of Express Warranty By The Class Against Shop-Vac and Additionally by the Lowe's Subclass Against Lowe's

131.   Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

132.   Defendants expressly warranted in their marketing, advertising and promotion of the Shop-Vac wet/dry vacuums that the Shop-Vac wet/dry vacuums had certain power and capacity specifications.   These statements are untrue as detailed above, and the vacuums delivered by Defendants to Plaintiffs fail to conform to the promised specifications, are incapable of operating at the promised specifications, and are incapable of performing the same work as machines actually meeting such specifications.

133.   Defendants have additionally made written affirmations of fact or promises that the vacuums would meet a specified level of performance over a specified period of time with regards to horsepower and capacity through their packaging, displays and hang tags in stores.   For example, Defendant Shop-Vac's

self-imposed definition of peak horse power requires that the vacuum be capable of producing a maximum output horsepower.

134.   Plaintiffs and members of the Classes purchased the Shop-Vac wet/dry vacuums based upon the above express warranties.

135.   Defendants breached their express warranties by selling the Shop-Vac wet/dry vacuums with a motor that, even under ideal conditions, cannot operate anywhere near the stated peak horsepower and with a tank that has a capacity which is significantly less than represented.

136.   The vacuums remain incapable of performing at their "peak horsepower" specifications, or other representations of power, and is false and/or misleading because the motor in the vacuum cannot operate anywhere near the stated peak horsepower for any period of time.  As a result of the failure to operate at represented power specifications, the vacuums are incapable of lifting heavier, more adhesive, and tackier materials, which machines meeting such specifications would be capable of.

137.   Moreover, the description of the vacuums capacity is false and/or misleading because during the operation of the unit the tank's capacity is significantly less than represented.  As a result of the vacuums failure to meet the promised specifications with regard to capacity, the vacuums are incapable of

operating for the same length of time, or to pick up as much material, as a machine meeting such specifications.

138.   Plaintiffs and the members of the Classes were injured and entitled to revocation of their acceptance as a direct and proximate result of Defendants' breach through its failure to deliver goods in conformance with promised product specifications because:  (a) they are incapable of performing the same amount of useful work as machines actually meeting the promised specifications; (b) they paid a price premium for the Shop-Vac wet/dry vacuums; and (c) the Shop-Vac wet/dry vacuums did not have the quality or value as promised.

## COUNT IV

### For Breach of Implied Warranty By the Class Against Shop-Vac and Additionally By the Lowe's Subclass against Lowe's

139.   Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

140.   A Warranty of Merchantability is implied by law in sales of goods such as the wet/dry vacuums forming the subject matter of this case, and warrants that such goods pass without objection into the trade for the sale of such goods.

141.   As discussed in detail above, Plaintiffs' expert analysis has determined that the vacuums do not pass into the trade "without objection" as they do not conform to their represented specifications, and are incapable of operating

at their stated power or capacity.  The vacuums additionally do not pass into the trade "without objection" as they are improperly packaged, in that their boxes contain inaccurate information regarding their specifications as to power and capacity.

142.    Additionally the vacuums do not pass into the trade "without objection" as they are improperly packaged, in that their boxes and casings fail to conform to the promises or affirmations of fact made on the container or product labels, or as described on the product packaging provided to Plaintiffs with the vacuums.

143.   Plaintiffs and the members of the Classes were injured as a direct and proximate result of Defendants' breach because:   (a) they are incapable of performing the same amount of useful work as machines actually meeting the promised specifications; (b) they paid a price premium for the Shop-Vac wet/dry vacuums; and (c) the Shop-Vac wet/dry vacuums did not have the quality or value as promised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

A.      For an order certifying the national Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as Class Representatives and their attorneys as Class Counsel to represent the Class members;

B.      For an order certifying the Lowe's Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs McMichael and Harbut as the representatives of the Subclass and their attorneys as counsel to the Subclass;

C.      For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

D.      For an order declaring that Defendants' conduct violates the statutes referenced herein;

E.      For an order awarding compensatory and punitive damages in amounts to be determined by the Court and/or jury;

F.      For an order awarding the Plaintiffs revocation of their acceptance of Defendants' noncompliant goods;

G.      For prejudgment interest on all amounts awarded;

H.      For an order of restitution and all other forms of equitable monetary relief;

I.      For injunctive relief as the Court may deem proper; and

J.      For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of all issues so triable.

Dated:  September 12, 2013             Respectfully submitted,

                                      By: _____*/s/ Andrei Rado*_____
                                               Andrei Rado

                                      **MILBERG LLP**
                                      Sanford P. Dumain
                                      Andrei Rado
                                      One Pennsylvania Plaza, 49th Floor
                                      New York, New York 10119
                                      Tel:  212-594-5300
                                      Fax: 212-868-1229
                                      Email: sdumain@milberg.com
                                      Email: arado@milberg.com

                                      **LAX LLP**
                                      Robert I. Lax
                                      380 Lexington Avenue, 31st Floor
                                      New York, New York 10168
                                      Tel:  212-818-9150
                                      Fax: 212-818-1266
                                      Email: rlax@lax-law.com

                                      **FARUQI & FARUQI LLP**
                                      Adam Gonnelli
                                      369 Lexington Avenue, 10th Floor
                                      New York, New York 10017
                                      Tel:  212-983-9330
                                      Fax: 212-983-9331
                                      Email: agonnelli@faruqilaw.com

                                      ***Interim Class Counsel***

                                      **DILWORTH PAXSON LLP**
                                      Joseph U. Metz (PA ID No. 32958)
                                      112 Market Street, Suite 800
                                      Harrisburg, Pennsylvania 17101-2015

Tel:  717-236-4812
Fax: 717-236-7811
Email: jmetz@dilworthlaw.com

*Interim Liaison Counsel*

**LITE DePALMA GREENBERG LLC**
Bruce Daniel Greenberg
Marissa Lenore Quigley
Two Gateway Center, 12th Floor
Newark, New Jersey 07102
Tel:  (973) 623-3000
Email: bgreenberg@litedepalma.com
        mquigley@litedepalma.com

**REESE RICHMAN LLP**
Michael R. Reese
875 Avenue of the Americas, 18th Floor
New York, New York 10001
Tel:  (212) 643-0500
Fax: (212) 253-4272
Email: mreese@reeserichman.com

**BARON & HERSKOWITZ**
Jon Herskowitz
9100 South Dadeland Boulevard
One Datran Center, Suite 1704
Miami, Florida 33156
Tel: (305) 670-0101
Email: jon@bhfloridalaw.com

**PINILIS HALPERN LLP**
William J. Pinilis
160 Morris Street
Morristown, New Jersey 07962
Tel: (973) 401-1111
Fax: (973) 401-1114
Email: wpinilis@consumerfraudlawyer.com

*Interim Executive Committee Members*

## CERTIFICATE OF SERVICE

The undersigned certifies that, on September 12, 2013, he caused this document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of filing to counsel of record for each party.

Dated: September 12, 2013

_____
*/s/ Andrei Rado*
Andrei Rado