

DILWORTH
PAXSON LLP

DIRECT DIAL NUMBER:                                              James J. Rodgers
(215) 575-7143                                              jrodgers@dilworthlaw.com

September 14, 2016

**VIA ECF FILING**

Hon. Yvette Kane
United States District Judge
United States District Court,
Middle District of Pennsylvania
228 Walnut Street
Harrisburg, PA 17101

> RE:   **In Re: Shop-Vac Mktg. and Sales Practice Litig.**
>       **Case No. 4:12:md-02380-YK (M.D. Pa.)**

Dear Judge Kane:

I write on behalf of Plaintiffs and the Class regarding the proposed Settlement in the above captioned litigation, the Final Settlement Hearing of which is scheduled to be heard on Thursday, September 15, 2016.   I write specifically to update the Court regarding discovery relating to two of the three objectors, Ms. Michelle Vullings, and Ms. Shirley Morales.

The parties served Ms. Vullings with demands for documents and interrogatories on August 26, 2016.  Ms. Vulling's objection, filed by her husband Mr. Brent Vullings who serves as her counsel, failed to provide evidence of her standing as a member of the class to state an objection, and the demands were focused upon these issues.  Although the discovery demands were returnable on September 5, 2016, no responses have been received from Ms. Vullings.  It is respectfully requested that her objection be struck for her failure to comply with plaintiffs discovery, or this Court's Preliminary Approval Order requiring any Objector's to comply with discovery requests from the parties.[1]

---

[1]   The Court's Preliminary Approval Order of May 26, 2016, ¶(7)(d) Orders that the "Failure by an Objector to make himself or herself available for a deposition or otherwise comply with expedited discovery requests may result in the Court striking the Objector's objection and otherwise denying the Objector the opportunity to make an objection or to be further heard. (Dkt. 165 at 4).

Hon. Yvette Kane
United States District Judge
September 14, 2016
Page 2

The parties served Ms. Shirley Morales with discovery demands[2] and a Notice for Deposition on August 26, 2016, which called for her deposition on September 9, 2016. Ms. Morales requested that her deposition be held in Portland, Oregon at a time not to interfere with her teaching schedule. Sunday September 11, 2016 was selected to avoid her work obligations, and the parties accommodated her requests.

The transcript of Ms. Morales' deposition evidences that although her objection is fashioned to appear as a pro-se objection, apparently and purportedly drafted by herself and mailed to the Clerk, it was actually surreptitiously drafted by a member of the Pennsylvania Bar, Mardi Harrison, Esq., an attorney who represents objectors to class action settlements.[3] *See Melinda Mehigan, et. al., v. Ascena Retail Group, Inc., et. al.* Case # 2:15-cv---724-MAK, E.D. PA[4]. Moreover, the transcript reveals that Ms. Morales has little understanding about the claims in the case, does not understand what it means to object to a settlement, has no understanding about her own objection, cannot explain why she believes the settlement is unfair to class members or how it might be improved, and claimed no understanding regarding the resolution of her previous objections for which she received payment, or even the amount of such payments.[5] Further, Ms. Morales appears to have forgotten about an objection that occurred only six months ago where her objection was stricken for lack of standing. It is respectfully submitted that the Transcript, which is attached, evidences that – like Ms. Vullings – Ms. Morales is a serial objector to class action settlements, her objection is not sincerely stated or held, and is designed to create an incorrect impression with the Court.

We look forward to discussing this matter with the Court at the Hearing on Thursday.

Respectfully,

James J. Rodgers

JJR:rb

---

[2]   Ms. Morales timely responded to the written discovery requests of the parties.
[3]   Although Ms. Harrison improperly objected and instructed Ms. Morales not to answer deposition questions pertaining to whether or not a written engagement letter exists, Ms. Morales made clear that Ms. Harrison was retained to represent her prior to the Objection being served, and that Ms. Harrison was responsible for writing it. Ms. Morales testified in regards to who assisted in the drafting of the objection that, "I'm not sure. I just gave basic information and I spoke with Mardi." Deposition of Shirley Morales, P. 45, L 12-13.
[4]   It is worth noting that in *Ascena* Ms. Harrison first entered an appearance and then the Objections of her client, unlike in this matter. In that case, Mr. Vullings also filed an objection on behalf of his wife Michelle W. Vullings.
[5]   Q.  How about if we change the timeframe from the past year, do you recall objecting to any other cases within the past year?
     A.  You know, I don't really understand what "objecting to a case" is. So that's part of my problem. Deposition of Shirley Morales, P. 26, L 5-10.

# The Deposition of

## **SHIRLEY MORALES**
September 11, 2016

## IN RE SHOP-VAC MARKETING AND SALES PRACTICES LITIGATION

## Case No.:  4:12-md-23080YK



# SYNERGY
## LEGAL
### LITIGATION SUPPORT SERVICES

**SHIRLEY MORALES**

1 (Pages 1 to 4)

| Page 1 |
|---|

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IN RE SHOP-VAC MARKETING AND     MDL No. 2380
SALES PRACTICES LITIGATION
Civil Action No.
4:12-md-23080-YK

DEPOSITION OF SHIRLEY MORALES
Taken on behalf of the Plaintiff
September 11, 2016

BE IT REMEMBERED THAT, pursuant to Oregon Rules
of Civil Procedure, the deposition of SHIRLEY MORALES
was taken before Suzanne Ricardo, CSR 13639, a
Certified Shorthand Reporter, on September 11, 2016
commencing at the hour of 2:58 p.m., the proceedings
being reported at the offices of Kelly D. Jones,
819 SE Morrison Street, Suite 225, Portland, Oregon.

| Page 2 |
|---|

1
2
3       APPEARANCES
4
5   Appearing on behalf of the PLAINTIFF:
6   BONNER C. WALSH
7   WALSH LLC
8   21810 Pine Crest Drive
9   PO Box 7
10  Bly, Oregon  97622
11  (541)359-2817
12  bonner@walshpllc.com
13
14  Appearing on behalf of the DEFENDANT:
15  MICHAEL B. SHORTNACY
16  SIDLEY AUSTIN LLP
17  555 West Fifth Street
18  Los Angeles, California  90013
19  (213)896-6665
20  mshortnacy@sidley.com

| Page 3 |
|---|

1   APPEARANCES (continued.)
2
3   Appearing on behalf of the DEPONENT:
4   MARDI HARRISON (by telephone).
5   THE LAW OFFICE OF MARDI HARRISON
6   125 Edison Furlong Road
7   Doylestown, Pennsylvania  18901
8   (267)252-1035
9   mardi@suetheboss.com

| Page 4 |
|---|

EXAMINATION INDEX

| EXAMINATION | PAGE |
|---|---|
| By Mr. Walsh | 5 |
| By Mr. Shortnacy | 75 |
| By Mr. Walsh | 89 |

EXHIBIT INDEX

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1- | Business Card and CV | 9 |
| 2- | Discovery Request | 15 |
| 3- | Responses to Interrogatories | 15 |
| 4- | Photograph | 18 |
| 5- | Objection | 41 |
| 6- | Chase Objection | 65 |
| 7- | Joint Motion for Withdrawal | 73 |

WITNESS INSTRUCTED
NOT TO ANSWER

| PAGE | LINE |
|---|---|
| 88 | 10 |
| 94 | 20 |

www.synergy-legal.com                    September 11, 2016

SHIRLEY MORALES

## Page 5

1     Portland, Oregon; Sunday, September 11, 2016
2     2:58 p.m.
3
4     SHIRLEY MORALES, having been first duly sworn, was
5 examined and testified as follows:
6
7       MR. WALSH: First and foremost, I was going
8 to state on the record that we have your counsel
9 appearing by phone and we did that by agreement;
10 is that correct, Mardi?
11     MS. HARRISON: Yes.
12     MR. WALSH: And we're all going to try to
13 work through this as best as possible.
14
15       EXAMINATION
16 BY MR. WALSH:
17     Q. Would you state your full name for the
18 record, please.
19     A. Shirley Ann Morales.
20     Q. And you do realize you've been sworn here
21 today; is that correct?
22     A. Yes.
23     Q. Have you ever been deposed before?
24     A. I might have been. I've been at one where I
25 watched someone else, but I can't remember if I was

## Page 6

1 deposed.
2     Q. About how long ago was that, if you remember?
3     A. Yes, that was around 1986.
4     Q. Well, you are doing better than me, if you
5 can remember the year, if it was around 1986.
6     You have a little bit of an idea how
7 depositions go.
8     A. Yes.
9     Q. We're going to discuss some guidelines and
10 then I'm going to have what I call rules, but they are
11 more of an agreement between us that will help us do
12 this a little bit quicker and easier. I'll go through
13 those and we'll see if we can agree to them or not.
14 Like the court reporter said, she's here to take all
15 of this down, so it's very important, whatever your
16 answer is, that it be out loud. It's real easy for us
17 to nod and say "uh-huh" or "huh-uh," but if you can do
18 verbal answers, that will help a lot today.
19     Can we have an agreement to have verbal
20 answers?
21     A. Yes.
22     Q. And then -- you've been doing so great at it
23 so far -- and most people don't, even this early in
24 the deposition -- and that is, we'll need to try to
25 not talk over each other. I'll do my best to let you

## Page 7

1 answer your question completely, if you'll do your
2 best to let me finish mine.
3     Okay?
4     A. Yes.
5     Q. Perfect. We'll let you know if we need you
6 to speak up, like your counsel did earlier. It's
7 important to speak up. That's not really an
8 agreement, it's more of a statement.
9     If you need a break at any time, just let me
10 know, and we'll try to accommodate you.
11     Okay?
12     A. All right.
13     Q. Now, the rules are, if I have a question on
14 the table, you are supposed to answer it before a
15 break. I may pressure you to answer that question.
16 So why I'm telling you that is, it's important to say,
17 "I'm going to need a break soon," and just let me
18 know, and we'll work with you.
19     Okay?
20     A. All right.
21     Q. Here's the part where I say, "the rules,"
22 they are really agreements, but it's just something
23 that's very important, so I like to make sure we
24 understand it. And that is, if you don't completely
25 understand one of my questions, just let me know. You

## Page 8

1 must immediately let me know that you don't, so I can
2 help you understand.
3     Okay?
4     A. I will do my best.
5     Q. Perfect. That's all can I ask for.
6     And if you don't know an answer to a
7 question, just tell us. That's fine.
8     A. All right.
9     Q. And if you need to review any documents
10 today, let me know. If we have them, I'll get them
11 for you. If not, we'll get them printed out.
12     A. All right.
13     Q. Could we have a further agreement that if I
14 refer to "Shop-Vac," that you'll know I'm talking
15 about -- if I say "Shop-Vac" or "vacuum," can we have
16 an agreement that you'll know we're talking about the
17 Shop-Vacs in this case?
18     A. Yes.
19     Q. And when I refer to the "Objection," could we
20 have the agreement that I'm talking about the
21 objection that you filed in this case?
22     A. Yes.
23     Q. And I see that you did bring some documents
24 here for me today. You brought a business card from
25 Springwater Trail High School; is that correct?

Electronically signed by Suzanne Ricardo (501-090-451-8941)         60349228-2bd4-443d-bce9-173720039684

SHIRLEY MORALES

### Page 9

1    A.  That's correct.
2    Q.  And then you brought a CV, basically, that
3  talks about your previous work and your current
4  position at Springwater Trail High School; correct?
5    A.  That's correct.
6    MR. WALSH:  I'm going to go ahead and have
7  these marked as Exhibit 1.  I don't have any questions
8  about them, I'm just going to have them marked and we
9  will keep them.
10    (Plaintiff's Exhibit 1 was marked for
11    identification.)
12  BY MR. WALSH:
13    Q.  And you also brought the Shop-Vac vacuum
14  cleaner here with you today; is that correct?
15    A.  Yes, I did.
16    Q.  And previously, through your counsel, you
17  produced several pictures of three vacuum cleaners.
18    Do you remember that?
19    A.  Yes.
20    Q.  And then some detailed pictures of one of
21  those three vacuum cleaners.
22    A.  That's right.
23    Q.  And the vacuum cleaner that you brought with
24  you here today, that is the middle vacuum from the
25  picture that you sent; is that correct?

### Page 10

1    A.  That is correct.
2    Q.  And any pictures that you gave us that were
3  of components of the vacuum, rather than the three
4  vacuum cleaners, were pictures of the vacuum that you
5  brought us here today.
6    A.  That's right.
7    MR. WALSH:  Mardi, can you still hear us
8  okay?  The air conditioning kicked in.
9    MS. HARRISON:  I can hear you.  It's a little
10  harder to hear Shirley.
11    THE WITNESS:  I'm sorry, Mardi.  I talk low.
12  BY MR. WALSH:
13    Q.  Now, I have some intro questions.  I don't
14  want to know what you discussed with your attorney.
15  Don't tell me what you discussed with your attorney,
16  but my question is:  Did you discuss this deposition
17  with your attorney prior to coming here today?  It's
18  just a "yes" or "no."
19    A.  Yes.
20    Q.  Was there anyone else present while you were
21  having that conversation?
22    A.  No.
23    Q.  Who is your current employer?
24    A.  Springwater Trail High School -- well, that's
25  actually Gresham-Barlow School District.

### Page 11

1    Q.  And what do you do?
2    A.  I'm a teacher.
3    Q.  And what do you teach?
4    A.  I teach art and yoga therapy.
5    Q.  Any other subjects that you teach there at
6  Springwater?
7    A.  No.
8    Q.  And this isn't in your first jobs as a
9  teacher, is it?
10    A.  No.
11    Q.  Where else have you been a teacher?
12    A.  Oh, my goodness.  I've been a teacher at
13  Sweetwater School, at Springdale Job Corps, and for
14  Multnomah Educational Service District.  And I've also
15  worked for a variety of schools through the Regional
16  Arts and Culture Council, and also as a private
17  contractor.
18    Q.  Was that always in Oregon or in other states,
19  as well?
20    A.  That was always in Oregon.  I also taught at
21  Mt. Hood Community College.
22    Q.  And what did you teach at Mt. Hood Community
23  College?
24    A.  Pilates and yoga.
25    Q.  Besides art and yoga and other associated

### Page 12

1  disciplines, like Pilates and yoga, are there any
2  other subjects you have taught in any school
3  environment?
4    A.  Yes, and it's many years -- it's difficult to
5  recall everything, but I've taught -- I started out
6  teaching reading, and that was for Parkrose School
7  District.
8    Q.  Have you ever taught any science courses?
9    A.  Only as a substitute.
10    Q.  We'll just start broad and move forward a
11  little bit --
12    A.  Excuse me, many of my classes -- actually,
13  there was a class that was art integrated with
14  science.  And I don't think of myself as a scientific
15  person, but it was astronomy.
16    Q.  Let's talk for just a minute about your
17  educational background.
18    Where did you go to high school?
19    A.  In La Palma, California.
20    Q.  And what year did you graduate?
21    A.  1969.
22    Q.  And did you have any post secondary education
23  after graduating from La Palma High School in 1979
24  (sic)?
25    A.  Yes.

Electronically signed by Suzanne Ricardo (501-090-451-8941)                    60349228-2bd4-443d-bce9-173720039684

SHIRLEY MORALES

| Page 13 |
|---|

1    Q.  And where did you go to school after La Palma
2  High School?
3    A.  Well, you want every school that I've gone to
4  or the ones -- primary --
5    Q.  Let's say, were there any schools that you
6  went to where you obtained a degree or certification?
7    A.  Yes.
8    Q.  What other education did you go to -- that
9  was a terrible question.  See, I will do that
10  sometimes, too.  I'll ask terrible questions that
11  don't even make sense to me, and I'll have to stop and
12  go back.  Sorry about that.
13      After you went to high school, tell me what
14  schools you went to, where you obtained a degree.
15    A.  I went to Eastern Oregon University.
16    Q.  And what degree did you obtain from Eastern
17  Oregon University?
18    A.  A Bachelor's degree.
19    Q.  And what discipline was that Bachelor's
20  degree in?
21    A.  It was liberal studies, with two minors.  One
22  was in art, and the other was in sociology and
23  anthropology.
24    Q.  I'm smiling because I did anthropology a good
25  bit, too.

| Page 14 |
|---|

1      Besides the Bachelor's degree in Liberal Arts
2  from Eastern Oregon University, were there any other
3  schools you went to where you obtained a degree?
4    A.  Yes.
5    Q.  What school was that?
6    A.  Lewis-Clark State College.
7    Q.  And what degree did you obtain at Lewis-Clark
8  State College?
9    A.  It was a teacher certification.
10    Q.  So it wasn't a degree, it was a
11  certification?
12    A.  That's right.
13    Q.  Are there any other certifications you hold,
14  besides the teacher certification?
15    A.  Yoga teacher certification.
16    Q.  Where did you get the yoga teacher
17  certification?
18    A.  Insight Yoga.
19    Q.  Let's just have you spell "Insight."
20    A.  I-N-S-I-G-H-T.
21    Q.  Thank you.
22      Now, this is a question that I always have to
23  ask everybody that I'm deposing, don't take it
24  personally.  I'm going to exclude traffic tickets.
25  Besides traffic tickets, have you had any run-ins with

| Page 15 |
|---|

1  the law?
2    A.  I don't believe so.
3    Q.  So we keep things moving forward, I think
4  it's probably best to go through the discovery
5  responses --
6    A.  Can I change that and just say "no"?  I am
7  sure I haven't had any.
8    Q.  I'm going fix that, too, on the record for
9  you.  So you are saying, "no," you have not had any
10  criminal convictions in the last ten years; is that
11  correct?
12    A.  That's correct.
13    Q.  And that was perfect.  That's something I
14  didn't say earlier that you caught on to and handled
15  just perfectly, and that is, if you think about
16  something and you realize you need to fix it, fix it
17  sooner rather than later.  So thank you.
18    MR. WALSH:  I'm going get marked as Exhibit 2
19  a copy of the discovery request that we sent to you.
20    Mardi, I'm going to hand her the discovery
21  request that we sent to you, and I'm also going to get
22  a copy of the answers and hand that to her, as well.
23    MS. HARRISON:  Okay.  I've got them here.
24    (Plaintiff's Exhibits 2 and 3 were marked for
25    identification.)

| Page 16 |
|---|

1  BY MR. WALSH:
2    Q.  And then Exhibit 3 are the responses that we
3  were given.  I just wanted to take a moment and work
4  through these with you.  If you would turn to page
5  No. 9 of Exhibit 2, and then page 2 of Exhibit 3.  And
6  if you'll look at question No. 1 there on page 9 of
7  Exhibit 2, I'm going to read it to you.  We asked,
8  "Please state whether you have owned Shop-Vac brand
9  wet/dry vacuum at any time from January 1, 2006
10  through May 25th, 2016.  If yes, please state the
11  of purchase, receipt as gift, or other means by which
12  you acquired possession of the wet/dry vacuum."
13      Did I read that correctly?
14    A.  Yes.
15    Q.  And your response was, "I purchased the
16  Shop-Vac on or around sometime in the 2008-2010 time
17  frame."
18      Did I read that correctly?
19    A.  Yes.
20    Q.  My only questions there are -- let me ask a
21  few.
22      What did you get the Shop-Vac for?
23    A.  What did I get it for?
24    Q.  Uh-huh.
25    A.  Primarily, I wanted to vacuum the water out

Electronically signed by Suzanne Ricardo (501-090-451-8941)                    60349228-2bd4-443d-bce9-173720039684

SHIRLEY MORALES

### Page 17

1  of the very bottom of my hot tub. Secondarily, I find
2  that there's use for a Shop-Vac, now and then,
3  cleaning up after a project.
4      Q.  When you say "project," you are talking about
5  art projects?
6      A.  No.  I was thinking more of a home
7  improvement project.
8      Q.  And in the picture you gave us, I noticed you
9  had three different vacuums.
10         Were those all three your vacuums?
11      A.  Yes.
12      Q.  You are a big purchaser of wet/dry vacuums.
13         Would that be fair to say?
14      A.  Yes.  For -- as a homeowner, I usually have a
15  wet/dry vacuum.
16      Q.  Do you recall how much that Shop-Vac cost
17  when you purchased it -- a ballpark?
18      A.  You know, I'd say -- I don't recall the exact
19  amount, but, ballpark, in between $40 and $50.
20      Q.  And do you know if that was about the same,
21  more, or less than the other two vacuums that were in
22  the pictures that you gave to us?
23      A.  I don't recall the cost on the latest vacuum,
24  but the original Shop-Vac, I'd say it was perhaps a
25  little bit higher, but not very much.

