**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: SHOP-VAC MARKETING AND | : | |
| SALES PRACTICES LITIGATION | : | **MDL No. 2380** |
| _____ | : | |
| | : | **No. 4:12-md-2380** |
| **THIS DOCUMENT RELATES TO:** | : | |
| | : | **(Judge Kane)** |
| **ALL CASES** | : | |
| | : | |

**MEMORANDUM**

Before the Court is Plaintiffs' motion for final approval of class settlement, certification

of settlement class, appointment of class representatives and class counsel, and for approval of an

award of attorneys' fees, reimbursement of expenses, and service awards to class representatives.

(Doc. No. 172.)  For the reasons that follow, the Court will grant the pending motion, certify the

settlement class, approve the settlement agreement, appoint class representatives and class

counsel, and approve the application for attorneys' fees, expenses, and service awards.

**I.      BACKGROUND**

On August 16, 2012, the Judicial Panel on Multidistrict Litigation transferred cases

involving the marketing of Shop-Vac brand wet/dry vacuums to this Court for the coordination

of pretrial proceedings.  (Doc. Nos. 1, 9, 22.)  Plaintiffs Andrew Harbut, Alan McMichael, and

Kris Reid alleged, inter alia, that Defendants Shop-Vac Corporation, Lowe's Home Centers, Inc.,

and Lowe's HIW, Inc. made fraudulent and misleading representations about the peak

horsepower and tank capacity of Shop-Vac brand wet/dry vacuums.[1]  (Doc. No. 97.)  The first

_____

[1] Plaintiffs David Palomino and Scott Giannetti brought a parallel, class action lawsuit
against Defendant Shop-Vac for breach of the New Jersey Consumer Fraud Act and for breach
of warranty in the Superior Court of New Jersey, Law Division, Bergen County, Docket No.
BER-L-1399-12 (the "New Jersey Action").  (Doc. Nos. 12-5; 162-1 at 1-3; see Doc. No. 12-5 at
3-15.)  In the settlement agreement, the parties have agreed to "file with the New Jersey Superior

consolidated amended complaint was filed on February 19, 2013 (Doc. No. 62), and the second

consolidated amended complaint was submitted on September 12, 2013 (Doc. No. 97).

On October 25, 2013, Defendants Shop-Vac Corporation, Lowe's Home Centers, Inc.,

and Lowe's HIW, Inc. moved to dismiss the second consolidated amended complaint pursuant to

Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (Doc. No. 102.)  This Court granted in

part and denied in part Defendants' motion to dismiss.  (Doc. Nos. 115, 116.)  Thereafter, on

August 13, 2015, the parties entered into mediation with the Honorable Edward A. Infante,

retired Chief Magistrate Judge of the United States District Court for the Northern District of

California.  (Doc. No. 140 ¶ 2.)  In September 2015, the parties reached an agreement in

principle to settle (Doc. Nos. 140 ¶ 3; 161 at 16; 162-1 at 11, 43), and continued negotiating until

March 2016 with the assistance of Judge Infante (Doc. No. 156).[2]

On April 1, 2016, Plaintiffs Andrew Harbut, Alan McMichael, Kris Reid, David

Palomino and Scott Giannetti ("Plaintiffs"), on behalf of themselves and as representatives of the

proposed class, and Defendants Shop-Vac Corporation and Lowe's Home Centers, LLC[3]

("Defendants") executed the Class Action Settlement Agreement ("Settlement").[4]  (Doc. No.

162-1.)  The settlement class consists of "each person in the United States and its territories who,

from January 1, 2006 to the date of entry of the Preliminary Approval Order, either (1) purchased

---

Court the necessary papers to dismiss the New Jersey Action with prejudice and without costs."
(Doc No. 162-1 at 20.)

[2] The parties reached an agreement as to attorneys' fees months later and incorporated the
fee amount into the settlement agreement on April 1, 2016.  (Doc. Nos. 173 at 15; 174 ¶ 62.)

[3] Defendant Lowe's Home Centers, LLC was formerly known as "Lowe's Home Centers,
Inc., and Lowe's HIW, Inc."  (Doc. No. 125, see Doc. Nos. 118, 119 at 1 n.1.)  Lowe's Home
Centers, LLC is "the successor entity to Lowe's Home Centers, Inc., and Lowe's HIW, Inc."
(Doc. No. 119 at 1 n.1.)  Accordingly, the Settlement defines "Defendants" as Shop-Vac
Corporation and Lowe's Home Centers, LLC.  (Doc. No. 162-1 at 5.)

[4] The Court will refer to Plaintiffs Andrew Harbut, Alan McMichael, Kris Reid, David
Palomino, and Scott Giannetti and Defendants Shop-Vac Corporation and Lowe's Home
Centers, LLC collectively as "the parties."

a Vacuum, or (2) received a Vacuum as a gift, or (3) acquired possession of a Vacuum through other lawful means" ("Settlement Class").  (Doc. No. 162-1 at 9.)

The Settlement provides that Defendants will extend the manufacturer's warranty on the motors of the Shop-Vac brand wet/dry vacuums by twenty-four months, change how Shop-Vac discusses peak horsepower on its marketing materials, and modify the tank gallon legend of Shop-Vac brand wet/dry vacuums.  (Doc. No. 162-1 at 12-13.)  Defendant Shop-Vac will also maintain a website and toll-free number for class members who request a warranty remedy.  (Id. at 13.)  In exchange, the Settlement releases, inter alia, all claims that Plaintiffs or any member of the Settlement Class have or may in the future have against Defendants, that:

> (a) has been alleged in the Lawsuits or (b) could have been alleged in the Lawsuits or in another   court action and relates (i) to any of the alleged inadequacies, misstatements, or issues of or associated with the Vacuums alleged in the Lawsuits or (ii) to any act, omission, damage, matter, cause, or event whatsoever arising out of or related to the initiation, defense, or settlement of the Lawsuits or the claims or defenses asserted or that could have been asserted in the Lawsuits.

(Id. at 8.)

On April 1, 2016, the parties jointly moved this Court to: (1) preliminarily approve their proposed Settlement; (2) preliminarily certify the proposed Settlement Class; (3) appoint class representatives, liaison counsel, and class counsel for the Settlement Class; (4) approve the proposed form of notice; and (5) schedule a fairness hearing.  (Doc. No. 160.)  On May 25, 2016, the Court preliminarily approved the proposed settlement agreement, preliminarily certified the proposed settlement class, approved the proposed form of notice, and scheduled a fairness hearing for September 15, 2016.  (Doc. No. 164, 165.)

On July 25, 2016, Plaintiffs filed the present motion for final approval of the Settlement, certification of the Settlement Class, and appointment of class representatives and class counsel. (Doc. No. 172.)  In this motion, Plaintiffs also request approval of an award of $4,250,000 in

attorneys' fees, expenses, and service awards to class representatives.  (Id.)  The Court received

three written objections (Doc. Nos. 193; 196; 199-1 at 3),[5] and seventy-one class members

requested exclusion from the Settlement (Doc. No. 209 at 1-2).  On September 15, 2016, this

Court convened a fairness hearing.  No objectors attended the fairness hearing.  (Doc. No. 210.)

Following the hearing, the parties submitted a revised proposed order.  (Doc. No. 208.)  The

motion is ripe for disposition.

## II.     DISCUSSION

The Court first addresses the prerequisites for maintaining a class action.  Federal Rule of

Civil Procedure 23 governs class certification.  Fed. R. Civ. P. 23(a), (b).  Plaintiffs contend that

the proposed Settlement Class satisfies Rules 23(a) and (b)(3)'s prerequisites.  (Doc. No. 173 at

30.)  Defendants have stipulated to the certification of the Settlement Class.  (Doc. No. 162-1 at

10, 43, 128.)  The Court addresses, in turn, Federal Rules of Civil Procedure 23(a) and 23(b)(3)'s

requirements for maintaining a class action.

