## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: SHOP-VAC MARKETING AND SALES PRACTICES LITIGATION | MDL No. 2380<br><br>Civil Action No. 4:12-md-02380 |
| THIS DOCUMENT RELATES TO:<br>All Cases | (Judge Kane) |

### DECLARATION OF JAMES J. RODGERS IN SUPPORT OF CLASS PLAINTIFFS' MOTION TO COMPEL OBJECTOR-APPELLANT MICHELLE W. VULLINGS TO POST AN APPEAL BOND, PURSUANT TO FED. R. APP. P. 7

I, James J. Rodgers, declare as follows:

1.      I am a partner of the law firm of Dilworth Paxson LLP, located in Harrisburg, Pennsylvania.  I submit this declaration in support of Class Plaintiffs' Motion to Compel Objector-Appellant Michelle W. Vullings to Post an Appeal Bond, Pursuant to Fed. R. App. P. 7.  I have personal knowledge of the matters set forth herein based upon my active supervision and participation in all material aspects of the litigation.

2.      Attached as Exhibit A is a true and correct copy of a Class Action Complaint and Demand for Jury Trial in *Edelson PC v. The Bandas Law Firm PC, et al.*, No. 1:16-cv-11057 (N.D. Ill.).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.   Executed this 22nd day of December 2016, at Philadelphia, Pennsylvania.


                */s/ James J. Rodgers*
                 James J. Rodgers

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| EDELSON PC, an Illinois professional corporation, individually, and on behalf of all others similarly situated, |  | Case No. 1:16-cv-11057 |
| *Plaintiff,* |  |  |
| *v.* |  |  |
| THE BANDAS LAW FIRM PC, a Texas professional corporation, CHRISTOPHER BANDAS, an individual, LAW OFFICES OF DARRELL PALMER PC d/b/a DARRELL PALMER LAW OFFICE, a suspended California professional corporation, JOSEPH DARRELL PALMER, an individual, NOONAN PERILLO & THUT LTD., an Illinois corporation, C. JEFFERY THUT, an individual, GARY STEWART, an individual, and JOHN DOES 1-20, |  |  |
| *Defendants*. |  |  |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Edelson PC ("Edelson") individually and on behalf of a class of other similarly situated entities, brings this Class Action Complaint against Defendants The Bandas Law Firm PC, Christopher Bandas, Law Offices of Darrell Palmer PC d/b/a Darrell Palmer Law Office, Joseph Darrell Palmer, Noonan Perillo & Thut Ltd., C. Jeffery Thut, Gary Stewart, and John Does 1-20 (specifically unknown objector associates of the named Defendants) (collectively, "Defendants") based upon Defendants' practice of extorting monetary payments through abuse of the court system and by engaging in vexatious and harassing litigation and wire fraud. Plaintiff, for its Class Action Complaint, alleges as follows upon personal knowledge as to itself and its own acts and experiences and, as to all other matters, upon information and belief,

including investigation conducted by its attorneys.

## NATURE OF ACTION

1.      Defendants are among the most notorious and prolific "professional objectors" in the United States. Together, Defendants plan and coordinate actions to extort profit from legitimate and court-approved class action settlements, and specifically from counsel representing the class such as Plaintiff and the Class here. To further this plan, Defendants, who are serial racketeers, formed an association and enterprise of individuals and entities with the explicit purpose of extorting money through class action objections with no basis in the law ("the Objector Enterprise").

2.      Defendants file last-minute, frivolous objections to class action settlements, have their objections overruled due to their frivolity, and then threaten to or actually appeal the overruling to a higher court unless counsel for the class pays them to go away. Defendants do all of this with no intention of improving the terms of the class action settlement for the betterment of the class members; their only interest is exerting pressure so they can extort a payment for themselves for minimal work.

3.      Defendants know that with their appeal filed, the resolution of the underlying class action is held up until the appeal is decided or withdrawn, which in many instances can be years down the road. Defendants' goal, and the way they fund the Objector Enterprise, then, is to offer to forego or withdraw their appeal at a price. For a fee—sometimes as high as $500,000 in attorneys' fees—Defendants will withdraw their appeal and go away, at least until the next class action settlement.

4.      Defendants' abuse of the system has caused courts across the country to say, for instance, that "Bandas is a professional objector who is improperly attempting to 'hijack' the

settlement of this case from deserving class members and dedicated, hard working counsel, solely to coerce ill-gotten, inappropriate and unspecified 'legal fees.'"[1] And that "Mr. Palmer is likely a serial objector and other courts have recognized similar behavior. …this Court finds such behavior in bad faith and also potentially violative of local and ethical rules."[2]

5.      Through their Objector Enterprise, Defendants have routinely targeted cases where Plaintiff has been appointed class counsel and objected with frivolous arguments. Plaintiff has expended considerable unreimbursed attorney time and out-of-pocket expenses to accumulate the evidence necessary to force Defendants to leave empty-handed. That said, Defendants keep coming back, case after case, and Plaintiff's efforts to contain Defendants' nefarious effects have thus far been unable to prevent their return. *C.f.* Harry S. Miller, *The Cat Came Back* (1893). Even with one of the Defendants, Palmer, suspended from the practice of law, Defendants still conspire to extort Plaintiff by misusing the class action settlement process and the appellate courts.

6.      Recently, Defendants engaged their Objector Enterprise and targeted a court-approved class action settlement where Plaintiff was appointed class counsel. There, Defendants recruited an associate to file a frivolous objection which was overruled by the court. Then, after Defendants made threats to appeal the court's ruling, they contacted Plaintiff over interstate wires with an ultimatum: pay them $225,000 to go away (with nothing benefiting the class) or else they would file a frivolous appeal and hold up, indefinitely, the payment of claims to the class and court-approved attorneys' fees to class counsel. Faced with this lose-lose situation,

---

[1]      *Brown v. Wal-Mart Stores, Inc.*, No. 01 L 85, Order Denying Objections to the Settlement and Fees and the Motion to Intervene and for Pro Hac Vice Admission at 2 (Ill. Cir. Ct. 14th Cir. Oct. 29, 2009) (emphasis added).

[2]      *Heekin v. Anthem, Inc.*, No. 1:05-CV-01908-TWP, 2013 WL 752637, at *3 (S.D. Ind. Feb. 27, 2013).

Plaintiff agreed to pay $225,000 to Defendants and now seeks relief from this Court.

7.     Accordingly, Plaintiff Edelson PC, on behalf of the Class, brings this lawsuit and seeks injunctive relief, pursuant to the All Writs Act, 28 U.S.C. § 1651, labeling Defendants vexatious litigants and prohibiting them from:

a.     ghostwriting objections for the purpose of making their objections seem *pro se*;

b.     making or threatening to make objections to class action settlements not for the purpose of improving the settlements but for extracting payments for themselves;

c.     filing with any court objections to class action settlements or appeals of overruled objections without prior screening or approval by the Court where their status as vexatious litigants must be disclosed along with a copy of the injunction entered pursuant to this suit;

d.     withdrawing any objection or appeal from the overruling of any objection without disclosing payment in exchange for doing so and any corresponding benefit provided to the class, along with an order awarding damages, and costs and reasonable attorneys' fees.

8.     Plaintiff Edelson PC, on behalf of the Class, also brings this lawsuit under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, *et seq*. ("RICO") for acts of extortion under the Hobbs Act (18 U.S.C. § 1951), the unauthorized practice of law under the Illinois Attorney Act (705 ILCS 205/0.01), and Wire Fraud (18 U.S.C. § 1343).

## PARTIES

9.     Plaintiff Edelson PC is a professional corporation incorporated and existing under the laws of the State of Illinois.

10.     Defendant The Bandas Law Firm is a professional corporation incorporated and existing under the laws of the State of Texas with its principal place of business located at 500 N. Shoreline Boulevard, #1020, Corpus Christi, Texas 78401.

11.     Defendant Christopher Bandas is a natural person and citizen of the State of Texas. Defendant Bandas, individually and through his law firm, Defendant The Bandas Law Firm, has repeatedly engaged in the type of misconduct alleged here in Illinois and this District.

12.     Defendant Law Offices of Darrell Palmer PC d/b/a Darrell Palmer Law Office is a suspended professional corporation incorporated and existing under the laws of the State of California with its principal place of business located at 603 North Highway, 101 Suite A, Solana Beach, California 92075.

13.     Defendant Joseph Darrell Palmer is a natural persona and citizen of the State of California. Defendant Palmer, individually and through his law firm, Defendant Law Offices of Darrell Palmer PC d/b/a Darrell Palmer Law Office, has repeatedly engaged in the type of misconduct alleged here in Illinois and this District..

14.     Defendant Noonan Perillo & Thut Ltd., is a corporation incorporated and existing under the laws of the State of Illinois with its principal place of business located at 25 North County Street, Waukegan, Illinois 60085.

15.     Defendant C. Jeffery Thut is a natural person and citizen of the State of Illinois. Defendant Thut, individually and through his law firm, Defendant Noonan Perillo & Thut Ltd., does business in Illinois and this District and has repeatedly engaged in the type of misconduct alleged here in Illinois and this District.

16.     Defendant Gary Stewart is a natural person and citizen of the State of California.

## JURISDICTION AND VENUE

17.     This Court has original jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331 because they arise under RICO (18 U.S.C. §§ 1961, *et seq*.), which is a federal statute. This Court additionally has subject matter jurisdiction over this matter pursuant to 18 U.S.C. § 1964(c) because this case seeks recovery for injuries to business and property caused by violations of RICO (18 U.S.C. §§ 1961, *et seq*.), which states that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court."

18.     The Court has personal jurisdiction over Defendant Noonan Perillo & Thut Ltd. and Defendant Thut because Defendant Noonan Perillo & Thut Ltd., is an Illinois corporation, Defendants Noonan Perillo & Thut Ltd., and Thut do business in Illinois and in this District, Defendant Noonan Perillo & Thut Ltd., is headquartered in Illinois, and Defendants committed tortious acts within and purposefully directed at Illinois, such conduct designed to create an injury in that state. Furthermore, at all relevant times, Defendant Thut coordinated with Defendants to commit the tortious acts in and to target Illinois and this District.

19.     As described more fully below, when the tortious acts were committed, Defendant Thut was acting as the agent of each of the other Defendants. And, for each action, each of the other Defendants gave Thut authority to act as their agent.

20.     The Court has personal jurisdiction over Defendant Bandas because Defendant Bandas has enlisted Defendant Thut to act as his agent in Illinois and this District. At all relevant times, Thut acted with the authority and was in the control of Bandas. Moreover, Defendant Bandas committed tortious acts purposefully directed at Illinois and such conduct was designed to create an injury in Illinois and this District. In addition, Defendant Bandas has availed himself

of Illinois courts by filling admissions to courts throughout Illinois. As such, there exist the minimum contacts necessary to assert jurisdiction.

21. The Court has personal jurisdiction over Defendant The Bandas Law Firm PC because it ratified the conduct of its principal, Defendant Bandas, at all times know of his actions.

22. The Court has personal jurisdiction over Defendant Palmer because Defendant Palmer committed tortious acts purposefully directed at Illinois and this District and such conduct was designed to create an injury in Illinois. In addition, Defendant Palmer has availed himself to Illinois courts by filling admissions to courts throughout Illinois. As such, there exist the minimum contacts necessary to assert jurisdiction.

23. The Court has personal jurisdiction over Defendant Law Office of Darrell Palmer PC d/b/a Darrell Palmer Law Office because it ratified the conduct of its principal, Defendant Palmer, at all times know of his actions

24. The Court has personal jurisdiction over Defendant Stewart because Defendant Stewart has committed tortious acts purposefully directed at Illinois and this District and such conduct was designed to create an injury in Illinois.

25. Venue is proper because Defendants do business in this District and the causes of action arose, in substantial part, in this District. Venue is additionally proper in this District under 28 U.S.C. § 1391 because Noonan Perillo & Thut Ltd., is a resident of this District in that is a corporation organized under the laws of this State and it does business in this District.

## FACTUAL ALLEGATIONS

I.  **"Professional Objectors" Abuse Class Action Procedure to Use Objections to Class Action Settlements to Extort an Individual Payment of Fees with No Benefit to the Class.**

26.     Each year, hundreds of consumer class action lawsuits reach settlement. As required by the federal rules and rules of civil procedure of the several states (including the Illinois Code of Civil Procedure), class counsel seek approval of these settlements in courts across the country to provide relief to consumers and closure to defendants. In some cases, as those rules provide, class members file objections to voice displeasure or highlight possible cause for concern.

27.     But while many of the objections made are legitimate and seek to provide a benefit to the class, some attorneys have hijacked the system for profit. Known as "professional objectors," unscrupulous attorneys file a last-minute frivolous objection to a class action settlement, lose (often on purpose), and then threaten to or actually appeal to a higher court, all in an attempt to extort a nuisance payment from class counsel to go away to avoid the delay of the appeals process. Once they're paid to go away, however, the professional objectors return as soon as the next class action seeks court approval for a settlement and begin the entire process anew.

28.     The National Law Review has aptly described the professional objector's modus operandi:

> The broad right of any class action objector to appeal a district court's final judgment approving a settlement has given rise to what are referred to as professional objectors—attorneys who file specious objections for the sole purpose of using appellate delay to hold a class action settlement hostage in order to extort self-interested payments. Unlike legitimate objectors, who help police the class action settlement process, professional objectors engage in what courts

and commentators have characterized as "objector blackmail."[3]

29.    Others have called this scheme for what it is—extortion:

The business of professional objectors is to make insubstantial objections to class settlements on behalf of nonnamed class members, then threaten to appeal the judgment approving the settlement unless paid to desist. The business is extortion, and it is profitable because class counsel have a powerful incentive to avoid the costs that an appeal would impose.[4]

The United States Court of Appeals for the Seventh Circuit reached the same conclusion:

In the context of intervening in a class action settlement, extortion would mean intervening not to increase the value of the settlement, but in order to get paid to go away.[5]

30.    More have warned that attorneys and class members should increasingly "[w]atch out … for canned objections filed by professional objectors who seek out class actions to simply extract a fee for lodging generic, unhelpful protests."[6]

31.    The rise in professional objectors has been so great that new rules have been proposed to Federal Rule of Civil Procedure 23, which governs class actions. In that new rule,

"an objector can't be paid off to drop their objection without approval by the district court," said Leslie Brueckner, senior attorney at Public Justice. "That could have a big impact because it could effectively halt the problem of so-called 'professional objectors,' who basically hold up class action settlements for their own pecuniary gain, by basically exposing that kind of practice to the light of day."[7]

---

[3]       Anna C. Haac, *Ninth Circuit Grants Summary Affirmance In Objectors' Appeal From Class Action Settlement: A Case Study In Dealing With Serial Objectors*, Nat'l L. Rev. (Dec. 12, 2013), https://perma.cc/CE6H-9DWF (emphasis omitted).

[4]       John E. Loptaka & D. Brooks Smith, *Class Action Professional Objectors: What to do about Them?*, 39 Fla. St. U.L. Rev. 863, 929 (2012).

[5]       *Vollmer v. Selden*, 350 F. 3d 656, 660 (7th Cir. 2003).

[6]       Barbara J. Rothstein & Thomas E. Willging, Federal Judicial Center, *Managing Class Action Litigation: A Pocket Guide for Judges*, at 11 (2005), https://perma.cc/BT93-GV7D.

[7]       Anna C. Haac, *Ninth Circuit Grants Summary Affirmance In Objectors' Appeal From Class Action Settlement: A Case Study In Dealing With Serial Objectors*, Nat'l L. Rev. (Dec. 12, 2013), https://perma.cc/CE6H-9DWF.

32.    As described below, Defendants are extortionists that abuse the system, seeking to profit from the labor of class counsel across the country who prosecute fair and court approved class action settlements.

## II.    Defendants Are Notorious "Professional Objectors" That Abuse Legal Process for Personal Profit

33.    The website SerialObjector.com was created in 2015 to transparently track the filings of professional objectors in courts throughout the country. As the site explains,

> "[s]erial objectors 'subsist primarily off of the skill and labor of, to say nothing of the risk borne by, more capable attorneys. These are the opportunistic objectors. Although they contribute nothing to the class, they object to the settlement, thereby obstructing payment to lead counselor of the class in the hope that lead plaintiff will pay them to go away. Unfortunately, the class-action kingdom has seen a Malthusian explosion of these opportunistic objectors…' Class action settlements are often delayed by serial objectors objecting to the suit.[8]

34.    According to SerialObjector.com's data, Bandas and Palmer are the most prolific of these "opportunistic objectors," filing almost as many objections (103) as the next five top objectors (113).[9] A review of Bandas's and Palmer's, along with their new associate Thut's, objections demonstrate that they add nothing of value to the class actions to which they object but instead "object to the settlement[s] … in the hope that lead plaintiff[s] will pay them to go away."

A.    *Bandas is, ostensibly, the most prolific and notorious professional objector in the country.*

35.    The Bandas law firm, a small Texas outfit headed by Mr. Bandas, is a notorious "professional objector" who abuses the court system to file baseless objections to class action settlements and threatens to appeal their inevitable rejection, all in an attempt to extort a nuisance

---

[8]    *About - Serial Objector Index*, https://perma.cc/8TJS-5GFM.
[9]    *Persons - Serial Objector Index*, https://perma.cc/RY4Q-C93H.

payment from class counsel to go away without ever providing any benefit to the class.

36. On SerialObjector.com, Bandas is listed as having filed 55 objections over the past decade, almost an objection every other month—the most of any objector. However, these 55 objections likely represent only a small fraction of the total number of objections in which Bandas has been involved.

37. A review of the objections listed reveals that the vast majority, if not all, of Bandas's objections do not provide any benefit to the settlement class. According to SerialObjector's data, Bandas's objections are overruled, with the subsequent appeal then being withdrawn (assuredly after a coerced payout from class counsel) and/or serve as the basis for motions for sanctions more than 90% of the time. Unfortunately, notwithstanding the impropriety and sanctionable nature of his conduct, Bandas is apparently able to profit from his abuse of the system through the filing of frivolous objections. As noted below, Bandas has likely extracted millions of dollars from class counsel in exchange for going away without providing any corresponding benefit to anyone but himself (and his fellow professional objectors).

38. And while Bandas makes representations to counsel, courts, and others that he is merely the attorney for an objector who has legitimate criticism of a class action settlement, as described below, nothing could be farther from the truth. Instead, Bandas represents puppet clients who have little to no understanding of the class action settlement to which they're objecting (because they're often not even class members) and, at times, are ignorant that they're objecting at all. And when Bandas successfully extorts class counsel for fees (sometimes as much as $500,000 or more), Bandas's own client retainer agreements limit the amount of the funds that goes to the "client" to only $5,000. As a result, were Bandas to hold up a class action settlement for $500,000, the "client" would get only $5,000 and Bandas would get $495,000.

39.     When courts have had the opportunity to respond to Bandas (i.e., before Bandas extracts a fee to go away and withdraw his objection), the courts don't hold back. For example, one federal judge has found that "Bandas routinely represents objectors purporting to challenge class action settlements, and does not do so to effectuate changes to settlements, but does so for his own personal financial gain [and] has been excoriated by Courts for this conduct."[10] Another federal judge described Bandas as "a known vexatious appellant" who has been "repeatedly admonished for pursuing frivolous appeals of objections to class action settlements."[11]

40.     Yet another federal judge held that objections filed by Bandas to a class action settlement "were filed for the improper purpose of obtaining a cash settlement in exchange for withdrawing the objections."[12] Specifically, that court found Bandas was attempting to pressure the parties to give him $400,000 as payment to withdraw the objections and go away—Bandas was using the threat of questionable litigation to tie up the settlement unless the payment was made.

41.     In 2009, an Illinois Court took notice of Bandas's conduct and stated:

> The Bandas Objection filed on behalf of Ms. Carlson is a generic boilerplate objection prepared and filed by attorneys working for their own personal benefit and not for the benefit of this Class or for those lawyers' clients. The record before the Court demonstrates that **Bandas is a professional objector who is improperly attempting to 'hijack' the settlement of this case from deserving class members and dedicated, hard working counsel, solely to coerce ill-gotten, inappropriate and unspecified 'legal fees.'**[13]

---

[10]     *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 281 F.R.D. 531, 533 (N.D. Cal. 2012).

[11]     *In re Gen. Elec. Co. Sec. Litig.*, No. 09 Civ. 1951(DLC), 2014 WL 534970, at *9 (S.D.N.Y. Feb. 11, 2014).