### Page 18

1         MR. WALSH:  And just so I make sure that we
2  have this accurately on the record, can I have this
3  marked as Exhibit 4?
4         And, Mardi, what I'm marking as Exhibit 4 is
5  a picture of the three vacuums, and I'm going to hand
6  that to your client after we have it marked.
7         MS. HARRISON:  Okay.
8         (Plaintiff's Exhibit 4 was marked for
9         identification.)
10  BY MR. WALSH:
11      Q.  Just now, when we were talking about the
12  price, you referred to three things.  You referred to
13  the "Shop-Vac," the "older Shop-Vac," and the "newer
14  vacuum."
15         Do you remember that?
16      A.  That's correct.
17      Q.  And if you are looking at picture, the center
18  vacuum is the Shop-Vac you brought with you and the
19  one that we've been talking about today; correct?
20      A.  That's correct.
21      Q.  And the one you called the "older Shop-Vac"
22  is to the left, if you are facing the picture;
23  correct?
24      A.  Yes.
25      Q.  And the one you call the "newer

### Page 19

1  vacuum" -- that you don't recall the price for -- is
2  the one that is on the right and stainless steel and
3  marked "Stanley"?
4      A.  That's right.
5      Q.  I just want to make sure we're talking about
6  the same items.
7         That older Shop-Vac, do you recall when you
8  purchased it?
9      A.  No.
10      Q.  But do you know if was before or after 2006?
11      A.  It was before.
12      Q.  The middle Shop-Vac, I'm -- that's the only
13  one that you are asserting that you purchased that
14  gives you standing in this lawsuit; correct?
15      A.  Correct.
16      Q.  Do you recall what the stated capacity was on
17  that Shop-Vac?
18      A.  You mean, five-gallon?
19      Q.  Yes.
20      A.  Yes.
21      Q.  And do you recall what the stated horsepower
22  was on that vacuum?
23      A.  Well, I see it.
24      Q.  And what do you see it say?
25      A.  I see "2.0."

### Page 20

1      Q.  And do you know what the actual capacity of
2  that vacuum was?
3      A.  No.
4      Q.  And do you know what the actual horsepower of
5  that vacuum was?
6      A.  No.
7      Q.  Did you do any types of tests or measurements
8  for either of those two variables?
9      A.  No.
10      Q.  How can you be sure that you bought it during
11  the 2008-2010 timeframe?
12      A.  Well, because I had a project in my home, and
13  I do recall that I bought the Stanley at Costco, and I
14  have a ballpark idea in my mind of when I got my
15  Costco card, and I bought it within a year.  I mean, I
16  bought it after this one, not too long after.
17      Q.  And so you were able to look at your Costco
18  card -- or remember when you got your Costco card, and
19  work backwards to when you got the Shop-Vac?
20      A.  That's right.  I wasn't satisfied with this
21  one, so I bought this one (indicating).
22      Q.  And why weren't you satisfied with --
23         MR. SHORTNACY:  Do you want to clarify what
24  she's pointing to?
25         MR. WALSH:  Yes.

Electronically signed by Suzanne Ricardo (501-090-451-8941)                    60349228-2bd4-443d-bce9-173720039684

SHIRLEY MORALES

| Page 21 |
| --- |

1    BY MR. WALSH:
2        Q.   When you said you were not satisfied with
3    "this one," you indicated the Shop-Vac in the middle;
4    is that correct?
5        A.   That's right.
6        Q.   And you said that led to the purchase of the
7    Stanley vacuum that's to the right of the Shop-Vac.
8        A.   That's right.
9        Q.   And that Stanley vacuum is the one you
10   purchased at Costco; correct?
11       A.   That's right.
12       Q.   And you were able to determine when you had
13   your Costco membership, and you knew you purchased the
14   Stanley vacuum within, roughly, a year of purchasing
15   the Shop-Vac vacuum, because you were dissatisfied
16   with it, and that's how you came up the with 2008-2010
17   timeframe.
18       A.   That's right.
19       Q.   Did you have to look to figure when you had
20   your Costco membership, or did you just remember that?
21       A.   I thought back and had a pretty good idea.
22       Q.   It's really not all that long ago, is it?
23       A.   Well, it depends on how you look at that.
24   I'm not -- I don't know how to answer that.
25       Q.   It was six to eight years ago; right?

| Page 22 |
| --- |

1        A.   Uh-huh.
2        Q.   Is that a "yes"?
3        A.   Yes.
4        Q.   Sorry.  I have to -- if you are nodding or
5    making a sound, I have to run it down to a "yes" or a
6    "no."  Sorry about that.
7        A.   Of course.
8        Q.   And you feel confident in that assessment
9    that you made, that this purchase of the middle
10   Shop-Vac and the one you assert gives you standing in
11   the 2008-2010 timeframe.
12       A.   Yes.
13       Q.   If you would hand me Exhibit 4 -- actually,
14   put it on top of your resume and things.  I want to
15   make sure we don't lose those, for the court reporter.
16            If you would look at Interrogatory No. 2 on
17   page 9 of Exhibit 2, and I'm going to read it slower
18   this time, and ask you if I've read it correctly.
19            That question asks, "Please identify all
20   attorneys and law firms acting on your behalf or
21   providing legal counsel to you in connection with your
22   Objection, regardless of whether such counsel or law
23   firm has formally appeared in these proceedings of
24   record."  And then -- did I read that correctly?
25       A.   Yes.

| Page 23 |
| --- |

1        Q.   And then your response was, "Mardi Harrison,
2    Esq."
3            Did I read that correctly?
4        A.   Yes.
5        Q.   And, again, I don't want to know anything
6    about what you've talked about with Mrs. Harrison, but
7    how did you find Ms. Harrison to hire?
8        A.   You know, I'm not really sure.  I think maybe
9    a friend or on the Internet.  I'm just not sure.
10       Q.   But either a referral from a friend or
11   perhaps you found something on the Internet that led
12   you to her.  One of the two.
13       A.   That's right.
14       Q.   And approximately what date did you retain
15   Ms. Harrison, if you recall?
16       A.   No, I don't recall.
17       Q.   And besides Ms. Harrison, it's still your
18   position no one else is assisting you in this matter;
19   correct?
20       A.   That is correct.
21       Q.   Let's move on to Interrogatory No. 3 of
22   page 9 there of Exhibit 2.  We asked, "Please identify
23   any person, including yourself, who may be entitled to
24   compensation for any reason related to your
25   Objection."

| Page 24 |
| --- |

1            Did I read that correctly?
2        A.   Yes.
3        Q.   And your response to that was,
4    "Shirley Morales and Mardi Harrison, Esq."
5            Did I read that correctly?
6        A.   Yes.
7        Q.   Is that still your position, those are only
8    the two people --
9        A.   Yes.
10       Q.   Now we're starting to get a little bit into
11   the we're talking over each other.  So I'll still work
12   hard to let you answer the questions, if you'll let me
13   finish mine.
14       A.   Yes.
15       Q.   Thank you.  Let's go ahead and move down to
16   Interrogatory No. 4 on page 9.  It's going to move
17   over to page 10, as well, of Exhibit 2.  I'm going to
18   read that.  It says, "Please state the number of times
19   in which you, your counsel, including your counsel's
20   law firm, has objected to a class action settlement
21   within the five years preceding the date that you
22   filed your Objection and provide the caption of each
23   case in which such objection was made."
24            Did I read that correctly?
25       A.   That's correct.

Electronically signed by Suzanne Ricardo (501-090-451-8941)                    60349228-2bd4-443d-bce9-173720039684

SHIRLEY MORALES

Page 25

1    Q.  And your response -- I'm going to summarize
2  it, so she doesn't have to type it all back up.  Your
3  response was that you had objected to one case and
4  your counsel had objected to one case; correct?
5    A.  That's right.
6    Q.  And then the case you objected to was Crystle
7  Wong -- "Crystle" is spelled C-R-Y-S-T-L-E -- versus
8  Alacer, A-L-A-C-E-R, and that was in California; is
9  that correct?
10    A.  Yes, that was correct.
11    Q.  And is it still your contention, in the last
12  five years, that's the only case that you've objected
13  to?
14    A.  I think so.
15    Q.  That's the only case you remember objecting
16  to within the last five years?
17    A.  That's right.  I'm not sure.
18    Q.  You are not sure whether you objected to any
19  more?
20    A.  I'm not sure.  I thought there might be
21  something, but I can't remember, and I get notices.
22    Q.  You get a bunch of notices for class cases?
23    A.  Uh-huh, I do.
24    Q.  And when you receive a notice for a class
25  case, do you object to all of them?

Page 26

1    A.  No.
2    Q.  What percentage of the cases you get notice
3  for would you say you object to?
4    A.  Not very much.
5    Q.  How about if we change the timeframe to the
6  past year, do you recall objecting to any other cases
7  within the past year?
8    A.  You know, I don't really understand what
9  "objecting to a case" is.  So that's part of my
10  problem.
11    Q.  Well, in this case, you understand that you
12  objected in this case; correct?
13    A.  Uh-huh.
14    Q.  And when I say "this case," I'm referring to
15  Shop-Vac.
16    A.  Yes.
17    Q.  And I guess I'm asking, what part of the
18  word -- what part of the phrase "object to a class
19  action settlement" is unclear?  And I'll do my best to
20  clarify.
21    A.  You know, I just don't know a lot about it.
22  I don't know what to say.
23    Q.  That's fair.  I'm not trying to put answers
24  in front of you.  Let me ask it a different way.
25    Are there any other class actions within the

Page 27

1  past five years where you've hired an attorney to do
2  anything?
3    A.  I think there was one, but I just can't
4  remember the name of it.
5    Q.  What do you think that was?
6    A.  Actually, I think there was something with
7  Chase, and I don't think I qualified, but that's all I
8  can --
9    Q.  And when you say you don't think you
10  qualified, what do you mean by that?
11    A.  I didn't have the right account or something
12  like that.  I can't remember.  I remember, vaguely,
13  there was something about Chase, and I thought I might
14  qualify, but I didn't.  That's what I think.
15    Q.  And did you have an attorney for that?
16    A.  Yes.
17    Q.  Do you remember what their name was?
18    A.  I'm sorry, I don't.
19    Q.  That's okay.  Do you remember how long ago
20  that was?
21    A.  I don't.
22    Q.  Do you remember if it was within the last
23  year?
24    A.  I'm not sure.
25    Q.  Could be, might not be, really aren't sure,

Page 28

1  one way or another?
2    A.  That's true.
3    Q.  If it was in the past six months, do you
4  think you would remember?
5    A.  Honestly, I don't recall.
6    Q.  We should be on page 10, now, of Exhibit 2,
7  and let me read Interrogatory No. 5 to you, and let me
8  know if I read it correctly.  "Please provide a
9  statement disclosing any consideration, financial
10  compensation, or donation that you, your counsel (if
11  any), or your counsel's law firm (if any), has
12  received or directed the distribution of in connection
13  with the resolution or dismissal of an objection to a
14  class action settlement within the five years
15  preceding the date that you filed your Objection."
16    Did I read that correctly?
17    A.  Yes.
18    Q.  Does that question make sense to you?
19    A.  Yes.
20    Q.  And your response to that was, "I recall both
21  my counsel and I receiving some compensation around an
22  appeal, but I don't recall the amounts."
23    Did I read that correctly?
24    A.  That's correct.
25    Q.  And it's been a little while since you've

Electronically signed by Suzanne Ricardo (501-090-451-8941)                    60349228-2bd4-443d-bce9-173720039684

SHIRLEY MORALES

## Page 29

1    answered these, have you recalled the amounts of
2    compensation that you received since then?
3        A.  No.
4        Q.  What case was it that you received
5    compensation on, if you know?
6        A.  I think it's this Crystle Wong.
7        Q.  And do you remember what year you objected to
8    the Crystle Wong case?
9        A.  No.
10       Q.  And do you have a ballpark recollection of
11   how much money you received in the Crystle Wong
12   objection?
13       A.  No.  I'm not sure.  I mean, I know that it
14   wasn't a lot of money.
15       Q.  Well, I'm going to have ask a question, what
16   do you consider "a lot of money"?
17       A.  Well, it wasn't like $10,000 or anything like
18   that.  I don't recall exactly how much it was.
19       Q.  And do you know if that was amount you
20   actually received or the amount you and your counsel
21   received, or do you know?
22       A.  I was thinking -- I have no idea how much
23   counsel received.
24       Q.  That was how much you received, something
25   less than $10,000.

## Page 30

1        A.  Way less.
2        Q.  "Way less"?
3        A.  Yeah.
4        Q.  We're going to skip 6, because it didn't
5    apply.  And I do want to go over 7 a little bit.  Let
6    me read No. 7 to you, of Exhibit 2 on page 10, and
7    then let me know if I've read it correctly.  "To the
8    extent that they exist, please disclose the caption
9    for any case(s) where you or your counsel have had an
10   objection dismissed for any material defect, including
11   but not limited to lack of standing.  If that defect
12   was anything other than lack of standing, describe the
13   reason of the dismissal of you or your counsel's
14   objection."
15           Did I read that correctly?
16       A.  I think so.  I was a little lost.  Should we
17   go over it again, perhaps?
18       Q.  Sure.  We'll go over it again, just to make
19   sure we have it.  All right.  Interrogatory No. 7, the
20   last one on the page, "To the extent that they exist,
21   please disclose the caption for any case(s) where you
22   or your counsel have had an objection dismissed for
23   any material defect, including but not limited to lack
24   of standing.  If the defect was anything other than
25   lack of standing, describe the reason for the

## Page 31

1    dismissal of you or your counsel's objection."
2            Did I read that correctly?
3        A.  Yes.
4        Q.  Let me ask this:  Did you understand that
5    question?
6        A.  I think so.
7        Q.  What do you think you understand it to mean?
8        A.  That -- let's see -- that -- okay -- well,
9    that it would be me or my counsel would have had an
10   objection dismissed, which, I assume, by the court,
11   for any kind of material defect.  I assume that means
12   something wrong with a product, including but not
13   limited to a lack of standing.  I don't really --
14           MS. HARRISON:  Excuse me, Ms. Morales has no
15   legal training.  She's not in a position to interpret
16   a request that is filled with legal phrasing.  If you
17   want to rephrase your question so she can understand
18   it in normal language, that would be fine.
19           MR. WALSH:  I'm not asking for a legal
20   analysis.  I'll re-ask my question, though.  I'll make
21   it a little more clear.
22   BY MR. WALSH:
23       Q.  Ms. Morales, I'm not asking for a legal
24   opinion, but if you read this question, tell me what
25   it means to you.

## Page 32

1        A.  If there was a defect in a product, other
2    than a lack of standing -- essentially, it just means,
3    to me, if there's some kind of product that had a
4    defect and -- where I had counsel or I had
5    objected -- and there wasn't.  I don't have any
6    relationship to that question, because.
7        Q.  All right.  Thank you.  If you want to, go
8    ahead and -- one second here.  If you want to, you can
9    close both of those exhibits, and we'll place them
10   over there in the exhibit pile.
11           I'm asking, just because it looks like you
12   might want to, do you want to take a break for any
13   reason or are we good to keep going?
14       A.  We can keep going.
15       Q.  I was just double checking.  It looked like
16   you might need more drink or something.
17           Now I want to talk generally about the
18   Shop-Vac cases and see what we know.  And, again,
19   just like we were talking about earlier, I'm not
20   looking for legal opinions.  I'm just looking for what
21   you know and what you understand on these.
22           Do you know when the Shop-Vac cases were
23   initially filed?
24       A.  No.
25       Q.  Do you have an approximate date for when they

Electronically signed by Suzanne Ricardo (501-090-451-8941)                              60349228-2bd4-443d-bce9-173720039684

SHIRLEY MORALES

Page 33

1   were filed?
2       A.  No.
3       Q.  Do you know where these cases were filed?
4       A.  No.
5       Q.  It's okay.  Sorry if the questions seem
6   silly.
7           Do you know what causes of actions were
8   asserted in the lawsuits?
9       A.  No.
10      Q.  Do you have an opinion, one way or another,
11  whether a class should have been certified in this
12  case?
13          MS. HARRISON:  Objection.  That calls for a
14  legal comment.
15  BY MR. WALSH:
16      Q.  Do you understand what a "class action" is?
17      A.  Yes.
18      Q.  And what's your understanding of what a
19  "class action" is?
20      A.  It's when a large number of people are taking
21  an action against another party or company.  Does that
22  make sense?  Was that clear?
23      Q.  Yes, that's makes sense.
24          And you understand that the Shop-Vac case was
25  brought as a class action; correct?

Page 34

1       A.  Yes.
2       Q.  And do you have an opinion, as just a
3   layperson, just as Shirley Morales, do you have an
4   opinion as to whether or not this should have been a
5   class action?
6       A.  Yes.
7       Q.  "Yes," you do believe it should have been?
8       A.  As a layperson, yes.
9       Q.  Now, I'm just asking if you know what the
10  word means.  Do you know what it means to "certify" a
11  class action?
12      A.  No.
13      Q.  And earlier I asked a little bit about
14  whether you taught science, and you had an art class
15  that overlapped into astronomy, but what I didn't ask
16  is:  Do you have any scientific background?
17      A.  No.
18      Q.  Do you understand what "horsepower" is a
19  measurement of?
20      A.  Strength, is all that I would understand.
21      Q.  And when you say "strength," what do you use
22  that strength for?
23      A.  Well, I imagine that it has to do with the
24  engine or the power of the equipment and what it
25  actually can do, as far as a vacuum, how much it picks

Page 35

1   up.
2       Q.  So you would use -- if I've got this wrong,
3   just tell me.  You would use horsepower to compare
4   other similar vacuums to decide which one had more
5   strength?
6       A.  Yes, I think so.
7       Q.  And I don't want you to be uncomfortable
8   about that.  I want to make sure we're talking about
9   same thing.  It looks like we are, but I want to make
10  sure.  Let's have a hypothetical, and let's say if you
11  were look at three vacuums, and one said it was "1
12  horsepower," and one said it was "2 horsepower," and
13  one said it was "3 horsepower," based on what you
14  said, I think that your understanding would be the 3
15  horsepower should have more strength.
16      A.  I assume so.
17      Q.  That's what the whole case was about; right?
18      A.  Uh-huh.
19      Q.  Is that a "yes"?
20      A.  You know, what my interpretation of the case
21  was that the product was not efficient, or inadequate,
22  or that it was marketed falsely.
23      Q.  When we say "capacity," here today, what do
24  you understand "capacity" to mean in relation to
25  Shop-Vac?

Page 36

1       A.  How much the tank holds.
2       Q.  How do you think that that would be measured?
3   How do you think they would measure how much the tank
4   holds?
5       A.  Well, since it was a five-gallon Shop-Vac, I
6   would assume that it needed to hold five gallons.
7       Q.  As long as the tank held five gallons, then
8   you would think that would be accurate?
9       A.  As long as the tank picked up five gallons
10  before it cuts it out.
11      Q.  Those were different.  I appreciate that.  I
12  think we talked about why horsepower mattered.  I was
13  going to ask you "why does horsepower matter," but I
14  think you told me about the strength is why it matters
15  to you.
16          Is that fair?
17      A.  Yes.
18      Q.  Why does capacity matter?
19      A.  It matters, in my case, because I don't
20  like -- when I vacuum out my hot tub, I don't like to
21  have to bend down and pick it up several times.  I
22  want to know that it's going to fill all the way to
23  the top.
24      Q.  Now I want to talk a little about, what do
25  you know about Shop-Vac?

Electronically signed by Suzanne Ricardo (501-090-451-8941)                    60349228-2bd4-443d-bce9-173720039684

SHIRLEY MORALES

Page 37

1    Do you know how large a company Shop-Vac is?
2    A.   No.
3    Q.   Do you know how many people they employ?
4    A.   No.
5    Q.   Do you know what their annual net income is?
6    A.   No.
7    Q.   Do you know, besides vacuums, what other
8    products they offer?
9    A.   No.
10    Q.   Do you know what their current financial
11    status is?
12    A.   No.
13    Q.   When you were -- let me ask this:  In regards
14    to the Shop-Vac cases, are there any documents that
15    you've reviewed besides the Notice?
16    A.   Besides the Notice?
17    Q.   Right.  And let me do a better job on that
18    question.  I know I sent you discovery.  I know I sent
19    you a deposition notice, but I'm trying to talk about
20    the timeframe between when you got notice and when an
21    objection was filed in this case.
22    Can we talk about that timeframe?
23    A.   Yes.
24    Q.   And my question is:  What documents related
25    to the Shop-Vac case did you review prior to filing

Page 38

1    the Objection?
2    A.   You know, I recall reading some things
3    online, but I don't recall what they were named, and,
4    you know, I can't tell you -- I can't answer that
5    question 'yes' or "no" or with names.
6    Q.   That's not a problem.  Let me ask this:  You
7    said you remember reading things online, was that in
8    relation to the settlement website?
9    A.   I'm not sure.
10    Q.   How did you get notice of this case?
11    A.   You know, I think I heard about it from,
12    possibly, the guys who were working for me, but I
13    could have just seen it online.  I don't know
14    if -- I'm not sure.
15    Q.   So you didn't get a copy of the notice by
16    e-mail or mail, then?
17    A.   I don't recall.
18    Q.   Do you regularly check your e-mail?
19    A.   My e-mail, yes, I do.
20    Q.   Do you ever receive class action notices by
21    e-mail?
22    A.   I'm not sure.  I get a lot of e-mail.
23    Q.   I understand.  But here, you can't remember
24    whether or not you received it in the mail.
25    Is that a fair statement?