### A.     Class Certification

#### 1.     Settlement Class Definition

The Settlement Class consists of "each person in the United States and its territories who,

from January 1, 2006 to the date of entry of the Preliminary Approval Order, either (1) purchased

---

[5] Plaintiffs urge the Court to strike Michelle Vullings' objections for failure to comply with discovery requests and Shirley Morales' objections for filing for an improper purpose. (Doc. No. 201; see Doc. No. 210 at 19.)  Plaintiffs also maintain that Vullings and Morales are "professional objectors."  (Doc. Nos. 198 at 8, 201 at 2.)  Federal Rule of Civil Procedure 23 "confers the right to object upon class members."  NEWBERG ON CLASS ACTIONS § 13:22 (5th ed.); see McDonough v. Horizon Blue Cross Blue Shield of N.J., 641 F. App'x 146, 151 (3d Cir. 2015).  Given that no objectors attended the fairness hearing and that this Court received a total of three objections, the Court finds that striking Vullings' and Morales' objections would not further its role in reviewing the Settlement or in safeguarding the rights of absent class members. See In re Gen. Motors Corp., 55 F.3d at 785.  The Court declines to strike Vullings' and Morales' objections.

a Vacuum, or (2) received a Vacuum as a gift, or (3) acquired possession of a Vacuum through other lawful means."[6] (Doc. No. 162-1 at 9; <u>see</u> Doc. No. 161 at 17.)  The class excludes, <u>inter alia</u>, persons or entities who acquired a vacuum for the purpose of resale, Defendants' employees, and putative settlement class members who properly and timely requested exclusion from the proposed settlement.  (Doc. No. 162-1 at 9.)  The class definition is sufficiently "precise, objective and presently ascertainable."   MANUAL FOR COMPLEX LITIGATION § 21.222 (4th ed.)

### 2. Rule 23(a) Prerequisites

Federal Rule of Civil Procedure 23(a) provides four prerequisites to maintaining a class action: numerosity, commonality, typicality, and adequacy of representation.  Fed. R. Civ. P. 23(a).  The Court addresses each Rule 23(a) requirement for class certification in turn.

### a. Numerosity

The numerosity requirement is satisfied if "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  A named plaintiff can generally demonstrate numerosity if "the potential number of plaintiffs exceeds 40."  <u>Stewart v. Abraham</u>, 275 F.3d 220, 226-27 (3d Cir. 2001) (citing MOORE'S FEDERAL PRACTICE ¶ 23.22 (3d ed. 1999)).  Here, Plaintiffs claim that the class encompasses more than 25 million members (Doc. No. 173 at 31), and have demonstrated that notice was provided to 1,165,149 known class members (Doc. No. 175 ¶¶ 2, 13-14, 21).  Rule 23(a)'s numerosity requirement is satisfied.

### b. Commonality

Rule 23(a)(2)'s commonality prerequisite requires that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  The named plaintiff must "demonstrate that the

---

[6] The parties define "Vacuums" as "Shop-Vac brand wet/dry vacuums sold in the United States and its territories during the Class Period."  (Doc. No. 162-1 at 11.)

class members 'have suffered the same injury'" and that their claims "depend upon a common contention . . . capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011) (internal citation omitted).  Here, Plaintiffs have demonstrated that questions of fact and law regarding Defendants' alleged misrepresentations of peak horsepower and tank capacity are common to the class.  (See Doc. Nos. 97 ¶¶ 16-55; 115 at 10; 173 at 31-33.)  The commonality requirement is satisfied.

### c.      Typicality

Rule 23(a)(3)'s typicality requirement demands that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  The typicality requirement is satisfied "where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct."  In re Nat'l Football League Players Concussion Injury Litig., 821 F.3d 410, 428 (3d Cir. 2016) ("In re NFL Players Litig.") (internal quotation omitted).  Here, the claims of Andrew Harbut, Alan McMichael, Kris Reid, David Palomino, and Scott Giannetti are typical of the Settlement Class because they (1) purchased a Shop-Vac brand wet/dry vacuum (Doc. Nos. 97 ¶¶ 7-9; 176 ¶ 3; 177 ¶ 3; 178 ¶ 3; 179 ¶ 3; see Doc. Nos. 12-5 ¶ 8; 180 ¶ 3), and (2) assert claims based on Defendants' representation of peak horsepower and tank capacity (see Doc. Nos. 12-5; 97 ¶¶ 7-9; 115 at 10, 24; 173 at 32-33; 174 ¶¶ 45-47, 51).  Rule 23(a)(3)'s typicality requirement is satisfied.

### d.      Adequacy of representation

Rule 23(a)(4) provides that "representative parties [must] fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "This requires a determination of (1)

whether the representatives' interests conflict with those of the class and (2) whether the class attorney is capable of representing the class." Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 185 (3d Cir. 2001).

### i.    Adequacy of class representatives

First, as to the adequacy of class representatives, a "class representative must represent a class capably and diligently.  [A] minimal degree of knowledge about the litigation is adequate." In re NFL Players Litig., 821 F.3d at 430 (internal quotations and citations omitted).  Here, each of the named Plaintiffs submitted a sworn declaration detailing his involvement in this lawsuit and his efforts on behalf of the class.  (Doc. Nos. 176-180.)  Each named Plaintiff reported having his deposition taken, reviewing the deposition, and conferring with Plaintiffs' counsel about the settlement terms.  (Doc. Nos. 176-180.)  Named Plaintiffs were purportedly deposed for "a full day" and at least two named Plaintiffs traveled significant distances to be deposed.[7] (Doc. Nos. 173 at 54; 176 ¶ 3; 176 ¶ 3.)  The Court finds that the putative class representatives capably represented the class and merit the proposed incentive awards.

Nonetheless, Objector Michelle Vullings challenges the proposed awards to named Plaintiffs as excessive and unfair to the class.  (Doc. No. 193 at 3-4.)  "Incentive payments to class representatives do not, by themselves, create an impermissible conflict between class members and their representatives."  In re Online DVD-Rental Antitrust Litig., 779 F.3d 934, 943 (9th Cir. 2015) (internal citations omitted).  The purpose of incentive awards is "to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation, and to reward the public service of contributing to the

---

[7] Objector Michelle Vullings questioned the efforts of named Plaintiffs, asked whether they were deposed, and challenged how they protected the interests of the class.  (Doc. No. 193 at 3.)  Vullings' objection lacks merit.  Named Plaintiffs addressed Vullings' questions in their sworn declarations.  (Doc. Nos. 176-180.)

enforcement of mandatory laws." <u>Sullivan v. DB Investments, Inc.</u>, 667 F.3d 273, 333 n.65 (3d

Cir. 2011) (internal quotations and citations omitted).

Here, named Plaintiffs request a $5,000 award for their efforts on behalf of the class.

(Doc. Nos. 162-1 at 18; 173 at 53.)  The requested award of $5,000 is within the range of

compensation that courts have approved.  <u>See, e.g.</u>, <u>Henderson v. Volvo Cars of N. Am., LLC</u>,

No. 09-4146, 2013 WL 1192479, at *19 (D.N.J. Mar. 22, 2013) (awarding incentive awards of

$5,000 and $6,000); <u>In re CertainTeed Corp. Roofing Shingle Prod. Liab. Litig.</u>, 269 F.R.D. 468,

476, 486 (E.D. Pa. 2010) (awarding $2,500 and $5,000 incentive payments).  Therefore,

considering the named Plaintiffs' involvement, the amount of compensation sought, and the

duration of above-captioned multidistrict litigation, the Court will approve the incentive award

and overrule Vullings' objection.  <u>See</u> <u>Perry v. FleetBoston Fin. Corp.</u>, 229 F.R.D. 105, 118

(E.D. Pa. 2005) (discussing the factors to consider when awarding an incentive award).

### ii.    Adequacy of class counsel

Second, as to the adequacy of class counsel, this Court must weigh three criteria: whether

class counsel "(1) possessed adequate experience; (2) vigorously prosecuted the action; and (3)

acted at arm's length from the defendant."  <u>In re Gen. Motors Corp. Pick-Up Truck Fuel Tank</u>

<u>Prod. Liab. Litig.</u>, 55 F.3d 768, 801 (3d Cir. 1995).  Plaintiffs' counsel have conducted

significant work in investigating potential claims prior to filing suit, reviewed 22,000 pages of

Defendants' documents, took and defended multiple depositions, consulted with several experts,

and evidenced their experience in handling complex litigation.  (Doc. Nos. 173 at 13-14, 45, 50;

174 ¶¶ 4, 28, 55, 57.)  In fact, as to the third criterion, Defendants opposed the appointment of

law firms Milberg LLP, Lax LLP, and Faruqi & Faruqi LLP as Plaintiffs' interim class counsel.

(Doc. Nos. 24, 26, 52.)   The Court appointed Milberg LLP, Lax LLP, and Faruqi & Faruqi LLP over Defendants' opposition.[8]   (Doc. Nos. 55-56.)