[12]     *In re Hydroxycut Mktg. & Sales Practices Litig.*, No. 09md2087 BTM (KSC), 2013 WL 5275618, at *5 (S.D. Cal. Sept. 17, 2013).

[13]     *Brown v. Wal-Mart Stores, Inc.,* No. 01 L 85, Order Denying Objections to the Settlement and Fees and the Motion to Intervene and for Pro Hac Vice Admission at 2 (Ill. Cir. Ct. 14th Cir. Oct. 29, 2009) (emphasis added).

42.     These reactions from the courts are just a sample of the harsh words describing Bandas's conduct. However, they serve to cement Bandas's pattern of abusing the system by filing frivolous objections to class actions for personal profit.

   B.     *Palmer is second only to Bandas in the world of professional objectors.*

43.     Like Bandas, Palmer is a prolific and notorious professional objector. And like his colleague Bandas, Palmer exploits the court system to file frivolous objections to class action settlements to extort nuisance payments without ever providing the class any benefit.

44.     According to SerialObjector.com, Palmer is listed as having filed 48 objections—second only to Bandas—which likely represent only a small of Palmer's total objections. A review of Palmer's objections listed on SerialObjector.com reveals that he too is inept at securing any benefit to the class actions to which he objects: more than 90% of the time, Palmer's objections are withdrawn (likely after payment), overruled, and/or serve as the basis for motions for sanctions.

45.     Courts across the country have admonished Palmer for his exploitative schemes, a sample includes the following:

- "Palmer has been widely and repeatedly criticized as a serial, professional, or otherwise vexatious objector."[14]

- "Mr. Palmer has been deemed a 'serial objector'" with a history of "admitted . . . 'bad faith and vexatious conduct'"[15]

- "Finally, the Court does find evidence of bad faith or vexatious conduct on the part of appellants. Mr. Paul appears to be represented by an attorney who has not entered an appearance in this case. It is worth noting that attorney Darrell Palmer ('Mr. Palmer'), previously requested leave to appear *pro hac vice* in this case. However, this request was withdrawn after the Court scheduled a teleconference to address Mr. Palmer's

---

[14]     *Dennis v. Kellogg Co.*, No. 09-cv-1786, 2013 WL 6055326 (S.D. Cal. Nov. 14, 2013).
[15]     *In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 159 n. 40 (E.D. La. Jan.11, 2013).

motion. Despite this, Mr. Palmer is listed as the payor of Mr. Paul's Notice of Appeal filing fee. Mr. Palmer's office also emailed Plaintiffs a notice and copy of Mr. Paul's most recent filing. Plaintiffs have produced evidence that Mr. Palmer is likely a serial objector and other courts have recognized similar behavior. …this Court finds such behavior in bad faith and also potentially violative of local and ethical rules."[16]

46.     Worse, Palmer has a history of secretly objecting through others by "ghostwriting" objections. In a recent case in Illinois, Plaintiff uncovered Palmer's scheme to secretly profit from a court approved and fair class action settlement. Specifically, Plaintiff, discovered that a purportedly *pro se* objection was actually "ghostwritten" by Palmer. Worse, Palmer actively concealed his involvement in writing the objection, and the objector was even not a member of the settlement class. As explained more below, the reason that Palmer concealed his involvement from the Court was not an innocent one—Palmer was then facing attorney disciplinary charges in his home state of California. While such disciplinary charges were pending, Palmer was not eligible under Illinois Supreme Court Rule 707 to receive permission as an out-of-state attorney to provide legal services in Illinois.

47.     Palmer's actions in that case did not go unnoticed by the Court. The Honorable Neil Cohen of this Court appointed the Honorable Gilbert J. Grossi (ret.), as special prosecutor to investigate "whether indirect criminal contempt proceedings are warranted against" Palmer. In his report, Judge Grossi concluded:

> It appears clear from the substance and legal sophistication of the arguments made in the objection, that Ms. House [the objector] did not write this objection without the aid of legal counsel.  This is confirmed by a series of emails sent between [defense counsel] and Joseph Darrell Palmer [].  In these emails, Mr. Palmer acknowledges being Ms. House's attorney in this matter. Mr. Palmer, however, has never filed an appearance before Judge Cohen in this case.
>
> …

---

[16]     *Heekin v. Anthem, Inc.*, No. 1:05-CV-01908-TWP, 2013 WL 752637, at *3 (S.D. Ind. Feb. 27, 2013).

Regarding … Palmer, he acknowledged being Susan House's attorney in an email to [defense counsel]. He clearly composed the objection which Susan House submitted to the Court. Mr. Palmer also never submitted any written documentation to corroborate or substantiate any text supposed to have been received by Ms. House or any notice of her being a class member. When I spoke to Mr. Palmer on March 12, 2014, he refused to answer any questions and referred me to his attorney. After a mediation in California, a settlement was reached. However, to my knowledge, nothing was paid to Ms. House and she has attempted to withdraw her objection before this Court. Mr. Palmer's conduct appears questionable, suspicious and in apparent bad faith. Whether this rises to the level of proof beyond a reasonable doubt is a debatable issue.[17]

48.     Judge Grossi stated that he would submit his report to "any proper authorities in California which may be investigating Mr. Palmer."[18] In fact, soon after Judge Grossi issued his report, the State Bar of California's investigation against Palmer concluded, "finding him culpable of three counts of moral turpitude for the grossly negligent making of false statements in sworn affidavits filed in federal class actions."[19] Mr. Palmer appealed and, just as he does with his objection appeals, lost. In affirming the hearing judge's decision, the State Bar of California Review Department stated:

We … agree with the hearing judge's conclusion that Palmer acted with gross negligence, amounting to moral turpitude, in executing and filing the false affidavits.

…

In 2002, [Palmer] was convicted of a Colorado criminal offense for failing to properly report roughly $4,000 in sales taxes … . As a result of this conviction, the Colorado Supreme Court imposed discipline on Palmer … .

…

Palmer admits that he executed and filed three sworn affidavits, between June

---

[17]     A true and accurate copy of Judge Grossi's Report is attached hereto as Exhibit A. (citations omitted).

[18]     *Id.*

[19]     *In re Palmer*, No. 12-O-16924, 2016 WL 364192 (Cal. Bar Ct. Jan. 6, 2016),

2010 and July 2012, in which he declared falsely that he had never been subject to attorney discipline.

…

[S]uch lack of diligence was common in Palmer's practice. His long-time paralegal, who prepared the affidavits for his approval and signature, testified that Palmer "did not thoroughly review what [she] put in front of him to sign." This lack of attention is substantially below the ethical standard of care required of attorneys when signing and filing documents under oath.

…

For the foregoing reasons, we recommend that Joseph Darrell Palmer be suspended from the practice of law for two years, that execution of that suspension be stayed, and that Palmer be placed on probation for two years on the [meeting of certain] conditions … .[20]

49.     Although Palmer's suspension was to be stayed so long as he fulfilled certain conditions, Palmer apparently failed to meet those admittedly basic conditions placed on him by the State Bar of California. Palmer is still suspended from practicing law in California.

50.     Nevertheless, Palmer disregards his suspended status and continues to practice law by assisting in preparing and filing of objections to class action settlements. On October 26, 2016, Palmer once again was involved in the preparation of an objection, this time in *Clark v. Gannett Co., Inc.*, Case No. 16-CH-06603 (Cir. Ct. Cook Cty.). There, and as described more below, Palmer co-opted a friend, Gary Stewart, into filing a frivolous objection to a class action settlement and had Stewart state he was represented by Bandas and Thut. Notably, Palmer (and Bandas) never filed an appearance with the Court in *Gannett*, nor could he because he is presently suspended from the practice of law. On November 14, 2016, the Honorable Kathleen Kennedy overruled the objection and granted final approval of the *Gannett* settlement (the "*Gannett* Settlement").

---

[20]     *Id.*

C.     *Thut has partnered with Bandas and Palmer to quickly become an up-and-coming professional objector.*

51.     Jeff Thut is a former Illinois traffic ticket prosecutor, turned personal injury lawyer, turned professional objector who has repeatedly worked with Bandas and/or Palmer. Like Bandas and Palmer, Thut has filed objections on behalf of himself and his immediate family members, on at least one instance without their knowledge or permission, to attempt to extort a payment in exchange for withdrawing an objection without making any change to the settlement agreement.[21]

52.     Thut's rapid decent into the world of processional objecting caused him to be profiled in a July 2015 Reuters report about professional objectors. There, Thut described how he (and Bandas) attempted to extort payment from class counsel in an Illinois State Court proceeding:

> Jeffrey Thut, who is working with Bandas on the MetLife case, said Bandas is "nothing but professional." He said Bandas first called him to serve as local counsel for [an] objector, after the judge in the case ordered discovery. When he entered an appearance, he said, class counsel [] called to ask if he knew about Bandas' history. Thut, who told me he'd never worked on a class action before the MetLife case, said, "Is Chris Bandas a serial objector? I don't know. I'll let you make up your own mind. In my experience, he knows his stuff. He doesn't have horns."

> Thut said he has tried repeatedly **to convince** [class counsel] **to settle** the MetLife case **and lock in** [class counsel's] **$8.2 million in fees and costs**. He said he believes the settlement approval will be overturned because the trial judge did not permit objectors to inquire into a settlement between class counsel and the Old National Bank, which allegedly held a $3.6 million judgment against the firm.

> [The] serialobjector.com website has a dossier on Thut, too. His class action experience may have begun with the MetLife case but it didn't end there. He and Bandas have since teamed up to represent objectors in two other cases, a Chicago

---

[21]     *See e.g.*, *Wright v. Nationstar*, No. 14-cv-10457, Dkt. 79 (listing Thut as objector represented by Bandas); *In re Lifetime Fitness TCPA Litig.*, No. 14-md-2564, Dkt. 121 (detailing Thut's use of his daughter as an objector without her knowledge)

federal court class action against Chase and a Minnesota class action against Life Time Fitness. (Both are TCPA cases.) The objector Thut and Bandas represent in the Life Time class action is named Lindsey Thut – the same name as a University of Michigan soccer player whose father is Jeff Thut. I asked Thut if Life Time objector Lindsey Thut is his daughter. "I'll let you figure that out on your own," he said.[22]

53.     Discovery into the objection revealed that Lindsey Thut was Thut's daughter, that he personally filed a claim in the case with his personal information and apparently without her knowledge, and that Thut enlisted Bandas to assist him in the objection in order to extort a payment without any corresponding benefit to the class members.

54.     Thut's conduct mirrors the ethically-questionable tactics that have been used by Palmer and Bandas for years. Indeed, while SerialObjector.com's records on Thut show he is just getting started, listing only six recent objections, Thut is as inefficient and ineffective as his associates. Seemingly, none of Thut's objections were meritorious.

## III.    Defendants Coordinate Their Actions in Attempts to Extort Plaintiff and Class Counsel in Illinois and Throughout the Country.

55.     Although the individual actions of Defendants are alarming on their own, Defendants' level of coordination reveals their scheme to extort. As described above, Defendants, through the Objector Enterprise, have made over one hundred objections just in the last decade. Those objections were accomplished through the Objector Enterprise whereby Defendants would seek out which class actions to object to, solicit family, employees, or friends as "clients" to use, agree on which frivolous "arguments" to push, and decide on their pay-off price.

56.     This isn't conjecture. Instead, Defendants' scheme and unlawful Enterprise were

---

[22]     Allison Frankel, A New Way for Class Action Firms to Combat Serial Objectors, Reuters (June 29, 2015), https://perma.cc/RCW8-TZJD.

revealed when a former associate wrote a whistleblower like account, and when Reuters news service obtained previously-secret communications.

57.      After another objector refused to coordinate with Bandas and accept payment to drop an appeal of an overruled objection, that attorney submitted a detailed account of how Bandas and his associates operate, and filed it with the Seventh Circuit Court of Appeals under oath:

> Mr. Bandas proposed that I receive a contingent fee of a share of the proceeds of settled objections in cases where I performed consulting. … However, I grew uncomfortable with receiving a percentage of settled objections, both because I disagreed with the idea of settling objections for money at the expense of the class, and because I was concerned that I was most often being consulted in difficult cases where Mr. Bandas's actions before I became involved was putting him at risk of sanctions and where payment was thus unlikely. In 2013, Mr. Bandas and I agreed to a set of new retainer agreements where I would be paid by the hour, subject to a monthly minimum payment, with separate payments and separate retainers for cases where I made an appearance on behalf of one of Mr. Bandas's clients. The contingent payments I had received to date would be retroactively treated as a partial payment in advance for my appearance and argument in a Seventh Circuit appeal … .
>
> …
>
> I understood that my pay from Mr. Bandas was made possible and would not have occurred without Mr. Bandas profitably settling cases where I was not counsel of record, but rationalized accepting that money because of the benefit to caselaw of victories [] that might not have occurred if I was not assisting Mr. Bandas.
>
> …
>
> I grossed about $33,000 from Mr. Bandas in 2013, $125,000 in 2014, and $95,000 between January 1 and June 4, 2015 … . Mr. Bandas apparently found these profitable sums to pay, because he became very upset when I terminated my business relationship with him.
>
> …
>
> Mr. Bandas indicated to me on numerous occasions, including as recently as June 4, 2015, that I could increase my total income considerably if I … worked for him full-time. Mr. Palmer made me a similar offer in late 2013 or early 2014. I declined both gentlemen's offers.

…

In May 2015, a reporter contacted me and stated that class action attorneys had complained to him that "bad" objectors who settled cases for money were using my name to threaten class counsel into settling. I acknowledged that I had been retained in a number of class action appeals, … explained the limitations on my willingness to represent for-profit class-action objectors, and noted that that threat only made a difference if the underlying objection was meritorious. …[23]

58.     As the author described, the world of professional objectors—and Bandas' and Palmer's Enterprise specifically—is filled with coordinated back-room deals for illicit gain. Indeed, the author described the "threats" used by professional objectors used to get "class counsel into settling." While the author seemingly exhibits remorse from his brief association with Defendant Bandas, he recounts how he reluctantly assisted in Bandas's and Palmer's "profitable" business of objecting that was often "putting [them] at risk of sanctions and where payment was thus unlikely."

59.     That author's story is corroborated by an in-depth report by Reuters (*see* paragraph 52 above). There, Reuters uncovered how Defendants' Objector Enterprise engaged in similar backroom deals, improper use of acquaintances as client objectors, and secret schemes to extract money from legitimate class action settlements. Reuters reports:

In [the] MetLife case, Bandas is not counsel of record for objector [Clayton]. [Thut] signed Clayton's brief to the Illinois appellate court. But Anderson & Wanca obtained Clayton's retainer agreement after the state court judge overseeing the class action ordered discovery from him and another objector. As Clayton conceded at his deposition, Bandas is his lead lawyer. (Clayton said Bandas is a professional acquaintance who decades ago used him as an expert witness in a couple of personal injury suits. He also said he "presumed" Bandas was responsible for filing a previous objection Clayton attempted to bring in a New Jersey class action against Hertz.)

Clayton's retainer agreement in the MetLife case, which was an exhibit at his

---

[23]     A true and accurate copy of the account is attached hereto as Exhibit B.

deposition, included an interestingly vague clause about what reward he could expect as an objector. He could be entitled to an incentive payment from class counsel or the defendants in recognition of his service, the contract said. "Any incentive award or payment sought," the agreement added, "will never exceed $5,000."

Bandas, however, requests much more than $5,000 to settle appeals, based on two cases in which information about his settlements has become public. … Bandas allegedly told a lawyer for the defendant in a false advertising class action against the maker of Hydroxycut dietary supplements that he would withdraw for a payment of about $400,000 … .

The defense lawyer testified at an evidentiary hearing that Bandas subsequently called claiming he'd had a "senior moment" and forgotten their conversation. But the judge concluded that "Mr. Bandas was attempting to pressure the parties to give him $400,000 as payment to withdraw the objections and go away. Mr. Bandas was using the threat of questionable litigation to tie up the settlement unless the payment was made." Judge Moskowitz later denied a motion by class counsel in the Hydroxycut case to sanction Bandas for allegedly falsifying the signature of a client. The judge said he took the allegation very seriously but didn't have jurisdiction over Bandas because Bandas did not enter an appearance before him.[24]

60.     Unfortunately, Bandas, Palmer, and Thut have often avoided sanctions and reprimand from courts. Not from a lack of improper or illegal conduct, but because Defendants routinely and purposely fail to file appearances in cases where they attempt to extort class counsel through improper objections as a means to avoid consequences.

61.     For instance, in the recent *Gannett* case, Defendants' aimed their Objector Enterprise machine at Plaintiff and organized a scheme to misuse the objection system in an attempt to extort funds from it. There, Thut admitted to skirting his obligations as an Illinois attorney in order to assist Bandas and Palmer in filing of Defendant Gary Stewart's objection in the *Gannett* Settlement (the "Stewart Objection"). Upon receiving the Objection, Plaintiff called Thut to attempt to explain the numerous factual misstatements in the brief he signed. But while

---

[24]     Allison Frankel, *A new way for class action firms to combat serial objectors?* (June 29, 2015), https://perma.cc/RCW8-TZJD.

his brief is focused on a claimed "lack of information," Thut refused to discuss the information

he claimed was lacking, mistakenly believed the case was about text messaging (it's not), and the

only thing Thut could recall about the case was that the settlement website said Plaintiff, as court

approved class counsel, were getting $5 million in fees. (This statement was unsurprising, as bad

faith objectors like Thut, Bandas, Palmer, and Stewart look solely at fees because of the greater

opportunity for extortion.) Thut was candid about why he knew so little about the brief he signed

and filed: Bandas wrote the brief and Thut took Bandas's word for everything asserted in the

brief without performing any independent investigation of his own. Much of what Thut vouched

for without question was wholly meritless.

62.     While the Court in *Gannett* ultimately overruled Defendants' Stewart Objection,

Defendants have since threatened to appeal the decision and hold up final resolution of the case.

**IV.     Defendants Propose to Resolve The Stewart Objection Through Mediation But Hijack the Mediation to Extort Plaintiff.**

63.     After threatening to appeal the *Gannett* Court's overruling of the Stewart

Objection, Defendants contacted Plaintiff to offer a solution: engage in mediation resolve the

objection and forego any appeal of the Court's order granting final approval. On November 30,

2016, Defendant Bandas communicated with Plaintiff and proposed that Defendants' Stewart

Objection could be resolved through mediation.

64.     Plaintiff accepted this opportunity to allow Defendants to ostensibly inform it of

the changes they would like made to the settlement necessary to resolve the objection or obviate

the threatened appeal. Although Plaintiff believed that the Court was correct in overruling

Defendants' objection on the merits, Plaintiff was (and is) cognizant of its obligation to provide

the relief guaranteed through the settlement to the class members with as minimal a delay as

possible.

65.     On December 1, 2016, a mediator facilitated a telephonic mediation with Plaintiff and Defendants' representative, Defendant Bandas.

66.     During the mediation, Defendant Bandas demanded that Plaintiff pay between $225,000 and $445,000 to settle outstanding issues. Defendants' demands of $445,000 are more than they could ever have recovered if they were to succeed on appeal (had their objection not been frivolous).

67.     Despite Defendants' prior representations, Defendants, through Defendant Bandas, did not suggest, request, or require that any changes be made to the *Gannett* Settlement in any form in exchange for the $225,000 to $445,000. Instead, Defendants were only negotiating their fee to go away. Defendants made clear that if Plaintiff paid the "settlement" demand of between $225,000 and $445,000, Defendants would not pursue their appeal in *Gannet*. If Defendants did not pursue their appeal, then, *Gannett* class members could finally obtain the relief to which they were entitled. Defendants' demand was made in writing directly through the mediator.

68.     Through this "mediation," Plaintiff accepted Defendants' extortion demand of $225,000 and informed Defendants that it would disclose the agreement and seek approval of the court. In response to Plaintiff's requirement for Court approval, Defendants, again through Defendant Bandas, attempted to back out of the deal, fearing that Defendants' written extortion attempt would be brought to the attention of the Court.

## CLASS ALLEGATIONS

69.     **Class Definition:** Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of itself and a class of similarly situated entities, defined as follows:

All entities that paid or agreed to pay fees to any Defendant, related to an objection in a class action settlement, wherein, as a result of the fee, no modifications were made to the settlement, no benefit was provided to the settlement class, and no court approved the payment.