Page 39

1    A.   That's true.  I don't recall.
2    Q.   And you can't recall whether you got it by
3    e-mail?
4    A.   That's true, too.
5    Q.   And you think you may have just heard about
6    it from someone or seen it online; correct?
7    A.   That's right.
8    Q.   Did you review any of the expert opinions
9    that were filed in this matter?
10    A.   I don't recall everything that I read.
11    Q.   Do you recall anything that you read, besides
12    the Notice?
13    A.   My short-term memory is not as good as I'd
14    like it to be.  I don't recall, exactly, what all I
15    read.
16    Q.   And I understand your answers are your
17    answers.  I'm sorry, I just got to ask some questions
18    to do my best to identify what you did read, so I
19    apologize for that.
20    A.   Right.
21    Q.   Do you remember reading the application for
22    final approval in this case?
23    A.   I'm not sure.
24    Q.   That's just fine.  That is a perfectly fine
25    answer.  I just want to let you know, if you don't

Page 40

1    know, "I don't know" is fine.  It's always fine.
2    Don't worry about it.  I ask the questions, you answer
3    the questions with the truth, and we just move
4    forward.
5    How much -- do you have any idea how much the
6    capacity of these is overstated?
7    A.   No.
8    Q.   And do you have any idea how much the
9    horsepower of the vacuum is overstated?
10    A.   No.
11    Q.   Do you have any idea how a motor's life is
12    affected by horsepower?
13    A.   No.
14    Q.   Besides the Shop-Vac case that you objected
15    to, are you aware of any other Shop-Vac class actions
16    that have been filed?
17    A.   No.
18    Q.   Are you aware of a class action in New Jersey
19    that involves Shop-Vac vacuum cleaners?
20    A.   That's different than this one?
21    Q.   That's different than -- let me -- I'm not
22    here to answer questions, but let me rephrase that,
23    since you asked that way.
24    Do you understand what an "MDL" is -- if I
25    say "MDL"?

Electronically signed by Suzanne Ricardo (501-090-451-8941)                    60349228-2bd4-443d-bce9-173720039684

SHIRLEY MORALES

## Page 41

1       A.  No.
2       Q.  This case is an MDL case.  That means
3  multi-district litigation.  This case that you filed
4  the Objection in is in the Middle District of
5  Pennsylvania.
6           So my question is:  Besides the cases in the
7  Middle District of Pennsylvania, were you aware of any
8  other Shop-Vac class actions?
9       A.  Not to my conscious knowledge.  If I read
10  about something online, I wouldn't have differentiated
11  it.
12      Q.  Thank you.
13          MR. WALSH:  Now, can I have I this marked as
14  Exhibit 5, please.
15          Mardi, I'm having the actual Objection marked
16  as Exhibit 5.
17          (Plaintiff's Exhibit 5 was marked for
18              identification.)
19  BY MR. WALSH:
20      Q.  Let's talk about the Objection that you filed
21  in this case.
22          Why are you objecting to the settlement?
23      A.  Because it doesn't seem fair.
24      Q.  What doesn't seem fair about the settlement?
25      A.  You know, it's just something about it just

## Page 42

1  doesn't strike me as being fair.
2       Q.  Could you be a little more specific?  What
3  part about it does not seem fair?
4       A.  Well, if a consumer buys a product that
5  hasn't been honestly -- marketed honestly, that
6  doesn't seem fair.  And, also, you know, I could
7  clearly say that this product is not -- it's not an
8  efficient product.
9       Q.  What goals do you hope to achieve with your
10  Objection?
11      A.  Well, I think it's a good idea for consumers
12  to speak up when they don't think something is fair.
13      Q.  And when you were talking about things you
14  don't think are fair, it was that the vacuum hasn't
15  been marketed properly.  That was one thing; right?
16      A.  Right.
17      Q.  But your Objection was to the settlement in
18  the case, not to the product; is that correct?
19      A.  That's a little confusing for me.
20      Q.  Sure.
21      A.  Oh, I see, the settlement, what they offered.
22  Okay.  Is that what you mean?
23      Q.  Yes, that's what I mean.
24      A.  Right.
25      Q.  Your Objection was to what they offered, as

## Page 43

1  you've called it.
2       A.  That's right.
3       Q.  So my question is:  With your Objection to
4  what they offered, what are you hoping to achieve by
5  objecting?
6       A.  They should offer more.
7       Q.  And what more should they offer?
8       A.  I can't say.  They should somehow be
9  responsible for having lied to the consumer and
10  offered a product that wasn't very good.
11      Q.  Is there anything specific you can think of
12  that Shop-Vac should do in settlement, beyond what
13  they have offered to do?
14      A.  No.
15      Q.  Do you have any ultimate goal that you hope
16  to accomplish for the class as a whole?
17      A.  I haven't thought of that, no.
18      Q.  Is there any specific benefit that you want
19  for the class as a whole?
20      A.  It would be nice if it was somehow made fair.
21  I don't know how to do that.
22      Q.  Now, I'm going to move from benefits to the
23  class, and I'm going to ask:  Is there a benefit that
24  you want for yourself?
25      A.  I think the biggest benefit that I would like

## Page 44

1  is, I would like marketing practices to be honest and
2  fair.
3       Q.  And how could Shop-Vac make their marketing
4  practices more honest and fair?
5       A.  I don't have a solution, other than to
6  produce an excellent product and have it accurately
7  marketed.
8       Q.  Is there some amount of money that you are
9  seeking to withdraw your Objection?
10      A.  No.
11      Q.  Besides what we've discussed, are there any
12  other main objections to the settlement that you
13  can -- that you could articulate, as you sit here
14  today?
15      A.  I'm not sure.
16      Q.  I'm going to hand you what has been marked as
17  a Exhibit 5.
18          And have you seen this document before?
19      A.  Yes.
20          MS. HARRISON:  Could you just review for me
21  what Exhibit 5 is?
22          MR. WALSH:  Yes.  Exhibit 5 is the Objection.
23  It's Document 196 in the MDL.
24  BY MR. WALSH:
25      Q.  Ms. Morales, if you would please turn to

Electronically signed by Suzanne Ricardo (501-090-451-8941)                    60349228-2bd4-443d-bce9-173720039684

SHIRLEY MORALES

**Page 45**

1    page 3.
2         That's your signature there on page 3;
3    correct?
4         A.  Yes.
5         Q.  This is the Objection you filed this case?
6         A.  That's right.
7         Q.  Did you write this Objection yourself?
8         A.  No.
9         Q.  Now, I have to be careful about asking this
10   the right way.  Were you -- who were you assisted by
11   in writing this objection?
12        A.  I'm not sure.  I just gave basic information
13   and I spoke with Mardi.
14        Q.  I'm stopping you there, because I don't want
15   to get into anything that might be attorney-client
16   privilege.
17        A.  Okay.  All right.
18        Q.  I just want to stop there for a minute.
19             So this document was made after you had
20   retained Ms. Harrison?
21        A.  I believe so, yes.
22        Q.  So if I was to go through the paragraphs that
23   were in here and talk to you about the legal
24   information that was in here, would you have anything
25   more to say about your objection than what we've

**Page 46**

1    already discussed?
2         A.  Could you say that again?
3         Q.  Sure.  And what my question is:  Earlier,
4    your counsel raised an objection about us talking
5    legalese, and there's a whole bunch of legal theories,
6    legal words, all in here.  And my question -- we
7    talked about what your objections were, just a moment
8    ago, generally.  And my question is:  If we were to go
9    through here, and, for example, discuss, here in the
10   second paragraph it says, "The Injunctive Relief is
11   unreasonable and inadequate when considered from the
12   perspective of the Class as a whole."  If we were to
13   go through and discuss all of this, my question is:
14   Would you have more information about your Objection
15   beyond what we previously discussed when we were
16   talking about it without looking at this document?
17   Let me do a better job of asking.
18        A.  Okay.
19        Q.  We talked about your Objection --
20        A.  Uh-huh.
21        Q.  -- a minute ago, and what you were objecting
22   for -- you know what, we'll just do it this way.  It
23   will probably be better.
24             If you would look at the second full
25   paragraph, it says, "The Injunctive Relief is

**Page 47**

1    unreasonable and inadequate when considered from the
2    perspective of the Class as a whole."
3         Did I read that correctly?
4         A.  Yes.
5         Q.  And what did you mean by that objection?
6         A.  Well, that the relief is unreasonable and
7    inadequate.  That's all that I meant.
8         Q.  And here it says -- do you see where the
9    sentence begins, "The notice provides" -- do you see
10   that section?
11        A.  No.
12        Q.  Well, it's actually within the same
13   paragraph.  It should be --
14        A.  Yes.
15        Q.  -- the third sentence starts --
16        A.  "The notice provides."
17        Q.  And then it says, quote, in actual use,
18   Shop-Vac motors do not operate at the peak horsepower
19   shown."
20        Did I read that correctly?
21        A.  Yes.
22        Q.  And do you believe that that injunctive
23   relief, as it's called in the first of the paragraph,
24   is unreasonable and inadequate?
25        A.  What does --

**Page 48**

1         MS. HARRISON:  You are using legal
2    terminology that Ms. Morales may or may not be
3    familiar with.  She already told you she had
4    assistance of counsel in drafting this.
5         THE WITNESS:  Injunctive relief.
6    BY MR. WALSH:
7         Q.  Let's do this, go to page 3.
8         A.  Yes.
9         Q.  And that's your signature on page 3; correct?
10        A.  Yes.
11        Q.  And if you look on this document - just look
12   through the document, the whole document, and if you
13   would, let me know where, if anywhere, that your
14   counsel is disclosed in this document.
15        A.  I don't see anywhere.
16        Q.  Take your time and look through.
17        A.  So I'm just looking for the name of my
18   counsel; is that right?
19        Q.  That's correct.
20        A.  I don't see a name.
21        Q.  Thank you.  So let's take a step back, then.
22   Let's close this document, but keep it in front of
23   you.
24        A.  Okay.
25        Q.  And first, we were talking about your

Electronically signed by Suzanne Ricardo (501-090-451-8941)                          60349228-2bd4-443d-bce9-173720039684

SHIRLEY MORALES

13 (Pages 49 to 52)

Page 49

1  Objection. Now I want to see if I have something else
2  I understand.
3       What do you believe to be the benefits
4  offered to the class members in the settlement by
5  Shop-Vac?
6       A.  Well, that the warranty would be extended,
7  and that they would change -- I believe on their
8  website, they would change their marketing language to
9  accurately reflect.
10      Q.  Do you know if they were supposed to place
11  that disclosure anywhere else?
12      A.  I don't recall.
13      Q.  And where would you like them to place that
14  disclaimer, if you have an opinion?
15      A.  Well, I think it's -- I don't know.
16      Q.  Would it be helpful if it was on the box?
17      A.  If it was accurately marketed from the
18  beginning.  You can't go back.
19      Q.  But, now, if we're looking forward, and now
20  they put this disclaimer on the box, would that be
21  good?
22      A.  You know, I can't answer that question.
23      Q.  I'm just asking your opinion --
24      A.  I don't know.
25      Q.  -- since this is your Objection.

Page 50

1       A.  I don't know.  I mean, I don't -- go ahead.
2  I don't know.
3       Q.  No problem.  Let me ask you a different
4  hypothetical.  Here, in your Objection, in Document 5,
5  the complaint is, In actual use, Shop-Vac motors do
6  not operate at the peak horsepower shown, is
7  unreasonable and inadequate.
8       Did I paraphrase that first little paragraph?
9       A.  Can you show me where that is?
10      MR. WALSH:  Mardi, I'm pointing to the first
11  of paragraph 1.
12  BY MR. WALSH:
13      Q.  Here's where it says, "The Injunctive Relief
14  is unreasonable and inadequate," and then it's talking
15  about the injunctive relief, here in quotes, the
16  portion in quotations.
17      A.  And your question is:  Do I see this?
18      Q.  Yes.  Do you see that?
19      A.  Yes.
20      Q.  If you have an opinion, is it fair to
21  characterize this objection as being -- the injunctive
22  relief is unreasonable and inadequate because this
23  statement that they have to provide is unreasonable
24  and inadequate?
25      A.  I'm sorry, I'm not following you.

Page 51

1       Q.  That's okay.  This document says
2  that -- okay.
3       You had assistance in writing this document;
4  correct?
5       A.  Uh-huh.
6       Q.  And it complains about the injunctive relief
7  being unreasonable and inadequate; correct?
8       A.  Uh-huh.
9       Q.  And you are saying "yes"?
10      A.  Well, I'm --
11      Q.  No, no.  I'm saying, when you say "uh-huh,"
12  you are saying --
13      A.  I'm saying, "yes," I'm reading it.
14      Q.  Perfect.  And then there's a -- it says, "The
15  notice provides, 'In actual use, Shop-Vac motors do
16  not operate at the peak horsepower shown.'"
17      I read that correctly; right?
18      A.  I'm sorry, I'm not -- did you skip something?
19  I'm not seeing --
20      Q.  You know what, I will read the whole
21  paragraph, if it helps.
22      A.  I mean, we could highlight the parts, if you
23  are going to skip them.
24      Q.  I'm not trying to skip them.  I'm trying to
25  understand your Objection, because your name is the

Page 52

1  only name on the Objection, and it was shown as your
2  Objection, so I'm here asking you questions, and I'm
3  doing my best to understand what you understand.  So
4  sorry for the confusion.
5       Let's just do this:  What do you understand
6  "injunctive relief" to be?
7       A.  Well, I can only assume that what it means is
8  that -- I'm not sure what you mean by
9  "injunctive" -- or what's meant by "injunctive," but
10  I'm assuming that this means that what is being
11  offered as a settlement is not fair.  That's
12  what -- and it's unreasonable and inadequate.  That's
13  what I assume it means.  What's being offered to the
14  class as a whole is not fair.
15      Q.  And what is your understanding as to what is
16  being offered to the class as a whole?
17      A.  I'm sorry.  Let's see, you know, I know some
18  of it.  I memorized some of it.  My
19  understanding -- isn't it written down in here?  My
20  understanding is, basically -- and my short-term
21  memory is not good, but something about it just didn't
22  seem right when I heard about it.  And that you are
23  being offered kind of like a retroactive fix-it that
24  doesn't really give you a better product or a better
25  experience.  And what else?  It's ineffective.  It's

Electronically signed by Suzanne Ricardo (501-090-451-8941)            60349228-2bd4-443d-bce9-173720039684

SHIRLEY MORALES

| Page 53 |
| --- |

1    inadequate.
2        Q.   What's ineffective and inadequate?
3        A.   What they are offering.
4        Q.   In here, you would agree with me the quotes
5    say, in paragraph 1 of Exhibit 5 on page 1, "In actual
6    use, Shop-Vac motors do not operate at the peak
7    horsepower shown."  It says that; right?
8        A.   "In actual use, Shop-Vac motors do not
9    operate at the peak horsepower shown."
10       Q.   It says that; correct?
11       A.   Yes, it says that.
12       Q.   And so wherever that appears, you
13   don't -- I'm asking -- you don't feel that's a good
14   enough disclosure being made by Shop-Vac to let people
15   know how these vacuums operate?
16       A.   No.
17       Q.   Let's do a hypothetical.  What if it instead
18   said, "Peak horsepower, PHP, is a term used in the
19   wet/dry vacuum industry for consumer comparison
20   purposes.  It does not denote the operational
21   horsepower of a wet/dry vacuum, but rather the
22   horsepower output of a motor, including the motors
23   inertial contribution achieved in laboratory testing.
24   In actual use, Shop-Vac motors do not operate at the
25   peak horsepower shown."

| Page 54 |
| --- |

1        Would that be a better disclosure?
2        A.   You know, I don't think I'm in a position to
3    say "yes" or "no" to that.
4        Q.   But if something like that appeared on the
5    box, would it help you when you are purchasing a
6    Shop-Vac to determine the strength, as you put it
7    earlier?
8        MS. HARRISON:  Are you asking her to comment
9    on a hypothetical?
10       MR. WALSH:  I am.
11       MS. HARRISON:  This is supposed to be about
12   the facts she knows concerning this case.
13       MR. WALSH:  I've been trying to ask about
14   those, but since she didn't write the Objection, it's
15   been awfully hard.  So I'm stuck with the
16   hypothetical.
17       MS. HARRISON:  She didn't say she didn't
18   write the Objection.
19   BY MR. WALSH:
20       Q.   Ms. Morales, did you write this Objection?
21       A.   I had help writing it.
22       Q.   And what's your definition of "injunctive
23   relief"?
24       A.   I assume that what it means is that it's what
25   is being offered by the company as, you know, a fix-it

| Page 55 |
| --- |

1    for what they did wrong.
2        Q.   What does the term "settlement release" mean
3    to you, if anything?
4        A.   "Settlement release," where is that?
5        Q.   Page 2, first full paragraph.
6        A.   Releasing the settlement, ending it, letting
7    it go.
8        Q.   What does the term "CAFA" mean?  Last full
9    paragraph on page 2.
10       A.   Well, I would only be assuming if I told you
11   what I thought it meant.  That's what I'm doing.  I'm
12   just making assumptions.
13       Q.   So you are just -- so that's what I'm asking
14   you to do, again, now -- is to make an assumption.
15   And the assumption is this "peak horsepower" term goes
16   on a box from now on -- a Shop-Vac box.  And if you
17   saw that peak horsepower term defined as we just
18   discussed -- and I can re-list it, if you need me to
19   -- would that help you in making a decision as to what
20   Shop-Vac product or other product you would purchase
21   when seeking a wet/dry vacuum?
22       A.   This experience causes me to have more
23   questions, and so I would like to -- you know, it
24   would make me think that I need to know more before I
25   make purchases.  Whether it would help me or not, I

| Page 56 |
| --- |

1    probably would need even more information.
2        Q.   And what information would you need to know,
3    moving forward, in making purchases like this?  You
4    mentioned you thought you could use more.
5        A.   I think I would just need to do some research
6    and try to understand the product better.  You know, I
7    made this based on what was written on the box, and my
8    old -- my experience with the one that had quit
9    working.  It doesn't measure up to the old one and
10   what it does.
11       Q.   So has this vacuum quit working now?
12       A.   No, it hasn't quit working.
13       Q.   It was the old one that quit working?
14       A.   The old one, it's just the switch.  It still
15   works, it's just that sometimes it doesn't.  It's not
16   something I can rely on, because the switch is broken.
17   My partner said he would fix that, someday.
18       Q.   We're all good at over promising these
19   mechanical things.  I understand.  All right.  Let's
20   move on to the second paragraph here on page 1 of
21   Exhibit 5.
22       A.   Okay.
23       Q.   And that is where it says, "The Warranty
24   Relief also is unreasonable and inadequate."
25       Did I read that correctly?

Electronically signed by Suzanne Ricardo (501-090-451-8941)                    60349228-2bd4-443d-bce9-173720039684

SHIRLEY MORALES

15  (Pages 57 to 60)

Page 57

1      A.  Yes.  Oh, "warranty" -- you are talking about
2   third paragraph.
3      Q.  Yes.  You are right.  Thank you for that.
4   I'm sorry.
5      A.  Okay.  "The Warranty Relief" -- go ahead.
6      Q.  "Also is unreasonable and inadequate."
7      A.  Yes.
8      Q.  And what was your basis for that objection?
9      A.  Well, they are going to extend the warranty
10   by two years on the motor.  I mean, there's more to it
11   than that, and I don't understand, completely.  What I
12   do understand is that it's -- why extend a warranty on
13   a product that really is not an efficient product?  I
14   mean, that doesn't seem like it's a good response.
15      Q.  Any other reasons you can think of that that
16   relief is inadequate?
17      A.  Probably.
18      Q.  Now is your chance to tell me, what are
19   those?
20      A.  I think anything stated in here.  I've signed
21   my name to it.
22      Q.  So you would just rely on anything stated --
23      A.  I would rely on anything stated, and also my
24   experience with it.  I could walk over and show you.
25   You wouldn't like it, either, if you had that product.

Page 58

1      Q.  I've got one, but you know what, instead of
2   walking over there and you showing me, I'm going to go
3   get it and bring it over here.
4      A.  Well, there are more things that even what is
5   on here, but it probably is irrelevant, because it's
6   not on here.
7      Q.  Now is your day to tell me about those
8   things.  I would like to know what the other things
9   are that bother you about the product.
10      A.  I can't remember everything, because like I
11   said, I stopped using it, and then I let the guys who
12   are working at my house use it fairly recently.  One
13   thing is if you go to pick it up, the latch -- and
14   this is from the very beginning -- it just it doesn't
15   work.
16      Q.  Right.  When you go to pick it up, the top
17   will separate from the bottom.
18      A.  Uh-huh.
19      Q.  Is that a "yes"?
20      A.  Yes.
21      Q.  Sorry, it's so easy for us to say.
22          Besides the latches being ineffective on it,
23   any other complaints?
24      A.  It's not nearly as powerful as the other one
25   I have.  This one (indicating).