Accordingly, the Court finds that Rule 23(a)(4)'s adequacy in representation requirement is satisfied.  The Court will appoint Andrew Harbut, Alan McMichael, Kris Reid, David Palomino, and Scott Giannetti as class representatives, the law firm Dilworth Paxson LLP as Liaison Counsel, and the law firms Faruqi & Faruqi, LLP, Lax LLP, Lite DePalma Greenberg, LLC, and Milberg LLP as Class Counsel for the Settlement Class.

### 3.    Rule 23(b)(3): Common questions of law and fact predominate

In addition to satisfying the four Rule 23(a) prerequisites, the parties must also demonstrate that the proposed class satisfies "at least one of the three requirements listed in Rule 23(b)."  Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 345 (2011).  Here, the parties turn to Rule 23(b)(3), which applies when (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) when "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

The first inquiry – the "predominance inquiry" – tests "whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct."  Sullivan v. DB Invs., Inc., 667 F.3d 273, 298 (3d Cir. 2011).  "[I]n

---

[8] Defendants' decision not to oppose Plaintiffs' request for "an award of not more than $4,250,000 in attorneys' fees and expenses" ordinarily raises concerns of collusion.  NEWBERG ON CLASS ACTIONS § 13:9 (5th ed.).  "Courts have expressed mixed views about the relationship between clear-sailing provisions and adequacy of representation."  Gooch v. Life Inv'rs Ins. Co. of Am., 672 F.3d 402, 425 (6th Cir. 2012).  However, as discussed below, the $4,250,000 sum was Judge Infante's proposal and not agreed upon until months after the parties reached the material terms of the settlement.  (Doc. Nos. 173 at 38-39 & n.7; 174 ¶¶ 62-63); see In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 335 (3d Cir. 1998).

cases where it is alleged that the defendant made similar misrepresentations, non-disclosures, or engaged in a common course of conduct, courts have found that conduct to satisfy the commonality and predominance requirements." Varacallo v. Massachusetts Mut. Life Ins. Co., 226 F.R.D. 207, 231 (D.N.J. 2005) (citing In re Prudential Ins. Co. of Am. Sales Practices Litig., 962 F. Supp. 450, 511 (D.N.J. 1997)).

Here, the question of whether Shop-Vac and Lowe's representations were false and misleading is common to all of the class members, centered on Defendants' conduct, and impacts each of Plaintiffs' claims.  (Doc. Nos. 97 ¶¶ 24-25, 29-31, 36-37, 46-55, 61; 115 at 24; 173 at 35); see In re Linerboard Antitrust Litig., 305 F.3d 145, 163 (3d Cir. 2002) (discussing how common issues predominate where the "the inquiry necessarily focuses on defendants' conduct") (internal citation and quotation omitted).  Defendants' liability similarly turns on evidence common to all class members.  (Doc. No. 173 at 35); see Sullivan v. DB Invs., Inc., 667 F.3d 273, 298 (3d Cir. 2011).  Furthermore, the proposed benefits of warranty extensions and changes in marketing do not entail "individual damage calculations." Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1433 (2013).

As to the various state consumer protection statutes identified in the second consolidated amended complaint (Doc. No. 97 ¶¶ 61, 67-119), the differences in state law do not overshadow the issues common to the class.  The Third Circuit has concluded that "variations in state law do not necessarily defeat predominance" and "concerns regarding variations in state law largely dissipate when a court is considering the certification of a settlement class." Sullivan v. DB Investments, Inc., 667 F.3d 273, 296-97 (3d Cir. 2011).  For example, in In re Warfarin Sodium Antitrust Litigation, the Third Circuit remarked that variations in state consumer fraud laws are

"irrelevant to certification of a settlement class.'"   391 F.3d 516, 529 (3d Cir. 2004).

Accordingly, the Court finds that common issues of fact and law predominate.

The second inquiry – the superiority inquiry – "asks a district court to balance, in terms

of fairness and efficiency, the merits of a class action against those of alternative available

methods of adjudication."   In re Cmty. Bank of N. Va. Mortgage Lending Practices Litig., 795

F.3d 380, 409 (3d Cir. 2015) (interior citation omitted).   The Court finds that the Settlement is

superior to continued litigation after considering the costs of additional motion practice, the

terms of the Settlement, and the size of the alleged loss.   (Doc. Nos. 161 at 34; 173 at 36); see In

re Gen. Motors Corp., 55 F.3d at 796 (discussing the superiority requirement in the settlement

context).   Thus, having found that Rule 23(a) and 23(b)(3) are satisfied, the Court will certify the

class.

### B.   Notice

Plaintiffs also urge the Court to find that the notice provided satisfies due process,

Federal Rule of Civil Procedure 23, and the Class Action Fairness Act of 2005 ("CAFA"), 28

U.S.C. § 1715.   (Doc. No. 208 at 10.)   For the following reasons, the Court finds that the

requirements of Rule 23, due process, and CAFA are satisfied.

Federal Rule of Civil Procedure 23(c)(2)(B) requires the "best notice that is practicable

under the circumstances" to be given to potential members of a Rule 23(b)(3) class, "including

individual notice to all members who can be identified through reasonable effort."   Fed. R. Civ.

P. 23(c)(2).   Federal Rule of Civil Procedure 23(e)(1) requires the Court to "direct notice in a

reasonable manner to all class members" of a proposed settlement agreement.   Fed. R. Civ. P.

23(e)(1).   "[D]ue process further requires that notice be 'reasonably calculated, under all the

circumstances, to apprise interested parties of the pendency of the action and afford them an

opportunity to present their objections.'"  In re NFL Players Litig., 821 F.3d at 435 (quoting

Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950)).

Plaintiffs submitted the declaration of Cameron Azari,[9] a director of legal notice for

Hilsoft Notifications who is associated with the settlement administrator Epiq Systems Class

Action and Claims Solutions.  (Doc. No. 175.)  According to Azari, the notice program reached

"approximately 72% of adults, aged 18+ in the U.S. who shop at Lowe's, an estimated average

of 3.2 times each."[10]  (Id. ¶¶ 8, 38.)  Azari estimates that 370.75 million impressions were

created by Internet banner notices, including 13 million impressions from Spanish-language

notices.  (Id. ¶ 24.)  Those notices were placed on Conversant Ad Network, Facebook, and the

Family Handyman's website.  (Id. ¶ 24.)  The notice program also utilized mobile ads, sponsored

search listings on Google, Yahoo! and Bing, and an informational, settlement website,

www.ShopVacPHPSettlement.com.  (Id. ¶ 9; see id. ¶¶ 24-29.)

As to individual notice to known class members, the settlement administrator obtained e-

mail addresses and physical addresses from Shop-Vac's records.  (Id. ¶¶ 13, 21.)  The settlement

administrator sent 867,950 e-mails to potential class members and mailed 409,527 settlement

notices by USPS first class mail.  (Id. ¶¶ 14, 17-18.)  Azari estimates that the e-mailed or mailed

notices, sent to 1,165,149 "unique" class members, constitute a 93-percent deliverable rate.  (Id.

¶¶ 21, 38.)  The notices are informative and easy to read, describe the nature of the action, define

the proposed settlement class, identify the class claims, provide that class members may speak at

---

[9] This Court is cognizant of the frequency with which Cameron Azari's statements are
credited by federal district courts, e.g., In re Oil Spill by Oil Rig Deepwater Horizon, 295 F.R.D.
112, 126, 151 (E.D. La. 2013) (Barbier, J.), and a reference to Azari as a "a nationally
recognized notice expert," Gessele v. Jack in the Box, Inc., No. 10-960, 2013 WL 1326563, at
*13 (D. Or. Jan. 28, 2013) (Stewart, M.J.).

[10] In his declaration, Azari defines "reach" as "the percentage of a class exposed to
notice, net of any duplication among people who may have been exposed more than once. Notice
exposure is defined as the opportunity to see a notice."  (Doc. No. 175 ¶ 8 n.1.)

the fairness hearing, permit class members to opt-out of the Settlement, and address the binding effect of the judgment.  (Doc. 175 at 13, 15-16, 19, 38-50.)