70. **Numerosity**: The exact number of members of the Class is unknown and is not available to Plaintiff at this time, but individual joinder in this case is impracticable. The Class likely consists of at least 100 entities. Members of the Class can be easily identified through Defendants' records.

71. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include but are not limited to the following:

   a.  Whether Defendants' conduct violated RICO;

   b.  Whether Defendants' conduct constituted extortion under the Hobbs Act;

   c.  Whether Defendants took part in or facilitated the unauthorized practice of law in violation of the Illinois Attorney Act;

   d.  Whether Defendants' conduct constituted Wire Fraud;

   e.  Whether a permanent injunction is proper to restrain Defendants' conduct of filing frivolous objections to class action settlements;

   f.  Whether Defendants should be deemed vexatious litigants;

   g.  Whether Defendants have abused the court process; and

   h.  Whether Plaintiff and members of the Class are entitled to damages.

72. **Adequate Representation**: Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Proposed Class Counsel is competent

and experienced in complex litigation and class actions.[25] Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and members of the Class sustained damages as a result of Defendants' uniform wrongful conduct. Plaintiff has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff. Plaintiff is committed to vigorously prosecuting this action on behalf of the members of the Class, and it has the resources to do so. Plaintiff does not have any interest adverse to those of the other members of the Class.

73.    **Superiority**: This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. Joinder of all parties is impracticable, and the damages suffered by the individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendants' misconduct. Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort and expense will be fostered, and uniformity of decisions ensured.

74.    Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

---

[25]    Putative Class Counsel, Edelson PC, disclaims any interest in attorneys' fees to compensate it for serving as Class Counsel, as well as any interest in an incentive award to compensate it for serving at the Class Representative.

## COUNT I
## RICO § 1962
### As Against All Defendants on Behalf of Plaintiff and on Behalf of the Class

75.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

76.      Defendants are culpable persons or entities who are capable of holding legal or beneficial interests in property.

77.     The Objector Enterprise is an association-in-fact comprised of the Defendants and others, known and unknown, who are engaged in and whose activities affect interstate commerce and which have affected and damaged interstate commercial activity.

78.     To further the goals of the Objector Enterprise, which include (1) earning money through extortion, (2) the unauthorized practice of law, and (3) wire fraud, the Defendants agreed to and did conduct and participate in the conduct of the Objector Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally extorting Plaintiff and members of the Class.

79.     Specifically, the Defendants and other members of the Objector Enterprise willfully and intentionally violated numerous state and federal laws with the goal of obtaining money, directly and indirectly, through a pattern of racketeering activities composed of numerous indictable offenses, including but not limited to violations of the Hobbs Act (18 U.S.C. § 1951) and the Illinois Attorney Act (705 ILCS 205/0.01) and Wire Fraud (18 U.S.C. § 1343).

80.     While operating this pattern of racketeering, the Objector Enterprise has engaged in and affected interstate trade. The Objector Enterprise has transacted business in several states, across state lines, using various instrumentalities of interstate commerce such as telephones, the Internet, email, and the United States mail to communicate in furtherance of the activities of the

Objector Enterprise.

81.     The pattern of racketeering activity conducted by the members of the Objector Enterprise is distinct from the Objector Enterprise itself, as each act of racketeering is a separate offense committed by an entity or individual while the Objector Enterprise itself is an association of entities and individuals. The Objector Enterprise has an ongoing structure and/or organization supported by personnel and/or associates with continuing functions or responsibilities.

82.     The racketeering acts set out in this Complaint, and others, had the same pattern and similar purpose of extorting Plaintiff and members of the Class for the benefit of the Objector Enterprise and its members. Each racketeering act was related, had a similar purpose, involved the same or similar participants and methods of commission, and had similar results affecting Plaintiff and members of the Class. The racketeering acts, including violations of the Hobbs Act and the Illinois Attorney Act and acts of Wire Fraud, also related to each other in that they were part of the Objector Enterprise's goal of reaping illicit and unlawful profits from and through the extortion of Plaintiff and the Class to pay attorneys' fees and other money.

83.     The wrongful conduct of the Defendants and others has been and remains part of the Objector Enterprise's ongoing way of doing business and constitutes a continuing threat to the Plaintiff's and the Class's property. Without the repeated acts of violating the Hobbs Act and the Illinois Attorney Act, acts of Wire Fraud, and intentional coordination between all Defendants, the Objector Enterprise's scheme would not have succeeded.

84.     The pattern of racketeering activity through which the affairs of the Objector Enterprise were conducted and in which the Defendants participated consisted of at least the following:

    a.      Filing frivolous objections in class action settlements for the purpose of

27

extorting the lawyers representing the class;

b.      Concealing which members of the Objector Enterprise are participating in each class action objection;

c.      Concealing the fact that unlicensed attorneys are representing objectors in sharing in attorneys' fees;

d.      Improperly demanding monetary payments, without any benefit to the settlement class, in order to withdraw each objection;

e.      Threatening to appeal when courts overrule their objections unless they are paid sums to which they have no legal entitlement;

f.      On information and belief, engaging the services of purportedly neutral mediators to add legitimacy to their demands, despite using the same (or several of the same) mediators in over a dozen cases; and

g.      Improperly demanding monetary payments to which they have no legal entitlement, without any benefit to the settlement class, in order to not appeal or to withdraw the appeal.

85.      Each Defendant agreed to conduct the affairs of the Objector Enterprise:

a.      Christopher Bandas agreed to conduct the affairs of the Objector Enterprise by, for example, agreeing to (1) identify class action settlements for the Objector Enterprise to object to, including the *Gannett* Settlement; (2) share in any attorneys' fees or other money obtained through any objections to class action settlements, including the *Gannett* Settlement; (3) threaten to file or actually file frivolous objections to extort payment from class counsel; (4) ghostwrite, in whole or in part, the Stewart Objection to the *Gannett* Settlement; and (5) participate in the "mediation" to

"resolve" the Stewart Objection to the *Gannett* Settlement with the mediator knowing that it would be used for the improper purpose of demanding payment without any benefit to the *Gannett* Settlement class.

b.      The Bandas Law Firm PC agreed to conduct the affairs of the Objector Enterprise by ratifying the actions of its principal, Christopher Bandas, identified, in part, above.

c.      Joseph Darrell Palmer agreed to conduct the affairs of the Objector Enterprise by, for example, agreeing to (1) identify class action settlements for the Objector Enterprise to object to, including the *Gannett* Settlement; (2) share in any attorneys' fees or other money obtained through the any objections to class action settlements, including the *Gannett* Settlement; (3) threaten to file or actually file frivolous objections to extort payment from class counsel; (4) recruit his long-time associate Gary Stewart to file an objection in the *Gannett* Settlement; and (5) ghostwrite, in whole or in part, the Stewart Objection to the *Gannett* Settlement.

d.      Law Office of Darrell Palmer PC d/b/a Darrell Palmer Law Office agreed to conduct the affairs of the Objector Enterprise by ratifying the actions of its principal, Joseph Darrell Palmer, identified, in part, above.

e.      C. Jeffery Thut agreed to conduct the affairs of the Objector Enterprise by, for example, agreeing to file the objection of Gary Stewart in the *Gannett* Settlement. Moreover, Thut agreed to represent to the *Gannett* Court that he was the only attorney for Stewart despite agreeing to share any recovered attorneys' fees with at least Bandas, Palmer, and their law firms despite knowing that Palmer was then (and still) suspended from the practice of law and Bandas would not file any appearance with the Court.

f.    Noonan Perillo & Thut LTD agreed to conduct the affairs of the Objector

Enterprise by ratifying the actions of one of its principals, C. Jeffery Thut, identified, in

part, above.

g.    Gary Stewart agreed to conduct the affairs of the Objector Enterprise by,

for example, agreeing to be a purported objector in the *Gannett* Settlement. Stewart knew

that his objection would be overruled and that he and the rest of the Defendants would

profit from his objection being overruled by demanding a payment to go away from

Plaintiff. Stewart further was aware that Defendant Palmer was suspended from the

practice of law.

## Predicate Acts Violating the Hobbs Act, 18 U.S.C. § 1951

86.    The Hobbs Act, 18 U.S.C. § 1951, prohibits persons "in any way or degree" from

"obstruct[ing], delay[ing], or affect[ing] commerce" by "extortion or attempts or conspires to do

so."

87.    The Hobbs Act defines "extortion" to mean "the obtaining of property from

another, with his consent, induced by wrongful use of actual or threatened force, violence, or

fear, or under color of official right." 18 U.S.C. § 1951 (b)(2).

88.    Defendants, through the Objector Enterprise, intentionally used acts of extortion

to deprive Plaintiff and the Class of money and property.

89.    Specific to Plaintiff, through the objection brought by Defendants in *Clark v.

Gannett Co., Inc.*, Case No. 16-CH-06603 (Cir. Ct. Cook Cty.), Defendants deprived Plaintiff of

$225,000.

90.    Defendants deprived Plaintiff of $225,000 knowingly and willfully through an act

of extortion. Specifically, Defendants created a fear of economic harm for Plaintiff that, if the fee

demanded was not paid, Defendants would intentionally delay the *Gannett* Settlement through a frivolous appeal which would cause Plaintiff financial harm in the delay, substantial reduction, or cancellation of court-approved attorneys' fees in the *Gannett* Settlement.

91.    As a result of Defendants' extortion of $225,000 from Plaintiff, the interstate commerce associated with the resolution and final approval of the nationwide *Gannett* Settlement was obstructed and delayed. Defendants' objection has directly delayed the distribution of monetary benefits to Gannett class members across the United States.

92.    Defendants, through the Objector Enterprise, carried out nearly identical violations of the Hobbs Act as against members of the Class. Through dozens of class settlements over a period of years, Defendants have coordinated their efforts through the Objector Enterprise to object to class action settlements, demand monetary payments unrelated to any benefit provided to the settlement class, and after such frivolous objections are overruled, demand monetary payments to not appeal or withdraw such appeals, all without ever adding value to the settlements or benefit to the settlement classes. The Objector Enterprise has successfully extorted millions of dollars in unwarranted fees and other money through Defendants' racketeering activities and violations of the Hobbs Act.

93.    At all times, it was reasonably foreseeable that Defendants' violations of the Hobbs Act would be used to further the racketeering activities. And, as described throughout the Complaint, each Defendant agreed to the commission of the Hobbs Act Violation. For instance:

a.    Christopher Bandas agreed to coordinate the actions of the Defendants and to assist in the preparation and filing of the Stewart Objection despite knowing that it was frivolous and that demanding $225,000 to forgo the appeal would cause substantial economic fear in Plaintiff and amounted to extortion.

31

b.     The Bandas Law Firm PC agreed to ratify the actions of its principal, Christopher Bandas, at all times knowing of Defendant Bandas's actions.

c.     Joseph Darrell Palmer agreed to recruit Defendant Stewart to act as the purported objector in the Stewart Objection and to assist in the preparation and filing of the objection, despite knowing that the objection was frivolous and that demanding $225,000 to forgo the appeal would cause economic fear in Plaintiff and amounted to extortion.

d.     Law Office of Darrell Palmer PC d/b/a Darrell Palmer Law Office agreed to ratify the actions of its principal, Joseph Darrell Palmer, at all times knowing of Defendant Palmer's actions.

e.     C. Jeffery Thut agreed to act as the purported sole representative of Defendant Stewart to the *Gannett* Court despite knowing that the objection was frivolous and that demanding $225,000 to forego the appeal would cause economic fear in Plaintiff and amounted to extortion.

f.     Noonan Perillo & Thut LTD agreed to ratify the actions of one of its principals, C. Jeffery Thut, at all times knowing of Defendant Thut's actions.

g.     Gary Stewart agreed to be the named objector in the Stewart Objection knowing that the objection was frivolous and that demanding $225,000 to forego the threat of appeal would cause economic fear in Plaintiff and amounted to extortion.

94.     Because of their violations of the Hobbs Act, Plaintiff and members of the Class were deprived of money and property as detailed herein.

95.     As described in Section II, Defendants, through the Objector Enterprise, have engaged in the same conduct in over 109 class actions in the past decade. That is, according to

publicly available information, Defendants have filed objections to class action settlements, demand monetary payments unrelated to any benefit provided to the settlement class, and after such frivolous objects are overruled, demand monetary payments to not appeal or withdraw such appeals, all without any value added to the settlements or benefit to the settlement classes.

### Predicate Acts Violating the Illinois Attorney Act

96.     The Illinois Attorney Act requires that:

No person shall be permitted to practice as an attorney or counselor at law within this State without having previously obtained a license for that purpose from the Supreme Court of this State. No person shall receive any compensation directly or indirectly for any legal services other than a regularly licensed attorney, nor may an unlicensed person advertise or hold himself or herself out to provide legal services.

…

Any person practicing, charging or receiving fees for legal services or advertising or holding himself or herself out to provide legal services within this State, either directly or indirectly, without being licensed to practice as herein required, is guilty of contempt of court and shall be punished accordingly.

97.     Defendants and others known and unknown, willfully and knowingly did combine, conspire, and agree together and with each to violate the Illinois Attorney Act by facilitating or actually taking part in the unauthorized practice of law. Defendants acts were intentionally misleading and deceptive, and intended to defraud the court and other litigants.

98.     Such violations include, but are not limited to, the following:

a.     Since at least January 6, 2016, Defendant Palmer has been suspended from the practice of law.

b.     Defendant Palmer and his law firm continue to practice law by assisting in the preparation and filing of objections to class action settlements nationwide and in the state of Illinois. On October 26, 2016, Palmer took part in the preparation of an objection

in the *Gannett* case. There, Palmer co-opted a personal friend, Gary Stewart, into filing a frivolous objection to a class action settlement and had Stewart state he was represented by Defendants Bandas and Thut in order to conceal his involvement and deceive the court and the other litigants. Defendant Palmer did not file an appearance in the case.

       c.      Additionally, Defendant Bandas is not licensed to practice law in Illinois, did not move for pro hac vice admission, and did not file an appearance with the Court in *Gannett* in order to avoid submitting himself to the jurisdiction of the court despite acting as counsel for Stewart in the *Gannett* action.

99.     All Defendants have participated in and facilitated the unauthorized practice of law by Defendant Palmer and Defendant Bandas. Each Defendant had knowledge of Palmer's suspended status and took steps to conceal his role in ongoing litigation and objections from the court and other litigants.

100.    Likewise, each Defendant had knowledge that Defendant Bandas had failed to obtain pro hac vice admission and file an appearance in the *Gannett* action.

101.    All Defendants have or will improperly share in attorneys' fees with Defendants Palmer and Bandas even though they had not filed appearances on behalf of Defendant Stewart.

102.    Defendants have improperly acted as legal counsel in numerous class action objections without filing an appearance with the relevant court. Defendants likewise have improperly shared in attorneys' fees in numerous cases without complying with relevant state law concerning the practice of law.

103.    As described throughout the Complaint, each defendant agreed to the commission of the Illinois Attorney Act Violation. For instance:

       a.      Christopher Bandas agreed to coordinate and prepare the Stewart

Objection, represent Defendant Stewart in the objection, and share in any attorneys' fees or other money obtained through the Stewart Objection despite never filing an appearance with the *Gannett* Settlement Court. Moreover, Defendant Bandas knew that Defendant Palmer was suspended from the practice of law but nevertheless agreed to co-representation of Defendant Stewart with Defendant Palmer. As such, Defendant Bandas knew that his actions would contribute to his and Defendant Palmer's unlawful practice of law in Illinois, a violation of the Illinois Attorney Act.

b.      The Bandas Law Firm PC agreed to ratify the actions of its principal, Christopher Bandas, at all times knowing of Defendant Bandas's actions.

c.      Joseph Darrell Palmer agreed to solicit and recruit Defendant Stewart as an objector, prepare the Stewart Objection, represent Defendant Stewart in the objection, and share in any attorneys' fees or other money obtained through the Stewart Objection despite never filing an appearance with the *Gannett* Settlement Court and being suspended from the practice of law. As such, Defendant Palmer knew that his actions would constitute the unlawful practice of law in Illinois, a violation of the Illinois Attorney Act.

d.      Law Office of Darrell Palmer PC d/b/a Darrell Palmer Law Office agreed to ratify the actions of its principal, Joseph Darrell Palmer, at all times knowing of Defendant Palmer's actions.

e.      C. Jeffery Thut agreed to file an appearance with the *Gannett* Court and represent to the Court to be the only attorney for Defendant Stewart in the Stewart Objection. Despite that representation, Defendant Thut had entered into an agreement with at least Defendant Bandas, who Thut knew would not file an appearance with the

court, and Palmer, who Thut knew was suspended from the practice of law, to represent

Defendant Stewart in the Stewart Objection and to share in any attorneys' fees or other

money obtained through the Stewart Objection. Moreover, Defendant Thut knew that

Defendants Bandas's and Palmer's representation would be concealed from the court. As

such, Defendant Thut knew that his actions would contribute to the unlawful practice of

law in Illinois, a violation of the Illinois Attorney Act.

      f.      Noonan Perillo & Thut LTD agreed to ratify the actions of one of its

principals, C. Jeffery Thut, at all times knowing of Defendant Thut's actions

      g.      Gary Stewart agreed to be the named objector in the Stewart Objection

and to be represented by Defendants Bandas, Palmer, and Thut despite knowing that

Defendant Palmer was suspended from the practice of law and that representation by

Defendants Bandas and Palmer would be concealed from the *Gannett* Settlement Court.

104.    Because of these violations of the Illinois Attorney Act and other forms of

unauthorized practice of law, Plaintiff and members of the Class were deprived of money and

property that they would not otherwise have lost. Indeed, as direct and proximate result of the

Defendants' racketeering activities, Plaintiff and members of the Class have been injured in their

business and property in that, at a minimum, paying fees to the Defendants.

**Predicate Acts of Wire Fraud, 18 U.S.C. § 1343**

105.    Defendants, through the Objector Enterprise, intentionally used acts of artifice or

deceit in attempts to deprive Plaintiff and the Class out of money and property.

106.    At all times, it was reasonably foreseeable that interstate wires would be used to

further these acts of artifice or deceit. For instance, Defendants knew that they would use emails

and interstate phone calls to further their scheme, thereby transmitting electronic signals and oral

communications across interstate wires to communicate with Plaintiff and the Class, and they did in fact send such email communications and make phone calls over interstate wires.

107. As described herein, Defendants engaged in a plan and scheme to defraud Plaintiff. Specifically, on November 30, 2016, Defendants communicated with Plaintiff via interstate Internet wires and represented that Defendants had a non-frivolous objection to the *Gannett* Settlement that could be resolved to the benefit of the class. Plaintiff accepted Defendants' proposal with the understanding that Defendants would in fact inform them of the changes that Defendants would require in the settlement necessary to resolve the objection and benefit the *Gannett* Settlement class.

108. With that understanding, on December 1, 2016, Plaintiff participated with Defendants' representative Defendant Bandas in the mediation facilitated over interstate telephone and Internet wire.

109. During the mediation, Defendants demanded that Plaintiff pay $225,000 in return for Defendants withdrawal of their threat of appeal in the *Gannett* Settlement. Defendants, through Defendant Bandas, did not suggest, request, or require that any changes be made to the *Gannett* Settlement in any form. Defendants' demand was made in writing through the mediator over interstate internet wires.

110. As a direct and proximate cause of Defendants' plan and scheme, Plaintiff agreed and entered into a binding contract to pay $225,000 to Defendants in exchange for Defendants' withdrawal of their threat of appeal in the *Gannett* Settlement.

111. Defendants intended to profit from their scheme and obtain property belonging to Plaintiff. Specifically, Defendants intended that Plaintiff would pay to Defendants and Defendants would obtain $225,000 as a result of the purported mediation.