Page 59

1      Q.  And you just pointed at the older Shop-Vac?
2      A.  That's right.
3      Q.  And the older Shop-Vac claimed to be a 1.5
4   horsepower unit; is that correct?
5      A.  That's right.
6      Q.  And your feeling is that the newer Shop-Vac
7   that claimed to be a 2 horsepower was less powerful
8   than the 1.5?
9      A.  Yes.
10      Q.  What about the new Stanley product that
11   claims to be 2 horsepower, how did it compare to your
12   older Shop-Vac?
13      A.  Well, I don't have any complaints about the
14   new one.
15      Q.  Does the old Shop-Vac still work?
16      A.  Like I said, the switch is broken on it.  So
17   sometimes it will come on and sometimes it won't.
18      Q.  And you've said a few times today that you
19   don't feel this new Shop-Vac, the middle unit, the one
20   that you assert that gives you standing to object to
21   the lawsuit, you assert it is not an efficient
22   product.
23          What do you mean by "not an efficient
24   product"?
25      A.  It's not -- it just not as strong.  The top

Page 60

1   never stayed on.  If I go to pick it up, it flies off,
2   and whatever is inside, you know --
3      Q.  And one of your main uses was to vacuum out
4   your hot tub.
5      A.  That's correct.  And it's tippy.  It tips
6   over very easily.  It comes apart really easily -- the
7   hose does.  It's not as strong as the other one, and,
8   also, it doesn't fill up all the way.  So you have to
9   keep emptying it out.
10      Q.  Right.  Now I know you are going to rely on
11   the items that were listed in this objection -- and
12   I'm referring to Exhibit 5 -- I'm not going to keep
13   asking you a whole lot of questions about it, but I do
14   want to ask you, on page 2, second full paragraph,
15   third paragraph in here, it says, "The requested
16   attorney fees are not fair to the Class."
17          Did I read that section correctly?
18      A.  Yes.
19      Q.  And then it says in here --
20          MS. HARRISON:  Excuse me, you must have moved
21   away from the phone, because your voice is getting
22   much softer.
23          MR. WALSH:  Actually, I lowered my head to
24   read this a little closer.  I will pick this up and
25   make sure I do a better job here.

Electronically signed by Suzanne Ricardo (501-090-451-8941)                    60349228-2bd4-443d-bce9-173720039684

SHIRLEY MORALES

| Page 61 |
| --- |

1        MS. HARRISON: Thank you. I appreciate it.
2        MR. WALSH: No problem.
3    BY MR. WALSH:
4        Q. Do you see -- not the next sentence, but the
5    following one, "The Parties have not provided any
6    indication as to the value of the Injunctive Relief or
7    the number and value of warranties that will be called
8    by Class Members."
9        Did I read that correctly?
10       A. Could you read it again, please.
11       Q. Sure. "The parties have not provided any
12   indication as to the value of the Injunctive Relief or
13   the number and value of warranties that will be called
14   by Class Members."
15       A. Yes.
16       Q. "Yes," I read it correctly?
17       A. Yes, you read it correctly.
18       Q. And do you have an opinion as to the value of
19   the warranties offered in this settlement?
20       A. No, I don't have an opinion.
21       Q. Do you know anything about the monetary value
22   of the warranties that are offered in this case?
23       A. I may have read it, but if I did, I don't
24   recall the numbers.
25       Q. Let me ask this: It is your contention that

| Page 62 |
| --- |

1    the requested attorney fees are not fair to the class
2    correct?
3        A. Yes.
4        Q. Do you know how much the attorney fees are in
5    this case?
6        A. I think I read them, but I just don't recall.
7        Q. Would your opinion change if you knew the
8    value of the warranty was more than $170 million?
9        A. No.
10       Q. Did you know that the defendant, Lowe's,
11   sells -- did you know that Lowe's was also a defendant
12   in this lawsuit?
13       A. Yes.
14       Q. And did you know that they sell these types
15   of warranties?
16       A. That they sell warranties?
17       Q. Correct.
18       A. I hadn't thought of that.
19       Q. Just to be clear, I'm not talking about the
20   warranty that was offered here. I'm just saying that
21   Lowe's sells similar warranty products as what was
22   offered.
23       Were you aware of that?
24       A. "Similar warranty products," you mean
25   extending the warranty of the Shop-Vac?

| Page 63 |
| --- |

1        Q. Correct. So if go to Lowe's -- I'll give you
2    a hypothetical. If you go to Lowe's and you purchase
3    a Shop-Vac, they'll say, "Ms. Morales, would you also
4    like to purchase an extended warranty? After the
5    original warranty expires, we'll extend it by two
6    years."
7        A. Okay.
8        Q. Were you aware that they offered those?
9        A. Not on Shop-Vac.
10       Q. "No," you weren't aware they offered those on
11   Shop-Vacs?
12       A. That's correct.
13       Q. Sorry. Sometimes I ask a question and the
14   answer gets convoluted because of it. Thank you.
15       Do you know what Lowe's charges for those
16   types of extended warranties on Shop-Vac products?
17       A. No.
18       Q. Do you know what Lowe's charges for those
19   types of warranties on other products?
20       A. I've been offered warranties at Lowe's on
21   other -- extended warranties. I don't recall right
22   now. We're talking about a lot of different products.
23       Q. I understand. Thank you. Now let's move to
24   the last full paragraph on this page. That paragraph
25   says, "The Warranty Relief is nothing more than a

| Page 64 |
| --- |

1    coupon and CAFA should apply to Plaintiff's fee
2    request."
3        Did I read that correctly?
4        A. Yes, you did.
5        Q. Do you have an opinion as to what that
6    sentence means?
7        A. Well, I assume that CAFA means it's -- it's
8    some kind of standard enforced by some kind of an
9    association. That's my assumption of that. A coupon,
10   I mean, that it's not very valuable, that the Warranty
11   Relief, I mean, it seems really ineffective to me.
12       Q. Why does it seem ineffective to you?
13       A. I'm not a legal person. I don't understand
14   these things, very well. But a warranty to make sure
15   that the product lasts longer? Two years, isn't it?
16   Extending the warranty by two years.
17       Q. Correct.
18       A. It doesn't -- I think -- how do you want me
19   to --
20       Q. Your answer is fine. Your answer is your
21   answer. I'm not going to tell you how to answer, but
22   I am going to ask, what does the word "coupon," in
23   this context, mean to you, if anything?
24       A. That it's not adequate.
25       Q. Let me ask this: That warranty, accepting

Electronically signed by Suzanne Ricardo (501-090-451-8941)                    60349228-2bd4-443d-bce9-173720039684

SHIRLEY MORALES

Page 65

1    that extra two-year warranty, does that require to you
2    purchase anything else from Shop-Vac?
3        A.  No.
4        MR. WALSH:  Now, you haven't requested one,
5    but I'm going request a break now.
6        (Recess.)
7        MR. WALSH:  Mardi, I just sent you an e-mail,
8    since she was discussing she thought there was a Chase
9    objection before.  I've got a copy of the Chase
10   objection that was filed, and I've got a few questions
11   about that.
12       (Plaintiff's Exhibit 6 was marked for
13        identification.)
14   BY MR. WALSH:
15       Q.  You've just been handed a copy of Exhibit 6.
16   You probably haven't seen this first page before, but
17   let me ask you about it.  Go back --
18       A.  Oh, you wanted me to look at the first page?
19       Q.  Yes.  Up there, do you see where it says,
20   "T. Michael Kennedy, LLC"?
21       A.  Yes.
22       Q.  Do you see that?
23       A.  Yes, I do.
24       Q.  Do you know who T. Michael Kennedy was?
25       A.  I think he was the attorney, wasn't he, on

Page 66

1    the Chase case.
2        Q.  I'm asking you what you recall.
3        A.  I'm pretty sure.
4        Q.  We'll get more help on the next page, I
5    think.  Let's go to page 2 -- or page 1.  It's
6    actually numbered "1."
7        A.  Okay.
8        Q.  And if you would, look with me at the one,
9    two, third full paragraph that starts, "My name is
10   Shirley Morales."
11       A.  Where is this?  Okay.  Here.
12       Q.  Go ahead and read that, where it says, "My
13   name is Shirley Morales."
14       A.  "My name is Shirley" --
15       Q.  You don't need to read it out loud.  Go ahead
16   and read it to yourself, until you get to the part
17   that says "T. Michael Kennedy," and let me know when
18   you are done.
19       A.  Okay.  Yes, I'm done.
20       Q.  Okay.  Thank you.  Now, Ms. Morales, while
21   I'm asking you these next questions, I know you are
22   not an attorney, I understand, and we've gone over
23   several different legal terms, and you generally have
24   an idea about them, but don't necessarily know what
25   these legal words mean.

Page 67

1        Fair?
2        A.  Yes.
3        Q.  I understand that.  I'm not trying to beat
4    you up here.  I'm trying to get to know what is going
5    on.  So I have more questions.  All right.
6        So when I asked earlier about other
7    objections and you said there might be a Chase Bank
8    one that you left out before, is this it?
9        A.  Yes.
10       Q.  And do you recall, now that you've had a
11   chance to look at this, when you objected to the Chase
12   Bank case?
13       A.  No.  I recall it was around -- my father was
14   having surgery, so that's what I can relay.  Maybe
15   early spring, late winter.  I'm not sure.
16       Q.  Go to the first page one more time, and if
17   you look at the date stamp on here, does that help you
18   recall when this might have been?
19       A.  Yes.
20       Q.  And that date stamp says "March 28th, 2016,"
21   does that seem about the right time?
22       A.  It does.
23       Q.  So sometime in the spring of this year, there
24   was another objection in the Chase case; correct?
25       A.  That's right.

Page 68

1        Q.  What happened with that objection, if you
2    recall?
3        A.  I just recall that it -- something about it
4    didn't work out.  Maybe I wasn't a part -- I think I
5    didn't qualify.  You know, I have several Chase
6    accounts, so I thought I did, but I didn't.
7        Q.  So whenever I said "lack of standing," that
8    term doesn't really mean anything to you?
9        A.  No.
10       Q.  So if this was dismissed for lack of
11   standing, you wouldn't understand that, because you
12   are not an attorney.
13       Fair?
14       A.  That's right.
15       Q.  And do you remember what the Chase Bank
16   settlement was about?
17       A.  You know, I don't remember, exactly, what it
18   was about.
19       Q.  And do you remember why you objected to it?
20       A.  You know, when I read these things, sometimes
21   I just think the companies are taking advantage of the
22   clients, and so I'll object.
23       Q.  And T. Michael Kennedy --
24       A.  Not "clients" --
25       Q.  You meant "companies."

Electronically signed by Suzanne Ricardo (501-090-451-8941)                    60349228-2bd4-443d-bce9-173720039684

SHIRLEY MORALES

18 (Pages 69 to 72)

Page 69

1    A.  Companies taking advantage of the consumer.
2    Q.  Let me take a broad step back.  Why do you
3  think these class actions are filed against the
4  companies to begin with?
5    A.  Because someone noticed that they had done
6  something not really very honest, and so they -- it
7  happened to a lot of people.
8    Q.  And is that also why you object to class
9  cases, or are you trying to do something different?
10    A.  I can't answer that a "yes" or "no."  I don't
11  think it's real clear to me.
12    Q.  The reason I asked is, you just said that
13  sometimes you get the objections and you realize the
14  companies have done something bad and then you object
15  --
16    A.  Did I say "bad"?
17    Q.  I was paraphrasing.  I'm sorry, I paraphrase.
18    A.  I think I was saying that sometimes companies
19  are dishonest and they manipulate people unfairly.
20    Q.  And that's why you object to class actions?
21    A.  You know what, it's not -- okay.  I'm not
22  being real clear here.  I think you are saying why I
23  object to the class action is because sometimes I
24  think that what is given -- often, what the result of
25  that is unfair to the class.

Page 70

1    Q.  And so you felt that whatever was being given
2  to the class was unfair in this Chase case?
3    A.  You know, I don't recall, exactly, the
4  details of it.  I even -- I barely remember.  It's
5  been a rough year.
6    Q.  I understand and I apologize if you've had a
7  rough year.  And I apologize for the deposition, but
8  you did file an objection, so I do get to ask some
9  questions.
10    A.  I understand.  Life goes on.
11    Q.  I'm not trying to over complicate your life,
12  just trying to get questions answered.
13    So T. Michael Kennedy, how did you come to
14  hire Mr. Kennedy?
15    A.  I think I heard about him from a friend, or
16  else I found him on the Internet.  I really don't
17  remember.
18    Q.  If you heard about him from a friend, where
19  would that friend be from, if you know?
20    A.  You know, I have a lot of friends.  I don't
21  remember.
22    Q.  If there was someone from Hawaii that put you
23  in touch with Mr. Kennedy, do you know who that would
24  be?
25    A.  No.

Page 71

1    Q.  Have you ever talked about an objection with
2  anyone from Hawaii, that you recall?
3    A.  No.
4    Q.  When did you -- if you know, when did you
5  hire Mr. Kennedy to object in the Chase Bank matter?
6    A.  I don't recall.
7    Q.  But you hired him before the objection was
8  tendered in that case; is that fair to say?
9    A.  Yes.
10    Q.  And his name appears on this objection that
11  was filed on your behalf; is that correct?
12    A.  Yes.
13    Q.  And if you go to page 5 of the Objection, let
14  me know when you are there.  And on page 5, you see
15  right above where it says, "dated March 23rd," there's
16  a signature, do you see that?
17    A.  Uh-huh.
18    Q.  Is that your signature?
19    A.  You know what, I assume it is.
20    Q.  It doesn't look anything like your other
21  signatures is why I ask.
22    A.  Well, I make some pretty bad signatures
23  sometimes.
24    Q.  Let me ask you this, because I'm not trying
25  to beat you up, do you see in front of it, it has a

Page 72

1  "/S/."
2    Do you see that?
3    A.  Yes.
4    Q.  And if you turn to page 6, you'll see that
5  those have "/S/," too, which is something attorneys do
6  when they are signing on behalf of somebody else,
7  which is perfectly acceptable.  I was just trying to
8  figure out why the signatures look different.
9    So now, knowing that "/S/" sometimes just
10  means "with permission," do you still think you signed
11  it, or maybe you gave permission to somebody to sign?
12    A.  Maybe I gave permission.  I really don't
13  remember.
14    Q.  That's fine, but on this one, this was filed
15  by your attorney in that case; correct?
16    A.  Okay.
17    Q.  Is that correct?
18    A.  I don't remember.
19    Q.  That's okay.  Let's set that one aside, over
20  on the pile of exhibits.  That's something I do so I
21  never run away with them.  They get really angry if
22  you run away with exhibits.
23    MR. WALSH:  I am going to have this marked as
24  Exhibit 7.  And Mardi, I'm marking the Joint Motion
25  for Withdrawal.

Electronically signed by Suzanne Ricardo (501-090-451-8941)                    60349228-2bd4-443d-bce9-173720039684

SHIRLEY MORALES

## Page 73

1      (Plaintiff's Exhibit 7 was marked for
2      identification.)
3   BY MR. WALSH:
4      Q.  And what has just been handed to you was
5   something I would represent to you was filed by both
6   your attorney, T. Michael Kennedy, and by plaintiff's
7   counsel, Ben Bingham, in the Chase case.  And take a
8   moment, look at it.  Let me know when you are done
9   looking at it.
10     A.  Okay.  Okay.  I'm done looking at it.
11     Q.  I just wanted you to look at it so we can
12  know we're looking at the same top.  Look at the top,
13  I'm going to read it.  Let me know if I've read it
14  correctly.  "Joint Motion for Approval of Withdrawal
15  of Objection of Patrick John Hollins and Shirley
16  Morales."
17     Did I read that correctly?
18     A.  Yes.
19     Q.  And you are the "Shirley Morales" we're
20  talking about; correct?
21     A.  That's right.
22     Q.  And if you would, go down to paragraph 1, and
23  just let me know if I've read this correctly.  "The
24  parties have satisfied themselves that Mr. Hollins and
25  Ms. Morales are not members of this class.  Non-class

## Page 74

1   members do not have standing to object to class action
2   settlement."
3      Did I read that correctly?
4      A.  Yes.
5      Q.  If you turn to the next page, would you agree
6   with me that this is signed by -- electronically, with
7   "/S/," from Ben Bingham, for Bingham & Lea, and your
8   attorney, T. Michael Kennedy.
9      A.  Yes.
10     Q.  I think that's all the question I have about
11  that.  I have a few other questions that are hanging
12  out there that I wanted to ask, and then I'm going to
13  let Michael ask you some questions, and I might have a
14  few followup questions after he's done.  You can set
15  that one aside.
16     Now, when we're talking about the Shop-Vac
17  class action settlement, what improvements to the
18  settlement would you want made, if any?
19     MS. HARRISON:  I believe you've already asked
20  her that.
21     MR. WALSH:  You know what, I think you are
22  right.  I think I did ask her that, and I think she
23  answered it.  So don't answer that one.
24  BY MR. WALSH:
25     Q.  In regards to those items you mentioned

## Page 75

1   earlier about how you would want a settlement improved
2   in this matter, how would you like to see that
3   implemented?
4      A.  You know, I haven't imagined into that, so I
5   don't know.
6      MR. WALSH:  I'm going to let Michael ask you
7   some questions, and then I may have a few others.
8   Thank you.
9      EXAMINATION
10  BY MR. SHORTNACY:
11     Q.  Hi, Ms. Morales.  My name is
12  Michael Shortnacy.  I'm an attorney.  I represent
13  Shop-Vac Corporation and Lowe's Home Centers, LLC.  I
14  have a few followup questions to what Mr. Walsh was
15  asking you about just now.  I wanted to just go to
16  Exhibit 4.
17     A.  Here it is.
18     MS. HARRISON:  Refresh me on what Exhibit 4
19  is.
20     MR. SHORTNACY:  Exhibit 4 is the photograph
21  with the three wet/dry vacuums.
22  BY MR. SHORTNACY:
23     Q.  I want to try to get the timing a little more
24  filled, in terms of when you purchased these units.
25  One thing I will represent to you, Ms. Morales, during

## Page 76

1   the break, I took a look at the unit you brought with
2   you today, and under the lid of the unit there's a
3   little date stamp that's pressed into the unit when it
4   rolls off the assembly line and that provides a date
5   that it was made.  I will represent to you that this
6   unit was made on or about April 21st, 2010.
7      A.  Okay.
8      Q.  So I want to try to fill in some of the
9   dates, then.  Just accepting that representation --
10     A.  Sure.
11     Q.  -- you would have then purchased it sometime
12  after it was made.
13     A.  That could be.
14     Q.  And it's consistent with what you said in the
15  2010 --
16     A.  Sure.
17     Q.  Let me finish.
18     A.  Sorry.
19     Q.  Consistent with what you said before, in
20  terms of timeframe you recalled purchasing it;
21  correct?
22     A.  Uh-huh.
23     Q.  So can you help me, tell me what you
24  remember -- if that helps you, the 2010 date -- in
25  terms of the purchase of the Stanley unit, do you

Electronically signed by Suzanne Ricardo (501-090-451-8941)                    60349228-2bd4-443d-bce9-173720039684

SHIRLEY MORALES

| Page 77 |
| --- |

1    recall when you purchased that unit?
2        A.   Well, it wasn't -- within a year or some
3    months of after I purchased that one.
4        Q.   So after the middle Shop-Vac unit --
5        A.   Right.  I purchased --
6        Q.   -- after some period of time --
7        A.   Right.
8        Q.   -- you then purchased the Stanley?
9        A.   Right.
10       Q.   Can you help me with how long a time period
11   we're talking about?
12       A.   I believe that it was less than a year, but I
13   cannot tell you exactly.
14       Q.   So let's say -- you and I can agree, then,
15   that you purchased the middle Shop-Vac unit sometime
16   after April of 2010; correct?
17       A.   That -- I will agree to that, yes.
18       Q.   And so sometime between then -- a year or so
19   later is when you bought the Stanley; is that correct?
20       A.   Sometime in there, yes.
21       Q.   Going the other direction, was the first
22   Shop-Vac unit, the oldest one, depicted on the left --
23       A.   Yes.
24       Q.   -- of this photograph?
25       A.   Yes.

| Page 78 |
| --- |

1        Q.   Was it operational still at the time you
2    purchased the middle unit?
3        A.   I couldn't count on it.  Sometimes I could
4    get it to operate and sometimes I couldn't.  That's
5    why I bought another one.
6        Q.   And is it correct that the primary use of
7    each of these three units it to empty the water out of
8    your hot tub?
9        A.   Well, the first one, I don't know that it was
10   the primary use.  I've always tended to have a
11   Shop-Vac around, just because there's a lot of
12   different uses.
13       Q.   I think, before, you said, as long as you've
14   been a homeowner.
15           Prior to the Shop-Vac in this picture on the
16   far left, have you owned other Shop-Vacs?
17       A.   I know that I had at least one more, and that
18   was before I was a homeowner, actually, when I was a
19   renter.
20       Q.   Any other Shop-Vacs?
21       A.   We had one other one that was purchased right
22   after this one, and it was tall.  It was a larger
23   capacity, and we bought it because -- and it had
24   little spigot on it that you could empty the water out
25   of.  So we thought it would be good, but it just quit

| Page 79 |
| --- |

1    working almost immediately, so I think we threw it
2    away.
3        Q.   Do you recall where you purchased that from?
4        A.   No.  Actually, I didn't purchase that one.
5    My partner did.  I purchased this one and I purchased
6    that one at Bi-Mart (indicating).
7        Q.   And "this one," meaning the one on the far
8    left of the photograph?
9        A.   That's right.
10       Q.   You bought it at Bi-Mart?
11       A.   Bi-Mart.
12       Q.   Do you recall how much you paid?
13       A.   I think I probably paid about 39, 40 -- in
14   there, but I'm not sure.  I know it was a little less
15   than this one.
16       Q.   And do you recall when you made that
17   purchase?
18       A.   No, not exactly, but I do remember that, kind
19   of a little bit of details around when he bought the
20   other one, not too long after this and where I was
21   living at the time.  So I would say that -- well,
22   actually, there were some changes made in my house.
23   What I meant was where the hot tub was at time, things
24   like that.
25       Q.   Also, I mean, 2010 may help.  So for how long

| Page 80 |
| --- |

1    were using this unit on the far left, before 2010,
2    when you bought the middle unit?
3        A.   I know I had it in 2001.  I don't know any
4    more than that.
5        Q.   So we're talking about a nine-year spread,
6    more or less, 2001 to 2010.
7        A.   Uh-huh -- yeah.
8        Q.   Do you know what the capacity is of the
9    Stanley unit?
10       A.   I think it's only a four-gallon, actually.
11       Q.   And do you know what the power rating is?
12       A.   Well, it says "2.8," right there.
13       Q.   So you are looking at that from the
14   photograph?
15       A.   I'm looking at that photograph, and I -- you
16   know, otherwise, I wouldn't know.
17       Q.   And do you have any opinion or understanding
18   of the differential in power between the middle unit
19   and the Stanley unit?
20       A.   No.  I just know that this one is lot more
21   efficient.
22       Q.   And by "efficient," what do you mean?
23       A.   You know, I'm very intuitive, so I guess when
24   I'm using it, it's stronger and it doesn't tip, and,
25   you know, I'm just happy with it.  That's all.