Objector Vullings challenges the adequacy of the notice provided.  (Doc. No. 193 at 3.) Vullings questions (1) whether an expert evaluated the notice program, (2) the number of addresses the settlement administrator possessed, (3) whether the settlement administrator performed a change-of-address search, and (4) how the settlement administrator handled undeliverable notices.[11]  (Id.)  The Court finds Vullings' objections unavailing in light of Cameron Azari's three declarations.  (Doc. Nos. 162-1 at 72-86; 166-1; 175.)  The settlement administrator: (a) had "867,950 unique records for the initial email notice mailing," (b) determined that 146,312 emails were undeliverable, (c) mailed 409,527 settlement notices to members with only an associated, known physical mailing address or for undeliverable e-mail notices with an associated physical mailing address, and (d) checked the mailing addresses against the National Change of Address database.  (Doc. No. 175 ¶¶ 13, 16-18.)

Objector Shirley Morales challenges the content of the notice provided.  (Doc. No. 196 at 2.)  Specifically, Morales states that the notice did not identify "the value of the Warranty Relief to the Class" or the damages suffered by the named Plaintiffs.[12]  (Id.)  Here, as to the notice's content, the requirements of both Rule 23(c)(2)(B) and Rule 23(e)(1) apply because the parties "seek certification of a settlement class pursuant to Rule 23(b)(3) and approval of a settlement

---

[11] Objector Vullings also challenges the class administrator's costs and fees and the opt-out process.  (Doc. No. 193 at 5.)  The Court finds the challenge to the class administrator's costs meritless.  As to the opt-out process, the Court finds that requiring the exclusion requests to be mailed to the settlement administrator is not burdensome.  (Doc. No. 175 at 45); see McDonough v. Toys R Us, Inc., 80 F. Supp. 3d 626, 641 (E.D. Pa. 2015) ("Mailing a request is not unreasonably burdensome."); In re ABMD Ltd., 439 B.R. 475, 490 (Bankr. S.D. Ohio 2010).
[12] Objector Vullings similarly challenges whether class counsel failed to indicate the size of the Settlement Class in the notice or fee motion.  (Doc. No. 193 at 2.)

pursuant to Rule 23(e)." <u>In re Oil Spill by Oil Rig Deepwater Horizon</u>, 910 F. Supp. 2d 891, 913 (E.D. La. 2012).

Rule 23(c)(2)(B) specifically provides that notice must "clearly and concisely state in plain, easily understood language" the following content:

> (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B).  In contrast, Rule 23(e)(1) only states that the Court "must direct notice in a reasonable manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(b)(1).  According to the Third Circuit, "Rule 23(e) notice is designed to summarize the litigation and the settlement and 'to apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation.'"  <u>In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions</u>, 148 F.3d 283, 327 (3d Cir. 1998) (quoting 2 NEWBERG ON CLASS ACTIONS § 8.32).

Here, the summary e-mail notice and the mailed settlement notice contain the content enumerated in Rule 23(c)(2)(B), in addition to summarizing the litigation.  (Doc. No. 175 at 13, 16.)  The Court disagrees that the notice is rendered inadequate for omitting Plaintiff's valuation of the warranty or injunctive relief or not having specified the "mechanical failure or damage experienced" by named Plaintiffs.[13]  Rather, the notice provided satisfies Rule 23(c)(2)(B) and Rule 23(e)(1).  Therefore, upon review of the parties' submissions (Doc. Nos. 173-175, 198,

---

[13] The Manual for Complex Litigation recommends that settlement notices should "explain the basis for valuation of nonmonetary benefits if the settlement includes them."  MANUAL FOR COMPLEX LITIGATION (4th) § 21.312.  In their submissions to this Court, Plaintiffs approximate the total recovery to the class at no less than $174,250,000.  (Doc. No. 173 at 27.)  The Manual for Complex Litigation's recommendation is instructive, though not binding.  NEWBERG ON CLASS ACTIONS § 8:17 (5th ed.).  The Court discusses the valuation below.

200), the Court finds that the notice provided satisfies due process, Federal Rule of Civil Procedure 23, and CAFA.[14]  (Doc. Nos. 200, 200-1.)

### C.      Final Approval of the Settlement

Plaintiffs also move this Court to grant final approval of the Settlement.  (Doc. Nos. 172 at 1; 173 at 18-30.)  Plaintiffs argue that the Settlement merits final approval because the agreement is fair, reasonable, and adequate.  (Doc. No. 173 at 19) (citing Fed. R. Civ. P. 23(e)(2)).  The Court will grant final approval of the Settlement.

"Settlement agreements are to be encouraged because they promote the amicable resolution of disputes and lighten the increasing load of litigation faced by the federal courts." Ehrheart v. Verizon Wireless, 609 F.3d 590, 595 (3d Cir. 2010) (internal citation omitted). Nonetheless, the moving parties to the settlement "bear the burden of submitting sufficient information for the court to evaluate the settlement under Rule 23(e)."  NEWBERG ON CLASS ACTIONS § 13:42 (5th ed.); see In re Pet Food Prod. Liab. Litig., 629 F.3d 333, 350 (3d Cir. 2010).  This underscores the Court's fiduciary duty to guard the rights of absent class members. See In re Gen. Motors Corp., 55 F.3d at 785 ("[T]he district court acts as a fiduciary who must serve as a guardian of the rights of absent class members ….") (internal citations and quotations omitted) .

The Third Circuit has adopted the "Girsh factors" to guide the district court's review of a settlement.  McDonough v. Horizon Blue Cross Blue Shield of N.J., 641 F. App'x 146, 150 (3d Cir. 2015) (citing Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975)).  The Girsh factors are as follows:

---

[14] In accordance with CAFA, 28 U.S.C. § 1715(b), Defendants directed the Settlement Administrator to provide notice to 56 officials, including the Attorney General of the United States and the "Attorneys  General of each of the 50 states, the District of Columbia and the U.S. Territory officials."  (See Doc. No. 200-1.)

(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

Id. (quoting Girsh, 521 F.2d at 157.)  This Court addresses each of the nine Girsh factors in turn.

### 1.        Complexity, expense and likely duration of the litigation

The first Girsh factor "captures the probable costs, in both time and money, of continued litigation."  In re NFL Players Litig., 821 F.3d at 437 (internal citations and quotations omitted).  Here, at the fairness hearing, Defendants' counsel stated that Shop-Vac has prepared motions for summary judgment to present to this Court.  (Doc. No. 210 at 20; see Doc. No. 173 at 12.)  The costs associated with continued motion practice, additional discovery, retaining engineering experts, and a potential trial would be significant.  (Doc. No. 173 at 20.)  Plaintiffs' counsel has already expended more than four million dollars in attorneys' fees preparing and litigating the above-captioned multidistrict litigation.  Accordingly, the Court finds that the first Girsh factor favors approval of the Settlement.

### 2.        The reaction of the class to the settlement

The Court received only three written objections to the Settlement (Doc. Nos. 193, 196, 199-1), and seventy-one class members timely requested to exclude themselves from the Settlement (Doc. No. 209 at 1-2).  If this Court were to compare the number of objectors and exclusions against the number of known class members, less than 0.1% of known class members objected to or requested exclusion from the Settlement.  See In re NFL Players Litig., 821 F.3d at 438 (receiving objections and requests for exclusions from one-percent of class members favors settlement approval).  The reaction of the class favors approval of the Settlement.

16

### 3. The stage of the proceedings and the amount of discovery completed

The third <u>Girsh</u> factor "captures the degree of case development that class counsel have accomplished prior to settlement.  Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating."  <u>In re Gen. Motors Corp.</u>, 55 F.3d at 813.  Here, the parties conducted significant discovery, reviewed tens of thousands of pages of documents, fully briefed and orally argued two Rule 12(b)(6) motions to dismiss, and – prior to entering into mediation – faced imminent trial in the New Jersey Action.[15]  (Doc. Nos. 68; 90; 102; 114; 161 at 7-8 & n.3; 174 ¶¶ 57-60.)  Plaintiffs deposed Defendant Shop-Vac's Senior Vice President for Sales and Marketing, Director of Product Evaluation, and Defendants' expert, John Loud.  (Doc. No. 161 at 15.)  Defendants deposed the named Plaintiffs and Plaintiffs' principal expert, Glen Stevick.  (<u>See</u> <u>id.</u>)  The extent of case development achieved by the parties weighs in favor of approval of the Settlement.

### 4. Risks of establishing liability and damages

"The fourth and fifth <u>Girsh</u> factors survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement."  <u>In re NFL Players Litig.</u>, 821 F.3d at 439 (quoting <u>In re Prudential Ins.</u>, 148 F.3d at 319).