112.     As described throughout the Complaint, each Defendant agreed to the commission of the Wire Fraud. For instance:

a.     Christopher Bandas agreed to participate, as representative of Defendants, in the purported mediation. Defendant Bandas knew that, despite Defendants' representation that the Stewart Objection was filed as a mechanism to improve the *Gannett* Settlement for the benefit of the class, Defendants demanded $225,000 in exchange for foregoing the appeal without any benefit to the class. Moreover, Defendant Bandas knew that the mediation would and did occur over interstate wires and that Defendants intended to obtain the $225,000 from Plaintiff through a wire transfer over state lines.

b.     The Bandas Law Firm PC agreed to ratify the actions of its principal Christopher Bandas, at all times knowing of Defendant Bandas's actions.

c.     Joseph Darrell Palmer agreed to allow Defendant Bandas to act as his and the other Defendants' representative in the purported mediation. Defendant Palmer knew that, despite Defendants' representation that the Stewart Objection was filed as a mechanism to improve the *Gannett* Settlement for the benefit of the class, Defendants demanded $225,000 in exchange for forgoing the appeal without any benefit to the class. Moreover, Defendant Palmer knew that the mediation would occur over interstate wires and that Defendants intended to obtain the $225,000 from Plaintiff through a wire transfer over state lines.

d.     The Law Office of Darrell Palmer PC d/b/a Darrell Palmer Law Office agreed to ratify the actions of its principal Joseph Darrell Palmer, at all times knowing of Defendant Palmer's actions.

e.      C. Jeffery Thut agreed to allow Defendant Bandas to act as his and the other Defendants' representative in the purported mediation. Defendant Thut knew that, despite Defendants' representation that the Stewart Objection was filed as a mechanism to improve the *Gannett* Settlement for the benefit of the class, Defendants demanded $225,000 in exchange for foregoing the appeal without any benefit to the class. Moreover, Defendant Thut knew that the mediation would occur over interstate wires and that Defendants intended to obtain the $225,000 from Plaintiff through a wire transfer over state lines.

f.      Noonan Perillo & Thut LTD agreed to ratify the actions of one of its principals C. Jeffery Thut, at all times knowing of Defendant Thut's actions.

g.      Gary Stewart agreed to allow Defendant Bandas to act as his and the other Defendants' representative in the purported mediation. Defendant Stewart knew that, despite Defendants' representation that the Stewart Objection was filed as a mechanism to improve the *Gannett* Settlement for the benefit of the class, Defendants demanded $225,000 in exchange for foregoing the appeal without any benefit to the class. Moreover, Defendant Stewart knew that the mediation would occur over interstate wires and that Defendants intended to obtain the $225,000 from Plaintiff through a wire transfer over state lines.

113.      As described in Sections II and III and above, each Defendant knew that their agreement to participate in the commission of the predicate acts described above formed a pattern of racketeering activity. For instance:

a.      Christopher Bandas entered into an agreement with Palmer and Thut to secretly represent Stewart in the *Gannett* Objection and to share in recovered attorneys'

fees and other money knowing that (1) Palmer could not represent anyone because he was suspended from the practice of law; (2) he and Palmer (and recently, to a lesser extent, Thut) are notorious "professional" objectors who have been admonished by courts across the country for filing frivolous objections to class action settlements to extract profit through extortion; (3) the objection was frivolous; (4) any appeal of their overruled objection would be baseless; (5) the mediation was based upon fraud (*i.e.*, Defendant Bandas knew that the Objection Enterprise did not seek to improve the *Gannett* Settlement in any way but rather was carried out solely for personal profit); (6) the mediation would use interstate telephone and internet wires; and (7) demanding $225,000 in exchange for foregoing an appeal of the Objection Enterprise's *Gannett* Settlement objection without improving the terms of settlement would cause economic fear in Plaintiff. Those actions fit within and are a continuation of the scheme of Defendants' Objection Enterprise. Prior to agreeing to participate, Defendant Bandas knew of the Objection Enterprise's plan and scheme, and in fact, played a primary role in creating it. As such, Defendant Bandas knew that his agreement to participate in the Hobbs Act Violation, the Illinois Attorney Act Violation, and Wire Fraud was a pattern of racketeering activity.

b.     The Bandas Law Firm PC knew that its ratification of the actions of its principal, Christopher Bandas, which constitute the Hobbs Act Violation, the Illinois Attorney Act Violation, and Wire Fraud, was part of a pattern of racketeering activity.

c.     Joseph Darrell Palmer entered into an agreement with Bandas and Thut to secretly represent Stewart in the *Gannett* Objection and to share in recovered attorneys' fees and other money knowing that (1) he could not represent anyone because he was

suspended from the practice of law; (2) he and Bandas (and recently, to a lesser extent, Thut) are notorious "professional" objectors who have been admonished by courts across the country for filing frivolous objections to class action settlements to extract profit; (3) the objection was frivolous; (4) any appeal of their overruled objection would be baseless; (5) the mediation was based upon fraud (*i.e.*, Defendant Palmer knew that the Objection Enterprise did not seek to improve the *Gannett* Settlement in any way but rather was carried out solely for personal profit); (6) the mediation would use interstate telephone and internet wires; and (7) demanding $225,000 in exchange for forgoing an appeal of the Objection Enterprise's *Gannett* Settlement objection without improving the terms of settlement would cause economic fear in Plaintiff. Those actions fit within and are a continuation of the scheme of Defendants' Objection Enterprise. Prior to agreeing to participate, Defendant Palmer knew of the Objection Enterprise's plan and scheme, and in fact, played a primary role in creating it. As such, Defendant Palmer knew that his agreement to participate in the Hobbs Act Violation, the Illinois Attorney Act Violation, and Wire Fraud formed a pattern of racketeering activity.

d.      Law Office of Darrell Palmer PC d/b/a Darrell Palmer Law Office knew that its ratification of the actions of its principal, Joseph Darrell Palmer, which constitute the Hobbs Act Violation, the Illinois Attorney Act Violation, and Wire Fraud, was part of a pattern of racketeering activity.

e.      C. Jeffery Thut entered into an agreement with Bandas and Palmer to represent Stewart in the *Gannett* Objection and to share in recovered attorneys' fees and other money knowing that (1) Bandas and Palmer (and, to a lesser extent, Thut himself) are notorious "professional" objectors who have been admonished by courts across the

country for filing frivolous objections to settlements to extract profit; (2) Palmer was suspended from the practice of law; (3) the objection was frivolous; (4) any appeal of their overruled objection would be baseless; (5) the mediation was based upon fraud (*i.e.*, Defendant Thut knew that the Objection Enterprise did not seek to improve the *Gannett* Settlement in any way but rather was carried out solely for personal profit); (6) the mediation would use interstate telephone and internet wires; and (7) that demanding $225,000 in exchange for foregoing an appeal of the Objection Enterprise's *Gannett* Settlement objection without improving the terms of settlement would cause economic fear in Plaintiff. Those actions fit within and are a continuation of the scheme of Defendants' Objection Enterprise. Prior to agreeing to participate, Defendant Thut knew of the Objection Enterprise's plan and scheme, and in fact, played a primary role in creating it. As such, Defendant Thut knew that his agreement to participate in the Hobbs Act Violation, the Illinois Attorney Act Violation, and Wire Fraud formed a pattern of racketeering activity.

  f.  Noonan Perillo & Thut LTD knew that its ratification of the actions of one of its principals, C. Jeffery Thut, which constitute the Hobbs Act Violation, the Illinois Attorney Act Violation, and Wire Fraud, was part of a pattern of racketeering activity.

  g.  Gary Stewart has known Palmer for decades and knew that Palmer was suspended from the practice of law, that he along with all other Defendants had no good faith basis for objecting to the class action settlement, and that the goal of the *Gannett* Settlement objection was solely to extract personal profit from Plaintiff. Stewart also knew that demanding a large sum of money ($225,000) in exchange for foregoing an appeal of his objection without adding benefit to the class would cause economic fear in

Plaintiff. Those actions fit within and are a continuation of the scheme of Defendants'

Objection Enterprise. And Defendant Stewart knew the plan and scheme for the

Objection Enterprise. As such, Defendant Stewart knew that his agreement to participate

in the Hobbs Act Violation, the Illinois Attorney Act Violation, and Wire Fraud formed a

pattern of racketeering activity.

114. Under 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble their damages, plus

interest, costs, and reasonable attorneys' fees.

## COUNT II
**Permanent Injunction Pursuant to the All Writs Act, 28 U.S.C. § 1651
As Against Defendants Christopher Bandas, The Bandas Law Firm PC, Joseph Darrell
Palmer, Law Office of Darrell Palmer PC d/b/a Darrell Palmer Law Office, C. Jeffery
Thut, Noonan Perillo & Thut LTD, and John Does 1-20 on Behalf of Plaintiff and the Class**

115. Plaintiff incorporates by reference the foregoing allegations as if fully set forth

herein.

116. Defendants Christopher Bandas, The Bandas Law Firm PC, Joseph Darrell

Palmer, Law Office of Darrell Palmer PC d/b/a Darrell Palmer Law Office, C. Jeffery Thut, and

Noonan Perillo & Thut LTD (the "Attorney Defendants") are vexatious litigants and Plaintiff

and the Class seek a permanent injunction to protect against the Attorney Defendants' conduct.

117. Under the All Writs Act, this Court "may issue all writs necessary or appropriate

in aid of [its] respective jurisdiction[] and agreeable to the usages and principles of law." 28

U.S.C. § 1651 (a). Courts have read the All Writs Act to authorize the restriction of access to

federal courts to parties who repeatedly file frivolous and vexatious litigation.

118. State and federal courts look to five factors to determine whether a litigant is a

vexatious litigant and that a pre-filing order should be entered against them. The factors are: (1)

the litigant's history of litigation and in particular whether it entailed vexatious, harassing, or

duplicative suits; (2) the litigant's motive in pursuing the litigation (i.e., whether the litigant had a good faith expectation of prevailing); (3) whether the litigant is represented by counsel; (4) whether the litigant has caused unnecessary expense to the parties or placed a needless burden on the courts; and (5) whether other sanctions would be adequate to protect the courts and other parties.

119.     First, as described herein, the Attorney Defendants have a long history of vexatious and harassing litigation. Specifically, the Attorney Defendants have filed frivolous objections to legitimate class actions settlements throughout the country where Plaintiff and members of the Class are class counsel. Defendant Bandas has filed more than 55 objections within the past decade. Defendant Palmer has filed more than 48 objections within the past decade. Defendant Thut has filed at least six objections just since October 2014. Defendants' filings are all similar in that they are often made without the purported client having standing, are all objections to class action settlements, and are filled with frivolous arguments. As described in Section II, courts around the country have reprimanded the Attorney Defendants for filing frivolous objections to legitimate class actions.

120.     Second, the Attorney Defendants have an unlawful motive in pursuing their objections and do not have good faith expectations of prevailing. Specifically, the Attorney Defendants file their objections knowing that the courts will deny them. That is by design. Should courts sustain the Attorney Defendants' objections, there would likely not be any lucrative payout. But by filing frivolous objections that the courts must overrule, the Attorney Defendants can then file or threaten to file an appeal, knowing that their appeals (and the underlying class actions) will take months or years to be resolved.

121.     At that moment, the Attorney Defendants contact class counsel and offer to

withdraw their objections and threat of or actual appeal for a price. The Attorney Defendants use the threat of appeal of frivolous objections to extort a payment from class counsel. The Attorney Defendants' practice is well documented and noted by courts throughout the country. *See* Sections II and Section III, supra.

122.    Third, courts have looked to whether the litigant is represented by counsel as a factor in determining whether the litigant is vexatious because courts often provide protections to *pro se* litigants. But where the Attorney Defendants are attorneys, as is here, that protection is unwarranted.

123.    Fourth, the Attorney Defendants have caused unnecessary expense to Plaintiff and the Class and have placed a needless burden on the courts. As described above, the Attorney Defendants' filings serve no legitimate purpose and are filed with the Attorney Defendants knowing that the objections will be overruled. Yet, the Attorney Defendants file their frivolous and vexatious objections only to harass and extort money from Plaintiff and the Class and never require any change to a class settlement or benefit to the class in exchange for payment. As a result of each and every objection, Plaintiff and the Class must spend time and money, such as attorney time, hard costs (filing fees, printing costs, and more), and discovery costs, responding to frivolous arguments.

124.    Moreover, the Attorney Defendants have placed needless burden on the court systems. The Attorney Defendants' objections have totaled more than 109 over the past decade and have resulted in almost as many frivolous appeals. Courts and their staff have spent countless hours accepting, reading, filing, addressing, and, ultimately, overruling the Attorney Defendants' objections that are filed for an improper purpose.

125.    Fifth, no other sanctions would be adequate to protect the courts, Plaintiff, and the

Class. The Attorney Defendants often (purposely) fail to file appearances in the courts where they file objections so as to avoid the courts levying sanctions against them. As a result, those forum courts (and the class counsel representing class members settling claims) are left without any other means to prevent the Attorney Defendants from filing frivolous and vexatious objections.

126. Plaintiff and the Class have already suffered harm by and through the Attorney Defendants' frivolous objections and will suffer irreparable harm if the Attorney Defendants are not enjoined from filing further objections without merit.

127. Because the Attorney Defendants continue to file frivolous objections, even in the face of repeated judicial reprimand and public disapproval, Plaintiff and the Class have no adequate remedy at law. Extortion and improper use of the judicial process are unlawful, and Plaintiff and the Class have a clear and ascertainable right to be protected from the Attorney Defendants' repeated and wrongful acts.

128. As such, Plaintiff and the Class seek a permanent injunction labeling the Attorney Defendants' vexatious litigants and prohibiting them from (1) ghostwriting objections for the purpose of making their objection seem *pro se*, (2) making or threatening to make objections to class action settlements not for the purpose of improving the settlement but for extracting a payment for themselves, (3) filing with any court objections to class action settlements or appeals of overruled objections without prior screening or approval by the court where their status as vexatious litigants must be disclosed along with a copy of the injunction entered pursuant to this suit, and (4) withdrawing any objection or appeal from the overruling of any objection without disclosing payment in exchange for doing so and any corresponding benefit provided to the class.

## COUNT III
### Abuse of Process
### As Against All Defendants on Behalf of Plaintiff and the Class

129.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

130.     As described herein, Defendants have instituted proceedings against Plaintiff and the Class for an improper purpose. Specifically, Defendants have filed frivolous objections to legitimate class action settlements throughout the country where Plaintiff are class counsel. Knowing that the courts will deny their objections, Defendants then appeal or threaten to appeal such decisions. Defendants' know that their appeals (and the underlying class action) will take years to be resolved and offer to withdraw their appealed objections for a price. That is, Defendants use the threat of appeal of frivolous objections to extort a payment from class counsel. Defendants never require any change to a class settlement or benefit to the class in exchange for payment.

131.     Defendants have used the class action objection mechanism in a way not proper in the regular prosecution of the proceedings. As described herein, Defendants have engaged in the misapplication of the objection process and have used the objection process to accomplish results (the extortion of class counsel for personal profit) beyond the process's purview. The purpose of the class action objection is, in part, to reveal divergent interests of class members or exhibit the need to alter the class definition or to designate subclasses. In other words, it is not the intended purpose of a class action objection to extort payments from class counsel.

132.     Nevertheless, Defendants have used the class action objection process to accomplish a result the objection itself could not accomplish. Courts award fees to objectors who provide a benefit to the class. When used properly, the objection device cannot be employed to

47

obtain payment from class counsel or the class without providing a service or benefit to the class. Yet, Defendants have used the class action objection process in an attempt to extort a payment of fees from class counsel without making or seeking to make any change to a class action settlement.

133.    Plaintiff and the Class have been damaged by Defendants' scheme. As a proximate and foreseeable result of the Defendants' abuse of process, Plaintiff and the Class have lost money, paid attorneys' fees, court costs, and suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Edelson PC prays for the following relief:

a.    Certify this case as a class action on behalf of the Class defined above, appointing Edelson PC as representative of the Class, and appointing it as class counsel;

b.    An order under the All Writs Act labeling the Attorney Defendants as vexatious litigants and a judgment for injunctive relief prohibiting the Attorney Defendants from filing objections to class actions without prior screening and approval of the Court, amongst other things;

c.    An order finding that Defendants actions were an abuse of process;

d.    An order finding that Defendants' actions, as set out above, violate RICO, the Hobbs Act, and the Illinois Attorney Act, and constitute Wire Fraud;

e.    Enter judgment against Defendants for monetary, actual, consequential, and compensatory damages caused by their unlawful conduct;

f.    Award Plaintiff reasonable costs;

g.    Award Plaintiff pre- and post-judgment interest;

        h.      Enter judgment for injunctive, statutory and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Class; and,

        i.      Award such other and further relief as equity and justice may require.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Respectfully Submitted,

**EDELSON PC**, individually and on behalf of all others similarly situated,

Dated: December 5, 2016        By:  /s/ Rafey S. Balabanian
                           One of Plaintiff's Attorneys

Jay Edelson
jedelson@edelson.com
Benjamin H. Richman
brichman@edelson.com
EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Rafey S. Balabanian
rbalabanian@edelson.com
Eve-Lynn Rapp
erapp@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

# EXHIBIT A

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | | |
|---|---|---|
| DAVID LOCKETT, individually and on behalf | ) | |
| of all others similarly situated, | ) | |
| Plaintiff, | ) | Case No.13CH 21352 |
| v. | ) | Hon. Neil H. Cohen |
| MOGREET, INC, a Delaware corporation, | ) | |
| Defendant. | ) | |

<u>Report of Special Prosecutor</u>

Having been appointed as special prosecutor by the Honorable Neil Cohen to investigate whether indirect criminal contempt proceedings are warranted against any person or persons involved in his case, I , Gilbert J. Grossi, file the following report:

Indirect criminal contempt is conduct outside the presence of the Court which impedes, embarrasses, obstructs, or derogates the Court's authority. There is no statute in Illinois on indirect criminal contempt. It is based in common law. A person charged with criminal contempt is entitled to procedural safeguards, including the right to an attorney, the right to a jury trial and proof beyond a reasonable doubt. The issue is whether anyone's conduct in this case constitutes indirect criminal contempt and whether the burden of proof can be met.

After a proposed class action settlement in this case had been reached by the parties, an objection was filed before this Court by one Susan House. Ms. House claimed to be a member of the class due to her having received text messages from a qualified company in this lawsuit. Despite this allegation of being a member, Ms. House has never produced any written documentation or corroboration of these claims, including never submitting a copy of the alleged text or texts to anyone. Ms. House further claims to have received notice of being a member of the class. Once again, no written documentation of such notice has ever been produced. In fact, Jennifer Keough, Chief Operating Officer of the Garden City Group, the Claims Administrator of the class action, has filed a sworn declaration(attached to this Report as Exhibit1),stating that there is no record of any notice packet or email notice ever sent to a Susan House, notifying her of being a class member.

It appears clear from the substance and legal sophistication of the arguments made in the objection, that Ms. House did not write this objection without the aid of legal counsel. This is confirmed by a series of emails sent between Ari Rothman, defense counsel, and Joseph Darrell Palmer on February 26-27, 2014(attached to this report as Exhibit 2). In these emails, Mr. Palmer acknowledges being Ms. House's attorney in this matter. Mr. Palmer, however, has never filed an appearance before Judge Cohen in this case.

I met with plaintiff's attorneys in their office to discuss the facts of the case. I also spoke with Ari Rothman, the defense attorney, by phone. I left two voicemails for Ms. Susan House, which were not returned. I also called Judge Geary Cortes(ret.), the mediator in this case twice. He left me a voicemail stating that he had not filed any written report and was prohibited by confidentiality rules from discussing what was said during the mediation. After several attempts at a different phone number, I was able to speak to Joseph Darrell Palmer at (619) 985-1099 on March 12, 2014 at 12:07 P.M. After identifying who I was to Mr. Palmer, Mr. Palmer declined to answer any questions and referred me to his attorney.

I make the following conclusions and recommendations based on the evidence available to me: Susan House's objection is based wholly on her unsupported allegation that she is a member of the class and was notified of being a class member. Ms. House has at no time ever produced any written proof or documentation to support or corroborate these allegations in any way. In fact, Jennifer Keough, Claims Administrator, has declared in a sworn affidavit, that there is no record of any notice of being a class member ever being sent to a Susan House. It is certainly subject to doubt as to whether Ms. House is a valid member of the class, since we only have her word, which has been called into question by Jennifer Keough. Ms. House filed a subsequent document attempting to withdraw her objections. That being said, there is no direct evidence that Ms. House knowingly filed a false objection with the intent to obstruct or embarrass the Court. She clearly did not write the objection herself, but had the assistance of counsel. Although her conduct raises strong suspicions , the evidence against Ms. House does not rise to the level of proof beyond a reasonable doubt, which is the legal standard for indirect criminal contempt. Therefore, I would not recommend instituting indirect criminal contempt against Susan House.