Electronically signed by Suzanne Ricardo (501-090-451-8941)                    60349228-2bd4-443d-bce9-173720039684

SHIRLEY MORALES

21 (Pages 81 to 84)

Page 81

1    Q.   And when you are saying "it's stronger," the
2  "it" is the Stanley unit you are referring to?
3    A.   Uh-huh.  It's more powerful.  It seems to me
4  that it is, anyway.
5    Q.   What indicators to you suggest that it -- the
6  Stanley unit is more powerful than the middle shop
7  vacuum?
8    A.   I think the sound that it makes and the way
9  it quickly pulls the water up.
10    Q.   And so you are using the Stanley unit, as
11  well, to empty the hot tub water?
12    A.   That's what I use it for.  I've never used
13  the Stanley unit for anything else.
14    Q.   How about the middle Shop-Vac unit?
15    A.   I used it to empty the hot tub, and then I
16  let other people use it for other things.
17    Q.   So the power representation on the Shop-Vac,
18  you see that as a 2.0; is that correct?
19    A.   Uh-huh.
20    Q.   And this Stanley unit is listed at a 2.8; is
21  that correct?
22    A.   That's right.
23    Q.   Does the Stanley unit have a spigot, like you
24  referred to before, where you can drain water out?
25    A.   No.

Page 82

1    Q.   So you have to empty the Stanley?
2    A.   I have to empty it.
3    Q.   And that's true also for the middle Shop-Vac
4  unit?
5    A.   That's right.
6    Q.   How much water do you take out of your hot
7  tub when you are emptying it?
8    A.   I would be guessing.  It's the lower portion.
9  About this much (indicating).
10    Q.   So you've made a hand reference.  So for your
11  counsel, because she's not here, about a foot of
12  water.
13      Is that fair?
14    A.   I'd say, 15 inches from the bottom.
15    Q.   How many times do you have to empty the
16  Stanley unit when you are taking out that 15 inches of
17  water?
18    A.   I need to guess at that.
19    Q.   Okay.
20    A.   I don't count.
21    Q.   Take a guess.
22    A.   More than five, less than ten.  I'd say about
23  six or seven.
24    Q.   And how about for the middle Shop-Vac unit
25  when you were using it to empty your hot tub?

Page 83

1    A.   It's been too long for me to remember.
2  Obviously, this is small.  I know it, but it was a
3  good price, and it looked like a good item.  So I just
4  purchased it.  It's taller.  I don't have to bend over
5  as far.  So that doesn't bother me that it doesn't
6  pick up as much water.  Of course, I like this one
7  better (indicating).
8    Q.   Just to clarify, so the record will be clear,
9  you are saying the Stanley unit is taller, and that's
10  the one were you referring to that it doesn't bother
11  you --
12    A.   It doesn't bother me as much to have to bend
13  down and pick it up.  But I guess that's irrelevant.
14  I probably shouldn't have even included that, even
15  though I know it's only a four-gallon capacity.  It
16  does fill to the top.
17    Q.   The top of what?
18    A.   The top of the tank.
19    Q.   In your experience, using the Stanley unit,
20  it does not have a cutoff feature?
21    A.   It probably has one.  Not like this one.  It
22  only fills to about here (indicating).
23    Q.   So you are referring to the middle Shop-Vac
24  unit?
25    A.   Uh-huh.

Page 84

1    Q.   So you think you are able to fill up the
2  Stanley unit higher, to its four-gallon stated
3  capacity?
4    A.   Uh-huh, yeah, I assume.
5    Q.   About how often do you use the Stanley unit
6  to empty your hot tub?
7    A.   Probably only a couple times a year.
8    Q.   I want to ask some questions, just to follow
9  up on how you found out about the settlement.  You
10  mentioned before that you may have seen it referenced
11  online or you may have heard about it from others that
12  work for you.
13      Who were the other people doing work for you
14  that were you were talking about?
15    A.   I have a bunch of guys that have been helping
16  do some repair work on my home.
17    Q.   And so you think you may have heard about the
18  settlement from them?
19    A.   It could be.
20    Q.   Do you recall when?
21    A.   Well, let's see, we started last summer, and
22  we're still going at it.  So we had to break for a
23  while.  No, I can't tell you, for sure.
24    Q.   Let me give you a couple of dates, and it
25  might help your recollection.

Electronically signed by Suzanne Ricardo (501-090-451-8941)          60349228-2bd4-443d-bce9-173720039684

SHIRLEY MORALES

**Page 85**

1    A.  Okay.
2    Q.  The court in this action granted preliminary
3  approval to the settlement on May 26th, 2016, so this
4  summer.  That order directed notice to be given to the
5  identified class members and contained a lot of other
6  information.  Importantly, it directed notice, and
7  notice was then made on or around June 16th or so.
8    A.  Okay.
9    Q.  This summer.  So I imagine you would agree
10  with me that you heard about this settlement only
11  after notice was made available to the public; is that
12  right?
13    A.  I assume so.  I'm assuming.  I honestly don't
14  recall.
15    Q.  So my question is:  Assuming that notice was
16  made on June 16th and that notice was published on
17  various websites, post cards were mailed -- but you
18  said you didn't receive a post card or e-mail;
19  correct?
20    A.  I don't recall receiving either.
21    Q.  So when you became aware of the settlement,
22  tell me what you did.  What's the first thing did you?
23    A.  I think I just did a little research about
24  it.  I think I just looked for it online, a little bit
25  of information.

**Page 86**

1    Q.  What did you find out?
2    A.  Honestly, I don't really remember.
3    Q.  Did you reach out to Counsel at any point?
4    A.  Yes.
5    Q.  And who did you reach out to?
6    A.  Mardi.
7    Q.  And did Ms. Harrison contact you first
8  regarding this matter?
9    A.  No.  I think -- I don't remember how it went.
10    Q.  Had you worked with Ms. Harrison before?
11    A.  No.
12    Q.  Do you know Ms. Harrison personally?
13    A.  No.
14    Q.  Had you spoken with her or communicated with
15  her prior to working in connection with this
16  settlement?
17    A.  No, I don't believe so.
18    Q.  You said before that you often receive
19  notices about settlements; is that correct?
20    A.  Uh-huh.
21    Q.  How do you receive that information?
22    A.  Well, I --
23    MS. HARRISON:  I'm not hearing the whole
24  question.
25    MR. SHORTNACY:  The question is, Ms. Morales

**Page 87**

1  testified that she frequently or with some frequency
2  receives notices about class action settlements.
3  BY MR. SHORTNACY:
4    Q.  So my question is:  By what means do you get
5  these notices?
6    A.  Mail, usually by mail.
7    Q.  Are you aware of websites that collect class
8  action settlement information?
9    A.  Yes.
10    Q.  Do you know any of the names of them?
11    A.  I don't remember.  I don't try to remember
12  names of them, but I have been on them.  I've seen
13  them.
14    Q.  Are you signed up on any of these websites to
15  receive alerts regarding class action settlements?
16    A.  No.
17    Q.  Do you have any of those websites bookmarked
18  on your Internet browser?
19    A.  No.
20    Q.  Do you visit these websites to look and see
21  what settlements are filed and to see if you are a
22  purchaser of a product that may be affected by these
23  settlements?
24    A.  I have, on occasion.
25    Q.  And how often?

**Page 88**

1    A.  I don't know how to say that, not often, just
2  on occasion.
3    Q.  And does that refresh your recollection about
4  how you found out about the Shop-Vac settlement?
5    A.  You know, I do remember reading about the
6  Shop-Vac settlement online, but I don't remember where
7  I first saw it.
8    Q.  Do you have a written agreement with
9  Ms. Harrison to represent you in this matter?
10  +    MS. HARRISON:  Objection.  That is
11  privileged.
12    MR. SHORTNACY:  Are you instructing the
13  witness not to answer that question?
14    MS. HARRISON:  I am.
15    MR. SHORTNACY:  The fact of a written
16  agreement is -- I assert -- not privileged.  With that
17  clarification, is that still your instruction,
18  Counsel?
19    MS. HARRISON:  It is.
20  BY MR. SHORTNACY:
21    Q.  Is Ms. Harrison your attorney?
22    A.  Yes.
23    Q.  And how do you understand her to be acting on
24  your behalf?
25    A.  I don't know how to answer that question.  I

Electronically signed by Suzanne Ricardo (501-090-451-8941)                    60349228-2bd4-443d-bce9-173720039684

SHIRLEY MORALES

Page 89

1    mean, I don't know how to answer that. We
2    communicate.
3        Q.  How frequently?
4        A.  I don't know how to answer that, either.
5    We've had phone calls and e-mails, a number of
6    interactions.
7        Q.  Do you recall the first time, in terms of
8    date, when you first communicated with Ms. Harrison?
9        A.  No, I don't.
10       Q.  Was it this summer?
11       A.  Yes.
12       Q.  But not before that?
13       A.  I don't think so.
14           MR. SHORTNACY:  Do you want to take a short
15   break and see how much longer or further questioning
16   we have?
17           MR. WALSH:  I don't think it's going to be
18   long, but let's take a five-minute break.
19           MR. SHORTNACY:  We'll go off the record.
20           (Recess.)
21           FURTHER EXAMINATION
22   BY MR. WALSH:
23       Q.  I appreciate both you meeting here.  I know
24   we did this to accommodate everyone's schedules.
25   Thank you.

Page 90

1        A.  Thank you for Sunday.
2        Q.  No problem.
3        A.  I don't have to stress.
4        Q.  Right.  We try to be accommodating.
5    Now let's shift down to the hard stuff here.
6    All right.  We talked about the interrogatories
7    earlier and one of them was about had you gotten
8    compensation in one of these before.  And we talked
9    about that, but I did not talk about the timing, and I
10   want to go back and talk about the timing a little
11   bit.
12       A.  Okay.
13       Q.  That case where you and your counsel received
14   compensation, that was the Crystle Wong/Alacer case;
15   correct?
16       A.  That's right.
17       Q.  And that was one that was filed in
18   Los Angeles -- do you know?
19       A.  I don't remember exactly what city.
20       Q.  But it was in California; correct?
21       A.  I think so.  I'd have to look again.
22       Q.  I don't think I brought it with me.  So I'll
23   read you the case number.  The case number was
24   CGC-12-519221, but that's all the info I have.
25           Does that help you remember where is it?

Page 91

1        A.  No.
2        Q.  I didn't think it would.
3            Do you remember who the plaintiff's counsel
4    in that was?
5        A.  No.
6        Q.  If I said the name, "Michael Reese," would
7    that name have any meaning to you?
8        A.  No.
9        Q.  You don't remember whether or not he was a
10   counsel in that case?
11       A.  No.
12       Q.  And that's fine.  I'm just all about what you
13   remember.  Now, you stated in Interrogatory
14   No. 5 -- and you can look it up, if you want, or I'll
15   read it to you, and if it sounds right, then that's
16   all we need.  Let me read it to you, first.  This may
17   be enough.  You said, "I recall both my counsel and I
18   receiving some compensation around an appeal, but I
19   don't recall any amounts."
20           Does that sound about --
21       A.  That's right.
22       Q.  What did you mean when you said "around an
23   appeal," if you know?
24       A.  "Around an appeal"?
25       Q.  Uh-huh.

Page 92

1        A.  I have no idea.
2        Q.  Let's talk about this, do you know if you
3    received -- how long after you made an objection did
4    you receive compensation, if you know?
5        A.  I don't recall.
6        Q.  Do you recall if final approval was given to
7    the settlement?
8        A.  I'm sorry.
9        Q.  Let me ask that better.
10           Do you recall if final approval was given by
11   the court in the Crystle Wong versus Alacer case?
12       A.  I don't recall.
13       Q.  Does that mean anything to you -- that
14   question I just asked you?
15       A.  No.
16       Q.  Do you understand what it is for a case to
17   get final approval?
18       A.  I would be guessing.
19       Q.  And I don't want you to guess.
20       A.  All right.
21       Q.  But would you agree with me that an appeal
22   was filed in the Crystle Wong case?  Do you know?
23       A.  An appeal?
24       Q.  Correct.  Let me ask a better question?
25       A.  Okay.

Electronically signed by Suzanne Ricardo (501-090-451-8941)                    60349228-2bd4-443d-bce9-173720039684

SHIRLEY MORALES

**Page 93**

1    Q.  Do you know if you filed an appeal in the
2   Crystle Wong case?
3    A.  I don't remember what it was called that I
4   did.  I would need to look.  Can I look here?
5    Q.  Sure.  Absolutely.  I'm not trying to hide
6   it.
7    A.  Where is this?
8    Q.  That will be Exhibit No. 3 on page No. 2.
9   And that is in response to Interrogatory No. 5.
10   A.  You know, I just have to say, I don't
11  remember.  I don't remember much about it.
12   Q.  That's fine.  Let's ask this, do you remember
13  how long you were involved in that Crystle Wong case
14  from start to finish?
15   A.  No.
16   Q.  Was it years?
17   A.  No.
18   Q.  Was it months?
19   A.  I don't recall, but I know it wasn't years.
20   Q.  Do you know if it was more than one year?
21   A.  Gosh, I don't remember.
22   Q.  Do you think it was less than a year?
23   A.  Honestly, I'm sorry, I don't recall.
24   Q.  That's okay.
25      Would you agree with me on this -- because

**Page 94**

1   this is a California case, so California cases have
2   all of their dockets online.  So if I was able to go
3   online and I saw something that showed your Objection
4   and then I saw something that showed your appeal being
5   withdrawn, you wouldn't have any reason to dispute
6   those dates, would you?
7    A.  I wouldn't have any reason to dispute
8   anything, because I don't remember.
9    Q.  Fair enough.
10      MR. WALSH:  All right.  Mardi, I'm going to
11  revisit something, you are probably going to object to
12  it, but I'm going ask.
13      So give her time to object if she wants to.
14      Where you made an objection earlier,
15  Ms. Harrison, I have a question for Ms. Morales.
16  BY MR. WALSH:
17   Q.  And that question is: Ms. Morales, I just
18  want to know, "yes" or "no," whether or not you and
19  Ms. Harrison have a written agreement.
20  +   MS. HARRISON:  And I'm going object and
21  direct her not to answer.  It's irrelevant and it is
22  confidential.
23      MR. WALSH:  So I'm going ask your counsel,
24  are you instructing your client not answer that
25  question?

**Page 95**

1      MS. HARRISON:  I am instructing her not to
2   answer.
3      MR. WALSH:  So, Ms. Harrison, if I were to
4   ask any further questions about that agreement and
5   what that agreement contained, you would make that
6   objection or similar objections.  Is that fair to say?
7      MS. HARRISON:  That is very fair to say.
8      MR. WALSH:  Michael, did you have further
9   questions?
10      MR. SHORTNACY:  No further questions.
11  BY MR. WALSH:
12   Q.  Ms. Morales, thank you very much for your
13  time today.  Was there any reason that any answer you
14  gave today would not be to the full extent of your
15  knowledge?
16   A.  Pardon me?
17   Q.  Sure.  You are not under any -- well, you are
18  not taking any medications right now that would affect
19  your ability to give truthful answers, are you?
20   A.  No.
21   Q.  And you didn't go and have a five-martini
22  lunch or anything like that that would impair your
23  ability to understand my questions today?
24   A.  No.
25   Q.  So my question was just basically: Was there

**Page 96**

1   any reason that you could share with us now that would
2   be a reason that would cause you to give inaccurate
3   answers here today?  I'm not trying to be tricky.  I'm
4   just trying to ask, there's no medical condition,
5   there's no medication you are taking, there's no
6   five-martini lunches --
7    A.  No.
8    Q.  -- that would impair your ability to answer a
9   question?
10   A.  No.
11   Q.  And when you haven't understood my questions
12  today, you've asked me to clarify; is that correct?
13   A.  I've done the best that I could to do that.
14  I don't -- I can't tell you that I've asked every
15  little --
16   Q.  But if you didn't understand, you tried to
17  make you know you didn't understand?
18   A.  I tried to, yes.
19      MR. WALSH:  Again, I thank you for your time
20  and I have no further questions.
21      Ms. Harrison, do you have any questions for
22  your client?
23      MS. HARRISON:  I do not.
24      (Deposition concluded at 5:13 p.m.)
25

Electronically signed by Suzanne Ricardo (501-090-451-8941)                    60349228-2bd4-443d-bce9-173720039684

SHIRLEY MORALES

Page 97

```
 1          REPORTER'S CERTIFICATE
 2
 3          I, Suzanne Ricardo, a Certified
 4  Shorthand Reporter No. 13659, do hereby certify:
 5          That the foregoing proceedings were
 6  taken before me at the time and place herein set
 7  forth; that any witnesses in the foregoing
 8  proceedings, prior to testifying, were placed under
 9  oath; that a verbatim record of the proceedings was
10  made by me using machine shorthand which was
11  thereafter transcribed under my direction; further,
12  that the foregoing is an accurate transcription
13  thereof.
14          I further certify that I am neither
15  financially interested in the action nor a relative or
16  employee of any attorney of any of the parties.
17          IN WITNESS WHEREOF, I have hereunto
18  subscribed my name this 12th day of September, 2016.
19
20
21
22
23          Suzanne Ricardo
            CSR No. 13659
24
25
```

Electronically signed by Suzanne Ricardo (501-090-451-8941)                    60349228-2bd4-443d-bce9-173720039684