Here, at the fairness hearing, Defendants maintained that Plaintiffs' claims are defensible and stressed their preparation for trial.  (Doc. No. 210 at 20.)  Defendants have vigorously argued that their representations were "technically true" because peak horsepower is a "term of art that only refers to horsepower levels reached for a brief time in laboratory conditions, not during actual consumer use."  (Doc. Nos. 103 at 25-26; 109 at 23 & n.20; 115 at 12; 161 at 14;

---

[15] The trial date in the New Jersey Action is "stayed pending this Court's determination of this motion."  (Doc. No. 174 ¶ 52.)

162-1 at 3.)  Defendants contended that the advertised peak horsepower rating is accurate when measured using Shop-Vac's methodology.  (Doc. No. 103 at 25-26; <u>see</u> Doc. No. 114 at 7.)  As to tank capacity, Defendants argued that Plaintiffs never challenged the "size of the containers," but only their capacity when used.  (Doc. Nos. 103 at 25; 109 at 14.)  Plaintiffs concede the risks of establishing liability at trial, acknowledge the possibility that conflicting expert testimony could lead to a "battle of the experts," and recognize the challenge of establishing damages. (Doc. Nos. 103 at 41; 109 at 27-29; 173 at 23-24)  Thus, the Court finds that the fourth and fifth <u>Girsh</u> factors favor approval of the Settlement.

### 5.      Risks of maintaining the class action through the trial

The sixth <u>Girsh</u> factor "measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial."  <u>In re Warfarin Sodium Antitrust Litig.</u>, 391 F.3d 516, 537 (3d Cir. 2004) (internal citation omitted).  Here, differences in the various state consumer protection statutes (Doc. No. 97 ¶¶ 61, 67-119), could present management problems. <u>See</u> <u>id.</u> at 537.  However, the Third Circuit affords the sixth <u>Girsh</u> factor "minimal consideration" in the context of a settlement class.  <u>In re NFL Players Litig.</u>, 821 F.3d at 440 (quoting <u>In re Prudential Ins.</u>, 148 F.3d at 321).  Accordingly, the sixth <u>Girsh</u> factor does not weigh in favor of or against approval of the Settlement.

### 6.      The ability of the defendants to withstand a greater judgment

The seventh <u>Girsh</u> factor "assesses the ability of defendants to withstand a greater judgment, and is 'most clearly relevant where a settlement in a given case is less than would ordinarily be awarded but the defendant's financial circumstances do not permit a greater settlement.'"  <u>In re NFL Players Litig.</u>, 307 F.R.D. 351, 394 (E.D. Pa. 2015) (quoting <u>Reibstein v. Rite Aid Corp.</u>, 761 F. Supp. 2d 241, 254 (E.D. Pa. 2011)).  Here, Plaintiffs speculate that

Defendant Shop-Vac may be unable to pay a greater judgment.  (Doc. Nos. 173 at 25-26; 174 ¶ 67.)  The Court declines to speculate about Defendants' financial circumstances.  Accordingly, the seventh <u>Girsh</u> factor is neutral.

**7.    The range of reasonableness of the settlement fund**

The eighth and ninth <u>Girsh</u> factors require this Court to "ask whether the settlement represents a good value for a weak case or a poor value for a strong case."  <u>In re NFL Players Litig.</u>, 821 F.3d at 440 (internal citations and quotations omitted).  As discussed above, Defendants will extend the manufacturer's warranty on the motors of the Shop-Vac brand wet/dry vacuums by twenty-four months, change how Shop-Vac discusses peak horsepower on its marketing materials, and modify the tank gallon legend of Shop-Vac brand wet/dry vacuums. (Doc. No. 162-1 at 12-13.)

Plaintiffs argue that extending the manufacturer's warranty by two years "addresses the most salient practical result to class members of using a vacuum closer to its motor's maximum power rating – the potential for premature failure."  (Doc. No. 173 at 26; <u>see</u> Doc. No. 162-1 at 12; 174 ¶ 58; Doc. No. 210 at 7.)  The Court agrees.  At the fairness hearing, the parties represented that the warranty extension applies irrespective of the size of the motor and addressed how the warranty relief accounts for premature failure.  (Doc. No. 210 at 6-9, 20-22.) Shop-Vac will administer the warranty program, provide new or reconditioned head units for qualifying settlement class members, and maintain a dedicated toll-free number for settlement class members.  (Doc. Nos. 162-1 at 13; 210 at 11, 22.)

Objector Shirley Morales challenges the warranty relief as "nothing more than a coupon." (Doc. No. 196 at 2.)  "[A] coupon is a discount on another product or service offered by the defendant in the lawsuit, with the critical factor being that the nonpecuniary benefit forces future

business with the defendant." NEWBERG ON CLASS ACTIONS § 12:11 (5th ed.) (internal citations and quotations omitted). The proposed settlement is not a coupon settlement. The warranty relief does not offer a discount on other products or force class members to conduct business with Defendants. See id. Rather, if a motor ceases to operate and the customer returns the motor, the customer would receive a new or reconditioned head unit directly from Shop-Vac. (Doc. No. 210 at 8-10, 21-22.) The proposed warranty relief is reasonable, addresses the alleged harm, and is not a coupon for additional Shop-Vac brand wet/dry vacuums.[16]

As to the changes in marketing peak horsepower and tank size, Plaintiffs contend that the Settlement removes the "potential for misrepresentation." (Doc. No. 173 at 29.) Objectors Morales and Vullings counter that the Settlement does nothing to prevent Defendants from continuing to mislead consumers.[17] (Doc. Nos. 196 at 1; 193 at 2.) These objections lack merit. Defendants have agreed to alter the tank gallon legend and provide on all marketing materials that refer to peak horsepower a statement that peak horsepower does not "denote the operational horsepower of a wet-dry vacuum but rather the horsepower output of a motor." (Doc. No. 162-1 at 12-13.) Accordingly, the Court finds the Settlement represents a good value for the Settlement Class. In re NFL Players Litig., 821 F.3d at 440. The eighth and ninth Girsh factors weigh in favor of approval of the Settlement.

---

[16] Objector Shirley Morales also challenges the release as "unfair and overinclusive." (Doc. No. 196 at 2.) Morales reasons that the release holds Defendants "harmless for wrongs it will commit in the future." (Id.) Morales' objection is meritless. As Plaintiffs point out, the settlement's definition of "Released Claims" includes "only claims that relate to marketing misstatement allegations such as those asserted in the case." (Doc. No. 198 at 15 & n.4.)

[17] Objector Vullings also complains that the settlement does "not adequately compensate Class Members who purchased the vacuum cleaner and simply disposed of said vacuum cleaner once it ceased to operate following its shorter than expected life." (Doc. No. 193 at 2.) However, as Plaintiffs responded in their reply brief, "settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." (Doc. No. 198 at 19) (quoting In re Prudential Ins., 148 F.3d at 317.) The Court finds the Settlement represents a good value for the Settlement Class. In re NFL Players Litig., 821 F.3d at 440.

### 8.     Final approval of the Settlement

Altogether, seven Girsh factors favor approval of the Settlement and two factors are neutral to the Settlement's approval.  This determination affirms the initial presumption of fairness afforded by the preliminary approval of the Settlement.  In re Gen. Motors Corp., 55 F.3d at 785.  Accordingly, the Court finds the Settlement to be fair, reasonable, and adequate.

### D.     Attorneys' Fees Award

Plaintiffs also move the Court to approve an award of $4,250,000 in attorneys' fees, expenses, and service awards.  (Doc. No. 172.)  Plaintiffs stress that Judge Infante proposed the $4,250,000 sum and that the parties did not agree upon the amount until months after reaching the material terms of the Settlement.  (Doc. Nos. 173 at 38-39 & n.7; 174 ¶¶ 62-63; see Doc. No. 156.)  Defendants do not oppose the requested award.  (Doc. No. 162-1 at 18.)  For the following reasons, the Court will approve the $4,250,000 award.

Federal Rule of Civil Procedure 23(h) provides that, "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."  Fed. R. Civ. P. 23(h).  The Third Circuit requires district courts to conduct a "thorough judicial review of fee applications" in class action settlements.  In re Diet Drugs, 582 F.3d 524, 537-38 (3d Cir. 2009) (quoting In re Gen'l Motors. Corp., 55 F.3d at 819).