Regarding attorney Joseph Darrell Palmer, he acknowledged being Susan House's attorney in an email to defense attorney Ari Rothman. He clearly composed the objection which Susan House submitted to the Court. Mr. Palmer also never submitted any written documentation to corroborate or substantiate any text supposed to have been received by Ms. House or any notice of her being a class member. When I spoke to Mr. Palmer on March 12, 2014, he refused to answer any questions and referred me to his attorney. After a mediation in California, a settlement was reached. However, to my knowledge, nothing was paid to Ms. House and she has attempted to withdraw her objection before this Court. Mr. Palmer's conduct appears questionable, suspicious and in apparent bad faith. Whether this rises to the level of proof beyond a reasonable doubt is a debatable issue. However, that appears to be moot because this Honorable Court does not have jurisdiction over the person of Mr. Palmer, since he has not filed an appearance in this case. In the case of <u>Dremak v. Iovate Health Sciences Group</u> CASE NO. 09md2087BTM(case attached as Exhibit 3), the U. S. District Court for the Southern District of California held that several district courts have found that they lack jurisdiction to sanction attorneys who have not appeared before them . Those cited cases <u>are Mercury Service, Inc. v. Allied Bank of Texas</u>, 117 F.R.D 147 (C.D. Cal 1987<u>); McGuire v. Sigma Coatings,Inc</u>, 48 F.3d 902( 5th Cir. 1995); and <u>Shade v. Bank of America, N.A.,</u> USA, 2009 WL 2252551(E.D. Cal. July 28, 2009). The Court in <u>Dremak</u> also found no personal jurisdiction over an attorney who had not filed an appearance before the Court. The <u>Dremak</u> case was also a class action with facts similar to those in our case. Ironically, Mr. Palmer and Mr. Bandas were also involved in the <u>Dremak</u> case. The Court in <u>Dremak</u> found insufficient evidence against Mr. Palmer and no jurisdiction over Mr. Bandas , who had not filed an appearance. Given this case law, I cannot recommend that indirect criminal contempt proceedings be brought against Mr. Palmer either, since he has not filed an appearance before this Court. I will, however, submit my report and attachments to any proper authorities in California which may be investigating Mr. Palmer.

Respectfully submitted,

Gilbert J. Grossi

Appointed Special Prosecutor

# EXHIBIT B

Nos. 15-1400 (L) and 15-1490

Consolidated with Nos. 15-1514, 15-1546, 15-1586, 15-1639

---

IN THE UNITED STATES COURT OF APPEALS

FOR THE SEVENTH CIRCUIT

---

In re Capital One Telephone Consumer Protection Act Litigation,

APPEAL OF: Antonia Carrasco, *et al.*, Objectors-Appellants

---

On Appeal from the United States District Court

for the Northern District of Illinois, Eastern Division, No. 1:12-cv-10064,

Judge James F. Holderman

---

Motion of Center for Class Action Fairness

to Withdraw from Representation of Jeffrey Collins in Appeal No. 15-1546,

to Intervene in Appeal Nos. 15-1400 and 15-1490 as Guardian Ad Litem for the Class,

for an Order to Disclose Settlement Terms if Helpful to the Court, and,

in the Alternative, an Order Issuing New Notice to the Class, and

Opposition of Center for Class Action Fairness to Rule 42 Motion to Dismiss

---

CENTER FOR CLASS ACTION FAIRNESS
Theodore H. Frank
1718 M Street NW, No. 236
Washington, DC 20036
(703) 203-3848
tfrank@gmail.com
*Attorneys for Movant*
 *Center for Class Action Fairness*

**Appearance and Circuit Rule 26.1 Disclosure**

Appellate Court No: <u>15-1400, 15-1490          </u>

Short Caption: <u>In re Capital One TCPA Litigation                    </u>

(1) The full name of every party that the attorney represents in the case:

<u>Center for Class Action Fairness; formerly represented Jeffrey Collins (15-1546).</u>

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Center for Class Action Fairness.</u>

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any; and        <u>None             </u>

ii) list any publicly held company that owns 10% or more of the party's or amicus'

stock:                                   <u>None             </u>

Attorney's Signature:      <u>/s/ Theodore H. Frank     </u>      Date: <u>June 10, 2015</u>

Attorney's Printed Name:  <u>Theodore H. Frank       </u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Cir.

R. 3(d).        <u>Yes          </u>

Address:      <u>1718 M Street NW, No. 236, Washington, DC 20036</u>

Phone:      <u>(703) 203-3848           </u>      Fax:  <u>None             </u>

Email:      <u>tfrank@gmail.com                    </u>

# Table of Contents

Appearance and Circuit Rule 26.1 Disclosure ........................................................ i

Table of Contents ................................................................................................... ii

Table of Authorities ............................................................................................... iii

Introduction ........................................................................................................... 1

Background ............................................................................................................. 3

    A.    The Underlying Appeal. ..................................................................... 3

    B.    The Appellants. ................................................................................. 4

    C.    The *HSBC* Appeal and Dismissal. ..................................................... 6

    D.    The Settlement. ................................................................................. 6

Argument ................................................................................................................ 8

I.     This Court should permit the Center to withdraw. ................................. 8

II.    This Court should permit the Center to intervene as guardian ad litem for the class in Appeal Nos. 15-1400 and 15-1490. ........................................... 9

    A.    This Court has and does exercise the discretion to deny motions to voluntarily dismiss appeals when absent class members are potentially prejudiced. ......................................................................................... 9

    B.    Class notice cures the prejudice to absent class members, but permitting the Center for Class Action Fairness to intervene as guardian ad litem for the class would be more efficient and avoid social cost and delay. ........... 14

    C.    This motion should be granted even if there is no motion to dismiss. ...... 17

III.   This Court has the discretion to order disclosure of the settlement offer to Mr. Bandas in this case and in *HSBC*. .............................................................. 18

IV.   The Center is willing to participate in oral argument on this motion. .................. 19

Conclusion ............................................................................................................. 19

Proof of Service ..................................................................................................... 21

# Table of Authorities

## Cases

*Alvarado v. Corporate Cleaning Services,*
    782 F.3d 365 (7th Cir. 2015) .................................................................... 2-3, 9, 12, 13, 18

*Americana Art China Co. v. Foxfire Printing & Packaging, Inc.,*
    743 F.3d 243 (7th Cir. 2014) ................................................................. 2, 9, 13

*Booth v. Mary Carter Paint Co.,*
    202 So. 2d 8 (Fla. App. 1967) ................................................................. 17

*In re Continental Ill. Sec. Litig.,*
    962 F.2d 566 (7th Cir. 1992) .................................................................. 14, 15

*Creative Montessori Learning Ctrs. v. Ashford Gear LLC,*
    662 F.3d 913 (7th Cir. 2011) .................................................................. 10

*Deposit Guar. Nat'l Bank v. Roper,*
    445 U.S. 326 (1980) ................................................................................ 11

*Duhaime v. John Hancock Mut. Life Ins. Co.,*
    183 F.3d 1 (1st Cir. 1999) ....................................................................... 12

*FTC v. Trudeau,*
    606 F.3d 382 (7th Cir. 2010) .................................................................. 15

*In re General Motors Corp. Engine Interchange Litig.,*
    594 F.2d 1106 (7th Cir. 1994) ............................................................... 18

*Gottlieb v. Barry,*
    43 F.3d 474 (10th Cir. 1994) .................................................................. 14-15

*Greisz v. Household Bank, N.A..,*
    176 F.3d 1012 (7th Cir. 1999) ............................................................... 11

*Hass v. Pittsburgh Nat'l Bank,*
    77 F.R.D. 382 (W.D. Pa. 1977) .............................................................. 15

*Miller v. Mackey Int'l, Inc.,*
    70 F.R.D. 533 (S.D. Fla. 1976) ...........................................................................15

*Pearson v. NBTY, Inc.,*
    772 F.3d 778 (7th Cir. 2014) .....................................................................4, 9, 11

*Pitts v. Terrible Herbst, Inc.,*
    653 F.3d 1081 (9th Cir. 2011) .............................................................................11

*Primax Recoveries, Inc v. Sevilla,*
    324 F.3d 544 (7th Cir. 2003) ..............................................................................11

*Redman v. RadioShack Corp.,*
    768 F.3d 622 (7th Cir. 2014) ..............................................................................14

*Rising-Moore v. Red Roof Inns, Inc.,*
    435 F.3d 813 (7th Cir. 2006) ..............................................................................18

*Robert F. Booth Trust v. Crowley,*
    687 F.3d 314 (7th Cir. 2012) .........................................................................11, 16

*Safeco Ins. Co. of Amer. v. American Int'l Group, Inc.,*
    710 F.3d 754 (7th Cir. 2013) ....................................................2, 9-11, 12, 13-14, 16, 18

*Skelton v. General Motors Corp.,*
    860 F.2d 250 (7th Cir. 1988) ..............................................................................16

*In re Synthroid Mktg. Litig.,*
    264 F.3d 712 (7th Cir. 2001) ..............................................................................17

*In re Troutt,*
    460 F.3d 887 (7th Cir. 2006) ..............................................................................15

*United States v. Laraneta,*
    700 F.3d 983 (7th Cir. 2012) ..............................................................................16

*Vollmer v. Selden,*
    350 F.3d 656 (7th Cir. 2003) .........................................................................11, 14

*Zurich Am. Ins. Co. v. Watts Industries, Inc.,*
    417 F.3d 682 (7th Cir. 2005) ..............................................................................18

Rules and Statutes

Fed. R. App. Proc. 27(e) ................................................................................. 19

Fed. R. App. Proc. 47(b) ............................................................................... 8-9

Fed. R. Civ. Proc. 23(e)(3) ............................................................................ 12

Fed. R. Civ. Proc. 23(e)(5) ............................................................................ 12

Fed. R. Civ. Proc. 23(g) .................................................................................. 3

Fed. R. Civ. Proc. 23(h) ............................................................................... 1, 3

IRC § 501(c)(3) ............................................................................................. 17

Rev. Proc. 92-59 ........................................................................................... 17


Other Authorities

Fitzpatrick, Brian,
  *The End of Objector Blackmail?*, 62 VAND. L. REV. 1623 (2009) ......................... 5, 11, 12

Benedict, John E.,
  *It's a Mistake to Tolerate the Mary Carter Agreement*, 87 COLUM. L. REV. 368
  (1987) ...................................................................................................... 17

Insure.com,
  "Objectors to class action settlements: Watchdogs or scum of the earth?"
  (Mar. 23, 2000), *available at* http://www.insure.com/general-
  insurance/objectors.html ............................................................................. 5

Henderson, William D.,
  *Clear Sailing Agreements: A Special Form of Collusion in Class Action
  Settlements*, 77 TULANE L. REV. 813 (2003) .................................................. 14

Jones, Ashby, *A Litigator Fights Class-Action Suits*
  WALL ST. J. (Oct. 31, 2011) ........................................................................ 4

Karlsgodt, Paul & Raj Chohan, *Class Action Settlement Objectors: Minor Nuisance
   or Serious Threat to Approval*,
   BNA: CLASS ACTION LITIG. REPORT  (Aug. 12, 2011) ...................................................4

Leary, Marie, *FJC Report on Class Action Objector Appeals in Three Circuit Courts of
   Appeals*,
   FEDERAL JUDICIAL CENTER  (2013) .............................................................. 4-5

Liptak, Adam, *When Lawyers Cut Their Clients Out of the Deal*,
   N.Y. TIMES, Aug. 13, 2013, at A12.................................................................15

Morrison, Alan B.,
   *Improving the Class Action Settlement Process: Little Things Mean a Lot*, 79
   GEO. WASH. L. REV. 428 (2011) ...................................................................12

## Introduction

The non-profit public-interest law firm Center for Class Action Fairness authored a merits brief ("the Center brief") in this appeal challenging the FRCP 23(h) proceedings and award of over $15.6 million to class counsel in the Telephone Consumer Protection Act ("TCPA") class-action settlement approved by the district court. Three sets of appellants filed that brief, including the Center's client Jeffrey Collins. Class counsel, Lieff Cabraser, has now offered a $25,000 settlement to Mr. Collins to dismiss his appeal of their fee award. Declaration of Theodore H. Frank ("Frank Decl.") ¶ 3. No court has ever awarded $25,000 to a successful objector. Though Mr. Collins has previously testified under oath that he did not want to settle his objection for money, was objecting in good faith, and would be willing to stipulate to an injunction barring settlement without court approval (Dkt. 197-1), the financial pressure imposed by class counsel has apparently induced him to agree to move to dismiss his appeal. Ironically, Lieff Cabraser's briefs below, Lieff Cabraser's expert witness below, and Lieff Cabraser's name partner, Elizabeth Cabraser, have all condemned the ethics of paying objectors to dismiss appeals.

On information and belief, there is a deal in place for the other two appellants who joined the Center brief to dismiss their appeals for a substantially larger sum of cash: attorney Christopher Bandas and appellant Antonia Carrasco have previously settled and dismissed a related appeal, *Wilkins v. HSBC Bank Nevada, N.A.*, No. 15-1640, involving a smaller TCPA fee award to the same class counsel, Lieff Cabraser. Frank Decl. ¶¶ 48-55. The amounts of these settlements are unknown, and class counsel

1

refuses to disclose them to the Center. *Id.* ¶¶ 82-83. But this Court can order their disclosure if it feels the amounts relevant.

The Center brief raises meritorious issues. If all three appeals underlying the Center brief are dismissed by settlement with class counsel, it would "jeopardize the interests of the unrepresented class members." *Safeco Ins. Co. of Amer. v. American Int'l Group, Inc.*, 710 F.3d 754, 755 (7th Cir. 2013). Furthermore, the Center brief raises issues of first impression in this Circuit (can six law firms collude at the class-counsel appointment stage to secretly split fees rather than compete for lead counsel status or must the side-agreement be disclosed to the class?) and decision of the appeal would also clarify the "common and economically significant" question of how to apply this Circuit's market-mimicking test; resolving these two issues would "provide additional guidance to the district courts." *Americana Art China Co. v. Foxfire Printing & Packaging, Inc.*, 743 F.3d 243, 246 (7th Cir. 2014).

Though the Center relied upon Mr. Collins's representation that he would not settle his objection for money, it is bound by its client's decision to dismiss his appeal and cannot ethically argue in this Court against the dismissal of Appeal No. 15-1546—even though Mr. Collins's counsel finds the deal repugnant and has a fundamental disagreement with that course of action. But this Court can equally protect members of the class "who did not consent to the dismissal" (*Safeco*, 710 F.3d at 755) by appointing the Center guardian ad litem for the class in Appeal Nos. 15-1400 and 15-1490, and denying any motion to voluntarily dismiss those two appeals.

These facts are all the Court needs, but it can order disclosure of all settlements between Lieff Cabraser and Mr. Bandas and Mr. Palmer if it believes that additional information would help its decision. *E.g., Alvarado v. Corporate Cleaning Services*, 782

F.3d 365, 372 (7th Cir. 2015). It can also recall a mandate in Appeal Nos. 15-1400 and 15-1490 if one has issued. *Id.*

## Background

### A.     The Underlying Appeal.

Mr. Collins, the appellant in No. 15-1546, appeals a fee award of $15,668,265 in a case where class counsel from six firms devoted 4,268 hours for all timekeepers—partners, associates, and support staff—garnering over $3671/hour.

This award is not because the underlying TCPA action was extraordinarily risky: the evidence showed that class counsel won settlements in 16 out of 38 TCPA class actions over the last four years and collected handsome fees for 64% of the hours they devoted to TCPA litigation. Moreover, the court found only that this case was "slightly" more risky than typical TCPA litigation. A37. Nor did it reflect extraordinary litigation efforts: the case settled immediately after the filing of the MDL complaint. Nor did it reflect above-average efficiency: six firms claimed a right to fees, though only three had been appointed in the district court's original Rule 23(g) order, and the lodestar was substantially higher than in other TCPA cases. Nor is this an extraordinary settlement: class members' multiple $500 statutory claims were settled for about $4/class member before attorneys' fees. A6-7.

Mr. Collins filed a merits brief on May 4 that asked whether the district court had correctly applied this court's "market-mimicking" test, and also asked whether Fed. R. Civ. Proc. 23(h) permitted the district court to delegate the allocation of a $15.6 million lump sum to a secret agreement amongst the firms undisclosed to the class or the court.

3

**B.      The Appellants.**

The brief was authored by Mr. Collins's non-profit public-interest law-firm, the Center for Class Action Fairness. The goal of the Center is to protect class members in the class action settlement process from certain abuses of the class action system; its work is nationally recognized. Frank Decl. ¶ 11. This Court has praised the Center's work, *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014), and has ruled in favor of Collins's lead appellate attorney, Theodore H. Frank, in four out of four oral arguments relating to class-action settlements, each time for the appellant; the Center has won numerous other landmark appeals for appellants in class-action settlement cases. *Id*. ¶¶ 12-13. The Center refuses to engage in *quid pro quo* settlements of appeals for money, and requires its clients to agree to not do so. *Id*. ¶¶ 15-18; Ashby Jones, *A Litigator Fights Class-Action Suits*, WALL ST. J. (Oct. 31, 2011); Paul Karlsgodt & Raj Chohan, Class Action Settlement Objectors: Minor Nuisance or Serious Threat to Approval, BNA: CLASS ACTION LITIG. REPORT (Aug. 12, 2011) (distinguishing CCAF from professional objectors). Mr. Collins even signed a declaration under oath that he was not interested in selling his appeal for money; the Center would have represented a different objector if they had thought Mr. Collins would abandon the class. *Id*. ¶¶ 38-41; Dkt. 197-1.

Collins's objection below won almost $7 million for the class, and he had a fee request pending and stayed in the district court for about $160,000, or about 2.3% of the total.

Objector-appellants represented by Christopher Bandas (No. 15-1400) and Darrell Palmer (No. 15-1490) joined the Center brief. Mr. Bandas and Mr. Palmer are for-profit objectors who voluntarily dismiss the vast majority of their appeals. *See generally* Marie Leary, *FJC Report on Class Action Objector Appeals in Three Circuit Courts*

4

*of Appeals* Appendices A-C, Federal Judicial Center (2013) (identifying over two dozen occasions where Mr. Bandas and Mr. Palmer filed Rule 42(b) motions in the Second, Seventh, and Ninth Circuits in a five-year period, not including four dismissals for failure to prosecute). In the district court below, class counsel argued that such objectors are to be disdained because of "a lurid history of making objections solely for the purpose of 'selling' appeals." Dkt. 269 at 29; *see also* Dkt. 262 at 19 (complaining of objections "submitted by so-called 'professional' or 'serial' objectors who regularly make objections to class action settlements for their own pecuniary gain"). Class counsel Lieff Cabraser's name partner, Elizabeth Cabraser, has publicly criticized such tactics. Insure.com, "Objectors to class action settlements: Watchdogs or scum of the earth?" (Mar. 23, 2000), *available at* http://www.insure.com/general-insurance/objectors.html (calling professional objectors "extortionist[s]"). And class counsel's expert witness in the district court below (and in *HSBC*), Vanderbilt Law Professor Brian Fitzpatrick, has called for procedural measures to handcuff for-profit objectors and *quid pro quo* settlements. Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 VAND. L. REV. 1623 (2009) (arguing courts should preclude alienability of objection appeals). Though CCAF disapproves of such tactics, Mr. Bandas and Mr. Palmer have previously cooperated with CCAF appeals for the good of the class; Mr. Frank has previously worked or consulted for Mr. Bandas and Mr. Palmer in objections he thought meritorious for a flat-rate or hourly fee when such cases did not present a conflict with his work for CCAF. Frank Decl. ¶¶ 19-29. Mr. Frank believed that the for-profit objectors would cooperate with Mr. Collins's appeal, and permitted them to join the brief in compliance with the Seventh Circuit's order to eliminate duplicative briefing where possible. *Id.* ¶ 84. Neither Mr. Bandas nor Mr. Palmer contributed to the brief, other than Mr. Palmer

confirming for the jurisdictional statement that his clients had filed settlement claims. *Id.* ¶ 46.