SHIRLEY MORALES

Page 1

| A | | | | |
|---|---|---|---|---|
| **A-L-A-C-E-R** 25:8 | 69:1 | 96:3 | 34:9 45:9 | 41:7 62:23 |
| **ability** 95:19,23 96:8 | **affect** 95:18 | **anthropology** 13:23,24 | 46:17 49:23 | 63:8,10 85:21 |
| **able** 20:17 21:12 84:1 94:2 | **ago** 6:2 21:22,25 27:19 46:8,21 | **anyway** 81:4 | 52:2 53:13 | 87:7 |
| **Absolutely** 93:5 | **agree** 6:13 53:4 74:5 77:14,17 | **apart** 60:6 | 54:8 55:13 | **awfully** 54:15 |
| **acceptable** 72:7 | 85:9 92:21 93:25 | **apologize** 39:19 70:6,7 | 60:13 66:2,21 75:15 | |
| **accepting** 64:25 76:9 | **agreement** 5:9 6:11,19 7:8 | **appeal** 28:22 91:18,23,24 | **asks** 22:19 | **B** |
| **accommodate** 7:10 89:24 | 8:13,16,20 88:8,16 94:19 | 92:21,23 93:1 94:4 | **assembly** 76:4 | **B** 2:13 |
| **accommodating** 90:4 | 95:4,5 | **APPEARAN...** 2:1 3:1 | **assert** 22:10 59:20,21 88:16 | **Bachelor's** 13:18,19 14:1 |
| **accomplish** 43:16 | **agreements** 7:22 | **appeared** 22:23 54:4 | **asserted** 33:8 | **back** 13:12 21:21 25:2 |
| **account** 27:11 | **ahead** 9:6 24:15 32:8 50:1 57:5 | **appearing** 2:3 2:12 3:3 5:9 | **asserting** 19:13 | 48:21 49:18 65:17 69:2 |
| **accounts** 68:6 | 66:12,15 | **appears** 53:12 71:10 | **assessment** 22:8 | 90:10 |
| **accurate** 36:8 97:12 | **air** 10:8 | **application** 39:21 | **assistance** 48:4 51:3 | **background** 12:17 34:16 |
| **accurately** 18:2 44:6 49:9,17 | **Alacer** 25:8 92:11 | **apply** 30:5 64:1 | **assisted** 45:10 | **backwards** 20:19 |
| **achieve** 42:9 43:4 | **alerts** 87:15 | **appreciate** 36:11 61:1 | **assisting** 23:18 | **bad** 69:14,16 71:22 |
| **achieved** 53:23 | **amount** 17:19 29:19,20 44:8 | 89:23 | **associated** 11:25 | **ballpark** 17:17 17:19 20:14 |
| **acquired** 16:12 | **amounts** 28:22 29:1 91:19 | **approval** 39:22 73:14 85:3 | **association** 64:9 | 29:10 |
| **acting** 22:20 88:23 | **analysis** 31:20 | 92:6,10,17 | **assume** 31:10,11 35:16 36:6 | **Bank** 67:7,12 68:15 71:5 |
| **action** 1:6 24:20 26:19 28:14 | **Angeles** 2:16 90:18 | **approximate** 32:25 | 52:7,13 54:24 64:7 71:19 | **barely** 70:4 |
| 33:16,19,21,25 34:5,11 38:20 | **angry** 72:21 | **approximately** 23:14 | 84:4 85:13 | **based** 35:13 56:7 |
| 40:18 69:23 74:1,17 85:2 | **Ann** 5:19 | **April** 76:6 77:16 | **assuming** 52:10 55:10 85:13,15 | **basic** 45:12 |
| 87:2,8,15 97:15 | **annual** 37:5 | **art** 11:4,25 12:13 13:22 | **assumption** 55:14,15 64:9 | **basically** 9:2 52:20 95:25 |
| **actions** 26:25 33:7 40:15 | **answer** 4:21 6:16 7:1,14,15 | 17:5 34:14 | **assumptions** 55:12 | **basis** 57:8 |
| 41:8 69:3,20 | 8:6 21:24 24:12 38:4 | **articulate** 44:13 | **astronomy** 12:15 34:15 | **beat** 67:3 71:25 |
| **actual** 20:1,4 41:15 47:17 | 39:25 40:2,22 49:22 63:14 | **Arts** 11:16 14:1 | **attorney** 10:14 10:15,17 27:1 | **beginning** 49:18 58:14 |
| 50:5 51:15 53:5,8,24 | 64:20,20,21,21 69:10 74:23 | **aside** 72:19 74:15 | 27:15 60:16 62:1,4 65:25 | **begins** 47:9 |
| **adequate** 64:24 | 88:13,25 89:1 89:4 94:21,24 | **asked** 16:7 23:22 34:13 40:23 | 66:22 68:12 72:15 73:6 | **behalf** 1:11 2:3 2:12 3:3 22:20 |
| **advantage** 68:21 | 95:2,13 96:8 | 67:6 69:12 74:19 92:14 | 74:8 75:12 88:21 97:16 | 71:11 72:6 88:24 |
| | **answered** 29:1 70:12 74:23 | 96:12,14 | **attorney-client** 45:15 | **believe** 15:2 34:7 45:21 47:22 |
| | **answers** 6:18,20 15:22 26:23 | **asking** 26:17 31:19,23 32:11 | **attorneys** 22:20 72:5 | 49:3,7 74:19 77:12 86:17 |
| | 39:16,17 95:19 | | **AUSTIN** 2:14 | **Ben** 73:7 74:7 |
| | | | **available** 85:11 | **bend** 36:21 83:4 83:12 |
| | | | **aware** 40:15,18 | **benefit** 43:18,23 |

SHIRLEY MORALES

43:25
benefits 43:22
49:3
best 5:13 6:25
7:2 8:4 15:4
26:19 39:18
52:3 96:13
better 6:4 37:17
46:17,23 52:24
52:24 54:1
56:6 60:25
83:7 92:9,24
beyond 43:12
46:15
Bi-Mart 79:6,10
79:11
big 17:12
biggest 43:25
Bingham 73:7
74:7,7
bit 6:6,12 12:11
13:25 17:25
24:10 30:5
34:13 79:19
85:24 90:11
Bly 2:8
BONNER 2:4
bonner@wals...
2:10
bookmarked
87:17
bother 58:9 83:5
83:10,12
bottom 17:1
58:17 82:14
bought 20:10,13
20:15,16,21
77:19 78:5,23
79:10,19 80:2
box 2:7 49:16,20
54:5 55:16,16
56:7
brand 16:8
break 7:9,15,17
32:12 65:5
76:1 84:22
89:15,18

bring 8:23 58:3
broad 12:10
69:2
broken 56:16
59:16
brought 8:24 9:2
9:13,23 10:5
18:18 33:25
76:1 90:22
browser 87:18
bunch 25:22
46:5 84:15
business 4:12
8:24
buys 42:4

**C**

C 2:4
C-R-Y-S-T-L-E
25:7
CAFA 55:8 64:1
64:7
California 2:16
12:19 25:8
90:20 94:1,1
call 6:10 18:25
called 18:21
43:1 47:23
61:7,13 93:3
calls 33:13 89:5
capacity 19:16
20:1 35:23,24
36:18 40:6
78:23 80:8
83:15 84:3
caption 24:22
30:8,21
card 4:12 8:24
20:15,18,18
85:18
cards 85:17
careful 45:9
case 8:17,21
24:23 25:3,4,6
25:12,15,25
26:9,11,12,14
29:4,8 33:12

33:24 35:17,20
36:19 37:21,25
38:10 39:22
40:14 41:2,2,3
41:21 42:18
45:5 54:12
61:22 62:5
66:1 67:12,24
70:2 71:8
72:15 73:7
90:13,14,23,23
91:10 92:11,16
92:22 93:2,13
94:1
case(s) 30:9,21
cases 25:22 26:2
26:6 32:18,22
33:3 37:14
41:6 69:9 94:1
caught 15:14
cause 96:2
causes 33:7
55:22
center 18:17
Centers 75:13
CERTIFICATE
97:1
certification
13:6 14:9,11
14:14,15,17
certifications
14:13
certified 1:17
33:11 97:3
certify 34:10
97:4,14
CGC-12-519221
90:24
chance 57:18
67:11
change 15:6
26:5 49:7,8
62:7
changes 79:22
characterize
50:21
charges 63:15

63:18
Chase 4:17 27:7
27:13 65:8,9
66:1 67:7,11
67:24 68:5,15
70:2 71:5 73:7
check 38:18
checking 32:15
city 90:19
Civil 1:6,15
claimed 59:3,7
claims 59:11
clarification
88:17
clarify 20:23
26:20 83:8
96:12
class 12:13
24:20 25:22,24
26:18,25 28:14
33:11,16,19,25
34:5,11,14
38:20 40:15,18
41:8 43:16,19
43:23 46:12
47:2 49:4
52:14,16 60:16
61:8,14 62:1
69:3,8,20,23
69:25 70:2
73:25 74:1,17
85:5 87:2,7,15
classes 12:12
cleaner 9:14,23
cleaners 9:17,21
10:4 40:19
cleaning 17:3
clear 31:21
33:22 62:19
69:11,22 83:8
clearly 42:7
client 18:6 94:24
96:22
clients 68:22,24
close 32:9 48:22
closer 60:24
collect 87:7

College 11:21,23
14:6,8
come 59:17
70:13
comes 60:6
coming 10:17
commencing
1:18
comment 33:14
54:8
communicate
89:2
communicated
86:14 89:8
Community
11:21,22
companies
68:21,25 69:1
69:4,14,18
company 33:21
37:1 54:25
compare 35:3
59:11
comparison
53:19
compensation
23:24 28:10,21
29:2,5 90:8,14
91:18 92:4
complains 51:6
complaint 50:5
complaints
58:23 59:13
completely 7:1
7:24 57:11
complicate
70:11
components
10:3
concerning
54:12
concluded 96:24
condition 96:4
conditioning
10:8
confident 22:8
confidential

SHIRLEY MORALES

94:22
confusing 42:19
confusion 52:4
connection
22:21 28:12
86:15
conscious 41:9
consider 29:16
consideration
28:9
considered
46:11 47:1
consistent 76:14
76:19
consumer 42:4
43:9 53:19
69:1
consumers
42:11
contact 86:7
contained 85:5
95:5
contention
25:11 61:25
context 64:23
continued 3:1
contractor
11:17
contribution
53:23
conversation
10:21
convictions
15:10
convoluted
63:14
copy 15:19,22
38:15 65:9,15
Corporation
75:13
Corps 11:13
correct 5:10,21
8:25 9:1,4,5,14
9:25 10:1
15:11,12 18:16
18:19,20,23
19:14,15 21:4

21:10 23:19,20
24:25 25:4,9
25:10 26:12
28:24 33:25
39:6 42:18
45:3 48:9,19
51:4,7 53:10
59:4 60:5 62:2
62:17 63:1,12
64:17 67:24
71:11 72:15,17
73:20 76:21
77:16,19 78:6
81:18,21 85:19
86:19 90:15,20
92:24 96:12
correctly 16:13
16:18 22:18,24
23:3 24:1,5,24
28:8,16,23
30:7,15 31:2
47:3,20 51:17
56:25 60:17
61:9,16,17
64:3 73:14,17
73:23 74:3
cost 17:16,23
Costco 20:13,15
20:17,18 21:10
21:13,20
Council 11:16
counsel 5:8 7:6
9:16 22:21,22
24:19 25:4
28:10,21 29:20
29:23 30:9,22
31:9 32:4 46:4
48:4,14,18
73:7 82:11
86:3 88:18
90:13 91:3,10
91:17 94:23
counsel's 24:19
28:11 30:13
31:1
count 78:3 82:20
couple 84:7,24

coupon 64:1,9
64:22
course 22:7 83:6
courses 12:8
court 1:1 6:14
22:15 31:10
85:2 92:11
Crest 2:6
criminal 15:10
Crystle 25:6,7
29:6,8,11
90:14 92:11,22
93:2,13
CSR 1:16 97:23
Culture 11:16
current 9:3
10:23 37:10
cutoff 83:20
cuts 36:10
CV 4:12 9:2

D

D 1:19
date 16:10 23:14
24:21 28:15
32:25 67:17,20
76:3,4,24 89:8
dated 71:15
dates 76:9 84:24
94:6
day 58:7 97:18
decide 35:4
decision 55:19
defect 30:10,11
30:23,24 31:11
32:1,4
defendant 2:12
62:10,11
defined 55:17
definition 54:22
degree 6:14,14
13:16,18,20
14:1,3,7,10
denote 53:20
depends 21:23
depicted 77:22
DEPONENT

3:3
deposed 5:23 6:1
deposing 14:23
deposition 1:10
1:15 6:24
10:16 37:19
70:7 96:24
depositions 6:7
describe 30:12
30:25
DESCRIPTION
4:11
detailed 9:20
details 70:4
79:19
determine 21:12
54:6
different 17:9
26:24 36:11
40:20,21 50:3
63:22 66:23
69:9 72:8
78:12
differential
80:18
differentiated
41:10
difficult 12:4
direct 94:21
directed 28:12
85:4,6
direction 77:21
97:11
discipline 13:19
disciplines 12:1
disclaimer 49:14
49:20
disclose 30:8,21
disclosed 48:14
disclosing 28:9
disclosure 49:11
53:14 54:1
discovery 4:13
15:4,19,20
37:18
discuss 6:9
10:16 46:9,13

discussed 10:14
10:15 44:11
46:1,15 55:18
discussing 65:8
dishonest 69:19
dismissal 28:13
30:13 31:1
dismissed 30:10
30:22 31:10
68:10
dispute 94:5,7
dissatisfied
21:15
distribution
28:12
District 1:1,2
10:25 11:14
12:7 41:4,7
dockets 94:2
document 44:18
44:23 45:19
46:16 48:11,12
48:12,14,22
50:4 51:1,3
documents 8:9
8:23 37:14,24
doing 6:4,22
52:3 55:11
84:13
donation 28:10
double 32:15
Doylestown 3:7
drafting 48:4
drain 81:24
drink 32:16
Drive 2:6
duly 5:4

E

e-mail 38:16,18
38:19,21,22
39:3 65:7
85:18
e-mails 89:5
earlier 7:6 15:14
32:19 34:13
46:3 54:7 67:6

SHIRLEY MORALES

| | | | | |
|---|---|---|---|---|
| 75:1 90:7 | 70:3 77:13 | **facts** 54:12 | 92:10,17 | **foregoing** 97:5,7 |
| 94:14 | 79:18 90:19 | **fair** 17:13 26:23 | **financial** 28:9 | 97:12 |
| **early** 6:23 67:15 | **EXAMINATI...** | 36:16 38:25 | 37:10 | **foremost** 5:7 |
| **easier** 6:12 | 4:1,3 5:15 75:9 | 41:23,24 42:1 | **financially** | **formally** 22:23 |
| **easily** 60:6,6 | 89:21 | 42:3,6,12,14 | 97:15 | **forth** 97:7 |
| **Eastern** 13:15 | **examined** 5:5 | 43:20 44:2,4 | **find** 17:1 23:7 | **forward** 12:10 |
| 13:16 14:2 | **example** 46:9 | 50:20 52:11,14 | 86:1 | 15:3 40:4 |
| **easy** 6:16 58:21 | **excellent** 44:6 | 60:16 62:1 | **fine** 8:7 31:18 | 49:19 56:3 |
| **Edison** 3:6 | **exclude** 14:24 | 67:1 68:13 | 39:24,24 40:1 | **found** 23:11 |
| **education** 12:22 | **Excuse** 12:12 | 71:8 82:13 | 40:1 64:20 | 70:16 84:9 |
| 13:8 | 31:14 60:20 | 94:9 95:6,7 | 72:14 91:12 | 88:4 |
| **educational** | **exhibit** 4:9,11 | **fairly** 58:12 | 93:12 | **four-gallon** |
| 11:14 12:17 | 9:7,10 15:18 | **falsely** 35:22 | **finish** 7:2 24:13 | 80:10 83:15 |
| **efficient** 35:21 | 16:2,5,5,7 18:3 | **familiar** 48:3 | 76:17 93:14 | 84:2 |
| 42:8 57:13 | 18:4,8 22:13 | **far** 6:23 34:25 | **firm** 22:23 24:20 | **frame** 16:17 |
| 59:21,23 80:21 | 22:17 23:22 | 78:16 79:7 | 28:11 | **frequency** 87:1 |
| 80:22 | 24:17 28:6 | 80:1 83:5 | **firms** 22:20 | **frequently** 87:1 |
| **eight** 21:25 | 30:6 32:10 | **father** 67:13 | **first** 5:4,7 11:8 | 89:3 |
| **either** 20:8 | 41:14,16,17 | **feature** 83:20 | 47:23 48:25 | **friend** 23:9,10 |
| 23:10 57:25 | 44:17,21,22 | **fee** 64:1 | 50:8,10 55:5 | 70:15,18,19 |
| 85:20 89:4 | 53:5 56:21 | **feel** 22:8 53:13 | 65:16,18 67:16 | **friends** 70:20 |
| **electronically** | 60:12 65:12,15 | 59:19 | 77:21 78:9 | **front** 26:24 |
| 74:6 | 72:24 73:1 | **feeling** 59:6 | 85:22 86:7 | 48:22 71:25 |
| **employ** 37:3 | 75:16,18,20 | **fees** 60:16 62:1,4 | 88:7 89:7,8 | **full** 5:17 46:24 |
| **employee** 97:16 | 93:8 | **felt** 70:1 | 91:16 | 55:5,8 60:14 |
| **employer** 10:23 | **exhibits** 15:24 | **Fifth** 2:15 | **five** 24:21 25:12 | 63:24 66:9 |
| **empty** 78:7,24 | 32:9 72:20,22 | **figure** 21:19 | 25:16 27:1 | 95:14 |
| 81:11,15 82:1 | **exist** 30:8,20 | 72:8 | 28:14 36:6,7,9 | **Furlong** 3:6 |
| 82:2,15,25 | **experience** | **file** 70:8 | 82:22 | **further** 8:13 |
| 84:6 | 52:25 55:22 | **filed** 8:21 24:22 | **five-gallon** | 89:15,21 95:4 |
| **emptying** 60:9 | 56:8 57:24 | 28:15 32:23 | 19:18 36:5 | 95:8,10 96:20 |
| 82:7 | 83:19 | 33:1,3 37:21 | **five-martini** | 97:11,14 |
| **enforced** 64:8 | **expert** 39:8 | 39:9 40:16 | 95:21 96:6 | |
| **engine** 34:24 | **expires** 63:5 | 41:3,20 45:5 | **five-minute** | **G** |
| **entitled** 23:23 | **extend** 57:9,12 | 65:10 69:3 | 89:18 | **gallons** 36:6,7,9 |
| **environment** | 63:5 | 71:11 72:14 | **fix** 15:8,16,16 | **generally** 32:17 |
| 12:3 | **extended** 49:6 | 73:5 87:21 | 56:17 | 46:8 66:23 |
| **equipment** | 63:4,16,21 | 90:17 92:22 | **fix-it** 52:23 | **getting** 60:21 |
| 34:24 | **extending** 62:25 | 93:1 | 54:25 | **gift** 16:11 |
| **Esq** 23:2 24:4 | 64:16 | **filing** 37:25 | **flies** 60:1 | **give** 52:24 63:1 |
| **essentially** 32:2 | **extent** 30:8,20 | **fill** 36:22 60:8 | **follow** 84:8 | 84:24 94:13 |
| **everybody** 14:23 | 95:14 | 76:8 83:16 | **following** 50:25 | 95:19 96:2 |
| **everyone's** | **extra** 65:1 | 84:1 | 61:5 | **given** 16:3 69:24 |
| 89:24 | | **filled** 31:16 | **follows** 5:5 | 70:1 85:4 92:6 |
| **exact** 17:18 | **F** | 75:24 | **followup** 74:14 | 92:10 |
| **exactly** 29:18 | **facing** 18:22 | **fills** 83:22 | 75:14 | **gives** 19:14 |
| 39:14 68:17 | **fact** 88:15 | **final** 39:22 92:6 | **foot** 82:11 | 22:10 59:20 |

SHIRLEY MORALES

go 6:7,12 9:6
    12:18 13:1,8
    13:12 15:4
    24:15 30:5,17
    30:18 32:7
    45:22 46:8,13
    48:7 49:18
    50:1 55:7 57:5
    58:2,13,16
    60:1 63:1,2
    65:17 66:5,12
    66:15 67:16
    71:13 73:22
    75:15 89:19
    90:10 94:2
    95:21
goal 43:15
goals 42:9
goes 55:15 70:10
going 5:7,12 6:9
    6:10 7:17 9:6,8
    14:24 15:8,18
    15:20,21 16:7
    18:5 22:17
    24:16,17 25:1
    29:15 30:4
    32:13,14 36:13
    36:22 43:22,23
    44:16 51:23
    57:9 58:2
    60:10,12 64:21
    64:22 65:5
    67:4 72:23
    73:13 74:12
    75:6 77:21
    84:22 89:17
    94:10,11,12,20
    94:23
good 13:24
    21:21 32:13
    39:13 42:11
    43:10 49:21
    52:21 53:13
    56:18 57:14
    78:25 83:3,3
goodness 11:12
Gosh 93:21

gotten 90:7
graduate 12:20
graduating
    12:23
granted 85:2
great 6:22
Gresham-Barl...
    10:25
guess 26:17
    80:23 82:18,21
    83:13 92:19
guessing 82:8
    92:18
guidelines 6:9
guys 38:12 58:11
    84:15

_____ H _____

hand 15:20,22
    18:5 22:13
    44:16 82:10
handed 65:15
    73:4
handled 15:14
hanging 74:11
happened 68:1
    69:7
happy 80:25
hard 24:12
    54:15 90:5
harder 10:10
Harrison 3:4,5
    5:11 10:9
    15:23 18:7
    23:1,6,7,15,17
    24:4 31:14
    33:13 44:20
    45:20 48:1
    54:8,11,17
    60:20 61:1
    74:19 75:18
    86:7,10,12,23
    88:9,10,14,19
    88:21 89:8
    94:15,19,20
    95:1,3,7 96:21
    96:23

Hawaii 70:22
    71:2
head 60:23
hear 10:7,9,10
heard 38:11
    39:5 52:22
    70:15,18 84:11
    84:17 85:10
hearing 86:23
held 36:7
help 6:11,18 8:2
    54:5,21 55:19
    55:25 66:4
    67:17 76:23
    77:10 79:25
    84:25 90:25
helpful 49:16
helping 84:15
helps 51:21
    76:24
hereunto 97:17
Hi 75:11
hide 93:5
high 8:25 9:4
    10:24 12:18,23
    13:2,13
higher 17:25
    84:2
highlight 51:22
hire 23:7 70:14
    71:5
hired 27:1 71:7
hold 14:13 36:6
holds 36:1,4
Hollins 73:15,24
home 17:6 20:12
    75:13 84:16
homeowner
    17:14 78:14,18
honest 44:1,4
    69:6
honestly 28:5
    42:5,5 85:13
    86:2 93:23
Hood 11:21,22
hope 42:9 43:15
hoping 43:4

horsepower
    19:21 20:4
    34:18 35:3,12
    35:12,13,15
    36:12,13 40:9
    40:12 47:18
    50:6 51:16
    53:7,9,18,21
    53:22,25 55:15
    55:17 59:4,7
    59:11
hose 60:7
hot 17:1 36:20
    60:4 78:8
    79:23 81:11,15
    82:6,25 84:6
hour 1:18
house 58:12
    79:22
huh-uh 6:17
hypothetical
    35:10 50:4
    53:17 54:9,16
    63:2