The Court may evaluate the fee application through either the percentage of recovery method or through the lodestar method.  Id. at 540.  "The percentage-of-recovery method is generally favored in common fund cases because it allows courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure.'"  In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 300 (3d Cir. 2005) (quoting In re Prudential Ins., 148 F.3d at 333). The lodestar method applies where "the nature of the settlement evades the precise evaluation

needed for the percentage of recovery method." In re Gen. Motors Corp., 55 F.3d at 821.  Here,

Plaintiffs urge the Court to assess the fee request under the percentage of recovery method.

(Doc. No. 173 at 39.)  The Court begins its evaluation of the $4,250,000 award under the

percentage of recovery method.

### 1.    Percentage of recovery method

When determining what constitutes a "reasonable percentage fee award," the Third

Circuit instructs district courts to consider the following ten factors:

> (1) the size of the fund created and the number of beneficiaries, (2) the presence
> or absence of substantial objections by members of the class to the settlement
> terms and/or fees requested by counsel, (3) the skill and efficiency of the
> attorneys involved, (4) the complexity and duration of the litigation, (5) the risk of
> nonpayment, (6) the amount of time devoted to the case by plaintiffs' counsel, (7)
> the awards in similar cases, (8) the value of benefits attributable to the efforts of
> class counsel relative to the efforts of other groups, such as government agencies
> conducting investigations, (9) the percentage fee that would have been negotiated
> had the case been subject to a private contingent fee arrangement at the time
> counsel was retained, and (10) any innovative terms of settlement . . . .

In re Diet Drugs, 582 F.3d 524, 541 (3d Cir. 2009) (internal citations and quotations omitted).

The Court addresses each of the ten factors in turn.

### a.    Size of the fund created and the number of beneficiaries

The Settlement does not create a common fund.  Plaintiffs concede this and urge the

Court to approximate the value of the Settlement at $174,250,000.  (Doc. No. 173 at 39-42.)

Plaintiffs reach the $174,250,000 valuation by multiplying the number of Shop-Vac brand

wet/dry vacuums sold during the class period (25,000,000 vacuums) by the lowest retail price for

a two-year extended warranty offered by Lowe's ($6.97).  (See Doc. No. 173 at 41-43.)

The proposed extended warranty would insure against the need to repair or replace a

Shop-Vac brand wet/dry vacuum.  See O'Keefe v. Mercedes-Benz USA, LLC, 214 F.R.D. 266,

305 (E.D. Pa. 2003) ("A warranty is simply the ex ante market price of insuring against a

foreseeable risk."). However, assigning a value to the Settlement's warranty relief poses challenges. First, the parties do not address either the likelihood of repair during the twenty-four months or the cost of repair. See Tom Baker, Peter Siegelman, "You Want Insurance with That?" Using Behavioral Economics to Protect Consumers from Add-on Insurance Products, 20 Conn. Ins. L.J. 1, 13 (2013) (calculating the value of an extended warranty by multiplying the probability of repair over two-years by the cost of repair). Second, while a warranty "cost[s] a manufacturer nothing unless repairs are claimed," the mere "fact of coverage is its own benefit; for a price, a consumer can purchase certainty as to what repairs will cost if they are needed." In re Volkswagen & Audi Warranty Extension Litig., 89 F. Supp. 3d 155, 169 (D. Mass. 2015).

Having considered these challenges, the Court turns to the market price for a two-year extended warranty as a "starting point" in evaluating the fund's size. Dewey v. Volkswagen of Am., 728 F. Supp. 2d 546, 594 (D.N.J. 2010) (citing O'Keefe, 214 F.R.D. at 305) (viewing the "market price for a warranty as a 'starting point' when valuing the settlement"); In re Volkswagen, 89 F. Supp. 3d at 169 (reasoning that the retail value of an extended warranty measures "what the class members gained from free extended coverage"). Here, the $6.97 benchmark is not the price of an extended warranty specific to a Shop-Vac brand wet/dry vacuum. Shop-Vac reportedly does not sell extended warranties.[18] (See Doc. No. 210 at 22.) Rather, the $6.97 benchmark corresponds to the least expensive two-year extended warranty, sold by Lowe's and determined by the cost of the warrantied appliance. (See Doc. Nos. 173 at 42; 174 ¶ 70.) The Court adopts the $6.97 benchmark as a conservative market price for two years of warranty coverage.

---

[18] Moreover, even if Shop-Vac did sell extended warranties, the price of the warranty may depend on the size of the vacuum's motor. (Doc. Nos. 161 at 25 n. 6; 210 at 10.)

The Court next turns to the number of beneficiaries.  At different stages in its briefing, Plaintiffs have maintained that the Settlement Class encompasses "tens of millions" or "25 million or more" class members.  (Doc. Nos. 161 at 28; 173 at 25, 31; 210 at 8; <u>cf.</u> Doc. No. 162-1 at 40.)  During the fairness hearing, Attorney Robert Lax repeatedly stressed that the Settlement Class consists of 25 million or more class members.  (Doc. No. 210 at 8, 12-13; 16; 19.)  Plaintiffs reached the 25,000,000 figure after analyzing Shop-Vac's sales during the class period.  (<u>See</u> Doc. No. 174 ¶ 69.)  The sale of 25,000,000 Shop-Vac brand wet/dry vacuums during the class period correlates to the number of beneficiaries, and Defendants have not contested the 25,000,000 figure.  Therefore, by multiplying the $6.97 benchmark by the estimated number of beneficiaries, the Court finds that the size of the fund approximates $174,250,000.  <u>See</u> <u>In re LG/Zenith Rear Projection Television Class Action Litig.</u>, No. 06-5609, 2009 WL 455513, at *9 (D.N.J. Feb. 18, 2009) (approximating the value of warranty relief to the class by multiplying a "conservative valuation of the warranty extension" by the estimated number of beneficiaries).  This factor is neutral to the Court's review of the proposed award.

**b.      Presence or absence of substantial objections**

The Court has received three written objections and each of the objections challenges the fee request.  (Doc. Nos. 193; 196; 199-1 at 3.)  Objector Morales writes that the parties have not identified the value of the Settlement's benefits or the number of warranties called by class members.  (Doc. No. 196 at 2.)  Objector Vullings would prefer cash compensation, challenges the fee award as excessive, argues that the fee award constitutes "potentially more than 80% of the settlement," and questions the cost to Defendants of providing the warranty relief.  (Doc. No. 193 at 2-5.)  In his succinct objection, Objector Rod Miller considers the $4,250,000 award "beneath contempt."  (Doc. No. 199-1 at 3.)  The Court addresses each of these objections in the

first and seventh prong of the percentage of recovery method analysis.  Although receipt of only three objections does indicate a positive reaction from the Settlement Class, the substance of the objections nonetheless weighs against approval of the proposed award.

### c.      The skill and efficiency of the attorneys involved

Plaintiffs' counsel have experience in handling class actions and coordinated the efforts of counsel from California to New Jersey.  (Doc. Nos. 12 at 8; 12-3 at 2; 52 at 21; 55 at 2.) Counsel worked at length to investigate Plaintiffs' claims, reviewed tens of thousands of pages of documents, took and defended multiple depositions, and evidenced their skill and experience in handling multidistrict litigation to this Court.  (Doc. Nos. 161 at 173 at 13-14, 45, 50; 174 ¶¶ 4, 28, 55, 57.)  This factor favors approval of the proposed award.

### d.      The complexity and duration of the litigation

The above-captioned multidistrict litigation began in early 2012 after an independent investigation into the horsepower and capacity of wet/dry vacuums.  (Doc. Nos. 12 at 4, 11-12; 55 at 2.)  Since consolidation, the parties have fully briefed and orally argued two Rule 12(b)(6) motions to dismiss.  (Doc. Nos. 68; 90; 102; 114.)  The consumer fraud claims, brought by Plaintiffs McMichael, Harbut and Reid, and the breach of express warranty, breach of implied warranty, and Magnuson-Moss Warranty Act claims, brought by Plaintiffs Harbut and Reid, survived the second Rule 12(b)(6) motion to dismiss.  (Doc. Nos. 115, 116.)  The complexity and duration of the above-captioned litigation favor approval of the award.

### e.      The risk of nonpayment and amount of time devoted

Plaintiffs maintain that they have spent "8,043.35 hours investigating, litigating, and resolving" the above-captioned multidistrict litigation on a contingency basis and have not

received any payment.  (Doc. No. 173 at 44-45.)  The risk of nonpayment and the amount of time devoted weigh in favor of approval of the award.