## C.    The *HSBC* Appeal and Dismissal.

Many of the players in this case also participated in *Wilkins v. HSBC Bank Nevada, N.A.*, No. 15-1640, another TCPA settlement before the same district-court judge with a large attorney-fee award, also involving Lieff Cabraser, Mr. Palmer, Mr. Bandas, and the appellant in No. 15-1400 here, Ms. Carrasco. Frank Decl. ¶¶ 48-53. Ms. Carrasco and three other sets of *HSBC* appellants, including Mr. Palmer's client, moved to voluntarily dismiss their *HSBC* appeals on April 22, 2015; this Court granted those motions on April 23, 2015 without comment. *Id.* ¶ 54. It is almost certainly the case that these appeals of a multi-million-dollar fee award settled collectively for a great deal of money. *Id.* ¶ 55. The amount is unknown, but this Court has the authority to require Lieff Cabraser and Mr. Bandas to disclose the terms of the settlement to the extent it is relevant. This appeal involves a larger fee award than the *HSBC* award and has actually been briefed by the Center; economics would predict that the sale of the appeal is worth more. *Id.*

## D.    The Settlement.

The full details of how the settlement with Mr. Collins happened are lurid, complex, and Grishamesque, but largely irrelevant to this motion; we disclose them in overlong unnecessary detail (to the extent attorney-client privilege permits) in the Frank Declaration so that class counsel will not be able to create red herrings by accusing the Center of hiding the ball. Frank Decl. ¶¶ 34-93. What is relevant to this motion is uncontested:

- The Center is a public-interest law-firm that brought Mr. Collins's objection and appeal for the public interest and the benefit of the class, and did not wish to settle the appeal solely to benefit Mr. Collins. Frank Decl. ¶¶ 10, 15, 18, 39; *see also* No. 15-1546 Merits Brief at 49.

- On June 3, 2015, Mr. Bandas approached a Lieff Cabraser attorney, David Stellings, and stated he had the ability to settle Mr. Collins's appeal and the appeals of the other objectors. Frank Decl. ¶ 72.

- On or about June 4, 2015, Mr. Stellings made a global settlement offer to Mr. Bandas. *Id.* ¶ 74.

- After business hours on Friday, June 5, 2015, Lieff Cabraser attorney Jonathan Selbin made a written settlement offer for Mr. Collins to Mr. Frank, and threatened to depose Mr. Collins if the settlement offer was not accepted: "$25k to dismiss the appeal and withdraw the fee motion in the district court, payable upon the Seventh Circuit dismissing the appeal without regard to the other appeals." Mr. Collins communicated to Mr. Frank that he wished to accept the settlement offer, and Mr. Frank communicated that to Mr. Selbin the night of June 5. *Id.* ¶¶ 80-81.

- As the settlement required, Mr. Collins filed a motion for voluntary dismissal of No. 15-1546 on June 8, 2015, in the form requested by class counsel. The clerk granted the motion and issued the mandate, removing his counsel from the service list. After Mr. Collins withdrew his motion for attorneys' fees in the district court, class counsel wired Mr. Collins $25,000. *Id.* ¶ 4.

On information and belief, the other appellants have settled or will settle; Mr. Palmer moved to dismiss the appeal in No. 15-1490 on June 10, 2015. Class counsel and

the for-profit objectors viewed the non-profit Center and its mission to litigate in the public interest as an obstacle to settling the appeals for money at the expense of the class.

## Argument

### I.      This Court should permit the Center to withdraw.

Class counsel has paid Mr. Collins $25,000 to dismiss his appeal against his attorneys' wishes. Center attorneys find Mr. Collins's decision to accept the settlement repugnant and have a fundamental disagreement with it; they could not, however, withdraw from representation of Mr. Collins without prejudicing his ability to comply with the settlement he instructed his attorneys to execute. *Id.* ¶ 4. Now that Mr. Collins's appeal no. 15-1546 has been dismissed, the Court should permit Center attorneys Theodore H. Frank and Melissa Holyoak to withdraw from Mr. Collins's representation if, for some reason, the Court chooses to recall the mandate in No. 15-1546. The Center is not requesting that the mandate in No. 15-1546 be recalled, as that would go against its former client's wishes in this case.

Mr. Collins has requested that a motion to withdraw include a request that he be left alone and not be contacted further about this case. The Center recognizes that the Court is probably not inclined to grant such a request on the current record in the absence of evidence of harassment that has not yet occurred, but includes Mr. Collins's wishes in the hopes that opposing counsel has the decency to honor it.

## II.     This Court should permit the Center to intervene as guardian ad litem for the class in Appeal Nos. 15-1400 and 15-1490.

Fed. R. App. Proc. 47(b) states that a "court of appeals may regulate practice in a particular case in any manner consistent with federal law, these rules, and local rules of the circuit." *See generally United States v. Laraneta*, 700 F.3d 983, 985 (7th Cir. 2012).

### A.     This Court has and does exercise the discretion to deny motions to voluntarily dismiss appeals when absent class members are potentially prejudiced.

> The first sentence of Rule 42(b) provides that, if all parties agree to an appeal's dismissal, then the clerk of court may close the proceeding without judicial action. … [T]he second sentence of Rule 42(b) applies: "An appeal may be dismissed on the appellant's motion on terms agreed to by the parties or fixed by the court." This sentence uses "may" rather than "must" so that the judges can protect the rights of anyone who did not consent to the dismissal. Although the members of the class are not technically parties, they have legally enforceable interests. *See Devlin v. Scardelletti*, 536 U.S. 1, 122 S.Ct. 2005, 153 L.Ed.2d 27 (2002).

*Safeco*, 710 F.3d at 755. A court can decline a motion to dismiss "if necessary to avoid an injustice." *Alvarado*, 782 F.3d at 372. "Given the conflicting incentives present in any class action suit, judicial review of class action settlements is vital at both the trial and appellate level." *Americana Art China*, 743 F.3d at 246 (citing *Safeco*, 710 F.3d at 759 (Posner, J., dissenting)); *accord, Pearson,* 772 F.3d at 787. After all, class action settlements "require judicial review (the 'fairness' hearing) even when there are no objectors, in recognition of the conflicts of interest that pervade class action litigation." *Safeco*, 710 F.3d at 761 (Posner, J., dissenting).

Over Judge Posner's dissent, the *Safeco* majority granted objector Liberty Mutual's motion to dismiss an appeal. But the majority acknowledged that such

9

dismissals may not always be appropriate in the class-action context. Judges must protect the rights of absent class members who have not explicitly consented to the dismissal of a pending appeal. *Id.* at 755. The majority explicitly recognized the obligation of the appellate court to "consider[], in the spirit of Rule 23(e), whether this settlement [of the appeal] has any potential to injure nonparticipants." *Id.* at 756.

After doing so, *Safeco* granted the motion, but did so because of two critical factors not applicable here. *First*, Liberty's objection focused on the settlement's treatment of Liberty's claims rather than a global problem with the settlement to the class; Liberty's settlement of its objection (and other litigation with AIG) was more akin to a "belated opt-out." *Id.* at 757. That is not true here, where the appellate brief in No. 15-1400 and 15-1490 relates to oversized fees and thus fairness to the class as a whole. *Second*, in *Safeco*, "[a]ll members of the class are large and sophisticated businesses, many with … legal staffs to protect their interests" so "there is no prospect of injury to any other class member." *Id.* at 757-58. That is not true in the case of 1,378,534 Capital One customers who filed claims in this settlement, and who have about $6 to $10 each at stake in this appeal. *See also Creative Montessori Learning Ctrs. v. Ashford Gear LLC,* 662 F.3d 913, 917 (7th Cir. 2011) (concerns are heightened "when the class members are consumers, who ordinarily lack both the monetary stake and the sophistication in legal and commercial matters that would motivate and enable them to monitor the efforts of class counsel on their behalf."). Thus, even the *Safeco* majority reasoning suggests grounds to refuse to dismiss the entire appeal here—and Judge Posner would have gone further and held the *Safeco* appeal pending investigation. *Id.* at 758-62. In particular, the dissent was concerned that "AIG is paying Liberty to drop objections to the settlement that, were they accepted, would benefit the class" and thought the court

should investigate that side deal. *Id.* at 761. This Court should demand disclosure of the side deal offered to Mr. Bandas in this case and in the related *HSBC* appeal: is it a settlement of Ms. Carrasco's right to augment her settlement claim by $10, or is it a "bribe" to avoid appellate review? *Id.* at 761. This Court has criticized the process of objectors "get[ting] paid to go away" because "it would benefit only the [objectors] at the expense of all other parties to the litigation." *Vollmer v. Selden*, 350 F.3d 656, 660 (7th Cir. 2003).

Courts regularly recognize in analogous circumstances that a "defendant may moot a class action through an offer of settlement only if he satisfies the demands of the class; an offer to one cannot moot the action because it is not an offer to all." *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1090 (9th Cir. 2011) (citing *Sosna v. Iowa*, 419 U.S. 393, 399, 402 (1975)); *accord id.* at 1087; *Primax Recoveries, Inc. v. Sevilla*, 324 F.3d 544, 546-47 (7th Cir. 2003); *Greisz v. Household Bank, N.A.*, 176 F.3d 1012, 1015 (7th Cir. 1999); *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 342 n.1 (1980) (Stevens, J., concurring). The same should be true when objectors are paid by class counsel to dismiss a nonfrivolous appeal, especially where the appeal could only enrich absent class members. *Cf.* Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 Vand. L. Rev. 1623 (2009) (proposing nonalienability of objector appeals). Moreover, in a different class-action-settlement context, this Court has criticized "kicker" clauses as a "gimmick to defeat objectors." *Pearson*, 772 F.3d at 786. What has happened here is a much more insidious gimmick that potentially precludes appellate review of class action abuse. *Cf. also Robert F. Booth Trust v. Crowley*, 687 F.3d 314, 318 (7th Cir. 2012) ("A district judge ought not try to insulate his decisions from appellate review by preventing a person from acquiring a status essential to that review.") (successful Center appeal). If it is problematic for a

neutral district judge to preclude appellate review, it is surely more so when class

counsel with fiduciary duties to the class tries to preclude appellate review of its fees

from a common fund by buying off individual class members challenging the fee on

appeal.[1]

Professor Fitzpatrick is the expert witness for class counsel in this case; his

published work disapproves of the ethics of class counsel's attempt to short-circuit the

appeal:

> In the context of class action settlements, however, it is usually not
> socially desirable to settle nonfrivolous objections. These objections
> inevitably affect more class members than those who brought the
> objections; thus, permitting class counsel to buy off these objectors
> prevents other class members from reaping the benefits of the
> objection. This is why the Federal Rules of Civil Procedure were
> amended in 2003 to prohibit class members from withdrawing their
> objections to class action settlements before the settlements were
> approved by district courts. [footnote citing Rule 23(e)(5) and
> Advisory Committee Notes omitted] In my view, a similar rule
> should be adopted to prohibit settlement of objections once they
> have been appealed.

62 VAND. L. REV. at 1627-28.

---

[1] *Duhaime v. John Hancock Mut. Life Ins. Co.*, 183 F.3d 1 (1st Cir. 1999) declined to
pursue the idea that there was need for court oversight of side-agreements with
objectors to withdraw appeals. But *Duhaime* was superseded by Rule 23(e)(3) and
(e)(5)'s respective requirements of scrutiny of side agreements and withdrawals of
objections in district court. *See* Alan B. Morrison, *Improving the Class Action Settlement
Process: Little Things Mean a Lot*, 79 GEO. WASH. L. REV. 428, 447 (2011). Moreover,
*Duhaime* was implicitly rejected by *Safeco*, which ignored *Duhaime* in its fact-specific
decision not to investigate the settlement in that appeal.

The class is prejudiced here under *Safeco* and *Alvarado*. There is a meritorious—and unquestionably nonfrivolous—appeal pending and partially briefed that could return millions of dollars to the class. Frank Decl. ¶ 7. Unlike *Safeco*, a dismissal of Appeal No. 15-1400 will affect not just Carrasco, but over a million claimants; moreover, the amount paid to Carrasco's attorney in *HSBC* (and likely offered to Carrasco's attorney in *Capital One*) demonstrates that the payment is for something other than the settlement of Carrasco's claim to an extra $10 or so. (Unlike Collins, Carrasco did not make a motion for attorneys' fees in the district court.) The Center always intended to see the appeal through. A settlement offer that class counsel's own expert considers "not socially desirable" should not be permitted to prejudice the class.

There's a second independent reason that this Court should hear appeal no. 15-1400. The Center brief raises important issues, including issues of first impression in this Circuit, and "[c]ases like this one are common and are economically significant. This is an opportunity to provide additional guidance to the district courts." *Americana Art China*, 743 F.3d at 246. It would thus be "irresponsible to dismiss this case without review." *Id*.

Under the Seventh Circuit's operating procedures, the clerk's office sometimes grants motions to dismiss and issues a mandate without review from judges when those motions indicate that a motion to dismiss is unopposed. As *Alvarado* indicates, the Court can recall a mandate when it thinks it appropriate to protect unnamed class members in collective litigation such as Rule 23 class action settlement appeals.

**B.    Class notice cures the prejudice to absent class members, but permitting the Center for Class Action Fairness to intervene as guardian ad litem for the class would be more efficient and avoid social cost and delay.**

*Safeco* suggested that class notice of settlement of an appeal could cure prejudice to class members by giving members of the class opportunity to express "dissatisfaction," perhaps to take up the cudgel of a former appellant. 710 F.3d at 755, 758. But unlike *Safeco*, where the class members were sophisticated parties with in-house counsel to review appellate dockets affecting their clients, the absent class members here are 1,378,534 Capital One customers, the vast majority of whom do not have access to PACER; even those that do would end up spending more money downloading pleadings at 10 cents a page than they have at stake in the case, much less in the appeal of attorneys' fees. And direct notice to each of these class members would be uneconomic, and unlikely to be productive: as this Court has noted, it is "naïve" to think individual class members have the incentive to engage in the transactions cost of objecting, or even the transactions cost of learning about the underlying complex legal issues in the Center brief in Appeal No. 15-1400. *Redman v. RadioShack Corp.*, 768 F.3d 622, 628 (7th Cir. 2014) (successful Center appeal); *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 573 (7th Cir. 1992). The costs multiply further if notice is given to the 17 million class members affected by the Rule 23(e) decision.

But there is an efficient shortcut: appoint a guardian ad litem, a sort of Promoter of the Faith, to represent the class's interests against class counsel. "Because the common-fund doctrine places the plaintiff's counsel in a position that is directly adverse to the class, a court can use its supervisory authority under Rule 23 to appoint a guardian ad litem to represent the class on the issue of attorneys' fees." William D. Henderson, *Clear Sailing Agreements: A Special Form of Collusion in Class Action*

14

*Settlements*,  77 TULANE L. REV. 813, 817 (2003). "Intervenors counteract any inherent

objectionable tendencies by reintroducing an adversarial relationship into the

settlement process and thereby improving the chances that a claim will be settled for its

fair value." *Vollmer v. Selden*, 350 F.3d 656, 660 (7th Cir. 2003); *e.g., Gottlieb v. Barry*, 43

F.3d 474, 490 (10th Cir. 1994) (endorsing possibility of guardian ad litem, though

holding it not required); *Miller v. Mackey Int'l, Inc.*, 70 F.R.D. 533, 535 (S.D. Fla. 1976)

(appointing guardian ad litem to act on behalf of class members in conjunction with

class counsel's fee motion); *Haas v. Pittsburgh Nat'l Bank*, 77 F.R.D. 382, 383 (W.D. Pa.

1977) (same). The Court has otherwise appointed *amicus* to argue where one position on

an appeal is unrepresented. *FTC v. Trudeau*, 606 F.3d 382, 385 (7th Cir. 2010); *In re Troutt*,

460 F.3d 887, 892 (7th Cir. 2006). It is not fundamentally different to do so here just

because it is a guardian ad litem for a dismissed appellant's argument unfairly affecting

absent class members, rather than an *amicus* for an absent appellee. "[J]udges in our

system are geared to adversary proceedings. If we are asked to do nonadversary things,

we need different procedures." *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 573 (7th Cir.

1992).

The Center for Class Action Fairness, a public-interest law firm is already

perfectly suited to intervene as guardian ad litem. Its attorneys participated in the

district court proceedings below, winning nearly $7 million for the class, and authored

the merits brief in Appeal Nos. 15-1400 and 15-1490. Adam Liptak of the *New York Times*

calls Center attorney Mr. Frank "the leading critic of abusive class action settlements."

Adam Liptak, *When Lawyers Cut Their Clients Out of the Deal*, N.Y. TIMES (Aug. 13, 2013).

And this Court has previously praised the Center's and Mr. Frank's work on behalf of

class members. *Pearson*, 772 F.3d 778. *See also* Frank Decl. ¶¶ 11-13. Because Mr.

Collins's entitlement to settlement money is contingent only upon this Court's dismissal of Appeal No. 15-1546, its intervention in Appeal Nos. 15-1400 and 15-1490 creates no conflict of interest with its former client.

Intervention is entirely within this Court's power to grant. *United States v. Laraneta*, 700 F.3d 983, 985 (7th Cir. 2012). "The complications of intervention are many fewer at the appellate stage, where participation is limited to filing briefs and, at the appellate court's discretion, participating in oral argument, which we permitted in this case." *Id.* at 986. And class counsel cannot dispute that Mr. Frank and the Center are better representatives of absent class members than Messrs. Bandas's and Palmer's clients, given class counsel's criticisms in the district court of for-profit objectors who settle objections for money.

Class counsel might protest that *they* are the guardian ad litem for the class. But "if class counsel could always be trusted to be the loyal and competent representative of the class, there would be no requirement that class action settlements be submitted for approval by a court, with approval dependent on the outcome of a hearing to determine the fairness of the settlement to the class." *Safeco*, 710 F.3d at 761 (Posner, J., dissenting). "That the plaintiffs say they have other investors' interests at heart does not make it so." *Robert F. Booth Trust v. Crowley*, 687 F.3d at 318 (Rule 23.1). This is especially true in the zero-sum game of an attorney-fee request, where the only issue is the division of the pie, not whether the pie will exist at all: if class counsel prevails on Appeal No. 15-1400, which does not challenge settlement approval, then the class will get *less*, rather than more money. *See Skelton v. General Motors Corp.*, 860 F.2d 250, 253 (7th Cir. 1988) (relationship between class counsel and the class turns directly adversarial when awarding fees from a common fund).

16

One concern about appointing a guardian ad litem is that doing so will encourage attorneys to stir up litigation for fees: who will watch the watchmen? There are multiple protections this Court can create to safeguard against that inefficiency or conflict of interest. *First*, there is an inherent protection in this situation by the fact that the Center is a IRC § 501(c)(3) public-interest law-firm. Tax law prohibits the Center from covering more than half of its long-term program expenses with attorneys' fees, or considering fees in its case selection. Rev. Proc. 92-59. *Second*, the Court can make the appointment contingent upon the guardian ad litem's agreement not to seek fees for the appellate representation beyond a percentage of any increased benefit to the class. *Cf. In re Synthroid Mktg. Litig.*, 264 F.3d 712, 720-21 (7th Cir. 2001) (recommending that courts set court-awarded attorney fees by an *ex ante* schedule). The Center will abide by whatever non-negative percentage this Court sets, including zero percent: in other words, the Center is willing to represent the class as guardian ad litem *pro bono* on this appeal, because it is required by law to be indifferent to the possibility of fees.[2]

## C.    This motion should be granted even if there is no motion to dismiss.

Mr. Palmer has filed a motion to dismiss No. 15-1490 on June 10, but there is not yet a motion to dismiss in No. 15-1400. It is possible that filing this brief will spook Mr. Bandas into refusing to dismiss No. 15-1400 or otherwise taking steps to deny that there is a settlement. If so, and there is no motion to dismiss made, or if a motion to dismiss is withdrawn after this motion is filed, this Court should still grant the Center's motion. The Court's decision will be aided if the Center, which wrote the opening merits brief,

---

[2] Mr. Collins made a fee request for 2.3% of the $7 million benefit to the class created in the district court below, to be paid by class counsel. His settlement agreement required him to withdraw that fee request, and he did so on June 9, 2015.

authors a 7,000-word reply brief in support of the appellants. *Cf. Booth v. Mary Carter Paint Co.*, 202 So. 2d 8 (Fla. App. 1967); John E. Benedict, *It's a Mistake to Tolerate the Mary Carter Agreement*, 87 COLUM. L. REV. 368 (1987).

* * *

The Court should appoint the Center as guardian ad litem for the class in Appeal Nos. 15-1400 and 15-1490.

## III.    This Court has the discretion to order disclosure of the settlement offer to Mr. Bandas in this case and in *HSBC*.