_____ I _____

I-N-S-I-G-H-T
    14:20
idea 6:6 20:14
    21:21 29:22
    40:5,8,11
    42:11 66:24
    92:1
identification
    9:11 15:25
    18:9 41:18
    65:13 73:2
identified 85:5
identify 22:19
    23:22 39:18
imagine 34:23
    85:9
imagined 75:4
immediately 8:1
    79:1
impair 95:22
    96:8

implemented
    75:3
important 6:15
    7:7,16,23
Importantly
    85:6
improved 75:1
improvement
    17:7
improvements
    74:17
inaccurate 96:2
inadequate
    35:21 46:11
    47:1,7,24 50:7
    50:14,22,24
    51:7 52:12
    53:1,2 56:24
    57:6,16
inches 82:14,16
included 83:14
including 23:23
    24:19 30:10,23
    31:12 53:22
income 37:5
INDEX 4:1,9
indicated 21:3
indicating 20:21
    58:25 79:6
    82:9 83:7,22
indication 61:6
    61:12
indicators 81:5
industry 53:19
ineffective 52:25
    53:2 58:22
    64:11,12
inertial 53:23
info 90:24
information
    45:12,24 46:14
    56:1,2 85:6,25
    86:21 87:8
initially 32:23
injunctive 46:10
    46:25 47:22
    48:5 50:13,15

SHIRLEY MORALES

50:21 51:6
52:6,9,9 54:22
61:6,12
**inside** 60:2
**Insight** 14:18,19
**INSTRUCTED**
4:20
**instructing**
88:12 94:24
95:1
**instruction**
88:17
**integrated** 12:13
**interactions**
89:6
**interested** 97:15
**Internet** 23:9,11
70:16 87:18
**interpret** 31:15
**interpretation**
35:20
**interrogatories**
4:14 90:6
**Interrogatory**
22:16 23:21
24:16 28:7
30:19 91:13
93:9
**intro** 10:13
**intuitive** 80:23
**involved** 93:13
**involves** 40:19
**irrelevant** 58:5
83:13 94:21
**item** 83:3
**items** 19:6 60:11
74:25

---

**J**

**January** 16:9
**Jersey** 40:18
**job** 11:13 37:17
46:17 60:25
**jobs** 11:8
**John** 73:11
**Joint** 4:18 72:24
73:14

**Jones** 1:19
**June** 85:7,16

---

**K**

**keep** 9:9 15:3
32:13,14 48:22
60:9,12
**Kelly** 1:19
**Kennedy** 65:20
65:24 66:17
68:23 70:13,14
70:23 71:5
73:6 74:8
**kicked** 10:8
**kind** 31:11 32:3
52:23 64:8,8
79:18
**knew** 21:13 62:7
**know** 7:5,10,18
7:25 8:1,6,10
8:14,16 10:14
17:18,20 19:10
20:1,4 21:24
23:5,8 26:8,21
26:21,22 28:8
29:5,13,19,21
30:7 32:18,21
32:22 33:3,7
34:9,10 35:20
36:22,25 37:1
37:3,5,7,10,18
37:18 38:2,4
38:11,13 39:25
40:1,1 41:25
42:6 43:21
46:22 48:13
49:10,15,22,24
50:1,2 51:20
52:17,17 53:15
54:2,25 55:23
55:24 56:2,6
58:1,8 60:2,10
61:21 62:4,10
62:11,14 63:15
63:18 65:24
66:17,21,24
67:4 68:5,17

68:20 69:21
70:3,19,20,23
71:4,14,19
73:8,12,13,23
74:21 75:4,5
78:9,17 79:14
80:3,3,8,11,16
80:16,20,23,25
83:2,15 86:12
87:10 88:1,5
88:25 89:1,4
89:23 90:18
91:23 92:2,4
92:22 93:1,10
93:19,20 94:18
96:17
**knowing** 72:9
**knowledge** 41:9
95:15
**knows** 54:12

---

**L**

**La** 12:19,23 13:1
**laboratory**
53:23
**lack** 30:11,12,23
30:25 31:13
32:2 68:7,10
**language** 31:18
49:8
**large** 33:20 37:1
**larger** 78:22
**lasts** 64:15
**latch** 58:13
**latches** 58:22
**late** 67:15
**latest** 17:23
**law** 3:5 15:1
22:20,22 24:20
28:11
**lawsuit** 19:14
59:21 62:12
**lawsuits** 33:8
**layperson** 34:3,8
**Lea** 74:7
**led** 21:6 23:11
**left** 18:22 67:8

77:22 78:16
79:8 80:1
**legal** 22:21
31:15,16,19,23
32:20 33:14
45:23 46:5,6
48:1 64:13
66:23,25
**legalese** 46:5
**let's** 12:16 13:5
14:19 23:21
24:15 31:8
35:10,10 41:20
48:7,21,22
52:5,17 53:17
56:19 63:23
66:5 72:19
77:14 84:21
89:18 90:5
92:2 93:12
**letting** 55:6
**Lewis-Clark**
14:6,7
**liberal** 13:21
14:1
**lid** 76:2
**lied** 43:9
**life** 40:11 70:10
70:11
**limited** 30:11,23
31:13
**line** 4:22 76:4
**listed** 60:11
81:20
**litigation** 1:5
41:3
**little** 6:6,12 10:9
12:11 17:25
24:10 28:25
30:5,16 31:21
34:13 36:24
42:2,19 50:8
60:24 75:23
76:3 78:24
79:14,19 85:23
85:24 90:10
96:15

**living** 79:21
**LLC** 2:5 65:20
75:13
**LLP** 2:14
**long** 6:2 20:16
21:22 27:19
36:7,9 77:10
78:13 79:20,25
83:1 89:18
92:3 93:13
**longer** 64:15
89:15
**look** 16:6 20:17
21:19,23 22:16
35:11 46:24
48:11,11,16
65:18 66:8
67:11,17 71:20
72:8 73:8,11
73:12 76:1
87:20 90:21
91:14 93:4,4
**looked** 32:15
83:3 85:24
**looking** 18:17
32:20,20 46:16
48:17 49:19
73:9,10,12
80:13,15
**looks** 32:11 35:9
**Los** 2:16 90:18
**lose** 22:15
**lost** 30:16
**lot** 6:18 26:21
29:14,16 38:22
60:13 63:22
69:7 70:20
78:11 80:20
85:5
**loud** 6:16 66:15
**low** 10:11
**Lowe's** 62:10,11
62:21 63:1,2
63:15,18,20
75:13
**lower** 82:8
**lowered** 60:23

lunch 95:22
lunches 96:6

**M**
machine 97:10
mail 38:16,24
　87:6,6
mailed 85:17
main 44:12 60:3
making 22:5
　55:12,19 56:3
manipulate
　69:19
March 67:20
　71:15
Mardi 3:4,5
　5:10 10:7,11
　15:20 18:4
　23:1 24:4
　41:15 45:13
　50:10 65:7
　72:24 86:6
　94:10
mardi@sueth...
　3:9
marked 9:7,8,10
　15:18,24 18:3
　18:6,8 19:3
　41:13,15,17
　44:16 65:12
　72:23 73:1
marketed 35:22
　42:5,15 44:7
　49:17
marketing 1:4
　44:1,3 49:8
marking 18:4
　72:24
material 30:10
　30:23 31:11
matter 23:18
　36:13,18 39:9
　71:5 75:2 86:8
　88:9
mattered 36:12
matters 36:14
　36:19

MDL 1:4 40:24
　40:25 41:2
　44:23
mean 19:18
　20:15 27:10
　29:13 31:7
　35:24 42:22,23
　47:5 50:1
　51:22 52:8
　55:2,8 57:10
　57:14 59:23
　62:24 64:10,11
　64:23 66:25
　68:8 79:25
　80:22 89:1
　91:22 92:13
meaning 79:7
　91:7
means 16:11
　31:11,25 32:2
　34:10,10 41:2
　52:7,10,13
　54:24 64:6,7
　72:10 87:4
meant 47:7 52:9
　55:11 68:25
　79:23
measure 36:3
　56:9
measured 36:2
measurement
　34:19
measurements
　20:7
mechanical
　56:19
medical 96:4
medication 96:5
medications
　95:18
meeting 89:23
members 49:4
　61:8,14 73:25
　74:1 85:5
membership
　21:13,20
memorized

52:18
memory 39:13
　52:21
mentioned 56:4
　74:25 84:10
Michael 2:13
　65:20,24 66:17
　68:23 70:13
　73:6 74:8,13
　75:6,12 91:6
　95:8
middle 1:2 9:24
　19:12 21:3
　22:9 41:4,7
　59:19 77:4,15
　78:2 80:2,18
　81:6,14 82:3
　82:24 83:23
million 62:8
mind 20:14
mine 7:2 24:13
minors 13:21
minute 12:16
　45:18 46:21
moment 16:3
　46:7 73:8
monetary 61:21
money 29:11,14
　29:16 44:8
months 28:3
　77:3 93:18
Morales 1:10,15
　5:4,19 24:4
　31:14,23 34:3
　44:25 48:2
　54:20 63:3
　66:10,13,20
　73:16,19,25
　75:11,25 86:25
　94:15,17 95:12
Morrison 1:20
Motion 4:18
　72:24 73:14
motor 53:22
　57:10
motor's 40:11
motors 47:18

50:5 51:15
　53:6,8,22,24
move 12:10
　23:21 24:15,16
　40:3 43:22
　56:20 63:23
moved 60:20
moving 15:3
　56:3
mshortnacy@...
　2:18
Mt 11:21,22
multi-district
　41:3
Multnomah
　11:14

**N**
name 5:17 27:4
　27:17 48:17,20
　51:25 52:1
　57:21 66:9,13
　66:14 71:10
　75:11 91:6,7
　97:18
named 38:3
names 38:5
　87:10,12
nearly 58:24
necessarily
　66:24
need 6:24 7:5,9
　7:17 8:9 15:16
　32:16 55:18,24
　56:1,2,5 66:15
　82:18 91:16
　93:4
needed 36:6
neither 97:14
net 37:5
never 60:1 72:21
　81:12
new 40:18 59:10
　59:14,19
newer 18:13,25
　59:6
nice 43:20

nine-year 80:5
nod 6:17
nodding 22:4
Non-class 73:25
normal 31:18
notice 25:24
　26:2 37:15,16
　37:19,20 38:10
　38:15 39:12
　47:9,16 51:15
　85:4,6,7,11,15
　85:16
noticed 17:8
　69:5
notices 25:21,22
　38:20 86:19
　87:2,5
number 24:18
　33:20 61:7,13
　89:5 90:23,23
numbered 66:6
numbers 61:24

**O**
oath 97:9
object 25:25
　26:3,18 59:20
　68:22 69:8,14
　69:20,23 71:5
　74:1 94:11,13
　94:20
objected 24:20
　25:3,4,6,12,18
　26:12 29:7
　32:5 40:14
　67:11 68:19
objecting 25:15
　26:6,9 41:22
　43:5 46:21
objection 4:16
　4:17 8:19,21
　22:22 23:25
　24:22,23 28:13
　28:15 29:12
　30:10,14,22
　31:1,10 33:13
　37:21 38:1

SHIRLEY MORALES

41:4,15,20
42:10,17,25
43:3 44:9,22
45:5,7,11,25
46:4,14,19
47:5 49:1,25
50:4,21 51:25
52:1,2 54:14
54:18,20 57:8
60:11 65:9,10
67:24 68:1
70:8 71:1,7,10
71:13 73:15
88:10 92:3
94:3,14 95:6
**objections** 44:12
46:7 67:7
69:13 95:6
**obtain** 13:16
14:7
**obtained** 13:6,14
14:3
**Obviously** 83:2
**occasion** 87:24
88:2
**offer** 37:8 43:6,7
**offered** 42:21,25
43:4,10,13
49:4 52:11,13
52:16,23 54:25
61:19,22 62:20
62:22 63:8,10
63:20
**offering** 53:3
**OFFICE** 3:5
**offices** 1:19
**Oh** 11:12 42:21
57:1 65:18
**okay** 7:3,11,19
8:3 10:8 15:23
18:7 27:19
31:8 33:5
42:22 45:17
46:18 48:24
51:1,2 56:22
57:5 63:7 66:7
66:11,19,20

69:21 72:16,19
73:10,10 76:7
82:19 85:1,8
90:12 92:25
93:24
**old** 56:8,9,13,14
59:15
**older** 18:13,21
19:7 59:1,3,12
**oldest** 77:22
**ones** 13:4
**online** 38:3,7,13
39:6 41:10
84:11 85:24
88:6 94:2,3
**operate** 47:18
50:6 51:16
53:6,9,15,24
78:4
**operational**
53:20 78:1
**opinion** 31:24
33:10 34:2,4
49:14,23 50:20
61:18,20 62:7
64:5 80:17
**opinions** 32:20
39:8
**order** 85:4
**Oregon** 1:14,20
2:8 5:1 11:18
11:20 13:15,17
14:2
**original** 17:24
63:5
**output** 53:22
**overlapped**
34:15
**overstated** 40:6
40:9
**owned** 16:8
78:16

**P**
**p.m** 1:18 5:2
96:24
**page** 4:3,11,22

16:4,5,6 22:17
23:22 24:16,17
28:6 30:6,20
45:1,2 48:7,9
53:5 55:5,9
56:20 60:14
63:24 65:16,18
66:4,5,5 67:16
71:13,14 72:4
74:5 93:8
**paid** 79:12,13
**Palma** 12:19,23
13:1
**paragraph**
46:10,25 47:13
47:23 50:8,11
51:21 53:5
55:5,9 56:20
57:2 60:14,15
63:24,24 66:9
73:22
**paragraphs**
45:22
**paraphrase** 50:8
69:17
**paraphrasing**
69:17
**Pardon** 95:16
**Parkrose** 12:6
**part** 7:21 26:9
26:17,18 42:3
66:16 68:4
**parties** 61:5,11
73:24 97:16
**partner** 56:17
79:5
**parts** 51:22
**party** 33:21
**Patrick** 73:15
**peak** 47:18 50:6
51:16 53:6,9
53:18,25 55:15
55:17
**Pennsylvania**
1:2 3:7 41:5,7
**people** 6:23 24:8
33:20 37:3

53:14 69:7,19
81:16 84:13
**percentage** 26:2
**perfect** 7:5 8:5
15:13 51:14
**perfectly** 15:15
39:24 72:7
**period** 77:6,10
**permission**
72:10,11,12
**person** 12:15
23:23 64:13
**personally** 14:24
86:12
**perspective**
46:12 47:2
**phone** 5:9 60:21
89:5
**photograph**
4:15 75:20
77:24 79:8
80:14,15
**PHP** 53:18
**phrase** 26:18
**phrasing** 31:16
**pick** 36:21 58:13
58:16 60:1,24
83:6,13
**picked** 36:9
**picks** 34:25
**picture** 9:25
17:8 18:5,17
18:22 78:15
**pictures** 9:17,20
10:2,4 17:22
**Pilates** 11:24
12:1
**pile** 32:10 72:20
**Pine** 2:6
**place** 32:9 49:10
49:13 97:6
**placed** 97:8
**Plaintiff** 1:11
2:3
**plaintiff's** 9:10
15:24 18:8
41:17 64:1

65:12 73:1,6
91:3
**please** 5:18 16:8
16:10 22:19
23:22 24:18
28:8 30:8,21
41:14 44:25
61:10
**PO** 2:7
**point** 86:3
**pointed** 59:1
**pointing** 20:24
50:10
**portion** 50:16
82:8
**Portland** 1:20
5:1
**position** 9:4
23:18 24:7
31:15 54:2
**possession** 16:12
**possible** 5:13
**possibly** 38:12
**post** 12:22 85:17
85:18
**power** 34:24
80:11,18 81:17
**powerful** 58:24
59:7 81:3,6
**practices** 1:5
44:1,4
**preceding** 24:21
28:15
**preliminary**
85:2
**present** 10:20
**pressed** 76:3
**pressure** 7:15
**pretty** 21:21
66:3 71:22
**previous** 9:3
**previously** 9:16
46:15
**price** 18:12 19:1
83:3
**Primarily** 16:25
**primary** 13:4

SHIRLEY MORALES

78:6,10
printed 8:11
prior 10:17
37:25 78:15
86:15 97:8
private 11:16
privilege 45:16
privileged 88:11
88:16
probably 15:4
46:23 56:1
57:17 58:5
65:16 79:13
83:14,21 84:7
94:11
problem 26:10
38:6 50:3 61:2
90:2
Procedure 1:15
proceedings
1:18 22:23
97:5,8,9
produce 44:6
produced 9:17
product 31:12
32:1,3 35:21
42:4,7,8,18
43:10 44:6
52:24 55:20,20
56:6 57:13,13
57:25 58:9
59:10,22,24
64:15 87:22
products 37:8
62:21,24 63:16
63:19,22
project 17:3,4,7
20:12
projects 17:5
promising 56:18
properly 42:15
provide 24:22
28:8 50:23
provided 61:5
61:11
provides 47:9,16
51:15 76:4

providing 22:21
public 85:11
published 85:16
pulls 81:9
purchase 16:11
21:6 22:9
55:20 63:2,4
65:2 76:25
79:4,17
purchased 16:15
17:17 19:8,13
21:10,13 75:24
76:11 77:1,3,5
77:8,15 78:2
78:21 79:3,5,5
83:4
purchaser 17:12
87:22
purchases 55:25
56:3
purchasing
21:14 54:5
76:20
purposes 53:20
pursuant 1:14
put 22:14 26:23
49:20 54:6
70:22

                Q
qualified 27:7
27:10
qualify 27:14
68:5
question 7:1,13
7:15 8:7 10:16
13:9 14:22
16:6 22:19
28:18 29:15
31:5,17,20,24
32:6 37:18,24
38:5 41:6 43:3
46:3,6,8,13
49:22 50:17
63:13 74:10
85:15 86:24,25
87:4 88:13,25

92:14,24 94:15
94:17,25 95:25
96:9
questioning
89:15
questions 7:25
9:7 10:13
13:10 16:20
24:12 33:5
39:17 40:2,3
40:22 52:2
55:23 60:13
65:10 66:21
67:5 70:9,12
74:11,13,14
75:7,14 84:8
95:4,9,10,23
96:11,20,21
quicker 6:12
quickly 81:9
quit 56:8,11,12
56:13 78:25
quotations
50:16
quote 47:17
quotes 50:15
53:4

                R
raised 46:4
rating 80:11
re-ask 31:20
re-list 55:18
reach 86:3,5
read 16:7,13,18
22:17,18,24
23:3 24:1,5,18
24:24 28:7,8
28:16,23 30:6
30:7,15 31:2
31:24 39:10,11
39:15,18 41:9
47:3,20 51:17
51:20 56:25
60:17,24 61:9
61:10,16,17,23
62:6 64:3

66:12,15,16
68:20 73:13,13
73:17,23 74:3
90:23 91:15,16
reading 12:6
38:2,7 39:21
51:13 88:5
real 6:16 69:11
69:22
realize 5:20
15:16 69:13
really 7:7,22
21:22 23:8
26:8 27:25
31:13 52:24
57:13 60:6
64:11 68:8
69:6 70:16
72:12,21 86:2
reason 23:24
30:13,25 32:13
69:12 94:5,7
95:13 96:1,2
reasons 57:15
recall 12:5 17:16
17:18,23 19:1
19:7,16,21
20:13 23:15,16
26:6 28:5,20
28:22 29:18
38:2,3,17 39:1
39:2,10,11,14
49:12 61:24
62:6 63:21
66:2 67:10,13
67:18 68:2,3
70:3 71:2,6
77:1 79:3,12
79:16 84:20
85:14,20 89:7
91:17,19 92:5
92:6,10,12
93:19,23
recalled 29:1
76:20
receipt 16:11
receive 25:24

38:20 85:18
86:18,21 87:15
92:4
received 28:12
29:2,4,11,20
29:21,23,24
38:24 90:13
92:3
receives 87:2
receiving 28:21
85:20 91:18
Recess 65:6
89:20
recollection
29:10 84:25
88:3
record 5:8,18
15:8 18:2
22:24 83:8
89:19 97:9
Reese 91:6
refer 8:14,19
reference 82:10
referenced
84:10
referral 23:10
referred 18:12
18:12 81:24
referring 26:14
60:12 81:2
83:10,23
reflect 49:9
refresh 75:18
88:3
regarding 86:8
87:15
regardless 22:22
regards 37:13
74:25
Regional 11:15
regularly 38:18
related 23:24
37:24
relation 35:24
38:8
relationship
32:6