### f.       The awards in similar cases

The seventh factor requests that the Court consider awards in similar cases.  "There is no consensus on what percentage of a common fund is reasonable, although several courts in this circuit have observed that percentage of recovery fee awards generally range from 19% to 45%, with 25% being typical."  Tavares v. S-L Distribution Co., No. 13-1313, 2016 WL 1743268, at *12 (M.D. Pa. May 2, 2016) (Jones, J.) (internal quotation and citation omitted).  Here, the proposed $4,250,000 award represents a 2.4% percentage fee of the $174,250,000 approximated fund.  Even if the number of beneficiaries – and by extension, the approximated fund – were overestimated by a factor of ten, the seventh factor would weigh in favor of approval.  In re LG/Zenith, 2009 WL 455513, at *9 (noting that "[e]ven if the number of class members, therefore, is overestimated in counsel's brief by a factor of three, the fee is reasonable as a percentage of the total award").  Therefore, this factor favors approval of the proposed award.

### g.       The value of benefits attributable to other groups

The eighth factor "seeks to compare the actions of government prosecutions and agency litigation to the instant private litigation."  Tavares, No. 13-1313, 2016 WL 1743268, at *12 (citing In re Diet Drugs, 582 F.3d at 544).  Here, the above-captioned litigation began when named Plaintiff Alan McMichael filed suit in the United State District Court for the District of New Jersey on February 6, 2012.  (Doc. No. 174 ¶ 3.)  Plaintiffs' counsel argue that their lawsuits were not the result of Government action or a media revelation, but the product of independent investigation and studies.  (Doc. Nos. 12 at 11; 173 at 46-47; 174 ¶ 4; but see Doc. No. 52 at 47.)  Those investigations began around November 2011 when Attorneys Lax and

Rado retained a consulting firm to measure the vacuums' horsepower.  (Doc. No. 12-17; see

Doc. No. 174 ¶ 4.)  The consulting firm concluded that the horsepower ratings were

"significantly overstated, achieving only a fraction of the advertised power."  (Doc. No. 12-17 at

3.)  In December 2011, Attorneys Gonnelli and Walsh similarly contacted a lab to measure the

vacuums' horsepower usage and tank capacities.  (Doc. Nos. 12-16.)  The eighth factor weighs in

favor of approval.

### h.    Private contingent fee arrangement and innovative terms

The ninth factor "requires the Court to evaluate whether the requested fee is consistent

with a privately negotiated contingent fee in the marketplace."  Tavares, No. 13-1313, 2016 WL

1743268, at *12 (internal citation and quotation omitted).  Here, Plaintiffs' counsel argue that

contingent fees between 30% and 40% are standard for non-class, commercial litigation.  (Doc.

No. 173 at 47) (quoting In re Remeron Direct Purchaser Antitrust Litig., No. 03-0085, 2005 U.S.

Dist. LEXIS 27013, at *46 (D.N.J. Nov. 9, 2005)).  The ninth factor weighs in favor of approval

of the fee award because the proposed percentage fee award is less than either 30% or 40% of the

approximated fund.  As to the tenth factor, the absence of any innovative terms is neutral to the

Court's evaluation of the fee request.  (Doc. No. 173 at 47); see In re Merck & Co., Inc. Vytorin

Erisa Litig., No. 08-285, 2010 WL 547613, at *12 (D.N.J. Feb. 9, 2010).

Having determined that the majority of the factors favor the approval of the fee request,

the Court finds that the award of $4,250,000 in attorneys' fees, expenses, and service awards

award is reasonable under the percentage of recovery method.[19]  The Court next turns to the

---

[19] Plaintiffs also urge the Court to deem counsels' expenses reasonable and necessarily incurred on behalf of the class.  (Doc. No. 173 at 52-53.)  "Attorneys' fees and costs are frequently analyzed together, so the same standards apply to [the] review of costs as to [the] review of attorneys' fees."  Loughner v. Univ. of Pittsburgh, 260 F.3d 173, 181 (3d Cir. 2001).  Here, Plaintiffs represent that the $390,277.44 in costs and expenses will be paid from the

lodestar method to confirm the reasonableness of the requested award.  See In re Ins. Brokerage

Antitrust Litig., 579 F.3d 241, 284-85 (3d Cir. 2009) (approving of the district court's use of a

lodestar cross-check to confirm the reasonableness of the fee request).

### 2.    Lodestar cross-check

Plaintiffs have calculated a combined lodestar of $5,091,251.25.  (Doc. No. 173 at 12.)

The lodestar is the "product of an attorney's hourly rate and the number of hours spent,"

Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 426 F.3d 694, 703 n.5 (3d Cir. 2005) (interior

citations omitted), and is "presumed to be the reasonable fee" Rode, 892 F.2d at 1183 (citing

Blum v. Stenson, 465 U.S. 886, 897 (1984)).  Here, Plaintiffs must show that their requested

billing rates and the hours claimed are reasonable.  Interfaith Cmty. Org. v. Honeywell Int'l, Inc.,

426 F.3d 694, 703 n.5 (3d Cir. 2005) (citing Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir.

1990)).  The Court turns to the proposed hourly rates.

### a.    Reasonableness of Hourly Rate

Plaintiffs argue that the proposed hourly rates from $350 to $900/hour are comparable to

the market rate for practicing partners.[20]  (See Doc. No. 173 at 50.)  Plaintiffs report associate

attorney billing rates ranging from $250 to $850/hour and of counsel hourly rates from $600 to

$675/hour.  (Doc. Nos. 182-184, 188-189.)  Plaintiffs urge the Court to exempt them from the

forum rate based on Plaintiffs' opposition to centralization in the Middle District of Pennsylvania

---

$4,250,000 sum.  (Doc. No. 173 at 51-52.)  For the reasons addressed in this Court's discussion
of attorneys' fees, the Court approves counsels' expenses as reasonable.

[20] As to the partner attorneys, Plaintiffs request the following billing rates: $350 for
Elizabeth Goldstein (Doc. No. 186), $500 for Bonner Walsh, Jeffrey Weinstein, and George
Granade (Doc. Nos. 185, 188), $555 for James Rodgers (Doc. No. 186), $575 for Poland Riggs
(Doc. No. 184), $625 for Andrei Rado and William Pinilis (Doc. Nos. 184, 187), $675 for Victor
Afanador and Susana Cruz Hodge (Doc. No. 182), $725 for Jon Herskowitz (Doc. No. 189),
$750 for Robert Lax and Bruce Greenberg (Doc. Nos. 181, 182), $775 for David Baron (Doc.
No. 189), $795 for Adam Gonnelli (Doc. No. 183), $800 for Michael Reese (Doc. No. 188), and
$900 for Sanford Dumain (Doc. No. 184).

and speculation that "this matter would likely never have been brought in the first instance" without Plaintiffs' counsel.  (Doc. No. 173 at 49.)

A court reviewing an hourly rate does so by "assess[ing] the experience and skill of the prevailing party's attorneys," and determining whether or not those fees are consistent with prevailing rates in the geographic area for similar services.  Rode v. Dellarciprete, 892 F.2d 1177, 1183 (3d Cir.1990).  A fair starting point for this reasonable rate is the attorney's "usual billing rate."  Pub. Interest Research Grp. of N.J., Inc. v. Windall, 51 F.3d 1179, 1185 (3d Cir. 1995).  "In the absence of such a showing, the district court must exercise its discretion in fixing a reasonable hourly rate."  Washington v. Phila. Cty. Court of Common Pleas, 89 F.3d 1031, 1036 (3d Cir. 1996).

Here, attorneys Robert Lax, Bruce Greenberg, Adam Gonnelli, Sanford Dumain, Bonner Walsh, James Rodgers, William Pinilis, Michael Reese, and Jon Herskowitz submitted an affidavit on behalf of themselves and their respective firm stating that the hourly rates claimed are their "regular current rates" and "commensurate with those prevailing in the market."  (Doc. 181-188; see Doc. No. 189.)  Attached to those affidavits are overviews of the respective attorneys' résumés and a discussion of his or her experience in complex litigation.  (Doc. Nos. 181-189.)  However, Plaintiffs' counsel fail to address the experience or qualifications of Jeffrey Weinstein, Jeffrey Shooman, Mary Jean Pizza, Marissa Quigley, Andrea Clisura, Dennis Dollar, Javier Hidalgo, Jason Hardy, David Baron, or Matthew Baron in their submissions.  (Doc. Nos. 182, 183, 185, 188, 189.)