In class and other collective-action litigation, this Court has noted its authority to order the disclosure of information relevant to the decision to dismiss appeals. *Alvarado*, 782 F.3d at 372; *Safeco*, 710 F.3d at 758. If the Court believes the size of the settlement offers to Mr. Bandas in this case and in the related *HSBC* case is relevant to the decision whether to grant a motion to dismiss in No. 15-1400 or to permit the Center to intervene as guardian ad litem for the class in this case, it should order Lieff Cabraser and Mr. Bandas to disclose that information. Class counsel should have no objection, since Lieff Cabraser attorney Jonathan Selbin has stated in writing that he "would be happy for every aspect of this to be reviewed by the Seventh Circuit." Frank Decl. ¶ 82. Settlement offers are not admissible to prove liability, but are admissible to prove the existence of the fact of a settlement offer; there is no settlement "privilege" in this circuit, especially in the class-action context. *In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1124 n.20 (7th Cir. 1979); *cf. also Rising-Moore v. Red Roof Inns, Inc.*, 435 F.3d 813, 816 (7th Cir. 2006); *Zurich Am. Ins. Co. v. Watts Industries, Inc.*, 417 F.3d 682, 688-90 (7th Cir. 2005).

IV.    **The Center is willing to participate in oral argument on this motion.**

Oral argument on motions are unusual, but the Court has the authority to order it. Fed. R. App. Proc. 27(e). If the Court would believe oral argument helpful, the Center is eager to answer any questions it might have.

## Conclusion

The Center for Class Action Fairness thus asks this Court for an order:

- permitting Center attorneys Theodore H. Frank and Melissa Holyoak to withdraw from representation of Jeffrey Collins in Appeal No. 15-1546;

- permitting the Center to intervene as guardian ad litem for the class in Appeal Nos. 15-1400 and 15-1490, or in the alternative ordering class counsel to issue new notice to the class settlement claimants to permit affected absent class members to intervene;

- denying any motion to dismiss Appeal Nos. 15-1400 and 15-1490, or recalling any mandate that has issued in Appeal Nos. 15-1400 and 15-1490; and

- providing any other relief deemed appropriate to reach decision in this matter, including, if necessary, an order requiring Mr. Bandas and class counsel to disclose the terms of the settlements in Appeal No. 15-1400 and Appeal No. 15-1640, the terms of the settlement offer made by Lieff Cabraser to Mr. Bandas on or about June 4, 2015, and any other settlement offer made relating to Appeal Nos. 15-1400 and 15-1490.

Dated:  June 10, 2015                    Respectfully submitted,


                                         CENTER FOR CLASS ACTION FAIRNESS


                                         /s/ Theodore H. Frank
                                         Theodore H. Frank
                                         1718 M Street NW, No. 236
                                         Washington, DC 20036
                                         (703) 203-3848
                                         tfrank@gmail.com
                                         Attorneys for Movant
                                             Center for Class Action Fairness

**Proof of Service**

I hereby certify that on June 10, 2015, I caused to be electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Seventh Circuit using the CM/ECF system, thereby effecting service on counsel of record who are registered for electronic filing under Cir. R. 25(a).

*/s/ Theodore H. Frank*

Theodore H. Frank

## Declaration of Theodore H. Frank
## in Support of Motion to Intervene

1.     My name is Theodore H. Frank, and I have personal knowledge of the matters attested to in this declaration.

2.     I am the lead appellate counsel for appellant Jeffrey Collins in Appeal No. 15-1546, and the attorney who signed and filed the joint brief of appellants in Appeal Nos. 15-1400, 15-1490, and 15-1546, challenging the Rule 23(h) award to class counsel in this case.

3.     I had a telephone conversation after business hours on Friday, June 5, 2015, with Jonathan Selbin of class counsel Lieff Cabraser. In that conversation, he made Mr. Collins a settlement offer where Mr. Collins would dismiss his appeal and withdraw his pending fee petition in the district court, and class counsel would pay Mr. Collins $25,000 upon those two things happening. Based on my understanding of earlier communications with my client (including, but not limited to, Mr. Collins's retainer agreement; Mr. Collins's declaration under oath in the district court; and Mr. Collins's emails to me of November 19, 2014; March 25, 2015; May 11, 2015; May 27, 2015, at 7:48 AM Central; and June 4, 2015 at 7:35 AM Central), I declined that offer. Mr. Selbin repeated his offer in writing in an email, and threatened to subpoena Mr. Collins in the district court. In further communications between me and Mr. Collins on June 5, Mr. Collins indicated to me that he now wished to accept the offer notwithstanding his earlier agreement and statements, and I wrote Mr. Selbin on June 5 to indicate that Mr. Collins accepted the offer.

4.     Pursuant to that settlement, I separately filed on Mr. Collins's behalf a motion to dismiss in the form requested by class counsel on Monday, June 8, 2015, and Mr. Collins withdrew his pending fee petition in the district court on June 9, 2015; class counsel then wired $25,000 to Mr. Collins. I find the settlement agreement between Mr. Collins and Mr. Selbin repugnant, and have a fundamental disagreement with Mr.

Collins's decision to accept the settlement offer. Ethical rules required me to communicate that settlement offer to Mr. Collins and to permit him to accept it; moreover, Mr. Collins would have been prejudiced by my withdrawal, given the short time-frame he had to accept the offer, so I filed the motion to dismiss instead of withdrawing. The Court has granted Mr. Collins's motion to dismiss and issued a mandate in Appeal No. 15-1546.

5.      Mr. Selbin's written offer made clear that the offer to Mr. Collins is contingent only upon the dismissal of Mr. Collins's appeal no. 15-1546, and no other appeal. The Center for Class Action Fairness's motion to intervene in Appeal Nos. 15-1400 and 15-1490 as guardian ad litem for the class thus presents no conflict of interest with Mr. Collins.

6.      Because its retainer agreement complies with conservative interpretations of federal guidelines for non-profit public-interest law firms, the Center for Class Action Fairness has no rights to any of the $25,000 Mr. Collins has received for settling his appeal. It thus has no conflict of interest with the class in agreeing to the dismissal of Mr. Collins's appeal, while opposing any dismissal of Appeal Nos. 15-1400 and 15-1490.

7.      In my opinion, the merits brief filed in Appeal Nos. 15-1400, 15-1490, and 15-1546, challenging the fee award and violation of Rule 23(h), is meritorious, and has a substantial chance of success that will improve the class outcome. The class will be unfairly prejudiced if the appellants in No. 15-1400 and No. 15-1490 are also permitted to dismiss their appeals after Mr. Collins dismisses his appeal. In addition, I believe that the Seventh Circuit's decision in Appeal Nos. 15-1400 and 15-1490 is "an opportunity to provide additional guidance to the district court" in a "common and economically significant" scenario.

8.      I believe the settlement satisfied Rule 23(e) at the time it was made and approved, and do not believe the class will be unfairly prejudiced if settlement approval is affirmed.

2

**Theodore H. Frank and the Center for Class Action Fairness**

9.      I graduated the University of Chicago Law School in 1994. I am a member of the Illinois, California, and District of Columbia bars; a former clerk for a judge on the U.S. Court of Appeals on the Seventh Circuit; and an elected member of the American Law Institute.

10.      I founded the Center for Class Action Fairness in 2009. It is a 501(c)(3) non-profit public-interest law firm, with its attorneys based out of Washington, DC.

11.      The goal of the Center is to protect class members in the class action settlement process from certain abuses of the class action system. The Center's attorneys have won class members millions of dollars and have received national acclaim from the press. *See, e.g.,* Adam Liptak, *When Lawyers Cut Their Clients Out of the Deal*, N.Y. TIMES (Aug. 13, 2013) (calling me "the leading critic of abusive class action settlements"); Jeffrey B. Jacobson, *Lessons From CCAF on Designing Class Action Settlements*, Law360 (Aug. 6, 2013) (discussing the Center's recent track record); Ashby Jones, *A Litigator Fights Class-Action Suits*, WALL ST. J. (Oct. 31, 2011).

12.      I have won over a dozen appeals on behalf of class members. I have argued before the Seventh Circuit three times in cases related to class action or shareholder derivative settlements on behalf of the Center, and won all three cases. *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014) (observing that CCAF "flagged fatal weaknesses in the proposed settlement" and demonstrated "why objectors play an essential role in judicial review of proposed settlements of class actions"); *Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014); *Robert F. Booth Trust v. Crowley*, 687 F.3d 314 (7th Cir. 2012). In addition, I was retained in my private capacity by Christopher Bandas to ghostwrite the briefs and successfully argue *Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014).

13.      Other courts have also praised the Center's work. *In re Dry Max Pampers Litig.*, 724 F.3d 713, 716-17 (6th Cir. 2013) (describing CCAF's client's objections as

3

"numerous, detailed, and substantive."); *Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 205 (D.D.C. 2013) (describing CCAF's client's objection as "comprehensive and sophisticated" and noting that "[o]ne good objector may be worth many frivolous objectors in ascertaining the fairness of a settlement."). Through its efficient work as a watchdog, the Center has won class members millions of dollars. *See, e.g., McDonough v. Toys "R" Us*, No. 06-cv-00242, 2015 U.S. Dist. LEXIS 7510, at *141 ("CCAF's time was judiciously spent to increase the value of the settlement to class members") (internal quotation omitted); *In re Classmates.com Consol. Litig.*, No. 09-cv-0045-RAJ, 2012 U.S. Dist. LEXIS 83480, at *29 (W.D. Wash. Jun. 15, 2012) (noting that CCAF's client "was relentless in his identification of the numerous ways in which the proposed settlements would have rewarded class counsel … at the expense of class members" and "significantly influenced the court's decision to reject the first settlement and to insist on improvements to the second").

14.     CCAF receives many more requests to bring meritorious objections to class actions and excessive fee requests than it has resources to pursue, and thus has no interest in wasting resources bringing an objection it does not believe is legally meritorious.

### The Center for Class Action Fairness and Professional Objectors

15.     Because CCAF is non-profit, it cannot and does not settle its objections for a *quid pro quo* cash payment to withdraw, as many professional objectors do.

16.     CCAF's clients would sometimes be co-appellants with so-called "professional objectors." In CCAF's early years, several professional objectors would become very angry with me when I would refuse to engage in settlement negotiations or accept payment to dismiss appeals.

17.     In a 2010 case, I represented a client with a meritorious Ninth Circuit appeal of approval of a settlement where the attorneys received $4 million and the class received zero. The appeals court ordered mediation, though I indicated to the mediator

4

that my clients did not want to settle. After we filed our opening brief, class counsel offered an extraordinary sum to my clients to dismiss their appeals. (Unfortunately, the offer was confidential, and I cannot disclose it absent a court order.) One of my clients, an attorney friend, apologetically indicated that the offer was too good to refuse. I withdrew as attorney for the two appellants, and they settled and dismissed the appeal. Neither the Center nor I received any compensation as part of that settlement.

18.     Since that time, the Center's retainer agreements contain multiple clauses relating to the motivations of the Center's clients and the possibility of settling objections for money. Among other provisions, the Center discloses that retaining the Center might deprive clients of the most financially advantageous outcome; clients promise that they are not seeking to settle their objections for money; and clients authorize the Center to move for an injunction prohibiting them from doing so. The Center also very carefully screens its clients to ensure their good faith in objecting and, when possible, uses Center attorneys or board members who are class members to object. We do not represent clients who do not agree to these terms.

### My Former Business Relationship with Mr. Bandas

19.     Christopher Bandas regularly represents clients who object to class action settlements. In 2012, both Mr. Bandas and I represented clients in a Third Circuit appeal. Mr. Bandas, unlike other professional objectors I had dealt with until then, cooperated with the Center's goals, did not complain about the Center's refusal to settle, joined the Center's brief with a Rule 28(i) letter instead of filing a separate brief that would distract the appeals court from the issues the Center wished to raise, and did not demand oral argument time. That appeal, *In re Baby Products Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013), was successful, and I greatly appreciated Mr. Bandas's cooperation.

20.     While the appeal was pending. Mr. Bandas telephoned me and praised my work and the work of the Center, and I was flattered. He asked if there was any way I could perform legal work for him.

21.     I was intrigued by the possibility. At the time, I was an independent contractor with the Center's then-parent § 501(c)(3) charity. I had been frustrated by the work of other objectors, who would make substandard arguments or otherwise waive the best arguments, and then lose appeals or district-court cases that would then create bad precedents that hurt the Center's work. And the Center was poorly funded and thinly staffed, so we were not able to object in many cases where we wished to represent clients or appeal in all the cases we wished to appeal. If I was able to brief and argue those non-Center cases instead, I could further the Center's goals. Furthermore, Mr. Bandas suggested that his contacts with other professional objectors could help the Center in cases with multiple objectors. Moreover, Mr. Bandas, along with Darrell Palmer, had recently won a Ninth Circuit appeal, *Dennis v. Kellogg*, so I believed him when he indicated that he was interested in the development of good case law. Finally, the supplemental income Mr. Bandas was paying me would permit me to take a pay cut from the Center, and use that money to hire an additional Center attorney.

22.     Mr. Bandas persuaded me that he was only agreeing to settle objections for money because courts failed to provide adequate compensation for successful objectors, and the settled and withdrawn objections were paying for the cases where he was successful but received nothing. My experiences with the Center where the Center often received nothing for successful objections, and had even our modest requests for fees reduced by district courts that would rubber-stamp much larger class counsel requests, were consistent with that, so I believed him: he was correct that settling objections for money was much more profitable than bringing successful objections. For example, though Mr. Bandas's and Mr. Palmer's *Dennis v. Kellogg* appeal was successful and resulted in material improvement in the settlement, the district court refused to award attorneys' fees to the objectors.

23.     Mr. Bandas's proposal thus seemed win-win-win-win: Mr. Bandas would be better off, the law of class action settlements would be better off, the Center would be

better off if I took a pay cut and if I won precedents on behalf of Mr. Bandas's clients, and I would be better off. (I did take a pay cut, and the difference largely paid for a junior attorney to work for the Center for a little over a year.)

24.     After receiving internal approval from the Center's Board of Directors and other Center attorneys, I agreed to consult with Mr. Bandas, subject to some ground-rules: (1) I would only work on objections that I believed to be meritorious; (2) I would only work on cases where the Center did not have a client and where independent Center attorneys agreed in advance that there was no conflict of interest; and (3) Mr. Bandas would not claim at any time that my work for him was being done by the Center for Class Action Fairness. I would only make appearances in cases where there was no prospect of settlement, and if a case settled after I made an appearance, I would be permitted to withdraw as counsel.

25.     My first assignment with Mr. Bandas was an expert report in a district-court case where I was paid by the hour.

26.     Mr. Bandas proposed that I receive a contingent fee of a share of the proceeds of settled objections in cases where I performed consulting. I at first agreed to this, subject to the exception that, if I provided expert testimony, I could not receive contingent payment and would need to be paid by the hour. However, I grew uncomfortable with receiving a percentage of settled objections, both because I disagreed with the idea of settling objections for money at the expense of the class, and because I was concerned that I was most often being consulted in difficult cases where Mr. Bandas's actions before I became involved was putting him at risk of sanctions and where payment was thus unlikely. In 2013, Mr. Bandas and I agreed to a set of new retainer agreements where I would be paid by the hour, subject to a monthly minimum payment, with separate payments and separate retainers for cases where I made an appearance on behalf of one of Mr. Bandas's clients. The contingent payments I had received to date would be retroactively treated as a partial payment in advance for my

appearance and argument in a Seventh Circuit appeal, *Eubank v. Pella Corp.*, where I had
written final drafts of the briefs. I declined assignments from Mr. Bandas where I did
not think the settlement or fee request was objectionable, or where I had a conflict of
interest, and, until this case, Mr. Bandas did not complain.

27.    I regularly gave oral reports to and answered questions from the Center's
Board of Directors about my outside consulting and legal work, how it was consistent
with the Center's mission, and what I was doing to avoid conflicts of interest. Subject to
their satisfaction with these reports, the Center continued to approve my outside work.

28.    While Mr. Bandas paid me much less than the written agreements
anticipated, I was generally satisfied with the business arrangement because I was not
especially interested in the money. I got to brief and argue interesting cases where the
Center did not have the resources or the clients to participate in. The objectors prevailed
in *Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014), and that was useful precedent that
the Center cited in its cases. I took a paycut from the Center and the Center used the
savings to hire expert witnesses and attorneys to bring more ambitious objections. Mr.
Bandas helped wrangle objectors in other CCAF cases to reduce cacophony in oral
arguments, and, until this case, did not interfere with CCAF cases or clients. I
understood that my pay from Mr. Bandas was made possible and would not have
occurred without Mr. Bandas profitably settling cases where I was not counsel of
record, but rationalized accepting that money because of the benefit to caselaw of
victories like *Eubank* that might not have occurred if I was not assisting Mr. Bandas.

29.    Mr. Palmer also retained me on behalf of five objectors to brief and argue
two Fifth Circuit appeals that I believed (and still believe) meritorious, but three of
those objectors fired him and me mid-appeal, and the other two chose to dismiss their
appeals rather than proceed and risk sanctions in a pending Rule 11 motion in the
district court for "filing a frivolous appeal." (For what it's worth, the argument class
counsel made for why the appeal was "frivolous" was a claim that the objectors did not

have standing to object to settlement approval, an argument that the Seventh Circuit itself called frivolous in *Eubank v. Pella Corp.*) Mr. Palmer did not pay me any of the amount agreed upon in the retainer, or reimburse me for my expenses, and I have not pursued him for it.

30.     I grossed about $33,000 from Mr. Bandas in 2013, $125,000 in 2014, and $95,000 between January 1 and June 4, 2015; and incurred about $32,000 of expenses on contract attorneys assisting me on my work for Mr. Bandas (with an invoice from a contract attorney yet to come). Mr. Bandas apparently found these profitable sums to pay, because he became very upset when I terminated my business relationship with him.

31.     My annual pay from CCAF is $199,200; CCAF provides me no benefits. Mr. Bandas indicated to me on numerous occasions, including as recently as June 4, 2015, that I could increase my total income considerably if I quit CCAF and worked for him full-time. Mr. Palmer made me a similar offer in late 2013 or early 2014. I declined both gentlemen's offers.

32.     I terminated my relationship with Mr. Bandas on June 4, 2015, other than, on June 5, 2015, to send him an almost-complete draft of an appeal brief that was due on June 12, 2015.

33.     In May 2015, a reporter contacted me and stated that class action attorneys had complained to him that "bad" objectors who settled cases for money were using my name to threaten class counsel into settling. I acknowledged that I had been retained in a number of class action appeals, including *Eubank v. Pella Corp.*, explained the limitations on my willingness to represent for-profit class-action objectors, and noted that that threat only made a difference if the underlying objection was meritorious. I noted the problem that for-profit objectors had because of courts' unwillingness to allow them to collect fees for successful objections; for example, Mr. Bandas has not

9

received any payment for success in *Eubank*. To the best of my knowledge, the reporter decided not to pursue the story.

### Jeffrey Collins Retains the Center, Objects, and Appeals

34.     Jeffrey Collins is a class member in this case.

35.     On August 20, 2014, Mr. Collins emailed me asking for help objecting in this case.  We exchanged several emails collecting preliminary information about his class membership and I told him the Center may be interested, and offered to discuss the case with him the next week.

36.     On August 21, 2014, Mr. Collins submitted a *pro se* objection in this matter, Dkt. No. 143.

37.     Around this time, one of the Center's attorneys had a family emergency, and I had two appellate oral arguments the week of September 8, 2014, and a fairness hearing on August 29, 2014. Because of this and the fact that the objection deadline was in October, I did not contact Mr. Collins again until September 4, 2014, or speak with him until September 8, 2014.

38.     Melissa Holyoak and I conducted extensive due diligence on Mr. Collins to ensure he was a class member and could make a claim, to ensure that his motive were consistent with the Center's mission, and to ensure that he understood that class counsel would try to harass him in retaliation for retaining us; interviewing him in total for over an hour.

39.     We offered Mr. Collins a *pro bono* retainer agreement, telling him that our non-profit did not settle objections for money, and if that he was interested in maximizing his financial return, he should not sign the retainer and instead retain a contingent-fee attorney to assist with his objection. The Center would not have accepted the representation if we thought Mr. Collins would settle his objection for money or if he had not agreed that it was not his intent to do so. Mr. Collins's *pro se* objection was to both the settlement and fees; we told him we could only represent him if he limited his

10

objection to class counsel's fee request. Mr. Collins agreed and signed the retainer on September 12, 2014.

40.    On July 22, 2014, I'd asked a Center attorney, Adam Schulman, to monitor this case in anticipation of filing an objection on behalf of a class member to what we expected to be an oversized fee request. Multiple class members in the 17-million-member class contacted me about the possibility of objecting without any effort on CCAF's part to find objectors. If Mr. Collins had not retained CCAF, we probably would have been able to arrange a retainer with another class member to object.