SHIRLEY MORALES

relative 97:15
relay 67:14
release 55:2,4
Releasing 55:6
relief 46:10,25
　47:6,23 48:5
　50:13,15,22
　51:6 52:6
　54:23 56:24
　57:5,16 61:6
　61:12 63:25
　64:11
rely 56:16 57:22
　57:23 60:10
remember 5:25
　6:2,5 9:18
　18:15 20:18
　21:20 25:15,21
　27:4,12,12,17
　27:19,22 28:4
　29:7 38:7,23
　39:21 58:10
　68:15,17,19
　70:4,17,21
　72:13,18 76:24
　79:18 83:1
　86:2,9 87:11
　87:11 88:5,6
　90:19,25 91:3
　91:9,13 93:3
　93:11,11,12,21
　94:8
REMEMBER...
　1:14
renter 78:19
repair 84:16
rephrase 31:17
　40:22
reported 1:19
reporter 1:17
　6:14 22:15
　97:4
REPORTER'S
　97:1
represent 73:5
　75:12,25 76:5
　88:9

representation
　76:9 81:17
request 4:13
　15:19,21 31:16
　64:2 65:5
requested 60:15
　62:1 65:4
require 65:1
research 56:5
　85:23
resolution 28:13
response 16:15
　23:1 24:3 25:1
　25:3 28:20
　57:14 93:9
responses 4:14
　15:5 16:2
responsible 43:9
result 69:24
resume 22:14
retain 23:14
retained 45:20
retroactive
　52:23
review 8:9 37:25
　39:8 44:20
reviewed 37:15
revisit 94:11
Ricardo 1:16
　97:3,23
right 7:12,20 8:8
　8:12 9:22 10:6
　14:12 19:2,4
　20:20 21:5,7,8
　21:11,18,25
　23:13 25:5,17
　27:11 30:19
　32:7 35:17
　37:17 39:7,20
　42:15,16,24
　43:2 45:6,10
　45:17 48:18
　51:17 52:22
　53:7 56:19
　57:3 58:16
　59:2,5 60:10
　63:21 67:5,21

67:25 68:14
71:15 73:21
74:22 77:5,7,9
78:21 79:9
80:12 81:22
82:5 85:12
90:4,6,16
91:15,21 92:20
94:10 95:18
Road 3:6
rolls 76:4
rough 70:5,7
roughly 21:14
rules 1:14 6:10
　7:13,21
run 22:5 72:21
　72:22
run-ins 14:25

──────── S ────────

S/ 72:1,5,9 74:7
SALES 1:5
satisfied 20:20
　20:22 21:2
　73:24
saw 55:17 88:7
　94:3,4
saying 15:9 51:9
　51:11,12,13
　62:20 69:18,22
　81:1 83:9
says 24:18 46:10
　46:25 47:8,17
　50:13 51:1,14
　53:7,10,11
　56:23 60:15,19
　63:25 65:19
　66:12,17 67:20
　71:15 80:12
schedules 89:24
school 8:25 9:4
　10:24,25 11:13
　12:2,6,18,23
　13:1,2,3,13
　14:5
schools 11:15
　13:5,14 14:3

science 12:8,14
　34:14
scientific 12:14
　34:16
SE 1:20
second 32:8
　46:10,24 56:20
　60:14
Secondarily
　17:1
secondary 12:22
section 47:10
　60:17
see 6:13 8:23
　13:9 19:23,24
　19:25 31:8
　32:18 42:21
　47:8,9 48:15
　48:20 49:1
　50:17,18 52:17
　61:4 65:19,22
　71:14,16,25
　72:2,4 75:2
　81:18 84:21
　87:20,21 89:15
seeing 51:19
seeking 44:9
　55:21
seen 38:13 39:6
　44:18 65:16
　84:10 87:12
sell 62:14,16
sells 62:11,21
sense 13:11
　28:18 33:22,23
sent 9:25 15:19
　15:21 37:18,18
　65:7
sentence 47:9,15
　61:4 64:6
separate 58:17
September 1:12
　1:17 5:1 97:18
Service 11:14
set 72:19 74:14
　97:6
settlement 24:20

26:19 28:14
38:8 41:22,24
42:17,21 43:12
44:12 49:4
52:11 55:2,4,6
61:19 68:16
74:2,17,18
75:1 84:9,18
85:3,10,21
86:16 87:8
88:4,6 92:7
settlements
　86:19 87:2,15
　87:21,23
seven 82:23
share 96:1
shift 90:5
Shirley 1:10,15
　5:4,19 10:10
　24:4 34:3
　66:10,13,14
　73:15,19
shop 81:6
Shop-Vac 1:4
　8:14,15 9:13
　16:8,16,22
　17:2,16,24
　18:13,13,18,21
　19:7,12,17
　20:19 21:3,7
　21:15 22:10
　26:15 32:18,22
　33:24 35:25
　36:5,25 37:1
　37:14,25 40:14
　40:15,19 41:8
　43:12 44:3
　47:18 49:5
　50:5 51:15
　53:6,8,14,24
　54:6 55:16,20
　59:1,3,6,12,15
　59:19 62:25
　63:3,9,16 65:2
　74:16 75:13
　77:4,15,22
　78:11,15 81:14

SHIRLEY MORALES

81:17 82:3,24
83:23 88:4,6
**Shop-Vacs** 8:17
63:11 78:16,20
**short** 89:14
**short-term**
39:13 52:20
**shorthand** 1:17
97:4,10
**Shortnacy** 2:13
4:5 20:23
75:10,12,20,22
86:25 87:3
88:12,15,20
89:14,19 95:10
**show** 50:9 57:24
**showed** 94:3,4
**showing** 58:2
**shown** 47:19
50:6 52:1 53:7
53:9,25
**shown.'** 51:16
**sic** 12:24
**SIDLEY** 2:14
**sign** 72:11
**signature** 45:2
48:9 71:16,18
**signatures** 71:21
71:22 72:8
**signed** 57:20
72:10 74:6
87:14
**signing** 72:6
**silly** 33:6
**similar** 35:4
62:21,24 95:6
**sit** 44:13
**six** 21:25 28:3
82:23
**skip** 30:4 51:18
51:23,24
**slower** 22:17
**small** 83:2
**smiling** 13:24
**sociology** 13:22
**softer** 60:22
**solution** 44:5

**somebody** 72:6
72:11
**someday** 56:17
**soon** 7:17
**sooner** 15:17
**sorry** 10:11
13:12 22:4,6
27:18 33:5
39:17 50:25
51:18 52:4,17
57:4 58:21
63:13 69:17
76:18 92:8
93:23
**sound** 22:5 81:8
91:20
**sounds** 91:15
**speak** 7:6,7
42:12
**specific** 42:2
43:11,18
**spell** 14:19
**spelled** 25:7
**spigot** 78:24
81:23
**spoke** 45:13
**spoken** 86:14
**spread** 80:5
**spring** 67:15,23
**Springdale**
11:13
**Springwater**
8:25 9:4 10:24
11:6
**stainless** 19:2
**stamp** 67:17,20
76:3
**standard** 64:8
**standing** 19:14
22:10 30:11,12
30:24,25 31:13
32:2 59:20
68:7,11 74:1
**Stanley** 19:3
20:13 21:7,9
21:14 59:10
76:25 77:8,19

80:9,19 81:2,6
81:10,13,20,23
82:1,16 83:9
83:19 84:2,5
**start** 12:10
93:14
**started** 12:5
84:21
**starting** 24:10
**starts** 47:15 66:9
**state** 5:8,17 14:6
14:8 16:8,10
24:18
**stated** 19:16,21
57:20,22,23
84:2 91:13
**statement** 7:8
28:9 38:25
50:23
**states** 1:1 11:18
**status** 37:11
**stayed** 60:1
**steel** 19:2
**step** 48:21 69:2
**stop** 13:11 45:18
**stopped** 58:11
**stopping** 45:14
**Street** 1:20 2:15
**strength** 34:20
34:21,22 35:5
35:15 36:14
54:6
**stress** 90:3
**strike** 42:1
**strong** 59:25
60:7
**stronger** 80:24
81:1
**stuck** 54:15
**studies** 13:21
**stuff** 90:5
**subjects** 11:5
12:2
**subscribed**
97:18
**substitute** 12:9
**suggest** 81:5

**Suite** 1:20
**summarize** 25:1
**summer** 84:21
85:4,9 89:10
**Sunday** 5:1 90:1
**supposed** 7:14
49:10 54:11
**sure** 7:23 15:7
18:1 19:5
20:10 22:15
23:8,9 25:17
25:18,20 27:24
27:25 29:13
30:18,19 35:8
35:10 38:9,14
38:22 39:23
42:20 44:15
45:12 46:3
52:8 60:25
61:11 64:14
66:3 67:15
76:10,16 79:14
84:23 93:5
95:17
**surgery** 67:14
**Suzanne** 1:16
97:3,23
**Sweetwater**
11:13
**switch** 56:14,16
59:16
**sworn** 5:4,20

--- T ---
**T** 65:20,24 66:17
68:23 70:13
73:6 74:8
**table** 7:14
**take** 6:14 14:23
16:3 32:12
48:16,21 69:2
73:7 82:6,21
89:14,18
**taken** 1:11,16
97:6
**talk** 6:25 10:11
12:16 32:17

36:24 37:19,22
41:20 45:23
90:9,10 92:2
**talked** 23:6
36:12 46:7,19
71:1 90:6,8
**talking** 8:14,16
8:20 17:4
18:11,19 19:5
24:11 32:19
35:8 42:13
46:4,16 48:25
50:14 57:1
62:19 63:22
73:20 74:16
77:11 80:5
84:14
**talks** 9:3
**tall** 78:22
**taller** 83:4,9
**tank** 36:1,3,7,9
83:18
**taught** 11:20
12:2,5,8 34:14
**teach** 11:3,4,5
11:22
**teacher** 11:2,9
11:11,12 14:9
14:14,15,16
**teaching** 12:6
**telephone** 3:4
**tell** 8:7 10:15
13:13 31:24
35:3 38:4
57:18 58:7
64:21 76:23
77:13 84:23
85:22 96:14
**telling** 7:16
**ten** 15:10 82:22
**tended** 78:10
**tendered** 71:8
**term** 53:18 55:2
55:8,15,17
68:8
**terminology**
48:2

SHIRLEY MORALES

**terms** 66:23
  75:24 76:20,25
  89:7
**terrible** 13:9,10
**testified** 5:5 87:1
**testifying** 97:8
**testing** 53:23
**tests** 20:7
**thank** 14:21
  15:17 24:15
  32:7 41:12
  48:21 57:3
  61:1 63:14,23
  66:20 75:8
  89:25 90:1
  95:12 96:19
**theories** 46:5
**therapy** 11:4
**thereof** 97:13
**thing** 35:9 42:15
  58:13 75:25
  85:22
**things** 15:3
  18:12 22:14
  38:2,7 42:13
  56:19 58:4,8,8
  64:14 68:20
  79:23 81:16
**think** 12:14 15:3
  15:15 23:8
  25:14 27:3,5,6
  27:7,9,14 28:4
  29:6 30:16
  31:6,7 35:6,14
  36:2,3,8,12,14
  38:11 39:5
  42:11,12,14
  43:11,25 49:15
  54:2 55:24
  56:5 57:15,20
  62:6 64:18
  65:25 66:5
  68:4,21 69:3
  69:11,18,22,24
  70:15 72:10
  74:10,21,22,22
  78:13 79:1,13

**80**:10 81:8
  84:1,17 85:23
  85:24 86:9
  89:13,17 90:21
  90:22 91:2
  93:22
**thinking** 17:6
  29:22
**third** 47:15 57:2
  60:15 66:9
**thought** 21:21
  25:20 27:13
  43:17 55:11
  56:4 62:18
  65:8 68:6
  78:25
**three** 9:17,21
  10:3 17:9,10
  18:5,12 35:11
  75:21 78:7
**threw** 79:1
**tickets** 14:24,25
**time** 7:9 16:9,16
  22:18 48:16
  67:16,21 77:6
  77:10 78:1
  79:21,23 89:7
  94:13 95:13
  96:19 97:6
**timeframe** 20:11
  21:17 22:11
  26:5 37:20,22
  76:20
**times** 24:18
  36:21 59:18
  82:15 84:7
**timing** 75:23
  90:9,10
**tip** 80:24
**tippy** 60:5
**tips** 60:5
**today** 5:21 6:18
  8:10,24 9:14
  9:24 10:5,17
  18:19 35:23
  44:14 59:18
  76:2 95:13,14

**95**:23 96:3,12
**told** 36:14 48:3
  55:10
**top** 22:14 36:23
  58:16 59:25
  73:12,12 83:16
  83:17,18
**touch** 70:23
**traffic** 14:24,25
**Trail** 8:25 9:4
  10:24
**training** 31:15
**transcribed**
  97:11
**transcription**
  97:12
**tricky** 96:3
**tried** 96:16,18
**true** 28:2 39:1,4
  82:3
**truth** 40:3
**truthful** 95:19
**try** 5:12 6:24
  7:10 56:6
  75:23 76:8
  87:11 90:4
**trying** 26:23
  37:19 51:24,24
  54:13 67:3,4
  69:9 70:11,12
  71:24 72:7
  93:5 96:3,4
**tub** 17:1 36:20
  60:4 78:8
  79:23 81:11,15
  82:7,25 84:6
**turn** 16:4 44:25
  72:4 74:5
**two** 13:21 17:21
  20:8 23:12
  24:8 57:10
  63:5 64:15,16
  66:9
**two-year** 65:1
**type** 25:2
**types** 20:7 62:14
  63:16,19

**U**

**uh-huh** 6:17
  16:24 22:1
  25:23 26:13
  35:18 46:20
  51:5,8,11
  58:18 71:17
  76:22 80:7
  81:3,19 83:25
  84:4 86:20
  91:25
**ultimate** 43:15
**unclear** 26:19
**uncomfortable**
  35:7
**understand** 7:24
  7:25 8:2 26:8
  26:11 31:4,7
  31:17 32:21
  33:16,24 34:18
  34:20 35:24
  38:23 39:16
  40:24 49:2
  51:25 52:3,3,5
  56:6,19 57:11
  57:12 63:23
  64:13 66:22
  67:3 68:11
  70:6,10 88:23
  92:16 95:23
  96:16,17
**understanding**
  33:18 35:14
  52:15,19,20
  80:17
**understood**
  96:11
**unfair** 69:25
  70:2
**unfairly** 69:19
**unit** 59:4,19
  76:1,2,3,6,25
  77:1,4,15,22
  78:2 80:1,2,9
  80:18,19 81:2
  81:6,10,13,14

**81**:20,23 82:4
  82:16,24 83:9
  83:19,24 84:2
  84:5
**UNITED** 1:1
**units** 75:24 78:7
**University** 13:15
  13:17 14:2
**unreasonable**
  46:11 47:1,6
  47:24 50:7,14
  50:22,23 51:7
  52:12 56:24
  57:6
**use** 17:2 34:21
  35:2,3 47:17
  50:5 51:15
  53:6,8,24 56:4
  58:12 78:6,10
  81:12,16 84:5
**uses** 60:3 78:12
**usually** 17:14
  87:6

**V**

**vacuum** 8:15
  9:13,17,21,23
  9:24 10:3,4,4
  16:9,12,25
  17:15,23 18:14
  18:18 19:1,22
  20:2,5 21:7,9
  21:14,15 34:25
  36:20 40:9,19
  42:14 53:19,21
  55:21 56:11
  60:3 81:7
**vacuums** 17:9
  17:10,12,21
  18:5 35:4,11
  37:7 53:15
  75:21
**vaguely** 27:12
**valuable** 64:10
**value** 61:6,7,12
  61:13,18,21
  62:8

SHIRLEY MORALES

variables 20:8
variety 11:15
various 85:17
verbal 6:18,19
verbatim 97:9
versus 25:7
   92:11
visit 87:20
voice 60:21

**W**
walk 57:24
walking 58:2
Walsh 2:4,5 4:4
   4:6 5:7,12,16
   9:6,12 10:7,12
   15:18 16:1
   18:1,10 20:25
   21:1 31:19,22
   33:15 41:13,19
   44:22,24 48:6
   50:10,12 54:10
   54:13,19 60:23
   61:2,3 65:4,7
   65:14 72:23
   73:3 74:21,24
   75:6,14 89:17
   89:22 94:10,16
   94:23 95:3,8
   95:11 96:19
want 10:14 13:3
   19:5 20:23
   22:14 23:5
   30:5 31:17
   32:7,8,12,12
   32:17 35:7,8,9
   36:22,24 39:25
   43:18,24 45:14
   45:18 49:1
   60:14 64:18
   74:18 75:1,23
   76:8 84:8
   89:14 90:10
   91:14 92:19
   94:18
wanted 16:3,25
   65:18 73:11

74:12 75:15
wants 94:13
warranties 61:7
   61:13,19,22
   62:15,16 63:16
   63:19,20,21
warranty 49:6
   56:23 57:1,5,9
   57:12 62:8,20
   62:21,24,25
   63:4,5,25
   64:10,14,16,25
   65:1
wasn't 14:10
   20:20 29:14,17
   32:5 43:10
   65:25 68:4
   77:2 93:19
watched 5:25
water 16:25 78:7
   78:24 81:9,11
   81:24 82:6,12
   82:17 83:6
way 26:24 28:1
   30:1,2 33:10
   36:22 40:23
   45:10 46:22
   60:8 81:8
we'll 6:13,24 7:5
   7:10,18 8:11
   12:10 30:18
   32:9 46:22
   63:5 66:4
   89:19
we're 5:12 6:9
   8:16 19:5
   24:10,11 30:4
   35:8 49:19
   56:18 63:22
   73:12,19 74:16
   77:11 80:5
we've 18:19
   44:11 45:25
   66:22 89:5
website 38:8
   49:8

websites 85:17
   87:7,14,17,20
went 13:6,13,14
   13:15 14:3
   86:9
weren't 20:22
   63:10
West 2:15
wet/dry 16:9,12
   17:12,15 53:19
   53:21 55:21
   75:21
WHEREOF
   97:17
winter 67:15
withdraw 44:9
Withdrawal
   4:18 72:25
   73:14
withdrawn 94:5
witness 4:20
   10:11 48:5
   88:13 97:17
witnesses 97:7
Wong 25:7 29:6
   29:8,11 92:11
   92:22 93:2,13
Wong/Alacer
   90:14
word 26:18
   34:10 64:22
words 46:6
   66:25
work 5:13 7:18
   9:3 16:3 20:19
   24:11 58:15
   59:15 68:4
   84:12,13,16
worked 11:15
   86:10
working 38:12
   56:9,11,12,13
   58:12 79:1
   86:15
works 56:15
worry 40:2
wouldn't 41:10

57:25 68:11
   80:16 94:5,7
write 45:7 54:14
   54:18,20
writing 45:11
   51:3 54:21
written 52:19
   56:7 88:8,15
   94:19
wrong 31:12
   35:2 55:1

**X**

**Y**
yeah 30:3 80:7
   84:4
year 6:5 12:20
   20:15 21:14
   26:6,7 27:23
   29:7 67:23
   70:5,7 77:2,12
   77:18 84:7
   93:20,22
years 12:4 15:10
   21:25 24:21
   25:12,16 27:1
   28:14 57:10
   63:6 64:15,16
   93:16,19
yes' 38:5
yoga 11:4,24,25
   12:1 14:15,16
   14:18

**Z**

**0**

**1**
1 9:7,10 16:6,9
   35:11 50:11
   53:5,5 56:20
   66:5,6 73:22
1- 4:12
1.5 59:3,8
10 4:22 24:17
   28:6 30:6

10,000 29:17,25
11 1:12,17 5:1
125 3:6
12th 97:18
13639 1:16
13659 97:4,23
15 4:13,14 82:14
   82:16
16th 85:7,16
170 62:8
18 4:15
18901 3:7
196 44:23
1969 12:21
1979 12:23
1986 6:3,5

**2**
2 15:18,24 16:5
   16:5,7 22:16
   22:17 23:22
   24:17 28:6
   30:6 35:12
   55:5,9 59:7,11
   60:14 66:5
   93:8
2- 4:13
2.0 19:25 81:18
2.8 80:12 81:20
2:58 1:18 5:2
20 4:23
2001 80:3,6
2006 16:9 19:10
2008-2010 16:16
   20:11 21:16
   22:11
2010 76:6,15,24
   77:16 79:25
   80:1,6
2016 1:12,17 5:1
   16:10 67:20
   85:3 97:18
213)896-6665
   2:17
21810 2:6
21st 76:6
225 1:20

**SHIRLEY MORALES**

**2380** 1:4
**23rd** 71:15
**25th** 16:10
**267)252-1035**
  3:8
**26th** 85:3
**28th** 67:20

**3**

**3** 15:24 16:2,5
  23:21 35:13,14
  45:1,2 48:7,9
  93:8
**3-** 4:14
**39** 79:13

**4**

**4** 18:3,4,8 22:13
  24:16 75:16,18
  75:20
**4-** 4:15
**4:12-md-2308...**
  1:6
**40** 17:19 79:13
**41** 4:16

**5**

**5** 4:4 28:7 41:14
  41:16,17 44:17
  44:21,22 50:4
  53:5 56:21
  60:12 71:13,14
  91:14 93:9
**5-** 4:16
**5:13** 96:24
**50** 17:19
**541)359-2817**
  2:9
**555** 2:15

**6**

**6** 30:4 65:12,15
  72:4
**6-** 4:17
**65** 4:17

**7**

**7** 2:7 30:5,6,19

  72:24 73:1
**7-** 4:18
**73** 4:18
**75** 4:5

**8**

**819** 1:20
**88** 4:22
**89** 4:6

**9**

**9** 4:12 16:5,6
  22:17 23:22
  24:16
**90013** 2:16
**94** 4:23
**97622** 2:8