With few exceptions, the claimed hourly rates are not consistent with the prevailing rates in the Middle District of Pennsylvania.  Cmty. Ass'n Underwriters of Am., Inc. v. Queensboro Flooring Corp., No. 10-1559, 2016 WL 1076910, at *5 (M.D. Pa. Mar. 18, 2016) (Mehalchick,

M.J.) (finding that experienced plaintiffs' attorneys warrant fees ranging from $180 to $325 per hour).  The Court will exempt Plaintiffs from the forum rate.  Plaintiffs sought centralization in the District of New Jersey, not the Middle District of Pennsylvania.  (Doc. No. 174 ¶ 6); see Polk v. N.Y. State Dep't of Corr. Servs., 722 F.2d 23, 25 (2d Cir. 1983).  The majority of Plaintiffs' counsel are not local to the Middle District of Pennsylvania.  See In re Vioxx Prod. Liab. Litig., 760 F. Supp. 2d 640, 660 (E.D. La. 2010) (finding a "a more national rate is the appropriate pole star" when evaluating the hourly rate in an MDL "where attorneys from across the country contributed common benefit work").  However, Plaintiffs' counsel fail to sustain their burden – with respect to the billing rate – by relying on their own affidavits and, as previously mentioned, not discussing the qualifications of certain attorneys.  L.J. ex rel. V.J. v. Audubon Bd. of Educ., 373 F. App'x 294, 297 (3d Cir. 2010) (internal citations omitted).  The Court must exercise its discretion in determining a reasonable rate.  L.J. ex rel. V.J., 373 F. App'x at 297.

District courts in this Circuit have approved awards of attorneys' fees in class action settlements where an attorney's hourly rate reached $835.00/hour or averaged $681.15/hour. See, e.g., Saint v. BMW of N. Am., LLC, No. 12-6105, 2015 WL 2448846, at *15 (D.N.J. May 21, 2015) (where average hourly billing rate ranged from $421.73 to $540.31);  Henderson v. Volvo Cars of N. Am., LLC, No. 09-4146, 2013 WL 1192479, at *16 (D.N.J. Mar. 22, 2013) (where billable rates ranged from $175 to $700 per hour); In re Schering-Plough/Merck Merger Litig., No. 09-1099, 2010 WL 1257722, at *18 (D.N.J. Mar. 26, 2010) (concluding that an "overall hourly lodestar non-weighted average ranging from $465.68 to $681.15 is not unreasonable"); In re Merck & Co., Inc. Vytorin Erisa Litig., No. 08-285, 2010 WL 547613, at *12–13 (D.N.J. Feb. 9, 2010) (approving fee request where attorney billing rates ranged from $250/hour to $835/hour ).

Accordingly, the Court finds that the hourly rates provided by counsel that do not exceed $750/hour and are accompanied by supporting documentation are reasonable.  The Court will cap the billing rates at $750/hour and assign a reasonably hourly rate of $200/hour for those attorneys whose experience and qualifications were not included in the documents supporting the attorneys' fee award.

### b.    Reasonableness of Hours Billed

The Court next turns to the reasonableness of the number of hours expended.  When calculating the hours reasonably expended, a district court "should review the time charged, decide whether the hours set out were reasonably expended for each of the particular purposes described and then exclude those that are 'excessive, redundant, or otherwise unnecessary.'" Loughner v. Univ. of Pittsburgh, 260 F.3d 173, 178 (3d Cir. 2001).  Similarly, a court may exclude hours when the evidence presented "inadequately documents the hours claimed." Rode, 892 F.2d at 1182-1183.  For purposes of a lodestar cross-check, this Court "may rely on summaries submitted by the attorneys and need not review actual billing records." In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 306-07 (3d Cir. 2005).

Here, with one exception, class counsel submitted a time report summarizing the total hours expended by each attorney and classifying the hours worked into eight categories.  (Doc. Nos. 181 at 6; 182 at 6; 183 at 6; 184 at 6; 185 at 7; 186 at 6; 187 at 5; 188 at 6.)  However, Attorney Jon Herskowitz filed a time sheet that provided only the total hours worked by Attorneys Herskowitz, David Baron, and Matthew Baron.  (Doc. No. 189 at 6.)  The Court will reduce the number of hours submitted by Baron and Herskowitz by half for inadequately documenting the hours claimed.  Rode, 892 F.2d at 1182-1183.  Having reviewed the amount

and quality of the work submitted, the Court finds no reason to reduce the number of hours claimed by the remaining attorneys.

### c.   Lodestar Calculation

The Court takes into account the aforementioned adjustments and calculates a lodestar of $4,624,854.38.  The lodestar is calculated as follows:

| Attorney | Hours | Rate | Amount |
|---|---|---|---|
| *Partners* | | | |
| Robert Lax | 1498.75 | $750 | $1,124,062.50 |
| Bruce Greenberg | 480.70 | $750 | $360,525.00 |
| Victor Afanador | 23.40 | $675 | $15,795.00 |
| Susana Cruz Hodge | 401.00 | $675 | $270,675.00 |
| Adam Gonnelli | 862.25 | $750 | $646,687.50 |
| Sanford Dumain | 404.00 | $750 | $303,000.00 |
| Andrei Rado | 65.50 | $625 | $40,937.50 |
| Roland Riggs | 6.75 | $575 | $3,881.25 |
| Bonner Walsh | 747.50 | $500 | $373,750.00 |
| Jeffrey Weinstein | 13.75 | $200 | $2,750.00 |
| Elisabeth Goldstein | 98.30 | $350 | $34,405.00 |
| James Rodgers | 9.50 | $555 | $5,272.50 |
| William Pinilis | 24.90 | $625 | $15,562.50 |
| Michael Reese | 220.75 | $750 | $165,562.50 |
| George Granade | 47.50 | $500 | $23,750.00 |
| Jon Herskowitz | 29.375 | $725 | $21,296.88 |
| David Baron | 3.25 | $200 | $650.00 |
| | | | |
| *Associates* | | | |
| Jeffrey Shooman | 117.60 | $200 | $23,520.00 |
| Mary Jean Pizza | 279.40 | $200 | $55,880.00 |
| Marissa Quigley | 42.90 | $200 | $8,580.00 |
| Danielle Alvarez | 524.00 | $475 | $248,900.00 |
| Kyle Shamberg | 11.70 | $475 | $5,557.50 |
| Erik Sardina | 20.10 | $375 | $7,537.50 |
| Andrea Clisura | 38.00 | $200 | $7,600.00 |
| Dennis Dollar | 34.05 | $200 | $6,810.00 |
| Javier Hidalgo | 29.00 | $200 | $5,800.00 |
| Cirong Kang | 92.50 | $400 | $37,000.00 |
| Scott Foglietta | 52.50 | $350 | $18,375.00 |
| Diana Gjonaj | 22.50 | $350 | $7,875.00 |
| Gloria Melwani | 16.50 | $550 | $9,075.00 |
| Matthew Baron | 8.25 | $200 | $1,650.00 |
| Jason Hardy | 29.75 | $200 | $5,950.00 |
| | | | |
| *Of Counsel* | | | |
| Paul Andrejkovics | 123.75 | $675 | $83,531.25 |

| Jennifer Czeisler | 1,137.75 | $600 | $682,650.00 |
|---|---|---|---|
| **Total** | **7,517.43 (hours)** | | **$4,624,854.38** |

Although the Court's lodestar calculation departs from counsel's estimated $5,091,251.25 lodestar (Doc. No. 173 at 48), the lodestar confirms the Court's finding that the award of $4,250,000 in attorneys' fees, expenses, and service awards is reasonable.

## III.   CONCLUSION

For the foregoing reasons, the Court will (a) approve the Settlement; (b) certify the nationwide Settlement Class; (c) appoint Andrew Harbut, Alan McMichael, Kris Reid, David Palomino, and Scott Giannetti as representatives of the Settlement Class, appoint the law firm Dilworth Paxson LLP as Liaison Counsel, and appoint the law firms Faruqi & Faruqi, LLP, Lax LLP, Lite DePalma Greenberg, LLC, and Milberg LLP as Class Counsel for the Settlement Class; and (d) approve the award of attorneys' fees, expenses and service awards in the sum of $4,250,000.  An order consistent with this memorandum follows.