41.    On October 26, 2014, Mr. Collins signed a declaration stating "I bring this objection in good faith. But if the court has any skepticism of my good faith, I am willing to stipulate to an injunction forbidding me from settling my objection without the court's approval." Dkt. 197-1.

42.    The Center retained local counsel, filed a superseding objection on Mr. Collins's behalf solely to fees, successfully moved for discovery and successfully compelled compliance with the discovery order, filed multiple rounds of briefing, fought off a motion for protective order that would have required briefing to be filed under seal, appeared at several interim hearings relating to discovery, and retained an expert witness and filed an expert report. Center attorney Melissa Holyoak prepared for and appeared at a lengthy fairness hearing on behalf of Mr. Collins. Mr. Collins was the only objector who appeared, through counsel or otherwise, at the fairness hearing.

43.    The objection was partially successful, and the district court reduced the $22.6 million attorney-fee request of class counsel by about $7 million.

44.    Mr. Bandas also had a client who had objected to the Capital One fee request. He suggested to me that it would be very lucrative if Mr. Collins or the Center found a way to decide not to appeal. I thought he was joking (or half-joking), and reminded him that I had fiduciary duties to the Center, that I could not personally

profit from a case the Center was involved in, and that this was a landmark case that the Center was very interested in seeing through.

45.    Mr. Collins was one of six groups of appellants that filed a notice of appeal. His appeal, No. 15-1546, was consolidated with lead appeal No. 15-1400.

46.    Mr. Collins filed his opening merits brief in this Court on May 4. The Center authored that brief. Appellants represented by Mr. Christopher Bandas in No. 15-1400 and Mr. Darrell Palmer in No. 15-1490 joined the brief. Neither Mr. Bandas nor Mr. Palmer contributed to the brief, other than Mr. Palmer confirming for the jurisdictional statement that his clients had filed settlement claims.

47.    On May 14, Mr. Collins filed in the district court a request for attorneys' fees of $160,619, slightly less than the Center's lodestar and about 2.3% of the class benefit, and a request for a $1,000 incentive award to Mr. Collins, each to be paid by class counsel. In advance of that motion, Ms. Holyoak had a telephone conversation with Mr. Collins about it, and sent him a draft for his approval. The parties agreed to stay consideration of the fee petition until the appeal was resolved.

### The *HSBC* Appeal

48.    At the same time the *Capital One TCPA* fee petition was being decided in his court, Judge Holderman also had a pending fee petition for a TCPA settlement in *Wilkins v. HSBC Bank Nevada, N.A.*, No. 14-C-190 ("*HSBC*").

49.    Mr. Collins had also filed a *pro se* objection in *HSBC*, but the Center did not have the resources to represent him in both *Capital One* and *HSBC*, and chose to pursue only one objection on his behalf.

50.    Mr. Bandas and Mr. Palmer had clients who objected in *HSBC*, though they appeared through other counsel. Their clients filed papers in *HSBC* adopting many of Mr. Collins's arguments in *Capital One*.

51.    Antonia Carrasco, the appellant in No. 15-1400, also objected in *HSBC*, and appealed the fee ruling in that case in appeal No. 15-1640. Mr. Bandas filed a notice

12

of appearance in No. 15-1640 on March 27, 2015.

52.     On several occasions in March and April, Mr. Bandas and I discussed the pending *HSBC* appeal and whether I could brief and argue that case. I noted that *HSBC* was likely to be consolidated with *Capital One*, a CCAF case. I cannot personally profit from CCAF's non-profit work under tax law, so I told Mr. Bandas that I could not brief *HSBC*, but that CCAF would be willing to represent Ms. Carrasco under a standard *pro bono* CCAF retainer agreement. I noted that it would be very problematic if Ms. Carrasco settled her appeal after CCAF made an appearance on her behalf, and we would need assurances that that did not happen.

53.     *HSBC* involved many of the same class attorneys as in the *Capital One* appeals, including Mr. Selbin of Lieff Cabraser.

54.     Ms. Carrasco and the other *HSBC* appellants, including Mr. Palmer's client, moved to voluntarily dismiss their *HSBC* appeals on April 22, 2015. This Court granted those motions on April 23, 2015 without comment.

55.     I do not know how much Mr. Selbin and Ms. Carrasco and Mr. Bandas settled the *HSBC* appeal for. Based on Mr. Bandas's conduct, I believe it is a substantial sum, far in excess of the amount offered to Mr. Collins individually to settle his appeal and fee petition, and that it would be informative of how much Mr. Bandas expects to settle Ms. Carrasco's *Capital One* appeal for if there is not already an agreement in place. In the absence of CCAF's motion for intervention, the *Capital One* settlement would have been likely to settle for much more money than *HSBC*, because I do not believe class counsel understood how strong the appellate arguments would be until they saw the briefing on May 4, and because class counsel has a larger fee award at stake in *Capital One* than in *HSBC*.

### Mr. Collins Expresses Discontent

56.     On or about May 26, Mr. Palmer's clients filed in the district court a motion for attorneys' fees of $1,500,000 and a request for a $2,000 incentive fee for each

13

of the two objectors he represented. Neither the Center nor I had any role in or advance notice of Mr. Palmer's fee petition.

57.    On the morning of May 27, Mr. Collins emailed me and two attorneys at the Center about Mr. Palmer's fee request. Mr. Collins had read Mr. Palmer's fee petition before I had.

58.    Ms. Holyoak immediately telephoned Mr. Collins, but he refused to take the call. He emailed Ms. Holyoak and I in response, asked us to take action on his behalf and said that we could contact him on June 3. Mr. Collins did not specify what that action should be.

59.    Immediately after I received Mr. Collins's email, I emailed Mr. Palmer and Mr. Bandas and demanded that Mr. Palmer withdraw his motion for fees, which I believed undermined the arguments Mr. Palmer signed onto on the appeal. Mr. Bandas also emailed Mr. Palmer and made the same request the same day. Ms. Holyoak and I began to make arrangements to file briefs in the district court opposing Mr. Palmer's fee request.

60.    I followed up with a text message to Mr. Palmer the same day. Mr. Palmer offered to modify his motion to satisfy us. Ms. Holyoak ceased preparing papers because we believed Mr. Palmer would be willing to file something consistent with our view of the law, though we were unsure whether Mr. Collins would be satisfied with that.

61.    That night I emailed Mr. Collins about Mr. Palmer's offer and asked for clarification. I followed up with another email on June 1. I received no response from Mr. Collins until June 3.

62.    On June 3, I emailed Mr. Palmer, and proposed a modification to his fee request. He gave an ambiguous response indicating that suggested he agreed, but did not respond to my queries about when and how he would file that modification. As of June 9, he has not filed a modification to the fee petition in the district court, and has not

14

responded to my attempts to contact him since June 5.

63.     Mr. Collins's May 27 and June 3 emails (six in total) were premised on misunderstandings about the Center's authority over Mr. Palmer and the Center's role in Mr. Palmer's fee request. They were also ambiguous. At various times, Mr. Collins both claimed to terminate our relationship and demanded that Ms. Holyoak and I to take actions on his behalf as his attorneys—sometimes in the same email. Ms. Holyoak and I did our best to clarify Mr. Collins's intentions—did he want us to act as his attorneys on his behalf or was he firing us?—a fact complicated by inconsistent and ambiguous instructions, and his refusal to talk to us by telephone.

64.     On June 3, at 2:17 PM, in response to an email asking for clarification, Mr. Collins dismissed us as his counsel. I emailed Mr. Collins on June 3 at 3:47 PM and informed him that we would be filing papers with the court telling the court we had been fired, and explaining to him what the likely consequences of that filing would be and what his options were. On June 3, at 5:34 PM Central, Mr. Collins emailed us and made an ultimatum if we were to continue as his attorneys.

65.     Based on Mr. Collins's six emails of May 27 and June 3, I believed it was likely that either Mr. Collins had terminated or would terminate his retainer with us or that the Center would have to terminate our representation of Mr. Collins. I also believed that there was a chance Mr. Collins would file a complaint with the district court. I had no concern about any truthful complaint Mr. Collins would file, other than the possibility that Mr. Collins's complaint to the court would come before Ms. Holyoak and I notified the appeals and district courts of our withdrawal, and that we would be accused of being less than forthright with the court.

66.     In an internal email I sent to the CCAF Board of Directors and other CCAF attorneys on June 3 at 9:13 PM Central, I notified them of plans to notify opposing counsel on June 4, and to file papers with the Court on June 5 withdrawing as Mr. Collins's counsel and seeking intervention as guardian ad litem for the class. We were

15

under no circumstances going to hide the fact that Mr. Collins had dismissed us if we were reasonably certain he had dismissed us; the only question requiring research preventing filing sooner was what we could and could not disclose to the Court about his ultimatum to us.

67.     On June 3, at 9:00 PM Central, I emailed Mr. Collins. I expressed regret that we declined his ultimatum, explained what we could and could not do on his behalf under the law, what we had and had not done to date, and the status of negotiations with Mr. Palmer about his fee request. I explained that I anticipated that he would be dissatisfied with our response, and offered to file a motion to withdraw as his attorneys, and gave him options as to what that motion would say.

68.     On June 4, at 7:35 AM Central, Mr. Collins emailed us, and indicated that, if we had not already filed papers withdrawing, he wished for the original retainer to remain in effect and to continue with the appeal. I sent Mr. Collins an email on June 4, 2015, at 8:35 AM Central, confirming that he wished to proceed with the appeal, that the original retainer was in effect and we were still his attorneys and he didn't want to fire us, and explaining how we would proceed from here to ensure he was happy with us. Ms. Holyoak ceased drafting motions to withdraw and to intervene.

### I Contact Mr. Bandas and Mr. Bandas Contacts Class Counsel

69.     On June 3, at 2:17 PM Central, I called Mr. Bandas. I explained that our client was probably terminating our representation, and asked if there was a way to negotiate Center representation of Ms. Carrasco so that we could see the appeal through. He said he would have to check with his client. I noted that if Mr. Bandas profited from a dismissal of the appeal that was not in the public interest after CCAF had used non-profit resources to file a brief that he had joined, it would create a tremendous appearance of impropriety that might risk CCAF's non-profit status if I continued to moonlight for him, and that I would have to terminate my relationship with Mr. Bandas to protect CCAF.

16

70.     I further texted Mr. Bandas at 2:56 PM Central on June 3, noting that I would need to make a filing with the Court by Friday morning, and hoped to have an answer by close of business Thursday whether we could represent his client. He responded that it would depend on whether he could get a hold of his client.

71.     The Center hoped it would be uncontroversial to represent an existing appellant, and thus made the inquiry to Mr. Bandas, who had previously been cooperative with the Center's appeals. The plan was to file a motion to withdraw (or announcement of termination) on June 5, and then either make a notice of appearance in 15-1400 or a motion to intervene as guardian ad litem using the *Safeco v. AIG* precedent. We wanted a quick answer from Mr. Bandas so we knew what the motion would say. We did not want to settle the appeal.

72.     According to two June 5 emails from Mr. Selbin, Mr. Bandas contacted a Lieff Cabraser partner "late Wednesday afternoon," (i.e., June 3) and claimed to be representing both his client and Mr. Collins and myself in settlement negotiations. According to Mr. Selbin, Mr. Bandas represented that I had been fired and did not want to disclose that "embarrassing" fact to the Seventh Circuit. As this declaration and motion shows, I am not embarrassed about my representation of Mr. Collins or the fact that Mr. Collins considered firing me.

73.     I texted Mr. Bandas at 8:17 AM Central on June 4 and notified him that Mr. Collins had "unfired" us, and that was no need for the Center to represent his client. I had a 27-minute conversation with Mr. Bandas that morning about the issue and other pending matters; Mr. Bandas indicated that his client wanted to settle, and I reminded him that it was a good thing that Mr. Collins changed his mind, because I would have had to terminate my consulting with Mr. Bandas otherwise if Ms. Carrasco had then settled her appeal for payment to Mr. Bandas.

74.     On June 4 at 4:02 PM Central, Mr. Bandas communicated to me an oral exploding offer of settlement, purportedly from class counsel. Mr. Collins must dismiss

17

his appeal by close of business June 8, 2015, with $25,000 payable to Mr. Collins upon the appeal's dismissal. He suggested that there was a global settlement offer that everyone else had agreed to. He confirmed the $25,000 offer in the passive voice in a text at 4:41 PM Central. The offer mentioned did not include any requirement to dismiss the fee petition. At this time, I texted Mr. Bandas to terminate my separate business arrangement with him. Mr. Selbin confirmed in writing to me on June 5 that Lieff Cabraser did make a global settlement offer to Mr. Bandas; though he wasn't sure when the offer was made, he thinks it was June 4. On information and belief, Mr. Bandas and Mr. Palmer have agreed to settle with class counsel for a substantial sum of money in exchange for dismissing their appeals in Nos. 15-1400 and 15-1490; on June 10, 2015, Mr. Palmer moved to dismiss appeal no. 15-1490.

75.     In the course of several emails and phone calls with Mr. Bandas seeking clarification and documentation on June 4 and June 5, Mr. Bandas represented (1) class counsel would not be willing to put the offer in writing because class counsel was afraid of what I would tell the court; (2) class counsel was not willing to speak with me because they did not trust me not to tell the court; (3) if I was worried that class counsel would renege, $25,000 could be put in my trust account in advance of the motion being filed. Mr. Selbin has asserted to me that the first two claims are false, and he was indeed willing to speak to me and put the offer in writing. I do not recall whether Mr. Bandas's third representation was on behalf of class counsel, on behalf of himself, or spoken in the passive voice to obscure who would be providing the $25,000; Mr. Selbin denies offering advance payment.

76.     I jokingly said to Mr. Bandas that I wondered whether this was a settlement offer coming from him, rather than from class counsel. He became very defensive, but also said that if the offer had been from him, he would have offered $100,000 to make sure there was no chance Mr. Collins would decline the offer. From

this statement I infer that Mr. Bandas is being offered at least $200,000, and likely much more, to dismiss his appeal.

77.     I noted to Mr. Bandas that the Seventh Circuit has *sua sponte* refused to dismiss class action settlement appeals twice, and that there might be an investigation, and that the Seventh Circuit could issue an opinion on professional objectors that would threaten his entire business model, and perhaps even issue a *sua sponte* order to show cause why counsel should not be disbarred. This was meant as friendly advice that he wanted to get something in writing from class counsel rather than stick his neck out, lest they claim he was lying about their settlement offer, and the Seventh Circuit investigated, but he apparently took it to be a threat.

78.     Mr. Collins suggested in a June 5 email he would accept the offer if it was in writing. This answer contradicted multiple communications he had previously sent to us, as well as his sworn declaration, so I tried to have a phone call with him, but he indicated he didn't want to discuss the matter further.

79.     One can't file a motion to dismiss without knowing what class counsel's position on costs are, and Mr. Collins also wanted something in writing, so I continued to insist on having something in writing or at least having a conference call with class counsel. In response, Mr. Bandas told me I was "being a baby," and didn't have anything else to say to me. Mr. Bandas's panicked response was the first I truly realized he had misled me, and I noted that now there was going to be an investigation and that the Seventh Circuit was unlikely to dismiss the appeal under these circumstances. Mr. Bandas hung up on me, and then emailed me to say that the offer had been withdrawn.

### Class Counsel Demands Its Offer Be Considered

80.     I left a voice-mail with Mr. Selbin to find out what had happened. In his return phone call to me after business hours on June 5, 2015, he confirmed that he made Mr. Bandas a settlement offer where Mr. Collins would dismiss his appeal and withdraw his pending fee petition in the district court, and class counsel would pay Mr.

Collins $25,000 upon those two things happening, and he repeated that offer to me. Based on my understanding of earlier communications with my client (including, but not limited to, Mr. Collins's retainer agreement; Mr. Collins's declaration under oath in the district court; and Mr. Collins's emails to me of November 19, 2014; March 25, 2015; May 11, 2015; May 27, 2015, at 7:48 AM Central; and June 4, 2015 at 7:35 AM Central), and my understanding of existing law, I declined that offer. Mr. Selbin asked me if I was still Mr. Collins's counsel. I said I was. Mr. Selbin asked me if there was a time when we did not represent Mr. Collins. I admitted that Mr. Collins had considered firing us, but did not.

81.    Mr. Selbin repeated his offer in writing in an email, and threatened to subpoena Mr. Collins in the district court. In further communications between me and Mr. Collins, Mr. Collins indicated to me that he now wished to accept the offer notwithstanding his earlier agreement and statements. Research indicated that legal ethics rules required me to accept an unethical settlement offer, notwithstanding the retainer agreement and my reliance upon it and Mr. Collins's declaration under oath, and I wrote Mr. Selbin to indicate that Mr. Collins accepted the offer.

82.    I noted to Mr. Selbin that his offer to Mr. Collins was unethical. He responded in writing that "I would be happy for every aspect of this to be reviewed by the Seventh Circuit or District Court, as we have done absolutely nothing wrong."

83.    In response, I asked Mr. Selbin to disclose what Lieff Cabraser had offered Mr. Bandas to settle his appeal in this matter. Mr. Selbin refused to disclose that information to me. On information and belief, it is a substantially larger sum than Mr. Collins has been paid.

84.    I relied upon Mr. Bandas's promise not to interfere with CCAF cases, and believed he would adhere to that promise here once I rejected his proposal to pay me to not appeal. Mr. Collins had authorized the Center to move for an injunction barring alienability of appeals and objections. Had I known Mr. Bandas would actually take

steps to undermine Mr. Collins's appeal, I would not have confided in Mr. Bandas, and the Center would have sought an injunction at an early stage of the proceedings to "tie the sailors to the mast."

## Communications with Mr. Collins

85.     Over the course of the district court proceedings, class counsel and defendant made numerous filings that referred to Mr. Collins and to pending objections. Melissa and I had numerous communications with Mr. Collins regarding those filings. Throughout the process, Melissa and I ran drafts of proposed filings by Mr. Collins, who occasionally made suggested changes.

86.     Mr. Collins and I exchanged a number of emails about the fact that two other appellants joined our brief and what that meant.

87.     On May 11, 2015, Mr. Collins sent me and other Center attorneys an email relating to press coverage of a Ninth Circuit decision and about his goals and motives for proceeding with the appeal.

88.     Ms. Holyoak and Mr. Collins exchanged emails on May 12 and May 13 about the Center's request for fees.

89.     While the appeal was pending, Darrell Palmer, counsel for Vanessa FV VanWieren and Mary Smith Tweed, filed a motion for $1.5 million in attorneys' fees and $2,000 in objector incentive payments. Ms. Holyoak and I had numerous communications with Mr. Collins regarding those requests. Mr. Collins refused to speak on the phone with us about the issue.

90.     On June 3, 2015, I had an exchange of emails with Mr. Collins where he gave me a take-it-or-leave-it ultimatum about proceeding with the appeal. Based on that ultimatum, I proposed to Collins a motion for the Center to withdraw as his counsel.

91.     On June 4 and 5, 2015, I had numerous emails with Mr. Collins regarding Mr. Bandas's oral settlement offer, Mr. Selbin's written settlement offer, Mr. Selbin's threatened subpoena, what other appellants were likely receiving to settle the case, and

the possibility of enhanced court-ordered incentive payments to compensate Mr. Collins for turning down settlement offers if he prevailed on appeal. Mr. Collins refused to speak on the phone with us about the issue.

92.      These communications all provide relevant insight into why Mr. Collins dismissed his appeal, why Mr. Collins settled, why the Center thought Mr. Collins did not want to settle, why the Center thought it might be (or might have been) fired, and why the Center has acted as it did. However, I do not have authority to disclose these privileged attorney-client communications except *in camera* under a court order.

93.      To this day, I don't know whether Mr. Collins thinks he fired CCAF on May 27, on June 3, or not at all, or whether he thinks CCAF did something wrong. Mr. Collins does not want to discuss the case anymore, does not want to make decisions relating to the case, and continued to give me instructions on how to act as his attorney as late as June 5, but has not answered follow-up questions and has refused to speak to me and Ms. Holyoak on the phone. I am following my client's June 5 instructions to the best of my ability (which he would have no authority to give me if I had been fired earlier) to protect his latest stated wishes, but even those instructions are ambiguous.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

Executed on June 10, 2015, in Washington, DC.

_____
Theodore H. Frank